RANDALL S. NEWMAN (SBN 190547)
Attorney at Law
99 Wall St., Suite 3727
New York, NY 10005
212.797.3735
rsn@randallnewman.net

*Attorney for Plaintiff,*
 *Christopher J. Cordova*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| CHRISTOPHER J. CORDOVA,<br><br>Plaintiff,<br><br>vs.<br><br>JONATHAN HUNEAULT A/K/A "FRAUDITOR TROLL",<br><br>Defendant. | Case No.<br><br>**COMPLAINT FOR:**<br><br>1. **Copyright Infringement, 17 U.S.C. §§ 101** *et seq.*<br>2. **Declaration of Copyright Infringement**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff, Christopher J. Cordova a/k/a Denver Metro Audits ("Plaintiff"), sues Defendant Jonathan Huneault a/k/a "Frauditor Troll" ("Defendant") and alleges as follows:

## INTRODUCTION

1. This case arises from the unauthorized use of a copyrighted video titled *"Another Chad Exposed!!! Worthless Denver Cops…ASSAULTED!!!"* created and published by Plaintiff on his YouTube channel "Denver Metro Audits" (@DenverMetroAudits). The video captures a real-time confrontation between Plaintiff, members of the Denver Police Department, and a third-party bystander. It was filmed and released to expose potential police misconduct and promote public accountability.

2. Defendant, a YouTube content creator operating under the alias "Frauditor Troll," republished more than half of Plaintiff's original video—over 27 minutes of expressive footage—under the guise of "critique," while contributing only a few minutes of sarcastic narration. The result is not commentary. It is theft, dressed in mockery and monetized through ad revenue.

3. This kind of deliberate, parasitic infringement is exactly what the Copyright Act was meant to prevent. The Infringing Video buries the original under ridicule, substitutes it in the market, and turns Plaintiff's message of accountability into a punchline. Plaintiff brings this action to stop the misuse, restore control over his work, and recover damages, costs, and attorneys' fees as permitted by law.

## JURISDICTION AND VENUE

4. This action arises under the Copyright Act, 17 U.S.C. § 101 *et seq.*, and includes a claim for Declaratory Relief under 28 U.S.C. § 2201.

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6. Venue is proper in this District pursuant to 28 U.S.C. § 1400(a) and § 1391(b), as the infringing content was published and distributed via YouTube, a platform headquartered in this District.

**COMPLAINT**

7. Defendant submitted a counter-notification under 17 U.S.C. § 512(g), thereby consenting to jurisdiction in this judicial district.

## PARTIES

8. Plaintiff Christopher J. Cordova is a resident of Colorado and the creator and operator of the YouTube channel "Denver Metro Audits" (@DenverMetroAudits).

9. Based upon information and belief, Defendant is an individual named Jonathan Huneault, who operates a YouTube channel under the alias "Frauditor Troll."

10. Plaintiff does not presently know Defendant's residence or place of business, but believes that Defendant resides in Canada. Defendant has taken steps to conceal his identity and location in order to evade service of process. For example, when submitting DMCA counter-notifications to YouTube, Defendant lists "99 Wall Street" as his address without providing a suite number or any other identifying information. 99 Wall Street is a commercial building in New York City known for hosting virtual offices and mail drop services, and the omission of a suite number renders the address unusable for personal service.

## FACTUAL ALLEGATIONS

11. YouTube is the largest video-sharing platform in the world and operates under the framework established by the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512.

12. The DMCA provides a process by which copyright owners may request the removal of infringing content through a notice-and-takedown mechanism. If the platform receives a valid takedown notice, it typically disables access to the allegedly infringing material.

13. However, the DMCA also allows the alleged infringer to submit a counter-notification claiming that the use is authorized, lawful, or otherwise non-infringing. If the copyright owner does not initiate a federal lawsuit within 14 days of receiving a counter-notice, YouTube is required by law to restore access to the disputed content pursuant to 17 U.S.C. § 512(g).

14. This statutory framework places the burden on copyright owners—particularly independent creators and small publishers—to enforce their rights through litigation.

15. Critically, under 17 U.S.C. § 411(a), a copyright registration (or refusal thereof) is a prerequisite to filing a lawsuit. As a result, creators who publish content regularly, such as daily or weekly videos, face substantial logistical and financial obstacles in registering each work. The process is time-consuming, costly, and impractical for many small creators, who are left with no legal recourse even when their work is stolen wholesale.

16. Infringers like Defendant exploit this imbalance by targeting content that is unlikely to be registered at the time of infringement, knowing that most creators lack the time or resources to pursue federal litigation.

17. In practice, it allows monetized YouTube channels to exploit copyrighted material by filing counter-notifications under the guise of "Fair Use," often requiring the original creator to choose between expensive federal litigation or allowing the infringement to continue unchecked.

18. In recent years, "Fair Use" has become a catchall defense on YouTube—frequently invoked not to support genuine commentary or critique, but to excuse the wholesale appropriation of others' creative works. Defendant's video is emblematic of that misuse. It offers no new message, no additional insight, and no transformation of purpose. Instead, it repackages Plaintiff's footage with sporadic ridicule, relying on the original's expressive content to attract viewers and monetize attention.

***The First Amendment Auditor Community on YouTube***

19. The First Amendment auditor community on YouTube consists of independent content creators who film interactions with government officials in public spaces to promote transparency and assert constitutional rights—primarily the First Amendment. These creators act as citizen journalists, watchdogs, and public advocates,

documenting real-time government conduct and holding public officials accountable through video.

20. The movement has grown into a powerful and controversial force on social media. First Amendment auditors regularly publish their videos to YouTube channels, where they have collectively attracted millions of subscribers and billions of views. These creators often operate under channel names or aliases and have become recognizable figures in the digital civil rights ecosystem.

21. Plaintiff is one such creator. He operates the YouTube channel "Denver Metro Audits" (@DenverMetroAudits), which has over 231,000 subscribers and more than 600 videos. Plaintiff's work has generated millions of views and frequent engagement from the public on issues of constitutional importance.

22. Other prominent First Amendment auditors on YouTube include:
    -Long Island Audit @LongIslandAudit (922k subscribers);
    -Amagansett Press @AmagansettPress (583k subscribers);
    -Delete Lawz @deletelawz1984 (646k subscribers);
    -James Freeman @JamesFreeman1 (581k subscribers);
    -Accountability For All @AccountabilityForAll (238k subscribers);
    -Bay Area Transparency @bayareatransparency1722 (334k subscribers);
    -Nasty Nathanial @NastyNathanial69 (69.3k subscribers);
    -Auditing Erie County @AuditingErieCounty (159k subscribers).

23. These creators have developed passionate communities and brought increased attention to issues of public transparency, police accountability, and constitutional rights. They also attract vocal critics, including content creators who republish auditor footage for the purpose of mockery or monetized ridicule.

***The Anti-Auditor or "Frauditor" Community on YouTube.***

24. The so-called "anti-auditor" or "frauditor" community is a genre of YouTube content creators who produce reaction-style videos targeting First Amendment auditors. While these channels purport to offer criticism or commentary, their actual content

typically consists of mockery, personal insults, and superficial narration designed to provoke laughter—not to engage with the substance of the original videos. The emphasis is not on analysis or critique, but on ridicule, with little to no transformative insight.

25. Rather than analyzing the substance of auditor videos, anti-auditor creators download the original work, embed it wholesale or in large portions, and insert snide commentary, exaggerated voiceovers, memes, sound effects, and sarcastic narration.

26. These additions rarely engage with the message or journalistic value of the underlying footage. Instead, they focus on the auditors themselves—mocking their voices, mannerisms, appearance, perceived emotional state, and personal lives.

27. Prominent anti-auditor channels include "Frauditor Troll", "Team Skeptic," "Degeneration Nation," "Lucid's Lair," "Unclean Hands," "KFARR Reacts," "First Amendment Shenanigans," "Black Hart Knight," and others. Many of these channels feature monetization through YouTube ads, memberships, merchandise, and affiliate links.

28. Their business model is simple: republish auditor videos, add minimal ridicule, and generate revenue. Originality is neither required nor provided. The underlying auditor footage does the heavy lifting in terms of content and audience engagement.

29. Defendant's channel, "Frauditor Troll," is emblematic of this practice. With nearly 1,900 uploads, the channel systematically mines the auditor community for content, providing only brief sarcastic commentary in return. These are not transformative works. They are derivative broadcasts riding on the back of other creators' labor.

30. This exploitative model thrives because most auditor videos are not registered with the U.S. Copyright Office at the time of publication. Without a registration, the original creator cannot sue, and anti-auditor channels know this. They use the DMCA counter-notice process to delay enforcement and bet that creators won't be able to respond within the 14-day window.

31. In this case, Defendant uploaded the Infringing Video long before Plaintiff had an opportunity to register the original work. This delay is not unique—it is baked into the Defendant's business model. By targeting creators who publish frequently, and

uploading unauthorized copies before they can register their content, Defendant exploits a known gap in the enforcement system. This action is part of a broader effort to hold Defendant accountable for a pattern of appropriation and monetized ridicule that would otherwise go unchecked and to deter ongoing abuse of YouTube's DMCA counter-notification process by Defendant and other creators who base their content upon stolen videos.

***The Parties' Respective Videos on YouTube***.

32. On or about March 16, 2022, Plaintiff published the Registered Video titled "ANOTHER CHAD EXPOSED!!! Worthless Denver Cops…ASSAULTED!!!," to his YouTube channel (@DenverMetroAudits) where it was made available to the public. The video was filmed, edited, and published by Plaintiff as part of his ongoing effort to document public accountability and government conduct. Plaintiff's video is available at the URL https://youtu.be/bhgHsPl4Mr0?si=F-7EgMg0bBZiy-QY. To date, the Registered Video has received over 66,000 views.

33. Plaintiff's Registered Video documents real-time events with the purpose of exposing governmental misconduct. The incident involved a tense public encounter between Plaintiff and Denver police, culminating in a confrontation with a third-party bystander who physically engaged with Plaintiff. These events were filmed live, with no reenactments.

34. The Registered Video was filmed, edited, and released as an original, standalone work.

35. Plaintiff intended to inform, educate, and provoke discussion regarding civil rights.

36. Plaintiff registered the video with the U.S. Copyright Office under Registration Number PA002457989 (the "Registered Video") on February 6, 2024.

37. Defendant operates a YouTube channel under the name "Frauditor Troll," which routinely republishes infringing content from First Amendment auditors without permission and adds commentary that mocks and insults the original creators.

38. On or about December 2, 2022, Defendant published a video using large portions of Plaintiff's Registered Video under the title "Frauditor DMA Gets Confronted by Angry Citizen (Hilarious)" (the "Infringing Video") to his Frauditor Troll YouTube channel. Defendant's video is available at the URL https://youtu.be/I-J8sdKZ504?si=s9kES3XTGpURZ1A3. To date, the Infringing Video has received over 75,000 views (more views than the Registered Video).

39. Defendant did not obtain permission or a license from Plaintiff to use the Registered Video in the Infringing Video.

40. The Infringing Video is not a commentary or critique *of* Plaintiff's work—it is a commercial re-airing of it. Approximately 87% of the Infringing Video, excluding the intro and outro, consists of unaltered footage taken directly from Plaintiff's Registered Video.

41. In total, Defendant used roughly 27 minutes and 3 seconds of a 48-minute, 14-second video—equating to 56% of the full work, but an even larger percentage of the expressive core, including the key interactions and narrative structure.

42. These copied segments are presented in long, uninterrupted blocks, with no attempt to edit, condense, or reinterpret the underlying footage. The visual and narrative experience remains entirely controlled by Plaintiff's original choices.

43. Defendant's contribution amounts to just under four minutes of commentary, scattered throughout the video. These brief interjections consist primarily of sarcasm, mockery, and personal attacks—not meaningful analysis or critique.

44. At no point does Defendant engage with the actual message of Plaintiff's work, which centers on law enforcement conduct and public accountability. Instead, Defendant reframes the entire encounter as a spectacle of ridicule.

45. The Infringing Video contains no substantive commentary on the journalistic structure, intent, or legal implications of Plaintiff's footage. It does not inform, educate, or offer new insight. Its purpose is not discussion—it is derision.

46. The short introductory and concluding segments serve only to brand the video and promote Defendant's monetized channel. They do not transform the content or alter its meaning.

**<u>Defendant's Video is Not Fair Use</u>**.

47. The Infringing Video is not an original creation. It is Plaintiff's work, lifted almost wholesale, and re-used for clicks, ad revenue, and online engagement under the false banner of "fair use."

48. The Infringing Video does not qualify as a protected "fair use." It consists predominantly of Plaintiff's copyrighted content, replayed in long, uninterrupted sequences. Defendant's minimal additions—less than four minutes of sarcastic narration—do not meaningfully critique the Registered Video or transform its message.

49. At no point does Defendant address the themes, structure, or message of the Registered Video. His commentary targets Plaintiff personally—mocking his voice, demeanor, and perceived motives—without engaging with the video's focus on law enforcement conduct and constitutional rights.

50. Defendant could have made his point using short clips, summaries, or original commentary. Instead, he used more than half of the Registered Video, including the expressive core, in a manner that overwhelmingly supplanted the Registered Video's market.

51. Defendant also chose not to provide any link to Plaintiff's Registered Video or channel. Viewers who watch the Infringing Video are never directed to the source material, nor are they encouraged to watch the unedited version. This omission reinforces that the goal was not to comment on Plaintiff's message or drive discussion—it was to replace it. Defendant did everything possible to ensure his version would be the one that generated attention, engagement, and ad revenue, while denying Plaintiff even the most basic attribution.

52. By omitting attribution and links to the Registered Video, Defendant not only usurped Plaintiff's work, but also deprived him of potential subscribers, engagement metrics, and brand visibility that could have expanded Plaintiff's reach and monetization.

***Plaintiff's DMCA Takedown and Defendant's Abuse of the Counter-Notice System***.

53. After witnessing Defendant's blatant copyright infringement, Plaintiff exercised his rights under copyright law. On or about June 5, 2023, Plaintiff submitted a valid takedown notice to YouTube for the unauthorized use of the Registered Video.

54. Rather than remove the infringing content, Defendant submitted a counter-notification on or about June 6, 2023, claiming—without merit—that the video was protected by the fair use doctrine.

55. Although Defendant submitted a counter-notification under the DMCA, Plaintiff could not file a lawsuit at that time because the currently Registered Video had not yet been registered. As a result, and pursuant to 17 U.S.C. § 512(g)(2)(C), YouTube was required to restore the Infringing Video after the statutory waiting period expired without Plaintiff being able to file suit.

56. Defendant has continued to display, distribute, and profit from the Infringing Video since it was restored.

57. As discussed above, Defendant's use of the Registered Video does not qualify as fair use. It is a commercial, non-transformative republishing of Plaintiff's Registered Video. Defendant copied over 27 minutes of expressive footage without permission, added minimal commentary that mocked Plaintiff personally, and offered no new meaning, purpose or message.

58. The Infringing Video directly competes with and supplants the market for the Registered Video. It delivers the same underlying content—without permission, attribution, or transformative commentary—diverting viewers, ad revenue, and public engagement from Plaintiff's YouTube channel. It's not fair use. It's a business model built on copyright infringement.

59. Plaintiff now seeks damages, declaratory and injunctive relief for post-registration infringement pursuant to the Copyright Act.

## FIRST CAUSE OF ACTION

### Copyright Infringement, 17 U.S.C. § 501

60. Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 59.

61. Plaintiff is the author and sole owner of all rights in the Registered Video registered with the U.S. Copyright Office under Registration No. PA0002457989.

62. Defendant copied, displayed, and distributed substantial portions of Plaintiff's video without authorization.

63. Defendant incorporated approximately 56% of Plaintiff's copyrighted work into the Infringing Video published on YouTube, without a license or permission. Excluding the intro and outro, approximately 87% of the Infringing Video is footage from the Registered Video.

64. Defendant's use of the Registered Video was for commercial purposes, including monetization through advertisements and promotion of merchandise.

65. Defendant's use of the Registered Video was not transformative and does not qualify as Fair Use.

66. Defendant operates a channel known for targeting creators in the First Amendment auditing community on YouTube. The widespread and repetitive use of others' content without permission – coupled with Defendant's response to Plaintiff's DMCA takedown notice—demonstrates actual knowledge or willful blindness to Plaintiff's rights.

67. As a result of Defendant's infringement, Plaintiff has suffered actual damage including lost viewership, lost revenue, reputational harm, and diminution of the market value of the Registered Video.

**COMPLAINT**

68. Plaintiff is entitled to recover statutory damages pursuant to 17 U.S.C. § 504(c), or alternatively, actual damages and Defendant's profits pursuant to 17 U.S.C. § 504(b).

69. Plaintiff is further entitled to injunctive relief, attorney's fees, and costs pursuant to 17 U.S.C. §§ 502 and 505.

## SECOND CAUSE OF ACTION

### Declaration of Copyright Infringement, 28 U.S.C. § 2201

70. Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 69.

71. An actual and justiciable controversy exists between Plaintiff and Defendant concerning Defendant's use of Plaintiff's Registered Video.

72. Plaintiff contends that Defendant's use of Plaintiff's Registered Video constitutes copyright infringement pursuant to 17 U.S.C. § 501 and is not protected under the doctrine of fair use.

73. Defendant has asserted that his use of Plaintiff's Registered Video is lawful and non-infringing.

74. Plaintiff seeks a judicial declaration under 28 U.S.C. § 2201 that the Defendant's unauthorized use of the Registered Video constitutes copyright infringement and is not protected by the doctrine of fair use.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Christopher J. Cordova, prays for judgment against Defendant as follows:

A. That judgment be entered in favor of Plaintiff and against Defendant;

B. The Court enter a declaratory judgment that Defendant's use of the Registered Video constitutes copyright infringement and is not protected by the doctrine of fair use;

**COMPLAINT**

C. A permanent injunction enjoining Defendant from further use of the Registered Video and requiring YouTube and any third-party platforms under Defendant's control to remove the Infringing Video and prevent further dissemination;

D. An award of monetary damages in an amount to be determined at trial;

E. An award of attorneys' fees and costs pursuant to 17 U.S.C. § 505;

F. Any other relief the Court deems just and proper.

## JURY TRIAL DEMANDED

Dated:  June 3, 2025

/s/ Randall S. Newman
Randall S. Newman, Esq. (SBN 190547)
99 Wall Street, Suite 3727
New York, NY 10005
(212) 797-3735
rsn@randallnewman.net

*Attorney for Plaintiff,*
*Christopher J. Cordova*

COMPLAINT