RANDALL S. NEWMAN (SBN 190547)
Attorney at Law
99 Wall St., Suite 3727
New York, NY 10005
212.797.3735
rsn@randallnewman.net

*Attorney for Plaintiff,*
 *Christopher J. Cordova*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

CHRISTOPHER J. CORDOVA,

      Plaintiff,

  vs.

JONATHAN HUDON-HUNEAULT,
NNEKA OHIRI and 14693663 CANADA
INC.,

      Defendants.

Case No. 25-cv-04685-VKD

**FIRST AMENDED COMPLAINT FOR:**

1. **Copyright Infringement, 17 U.S.C. §§ 101 *et seq.*;**

2. **Misrepresentation, 17 U.S.C. § 512(f);**

3. **Declaratory Relief, 28 U.S.C. § 2201 and 17 U.S.C. § 512(g);**

4. **Circumvention of Technological Measures, 17 U.S.C. §§ 1201, 1203**

**FIRST AMENDED COMPLAINT**

Plaintiff, Christopher J. Cordova ("Plaintiff"), files this First Amended Complaint (the "FAC")[1] against Defendants Jonathan Hudon-Huneault ("Huneault"), Nneka Ohiri ("Ohiri") and 14693663 Canada Inc. ("Canada Inc.") (Huneault, Ohiri and Canada Inc. are collectively referred to as the "Defendants") who operate the Frauditor Troll YouTube channel located at www.youtube.com/@frauditortroll (the "Frauditor Troll Channel") and alleges as follows:

## INTRODUCTION

1.     This case arises from Defendants' systematic theft and monetization of Plaintiff's copyrighted YouTube videos and their abuse of the Digital Millennium Copyright Act's ("DMCA") counter-notice process, 17 U.S.C. § 512(g), to force those stolen works back online.

2.     Defendants built the Frauditor Troll Channel on wholesale misappropriation of Plaintiff's videos and the works of other First Amendment auditors ("Auditors").

3.     Instead of adding transformative commentary, critique, or analysis, Defendants' videos rely almost entirely on Plaintiff's original footage, often playing for extended durations, interspersed with brief derisive remarks, or unoriginal on-screen memes. These token alterations serve no critical or educational purpose; they exist solely to ridicule the subjects and harvest advertising revenue through YouTube's Partner Program.

4.     Defendants obtained Plaintiff's videos through unlawful circumvention of YouTube's rolling-cipher technology, software designed to prevent unauthorized downloading, thereby violating both YouTube's Terms of Service and the anti-

---

[1] Plaintiff previously filed an Amended Complaint before service of process (ECF No. 20). Because that amendment was made as of right under Rule 15(a)(1) while the original complaint (ECF No. 1) had not yet been served, the current pleading is properly styled as the First Amended Complaint to reflect that it is the first amendment following service.

**FIRST AMENDED COMPLAINT**

circumvention provisions of 17 U.S.C. § 1201(a).[2] The result was a monetized archive of stolen content repackaged as so-called "fair use."

5.    Huneault has repeatedly bragged, both in Counter-Notices and on public livestreams, that he has received over forty-eight copyright strikes and that every single one has been overturned through the counter-notification process. His message is clear: mass infringement pays, and the DMCA's safeguards can be gamed indefinitely through form responses, delay and the prohibitive cost of federal litigation.

6.    Between July and October 2023, Huneault submitted at least nine Counter-Notices to YouTube under § 512(g)(3), each signed under penalty of perjury, asserting that the videos were protected by the non-existent "Fair Use Act of 1976" (the "Counter-Notices"). Huneault also claimed to own the Frauditor Troll Channel when Google's records show the AdSense account belongs to Ohiri; later, Huneault asserted that the Frauditor Troll Channel was owned by Canada Inc.

7.    Defendants' serial misrepresentations of ownership, combined with their use of a fictitious U.S. service address, demonstrate deliberate deception intended to obstruct enforcement and evade liability.

8.    Every Counter-Notice contained the same boilerplate paragraph, copied verbatim from prior counter-notices, asserting fair use without any reference to the actual content, purpose, or substantiality of the copied works. This rote formula bears no resemblance to a genuine fair-use analysis; it is merely a script crafted to exploit YouTube's automated reinstatement system.

9.    Upon learning of this action, Huneault and Ohiri publicly admitted that they permanently deleted more than 1,700 videos from the Frauditor Troll Channel in an effort to conceal evidence and evade accountability for their mass infringement of Plaintiff's and

---

[2] Plaintiff does not assert any independent claim under YouTube's Terms of Service. Those terms are referenced solely to illustrate the technological and contractual framework governing user access to YouTube's platform. Defendants' violations of those terms demonstrate their awareness that such conduct was unauthorized and support the inference of willful circumvention under 17 U.S.C. § 1201(a).

**FIRST AMENDED COMPLAINT**

1    other creators' works. The scope and timing of the deletion demonstrate willful destruction
2    of relevant evidence and a deliberate attempt to obstruct discovery in this case.

3        10.    After service of the Complaint, Huneault and Ohiri appeared on YouTube to
4    mock the proceedings, publicly declaring that it was a one-in-a-billion chance Plaintiff
5    would have filed this lawsuit and boasting that they would never settle. Those statements
6    expose Defendants' mindset: profit from theft while daring Plaintiff or anyone else to stop
7    them.

8        11.    Defendants' conduct, mass theft, repeated infringement, false Counter-
9    Notices, circumvention of technological protections, and public taunting, reveals not
10   misunderstanding of fair use but malice. This pattern of willful defiance threatens not only
11   Plaintiff's rights but the integrity of the DMCA itself.

12       12.    Plaintiff therefore brings this action under the Copyright Act for: (a) direct
13   infringement of his registered works, (b) knowing and material misrepresentations in
14   Counter-Notices submitted under 17 U.S.C. § 512(g), (c) declaratory relief, and (d)
15   circumvention of technological protection measures in violation of 17 U.S.C. § 1201(a).
16   Plaintiff seeks damages, declaratory and injunctive relief, and all remedies available under
17   the Act to halt Defendants' unlawful enterprise and restore the meaning of fair use.

18   <center>**JURISDICTION AND VENUE**</center>

19       13.    This action arises under the Copyright Act, 17 U.S.C. § 101 *et seq.*, and
20   includes a claim for Declaratory Relief under 28 U.S.C. § 2201.

21       14.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and
22   1338(a), as this case involves federal questions arising under the Copyright Act and the
23   Digital Millennium Copyright Act.

24       15.    Venue is proper in this District under 28 U.S.C. §§ 1391(b) and 1400(a)
25   because a substantial part of the events giving rise to the claims occurred here and the
26   infringing content was published and distributed via YouTube, which maintains its
27   principal place of business in this District.

28

**FIRST AMENDED COMPLAINT**

16.     Defendants consented to jurisdiction in this District by submitting the Counter-Notices under 17 U.S.C. § 512(g)(3).

## PARTIES

17.     Plaintiff is a resident of Colorado and the creator and operator of the YouTube channel "Denver Metro Audits" (@DenverMetroAudits) (the "DMA Channel").

18.     Plaintiff is the author and original copyright owner of the audiovisual works at issue. He retains all rights, title, and interest in the claims asserted in this action, including those arising under 17 U.S.C. §§ 512(f) and 1201. Although Plaintiff later assigned the copyrights in his broader catalog to Executive Lens LLC ("Executive Lens"), his wholly-owned company, those assignments expressly excluded and reserved to Plaintiff all accrued causes of action and claims relating to the infringements and DMCA violations alleged herein.

19.     Ohiri is an individual residing in Canada who co-owns and manages the Frauditor Troll Channel.

20.     Huneault is an individual residing in Canada who serves as the voice and narrator for videos on the Frauditor Troll Channel and co-owns and manages the Frauditor Troll Channel. Huneault and Ohiri are married.

21.     Canada Inc. is a Canadian corporation owned and controlled by Huneault and Ohiri, which acts as a co-owner or operating entity for the Frauditor Troll Channel.

22.     Upon information and belief, Ohiri, Huneault, and Canada Inc. jointly operate the Frauditor Troll Channel as a single business enterprise. They share access to the Channel's YouTube account, AdSense monetization, and related social media platforms, and each Defendant participates in the selection, editing, publication, and monetization of its videos. Defendants collectively profit from the unlawful conduct alleged herein and are therefore jointly and severally liable to Plaintiff for all resulting damages and statutory violations.

**FIRST AMENDED COMPLAINT**

# **FACTUAL ALLEGATIONS**

23.    YouTube is the largest video-sharing platform in the world and operates under the framework established by the DMCA.

24.    The DMCA provides a process by which copyright owners may request the removal of infringing content through a notice-and-takedown mechanism. If the platform receives a valid takedown notice, it typically disables access to the allegedly infringing material.

25.    The statute also gives the alleged infringer a way to respond: a counter-notification claiming the use is authorized, lawful, or otherwise non-infringing. If the copyright owner does not file a federal lawsuit within 10 business days of receiving a counter-notice, YouTube must restore access to the disputed content. 17 U.S.C. § 512(g).

26.    This framework shifts the burden onto copyright owners, often small creators or publishers, to file suit quickly or see their work reposted.

27.    Defendants exploited this imbalance by filing boilerplate Counter-Notices under § 512(g) designed to intimidate Plaintiff into dropping the matter and force reinstatement of stolen videos.

28.    This abuse allowed Defendants' Frauditor Troll Channel, to continue monetizing stolen infringing content while publicly claiming "fair use." In truth, Defendants' uploads consist almost entirely of Plaintiff's unaltered footage, supplemented by trivial mockery, recycled memes, and other non-transformative filler.

29.    In the context of this FAC, the term "Auditor" refers to Plaintiff and other independent content creators who record interactions with government officials in public spaces to promote transparency, document public conduct, and assert constitutional rights, particularly those protected by the First Amendment. These creators act as citizen journalists, watchdogs, and public advocates, often filming police encounters, public meetings, and other matters of public interest, and then editing and publishing that original footage online, most prominently on YouTube.

**FIRST AMENDED COMPLAINT**

30.    The Auditor movement has become a significant presence on social media, drawing millions of subscribers and billions of views, and generating substantial advertising revenue. Many Auditors operate under pseudonyms but have nonetheless become well-known figures within the digital civil rights community.

31.    Plaintiff is an Auditor, activist, and content creator who documents interactions with public officials, government employees, and law enforcement officers in the course of his advocacy work. He spends significant time filming, editing, and publishing these encounters to the DMA Channel, where the resulting videos serve both as a public record of official conduct and as a means of promoting government transparency and accountability. Plaintiff's work is part of the broader Auditor movement and has developed a dedicated audience focused on constitutional rights, public oversight, and civil liberties.

32.    In response to the growing popularity of Auditors like Plaintiff, Defendants created the Frauditor Troll Channel, an operation that purports to critique Auditor content but in reality exists to misappropriate, ridicule, and monetize Auditors' videos. Cloaked in the appearance of commentary, Defendants' videos rely on insult, mockery, and distortion rather than genuine critique or transformative discussion.

33.    The Frauditor Troll Channel is one of the largest Auditor-focused reaction channels and operates as a commercial enterprise built on satire, appropriation, and systematic infringement. It offers no new message, insight, or purpose. Instead, it repackages Plaintiff's original videos with intermittent ridicule to attract viewers and generate advertising revenue while contributing virtually no original content of its own. Although other channels have occasionally used Plaintiff's videos, none has engaged in the scale, volume, or deliberate exploitation of Plaintiff's works that defines Defendants' operation. This action targets that uniquely pervasive infringement, not the existence of criticism or commentary itself. The Frauditor Troll channel stands alone as the principal vehicle for mass theft and monetization of Plaintiff's copyrighted content.

**FIRST AMENDED COMPLAINT**

34.    The Frauditor Troll Channel has repeatedly used Plaintiff's copyrighted works without permission and without satisfying fair-use standards. Upon information and belief, between 2022 and 2025, Defendants unlawfully obtained and reproduced dozens of Plaintiff's videos, estimated between fifty and one hundred distinct works, uploading them to the Frauditor Troll Channel to derive advertising revenue and other commercial gain.[3]

35.    Upon information and belief, Defendants obtained the videos used from the DMA Channel by circumventing YouTube's technological protection measures, including its "rolling cipher" system, which encrypts and dynamically alters the video stream's URL signatures to prevent unauthorized downloads. YouTube's player software uses a decryption routine embedded in JavaScript code to authenticate requests and deliver content only through approved interfaces.

36.    Upon information and belief, Defendants used software applications, ripping utilities, or browser extensions specifically designed to bypass that rolling cipher and other technological measures controlling access to the audiovisual works hosted on YouTube. These tools retrieve and decrypt the obfuscated streaming URLs, enabling Defendants to make local copies of Plaintiff's videos in violation of YouTube's Terms of Service and 17 U.S.C. § 1201(a).

37.    The rolling cipher is a "technological protection measure" ("TPM") as defined in 17 U.S.C. § 1201(a)(3) because it controls access to Plaintiff's copyrighted works by requiring authorized software to decrypt and stream them in real time. By using programs that strip away this cipher, Defendants intentionally circumvented a technological measure and knowingly obtained unauthorized copies of Plaintiff's copyrighted works.

38.    Defendants' circumvention was not incidental but systematic. The Frauditor Troll Channel's production speed, volume, quality, and uniform editing style demonstrate

---

[3] Plaintiff estimates the number of stolen and infringed works based on the number of videos Plaintiff published and Defendants' pattern of serial theft and infringement of nearly every video Plaintiff posted prior to Defendants' deletion and purported destruction of more than 1,700 videos and all related metadata shortly after learning of this lawsuit. The precise number of stolen and infringed works cannot presently be determined due to Defendants' unilateral destruction of that evidence.

**FIRST AMENDED COMPLAINT**

the routine use of decryption software as part of a deliberate business model to acquire, republish, and monetize Plaintiff's copyrighted videos, in violation of YouTube's Terms of Service and 17 U.S.C. § 1201(a).

39.    When publicly discussing Plaintiff's 17 U.S.C. § 1201(a) claim against Defendants, Huneault did not deny the use of circumvention tools; instead, he suggested that he had another "defense," reinforcing the inference that Defendants used such software to unlawfully obtain Plaintiff's videos.

40.    Federal courts have recognized that YouTube's rolling cipher constitutes a technological protection measure within the meaning of 17 U.S.C. § 1201(a)(3) and that it "effectively controls access" to copyrighted works because it prevents users from downloading video streams without first executing YouTube's proprietary decryption code.

### *Plaintiff's Copyrighted Works*

41.    On or about March 16, 2022, Plaintiff published a video titled *ANOTHER CHAD EXPOSED!!! Worthless Denver Cops…ASSAULTED!!!* ("*Another Chad*"), to the DMA Channel.[4]

42.    Plaintiff registered *Another Chad* with the U.S. Copyright Office under Registration Number PA002457989 on February 6, 2024.

43.    On or about October 1, 2023, Plaintiff published a video titled *ANGRY MOB AT BELMAR LIBRARY!!! "CALL 911!" Cops don't show up* to the DMA Channel ("*Belmar Library*").[5]

44.    Plaintiff registered *Belmar Library* with the U.S. Copyright Office under Registration Number PA0002549333 on June 3, 2025.

---

[4] https://youtu.be/bhgHsPl4Mr0?si=F-7EgMg0bBZiy-QY.
[5] https://www.youtube.com/watch?v=86UKGVikxKQ&t=100s.

**FIRST AMENDED COMPLAINT**

45.     On or about February 3, 2022, Plaintiff published a video titled *FEDERAL COURTHOUSE FAIL!!! Threatened with arrest for recording and not one officer identifies!* ("*Courthouse Fail*") to the DMA Channel.[6]

### ***Defendants' Infringing Videos***

46.     On or about December 2, 2022, Defendants published a video titled *Frauditor DMA Gets Confronted by Angry Citizen (Hilarious)* ("Infringing Video 1") to the Frauditor Troll Channel.[7] Infringing Video 1 incorporates approximately twenty-five minutes and fifty-four seconds of Plaintiff's video *Another Chad* without authorization.

47.     Infringing Video 1 reproduces Plaintiff's footage in fifteen separate blocks with no commentary, twelve of which exceed one minute, three of which exceed two minutes, one exceeds three minutes, and one exceeds four minutes. This repeated use of lengthy, uninterrupted segments underscores the absence of meaningful transformation or interspersed analysis.

48.     Plaintiff's *Another Chad* video is forty-eight minutes and fourteen seconds in length, meaning Defendants reproduced more than fifty-four percent of Plaintiff's work. Excluding the introductory and concluding segments, eighty-seven percent of Defendants' video consists of Plaintiff's footage presented in long, unaltered blocks. The remaining thirteen percent comprises brief interjections totaling less than four minutes, primarily mocking Plaintiff rather than analyzing the subject matter or providing substantive commentary.

49.     On or about February 4, 2022, Defendants published a video titled *Frauditors Ejected from Federal Courthouse (NEW)* ("Infringing Video 2") to the Frauditor Troll

---

[6] https://www.youtube.com/watch?v=coiMQm_zzFE&t=1s. Registration of the *Courthouse Fail* video is currently pending before the U.S. Copyright Office. Plaintiff intends to amend this FAC to include that registration once it is issued.

[7] The video was available at the URL https://www.youtube.com/watch?v=I-J8sdKZ504. The video was removed after the filing of this action.

**FIRST AMENDED COMPLAINT**

Channel.[8] Infringing Video 2 incorporates approximately eighteen minutes and forty-six seconds of Plaintiff's *Courthouse Fail* video without authorization.

50.    Plaintiff's *Courthouse Fail* video is thirty minutes and twenty-seven seconds long, meaning Defendants misappropriated approximately sixty-two percent of Plaintiff's work. Excluding the brief introduction and outro, eighty-seven percent of Defendants' video consists of Plaintiff's footage, while Defendants' commentary accounts for only thirteen percent, two minutes and forty-eight seconds in total. These brief interjections provide no meaningful analysis or critique and do nothing to alter the expressive core of Plaintiff's work, which dominates the viewing experience.

51.    Plaintiff did not become aware of Infringing Video 2 until June 2023.

52.    On or about October 1, 2023, Defendants published a video titled *Frauditor DMA gets Camera Touched and CRIES A RIVER* ("Infringing Video 3") to the Frauditor Troll Channel.[9] Infringing Video 3 incorporates thirty-seven minutes and sixteen seconds of Plaintiff's *Belmar Library* video without authorization. (Infringing Video 1, Infringing Video 2 and Infringing Video 3 are collectively referred to as the "Infringing Videos").

53.    Infringing Video 3 reproduces Plaintiff's footage in twelve separate blocks with no commentary. Each block exceeds one minute; eight blocks exceed two minutes; three blocks exceed four minutes; and the longest uninterrupted segment runs over six minutes. This repeated use of extended, uninterrupted sequences underscores the absence of meaningful transformation or interspersed analysis.

54.    Plaintiff's *Belmar Library* video is forty-six minutes and fourteen seconds in length, meaning Defendants misappropriated approximately eighty-one percent of Plaintiff's work. Excluding the introductory and concluding segments, ninety-two percent of Defendants' video consists of Plaintiff's footage presented in long, uninterrupted blocks.

---

[8] https://www.youtube.com/watch?v=eVe4eoOzPvc&t=700s.
[9] https://www.youtube.com/watch?v=rSUT6MDdfoo. The video was removed after the filing of this action.

**FIRST AMENDED COMPLAINT**

The remaining eight percent consists of brief interjections totaling under three and a half minutes, primarily mocking Plaintiff rather than analyzing the subject matter or providing any meaningful commentary.

### *Defendants' Video - How to do Fair Use Properly and Avoid Copyright Strikes*

55.     On or about May 24, 2022, the Frauditor Troll Channel (or a related channel owned by Defendants) posted a video titled *How to do Fair Use Properly and Avoid Copyright Strikes*. The video is narrated by Huneault.

56.     In that video, Huneault claims to offer a formula for "100% safe fair use commentary videos." He instructs viewers that a "good amount of commentary is about 40 seconds to every minute so you say a little comment every minute that way you'll be safe." He also advises creators to pad videos with lengthy intros and outros and to intersperse other clips in order to "increase the proportion of time that is something else than one specific video." Finally, Huneault says that the goal is to use "less than fifty percent of a specific video" and asserts that when you're "only using 30% of someone's video, you are very unlikely to get a copyright strike."

57.     Although Plaintiff disagrees with Huneault's oversimplistic take on fair use, as discussed above, Huneault did not even follow his own purported "fair use" formula when misappropriating Plaintiff's Videos. This inconsistency demonstrates that Huneault and Ohiri lacked a subjective good-faith belief that the Infringing Videos were protected by fair use when submitting the Counter-Notices, satisfying the knowledge and bad-faith elements of 17 U.S.C. § 512(f).

### *Plaintiff's DMCA Takedowns and Defendants' Abuse of the Counter-Notice System*

58.     In June and October 2023, Plaintiff submitted twelve DMCA takedown notices to YouTube identifying videos uploaded by Defendants to the Frauditor Troll Channel that infringed Plaintiff's copyrighted works.

59.     Each Counter-Notice submitted by Defendants under penalty of perjury contained substantially identical boilerplate language, including the following:

**FIRST AMENDED COMPLAINT**

I am once again asking you to forward this counter notification to the plaintiff, according to the fair use act of 1976 I am legally allowed to make these types of videos. I am once again asking you to forward my counter notification to the plaintiff so I can have a chance to defend myself in a court of Law. I have a commentary channel where I provide review videos of 1st amendment auditors, I provide commentary, I add memes and sound effects to completely transform the original work into a Fair use video. On my channel I have received 48 copyright strikes and every single one of my videos have been reinstated through the counter notification system. I am willing to defend myself in a court of law. I have already hired an attorney to defend my fair use videos in court and I am asking you to forward my counter notification to the plaintiff so he can decided for himself if he chooses to go that route. I am the original creator of the Fair use videos on my channel and I know that my videos were taken down by mistake because they fall under the Fair use act. Please forward my counter notification so I can defend myself in a court of Law. Thank you, Jonathan Huneault

60.    The results were mixed. Defendants accepted two strikes without filing counter-notices, YouTube declined to remove one video, and Defendants filed the nine Counter-Notices under §512(g)(3) seeking reinstatement of the remaining works.[10]

61.    Each of the Counter-Notices contained substantially identical boilerplate language and multiple false statements, including that the uploads were protected by "fair use," that Huneault was "the original creator of the Fair Use videos on my channel," and that Defendants had retained legal counsel prepared to litigate the matter. These statements were materially false. Upon information and belief, Defendants made inconsistent and misleading representations about the ownership and monetization of the Frauditor Troll Channel, at times claiming it was owned by Huneault personally, at other times by Ohiri,

---

[10] Defendants filed eight counter-notices on or about July 5, 2023 and one counter-notice on or about October 20, 2023.

**FIRST AMENDED COMPLAINT**

and elsewhere by their Canadian corporation. Regardless of the claimed ownership, no counsel had been retained, and the Counter-Notices were knowingly false when submitted.

62.    Defendants further misrepresented their location by providing "99 Wall Street, New York, NY" without a suite number, as their service address in each Counter-Notice. In reality, Defendants are residents of Canada. This fictitious U.S. address obstructed Plaintiff's ability to effect service of process and constitutes an additional knowing misrepresentation to support the inference that Defendants' Counter-Notices were not filed in good faith.

63.    Defendants recently publicly admitted that they knew suite number 5892 was assigned to their bogus 99 Wall Street address, further demonstrating that the omission of the suite number was intentional and that the Counter-Notices were filed in bad faith.

64.    Relying on Huneault's misrepresentations regarding fair use, YouTube reinstated nine videos, resulting in financial benefit to all Defendants. After Plaintiff commenced this action on June 3, 2025, Defendants deleted nine of the ten videos,[11] including eight of the nine that had been reinstated by the Counter-Notices. One infringing video remains live on the Frauditor Troll Channel as of the filing of this FAC.

65.    Defendants' repeated use of false claims of fair use, a sham address, and fabricated assertions of ownership and legal representation demonstrate that the Counter-Notices were not merely mistaken but knowingly false and submitted in bad faith.

66.    On July 5, 2023, the same day Defendants submitted eight Counter-Notices under 17 U.S.C. § 512(g), Huneault emailed Plaintiff, stating: "If I counter every strike and they all get reinstated eventually it could penalize your channel. I'm going to keep making fair use videos, I'm legally allowed to do so."

67.    That evening, Huneault emailed again, identifying himself as "Josh," claiming he had "talked to a lawyer," demanding $9,000, and asserting: "You already know the videos will be reinstated in 3 weeks through the counter notification system."

---

[11] As alleged above, YouTube refused to remove one of the ten videos.

**FIRST AMENDED COMPLAINT**

68.    These contemporaneous emails confirm Defendants used the counter-notice mechanism as a tactic to force automatic reinstatement, not to correct any mistake or misidentification, and that Huneault deployed a false identity while doing so.

69.    On July 6, 2023, Huneault posted a video titled *DMA disabled Frauditor Troll for 3 Weeks, Big Mistake*, describing the counter-notice process and his expectation of reinstatement. He stated, among other things: "Obviously all the counter notifications are sent… I already filed the counter notifications… [Plaintiff] has 10 days to reply… then it gets reinstated… I beat 35 copyright strikes."

70.    That video also directly contradicted the July 2023 Counter-Notices, which stated: "I have already hired an attorney to defend my fair use videos in court." In the July 6 video, Huneault admitted he had not retained counsel, saying: "A paralegal can take care of that. I don't need to hire an expensive lawyer… I'm not a lawyer… I'm going to talk to a paralegal tomorrow."

71.    These contemporaneous statements constitute admissions of state of mind: Defendants viewed counter-notices as an automatic reinstatement mechanism and had not retained counsel despite swearing otherwise. They corroborate that Defendants' Counter-Notices were knowingly false and submitted in bad faith to force reinstatement, continue monetization, and intimidate Plaintiff into abandoning the infringement claims against them.

**The Market for Plaintiff and other Auditors' Footage**

72.    Defendants' dozens of stolen and uploaded videos serve as market substitutes for Plaintiff's original footage. For example, a legitimate commentary channel, Really Cool News[12], discusses Auditors' videos and conduct without reproducing a single frame of their copyrighted footage. Its view counts are a fraction of those on the Frauditor Troll Channel. This disparity demonstrates that audience demand for Defendants' content is driven not by any transformative commentary, but by the unauthorized display of Plaintiff's original

---

[12] www.youtube.com/@ReallyCoolNews

**FIRST AMENDED COMPLAINT**

works. Defendants' reproductions therefore serve as market substitutes for the originals, directly diminishing the market for authorized distribution and derivative works.

73. Upon information and belief, the Frauditor Troll Channel unlawfully obtained and infringed between fifty and one hundred of Plaintiff's copyrighted works. A serial misappropriation of Plaintiff's works on that scale functions as a market substitute: a YouTube viewer can watch virtually all of Plaintiff's copyrighted material on the Frauditor Troll Channel instead of on Plaintiff's own channel.

74. Indeed, many of Defendants' followers have publicly admitted that they watch Plaintiff's copyrighted footage on Defendants' channel instead of viewing the originals, often bragging that doing so "deprives the auditors of views and revenue." These admissions confirm that Defendants' uploads displace legitimate consumption of Plaintiff's content and usurp the economic incentive underlying copyright protection.

75. Plaintiff, through Executive Lens, is in the process of developing a licensing program under which authorized YouTube channels may license and monetize Plaintiff's footage in exchange for royalties. Plaintiff has already engaged in discussions with multiple channels regarding such licensing. However, Defendants' ongoing theft, monetization, and public rationalization of infringement have undermined this effort by fostering a belief among anti-Auditor content creators that Plaintiff's videos are free for the taking under the guise of "fair use." Until Defendants are held accountable, Plaintiff's ability to establish a lawful licensing market remains severely impaired.

76. Defendants' wholesale reproduction and monetization of Plaintiff's videos directly substitute for the originals, divert traffic, and poison the emerging licensing market for Plaintiff's footage. By saturating YouTube with unauthorized copies of Plaintiff's works, Defendants have not merely harmed the potential market-they have sought to destroy it, ensuring that theft and infringement, not creativity, determine who profits from Plaintiff's works.

**FIRST AMENDED COMPLAINT**

1  ***<u>Defendants' Conduct After this Action was Initiated</u>***

2      77.    Plaintiff commenced this action on June 3, 2025.

3      78.    Defendants were informed of this action via email on June 6, 2025.

4      79.    On the same day that Defendants received notice of this action, they began a

5  campaign to mass-delete evidence in an effort to conceal their wrongdoing and avoid

6  accountability.

7      80.    In total, Defendants deleted more than 1,700 videos from the Frauditor Troll

8  Channel which amounted to nearly ninety percent of the channel's video library.

9      81.    After Huneault and Ohiri were formally served in this action, they publicly

10  admitted that the 1,700 videos were not just merely removed from YouTube but were

11  permanently destroyed because they were concerned about being held accountable for their

12  mass infringement scheme.

13      82.    Huneault also publicly admitted that he knew Plaintiff was "broke" meaning

14  that he believed Plaintiff could not afford an attorney to pursue federal litigation, and that

15  it was a one-in-a-billion chance that Plaintiff would find counsel willing to hold Defendants

16  liable for their blatant copyright infringement scheme given the relatively modest monetary

17  damages.

18      83.    Huneault admitted that he paid Patrick J. D'Arcy, Esq. $2,800 before D'Arcy

19  filed an amicus brief in this matter, even though D'Arcy falsely represented to the Court

20  that he had not been compensated. The amicus filing was a bad-faith effort to inflate

21  Plaintiff's litigation costs and discourage Plaintiff and his counsel from pursuing legitimate

22  claims against Defendants. This conduct further demonstrates Defendants' bad faith

23  regarding the theft and monetization of Plaintiff's videos on the Frauditor Troll Channel.

24      84.    Lastly, Huneault publicly admitted that the Frauditor Troll Channel was a

25  satire channel, further confirming Plaintiff's allegation that the Infringing Videos are not

26  fair use.

27

28

**FIRST AMENDED COMPLAINT**

**FIRST CAUSE OF ACTION**

**Copyright Infringement**

**(17 U.S.C. § 501)**

**(*Infringement of Another Chad and Belmar Library*)**

85.     Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 84.

86.     Plaintiff is the creator and original author of the copyrighted audiovisual works titled *Another Chad* (U.S. Copyright Reg. No. PA0002457989) and *Belmar Library* (U.S. Copyright Reg. No. PA0002549333).

87.     Cordova subsequently assigned to Executive Lens LLC all rights, title, and interest in and to *Another Chad* and *Belmar Library*, including the exclusive rights under 17 U.S.C. § 106, while expressly reserving and retaining all causes of action and claims for infringement, violations of 17 U.S.C. § 512(f), and circumvention under 17 U.S.C. § 1201 arising prior to the effective date of the assignment.

88.     Accordingly, Executive Lens is the current owner of the copyrights, and Plaintiff retains standing to pursue the pre-assignment infringement and DMCA-related claims asserted herein.

89.     Defendants copied, displayed, and distributed substantial portions of *Another Chad* and *Belmar Library* without authorization, including through the publication of two infringing videos on YouTube ("Infringing Video 1" and "Infringing Video 3"). Infringing Video 1 incorporated approximately 56% of *Another Chad* (Infringing Video 1 is approximately 87% of Plaintiff's *Another Chad* footage excluding intro and outro material), and Infringing Video 3 incorporated approximately 81% of *Belmar Library* (Infringing Video 3 is approximately 92% of Plaintiff's *Belmar Library* footage excluding intro and outro material).

90.     Defendants' use of *Another Chad* and *Belmar Library* was for commercial purposes, including monetization through advertisements and the promotion of merchandise and channel memberships.

**FIRST AMENDED COMPLAINT**

91.    Defendants' use was not transformative and does not qualify as fair use under 17 U.S.C. § 107. As alleged herein, Defendants' reproductions served as market substitutes for Plaintiff's original works, diverting viewership and advertising revenue from the DMA Channel.

92.    As a direct and proximate result of Defendants' infringement, Plaintiff has suffered actual damages including lost viewership, lost advertising revenue, and diminution of the market and licensing value of *Another Chad* and *Belmar Library*.

93.    Pursuant to 17 U.S.C. § 504(b), Plaintiff is entitled to recover actual damages and any profits of Defendants attributable to the infringement.

## SECOND CAUSE OF ACTION

### Misrepresentation in Counter-Notifications under the DMCA

### (17 U.S.C. § 512(f))

94.    Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 93.

95.    Section 512(f)(2) of the Copyright Act provides, in relevant part, that "any person who knowingly materially misrepresents under this section . . . that material was removed or disabled by mistake or misidentification, shall be liable for any damages, including costs and attorneys' fees, incurred by…any copyright owner…who is injured by such misrepresentation."

96.    In the Counter-Notices submitted to YouTube under penalty of perjury, Defendants represented, among other things, that: (a) the removals were the result of "mistake or misidentification" and the Infringing Videos were protected by "fair use," citing a nonexistent "fair use act of 1976"; (b) Huneault owned the Frauditor Troll Channel and the videos at issue; (c) Defendants had already hired an attorney and were prepared to litigate; and (d) Defendants could be served at 99 Wall Street, New York, New York.

97.    Those statements were false, and, critically, were made without a good-faith belief at the time of each Counter-Notice that the videos were not infringing or the removals were by mistake or misidentification. As alleged above, the Infringing Videos reproduce

**FIRST AMENDED COMPLAINT**

the bulk of Plaintiff's works in long, uninterrupted blocks with only token, non-transformative interjections. Moreover, in or about May 2022, Defendants published a video titled *How to Do Fair Use Properly and Avoid Copyright Strikes,* in which Huneault instructed viewers to (a) insert commentary at least every 40 seconds, (b) limit use to less than 50% of another's work, and (c) pad videos with intros/outros to dilute the proportion of infringing content. Defendants' own infringing videos ignored each of those purported safeguards. This objective contradiction between Huneault's professed "fair use formula" and his conduct demonstrates that he knew the videos were not fair use and nonetheless represented otherwise under penalty of perjury in the Counter-Notices.[13] On July 5–6, 2023, Huneault further admitted that he filed counter-notices to "penalize" Plaintiff's channel, expected automatic reinstatement within three weeks, and had not retained counsel. YouTube relied on these misrepresentations to reinstate the removed videos, causing Plaintiff to incur litigation costs and other damages that would not have occurred but for Defendants' fraudulent Counter-Notices. These contemporaneous admissions show the Counter-Notices were tactical rather than truthful.

98.     After being served, Huneault and Ohiri publicly admitted in a YouTube video that there was a one-in-a-billion chance Plaintiff would actually hold Defendants accountable for copyright infringement because they knew Plaintiff lacked the financial resources to pursue federal litigation.

99.     Huneault misrepresented facts essential to the statutory process under §512(g)(3) which further demonstrates Defendants' pattern of knowingly false statements.

100.     The "already hired an attorney" assertion was false. As alleged above, the day after submitting the July 2023 Counter-Notices Huneault publicly admitted he had not hired a lawyer and would "talk to a paralegal" instead. Huneault made that statement

---

[13] Plaintiff does not concede that Huneault's statements regarding fair use are correct-they are reproduced solely to demonstrate that Huneault understood the principles he articulated and that his representations in the Counter-Notices were knowingly false.

**FIRST AMENDED COMPLAINT**

merely to mislead Plaintiff into believing that an attorney determined that Defendants' dozens of infringing videos were fair use.

101.    After being notified of this lawsuit, Defendants took no steps to appear or defend; instead, they engaged in evasive tactics, refusing to accept service of process and permanently destroying over 1,700 videos. These facts underscore that Defendants' Counter-Notices were not only legally baseless but knowingly false.

102.    Defendants publicly admitted that they destroyed the 1,700 videos to avoid being held accountable for the massive copyright infringement claims Plaintiff and others could have brought.

103.    The New York service address was false and materially misleading. As alleged above, Defendants are residents of Canada; listing "99 Wall Street, New York, NY" impeded service and misrepresented their true location. Defendants knowingly omitted suite number 5892 from the Counter-Notices to evade service and increase Plaintiff's litigation costs.

104.    Defendants' conduct epitomizes the systemic abuse Congress sought to prevent in § 512(f). Having publicly instructed others on the requirements of fair use, Huneault later admitted that Defendants simply file counter-notices without regard to the law because they believe no one will enforce it. This is not a mistake or misidentification, it is a deliberate exploitation of a flawed process, undertaken with knowledge that false assertions of lawful use would go unchallenged unless Plaintiff shouldered the cost of federal litigation Defendants believed he could not afford.

105.    As a direct result of Defendants' material misrepresentations regarding fair use, Plaintiff was forced to initiate this action to have the Infringing Videos removed from the Frauditor Troll Channel, and to prevent their re-upload. Plaintiff is entitled to recover damages, costs, and attorneys' fees under 17 U.S.C. § 512(f).

106.    Plaintiff is further entitled to injunctive relief requiring YouTube or its agents to remove the Infringing Videos from the Frauditor Troll Channel and to prevent their re-upload.

**FIRST AMENDED COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## THIRD CAUSE OF ACTION

### Declaratory Relief

### (28 U.S.C. § 2201 and 17 U.S.C. § 512(g))

### (*Courthouse Fail*)

107.    Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 106.

108.    On or about February 4, 2022, Defendants published Infringing Video 2 to the Frauditor Troll Channel.[14] Infringing Video 2 incorporates approximately eighteen minutes and forty-six seconds of Plaintiff's *Courthouse Fail* video without authorization.

109.    Plaintiff's *Courthouse Fail* video is thirty minutes and twenty-seven seconds long, meaning Defendants misappropriated approximately sixty-two percent of Plaintiff's work. Excluding the brief introduction and outro, eighty-seven percent of Defendants' video consists of Plaintiff's footage, while Defendants' commentary accounts for only thirteen percent, two minutes and forty-eight seconds in total. These brief interjections provide no meaningful analysis or critique and do nothing to alter the expressive core of Plaintiff's work, which dominates the viewing experience.

110.    An actual and justiciable controversy exists concerning Defendants' use of Plaintiff's *Courthouse Fail* video as that video remains live on the Frauditor Troll Channel and was subject to a DMCA Takedown and Counter-Notice under 17 U.S.C. § 512(g)(3), each claiming that the removed material was lawful and protected by fair use.

111.    YouTube reinstated Infringing Video 2 following a Counter-Notice submitted by Defendants under § 512(g)(3), creating an actual, live controversy as to whether the continued display of Infringing Video 2 is lawful.

112.    Plaintiff seeks a judicial declaration that Defendants' use of *Courthouse Fail* does not qualify as fair use under 17 U.S.C. § 107 and an injunction requiring YouTube to remove the video from its platform and prevent its re-upload.

---

[14] https://www.youtube.com/watch?v=eVe4eoOzPvc&t=700s.

**FIRST AMENDED COMPLAINT**

# FOURTH CAUSE OF ACTION

## Unlawful Circumvention of Technological Measures

## (17 U.S.C. §§ 1201, 1203)

113.   Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 112.

114.   Plaintiff is the author of the original audiovisual works published on his YouTube channels.

115.   Plaintiff owns all rights, title, and interest in and to the claims asserted in this action, including all claims for violations of 17 U.S.C. § 1201.

116.   Each of Plaintiff's works was uploaded to YouTube through the platform's standard publishing system. When published, YouTube automatically applied TPMs that control access to and prevent unauthorized copying or downloading of Plaintiff's audiovisual files, consistent with 17 U.S.C. § 1201.

117.   Upon information and belief, Defendants intentionally circumvented these TPMs by employing software tools commonly known as "rippers" or "downloaders" to download native-quality copies of Plaintiff's YouTube videos.

118.   Upon information and belief, Defendants unlawfully obtained between fifty and one hundred of Plaintiff's videos using these tools, often on the same day that the videos were posted to Plaintiff's YouTube channels so that Defendants could post the unlawfully obtained videos on the Frauditor Troll Channel.

119.   Defendants used those unlawfully obtained copies to create monetized videos for the Frauditor Troll Channel, reproducing extensive, unaltered portions of Plaintiff's works without license or authorization.

120.   By using circumvention software and disabling or bypassing YouTube's copy-protection systems, Defendants violated 17 U.S.C. § 1201(a), which prohibits the circumvention of a technological measure that effectively controls access to a copyrighted work.

**FIRST AMENDED COMPLAINT**

121.   Defendants' conduct was willful, knowing, and undertaken for commercial advantage, including the generation of advertising revenue through YouTube's AdSense program.

122.   As a direct and proximate result of Defendants' circumvention, Plaintiff has suffered actual damages, including loss of control over his copyrighted works, impairment of market value, and costs incurred to identify, remove, and prevent further distribution of infringing content.

123.   Plaintiff is entitled to recover actual or statutory damages under 17 U.S.C. § 1203(c), together with attorney's fees and costs, and to obtain injunctive relief restraining Defendants from further circumvention or trafficking in circumvention technology.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment against Defendants as follows:

A.   That judgment be entered in favor of Plaintiff and against Defendants for monetary damages caused by their infringement of Plaintiff's *Another Chad* and *Belmar Library* copyrights;

B.   That judgment be entered in favor of Plaintiff and against Defendants for monetary damages caused by their knowing material misrepresentations in the Counter-Notices pursuant to 17 U.S.C. § 512(f);

C.   That the Court enter a declaratory judgment that Defendants' use of *Courthouse Fail* is not protected by 17 U.S.C. § 107;

D.   That judgment be entered in favor of Plaintiff and against Defendants for their unlawful circumvention of technological protection measures in violation of 17 U.S.C. § 1201(a), including statutory damages of $2,500 per act of circumvention, actual damages, attorneys' fees, and a permanent injunction prohibiting further circumvention or distribution of works obtained through circumvention;

**FIRST AMENDED COMPLAINT**

E.    That the Court enter a permanent injunction enjoining Defendants from further use of *Another Chad, Courthouse Fail* and *Belmar Library* and requiring YouTube and any third-party platforms to remove the Infringing Videos and prevent further dissemination;

F.    That the Court award Plaintiff costs and attorneys' fees pursuant to 17 U.S.C. § 512(f);

G.    Any other relief the Court deems just and proper.


Dated:  November 3, 2025

/s/ Randall S. Newman
Randall S. Newman, Esq. (SBN 190547)
99 Wall Street, Suite 3727
New York, NY 10005
(212) 797-3735
rsn@randallnewman.net

*Attorney for Plaintiff,*
*Christopher J. Cordova*

**FIRST AMENDED COMPLAINT**