1   Simon Lin – State Bar No. 313661
2   4388 Still Creek Drive, Suite 237
    Burnaby, British Columbia, Canada V5C 6C6
3   T : 604-620-2666; F : 778-805-9830
    E : simonlin@evolinklaw.com
4
5   *Attorney for Defendants Jonathan Hudon-Huneault,*
    *Nneka Ohiri, and 14693663 Canada Inc.*
6
7
8                    **UNITED STATES DISTRICT COURT**
                    **NORTHERN DISTRICT OF CALIFORNIA**
9
10  CHRISTOPHER J. CORDOVA,                  )
                                            )   Case Number: 5:25-cv-04685-VKD
11          Plaintiff,                       )
                                            )   **DECLARATION OF SIMON LIN ISO**
12      vs.                                  )   **DEFENDANTS'      MOTION      FOR**
                                            )   **DISMISSAL    FOR    *FORUM    NON***
13  JONATHAN HUDON-HUNEAULT,                 )   ***CONVENIENS*  OR  ALTERNATIVELY**
    NNEKA OHIRI, 14693663 CANADA INC.,       )   **POSTING OF A BOND PURSUANT TO**
14                                          )   **CALIFORNIA    CODE    OF    CIVIL**
            Defendants.                      )   **PROCEDURE 1030**
15                                          )
                                            )
16                                          )
                                            )   **Judge:** Magistrate Judge Virginia K.
17                                          )   Demarchi
                                            )   **Complaint Filed**: June 3, 2025
18                                          )   **Trial Date**: February 1-2, 2027 (Bench Trial)
19                                          )
    _____ )
20
21          I, Simon Lin, do hereby declare as follows:

22          1.      I am an attorney at law and counsel of record for the Defendants JONATHAN

23  HUDON-HUNEAULT, NNEKA OHIRI, 14693663 CANADA INC. (the

24  "**Defendant(s)**"). I am a member in good standing of the State Bar of California and am

25  admitted to practice before this Court. I make this Declaration in support of Defendants'

26  Motion For Dismissal for *Forum Non Conveniens* or Alternatively Posting Of A Bond

27  Pursuant To California Code Of Civil Procedure 1030. I have personal knowledge of the

28  facts set forth in this Declaration, gained in my capacity as counsel for Defendants, and,

    if called as a witness, could and would testify competently to such facts under oath.

2.      I am called to the bars in California, USA (2016) and the Canadian provinces of British Columbia (2014) and Ontario (2019).

**Registering of a Copyright in Canada is Not Required**

3.      A true, complete, and correct copy of the Survey of National Legislation on Voluntary Registration Systems for Copyright and Related Rights prepared by the Secretariat of the World Intellectual Property Organization, downloaded on March 9, 2026, is attached to this declaration as **Exhibit A.**. In Annex III, pages 8-9 of this document, there is a summary of the Canadian registration of copyrights as follows (emphasis added):

> 3. Is copyright registration/recordation mandatory or voluntary in the following circumstances?
>
> (a) Recognition of creation?
>
> (b) Transfer of rights?
>
> (c) Initiation of judicial proceedings?
>
> (d) Other changes in title/ownership (such as leasing?)
>
> Recognition of creation in Canada does not depend on registration or any other formal act.  Copyright subsists automatically without any act beyond the creation of an original literary, musical, dramatic or artistic work in the circumstances set out in section 5 of the Copyright Act.
>
> Registration of copyright or an assignment of copyright, or a licence granting an interest in copyright or granting a security interest is permissive and not compulsory in Canada.  However, the registration of copyright, an assignment or licence will have a number of consequences under the Canadian Copyright Act, which are advantageous to the copyright owner.
>
> Registration of copyright is not required for the initiation of judicial proceedings.  However, the registration of copyright creates certain advantages to an applicant involved in litigation including that a certificate of registration of copyright is evidence that copyright subsists and a presumption that the person registered is the owner of the copyright.

4.      A true, complete, and correct copy of the "*A guide to copyright*" printed on March 9, 2026, from the Canadian Intellectual Property Office website at https://ised-

isde.canada.ca/site/canadian-intellectual-property-office/en/guide-copyright is attached to this declaration as **Exhibit B.**. The FAQ near the bottom of this guide, there is a question and answer as follows:

> **Do I need to register my copyright in order for my work to be protected? What are the benefits of copyright registration?**
>
> No, a work is protected by copyright law the moment it is created and fixed in a material form. Registering your work with CIPO is voluntary, but can be beneficial. The certificate of registration is evidence that copyright subsists in the work and that the person registered is the owner of the copyright. This evidence may, however, be challenged in a court proceeding.
>
> Please note that CIPO does not verify or examine the claims made in applications for copyright registration. Likewise, it is not responsible for monitoring registered works and how people use them, and it cannot guarantee the legitimacy, ownership, authorship or originality of a work.

5.      A true, complete, and correct copy of the "*What you should know about copyright*" printed on March 9, 2026, from the Canadian Intellectual Property Office website at https://ised-isde.canada.ca/site/canadian-intellectual-property-office/en/what-you-should-know-about-copyright is attached to this declaration as **Exhibit C.**. The top of this page states the following (emphasis added):

> **What is copyright?**
>
> Copyright is the exclusive legal right to produce, reproduce, publish or perform an original literary, artistic, dramatic or musical work. While there is no international copyright registration system, there are international treaties, such as the Berne Convention and the World Intellectual Property Organization Copyright Treaty, <u>that extend copyright protection to foreign jurisdictions without having to register your copyright</u>. <u>Registering your work with the Canadian Intellectual Property Office (CIPO) is voluntary</u>.

**Remedies for Copyright Infringement in Canada**

6.      A true, complete, and correct copy of the Canadian *Copyright Act,* R.S.C., 1985, c. C-42 can be downloaded from the Canadian Department of Justice Website at https://laws-lois.justice.gc.ca/eng/acts/C-42/Index.html. Sections 35 and 38.1(1) and (7) of the *Copyright Act* provides as follows (emphasis added with underline):

**Liability for infringement**

**35 (1)** Where a person infringes copyright, the person is liable to pay such damages to the owner of the copyright as the owner has suffered due to the infringement and, <u>in addition to those damages</u>, such part of the profits that the infringer has made from the infringement and that were not taken into account in calculating the damages as the court considers just.

**Proof of profits**

**(2)** In proving profits,

> **(a)** the plaintiff shall be required to prove only receipts or revenues derived from the infringement; and

> **(b)** the defendant shall be required to prove every element of cost that the defendant claims.

**Statutory damages**

**38.1 (1)** Subject to this section, a copyright owner may elect, at any time before final judgment is rendered, to recover, <u>instead of damages and profits referred to in subsection 35(1)</u>, an award of statutory damages for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally,

> **(a)** in a sum of not less than $500 and not more than $20,000 that the court considers just, with respect to all infringements involved in the proceedings for each work or other subject-matter, if the infringements are for commercial purposes; and

> **(b)** in a sum of not less than $100 and not more than $5,000 that the court considers just, with respect to all infringements involved in the proceedings for all works or other subject-matter, if the infringements are for non-commercial purposes.

...

DECLARATION OF SIMON LIN ISO DEFENDANTS' MOTION FOR DISMISSAL FOR *FORUM NON CONVENIENS* OR ALTERNATIVELY POSTING OF A BOND PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE 1030; Page 4/12

**Exemplary or punitive damages not affected**

(7) An election under subsection (1) <u>does not affect any right that the copyright owner may have to exemplary or punitive damages</u>.

7.      A true, complete, and correct copy of an article titled "*Damages for Intellectual Property Infringement in Canada*" authored by Heer Law – an IP firm in Canada last updated on January 15, 2025 and downloaded on March 9, 2026 is attached to this declaration as **Exhibit D.**. The relevant portions of the article relating to copyright states the following:

**Copyright**

A copyright holder has the sole right to produce or reproduce a work or a substantial part of it in any form. It also includes the right to perform the work or any substantial part of the work, and the right to publish an unpublished work or any substantial part of it. Under the *Copyright Act*, a successful plaintiff may elect compensatory damages *and* an accounting of the defendant's profits, provided that such profits are not already included as part of the damages award. Like damages awards in many trademark disputes, damages awards in copyright disputes may not be readily calculable. Nonetheless, courts must do the best they can as a matter of common sense and, in any event, may still award a nominal amount.

**Statutory damages**

At any time before final judgment is rendered, a plaintiff may elect statutory damages instead of damages and profits. A successful plaintiff need not prove the extent of its losses to obtain statutory damages. As a result, statutory damages may be preferable where a plaintiff is either unable or unwilling to prove the full extent of its losses.

….

**<u>Unfair Competition Law in Canada</u>**

8.      A true, complete, and correct copy of the Canadian *Trademarks Act*, R.S.C., 1985, c. T-13 can be downloaded from the Canadian Department of Justice website at https://laws-lois.justice.gc.ca/eng/acts/t-13/. Sections 7 and 53.2 of the *Trademarks Act* provides as follows (with emphasis added):

DECLARATION OF SIMON LIN ISO DEFENDANTS' MOTION FOR DISMISSAL FOR *FORUM NON CONVENIENS* OR ALTERNATIVELY POSTING OF A BOND PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE 1030; Page 5/12

## Unfair Competition and Prohibited Signs

**Prohibitions**

**7** No person shall

> **(a)** <u>make a false or misleading statement</u> tending to discredit the business, goods or services of a competitor;

> **(b)** direct public attention to his goods, services or business in such a way as to cause or be likely to cause confusion in Canada, at the time he commenced so to direct attention to them, between his goods, services or business and the goods, services or business of another;

> **(c)** pass off other goods or services as and for those ordered or requested; or

> **(d)** <u>make use, in association with goods or services</u>, of any description that is false in a material respect and likely to mislead the public as to

>> **(i)** the character, quality, quantity or composition,

>> **(ii)** the geographical origin, or

>> **(iii)** the mode of the manufacture, production or performance

> of the goods or services.

**...**

**Power of court to grant relief**

**53.2 (1)** If a court is satisfied, on application of any interested person, that any act has been done contrary to this Act, the court may make any order that it considers appropriate in the circumstances, including an order providing for relief by way of injunction and <u>the recovery of damages or profits, for punitive damages</u> and for the destruction or other disposition of any offending goods, packaging, labels and advertising material and of any equipment used to produce the goods, packaging, labels or advertising material.

9.      A true, complete, and correct copy of the Federal Court of Canada decision in *Zanin v. Ooma, Inc.,* 2025 FC 51 is accessible from the Canadian Legal Information Institute website at https://canlii.ca/t/k92nm. I am counsel for the Plaintiff in this Canadian case, and this decision is under appeal to the Federal Court of Appeal. The portions of the decision relating to the *Trademarks Act* are not subject of the appeal. In paragraphs 339-397, the court discusses the *Trademarks Act* provisions excerpted above.

10.     A true, complete, and correct copy of the Canadian *Competition Act,* R.S.C., 1985, c. C-34 can be retrieved from the Canadian Department of Justice website at https://laws-lois.justice.gc.ca/eng/acts/c-34/. Sections 36, 52(1), and 52.01(2) of the *Competition Act* provides as follows (with emphasis added):

**Recovery of damages**

**36 (1)** Any person who has suffered loss or damage as a result of

> **(a)** conduct that is contrary to any provision of Part VI, or

> **(b)** the failure of any person to comply with an order of the Tribunal or another court under this Act,

may, in any court of competent jurisdiction, sue for and recover from the person who engaged in the conduct or failed to comply with the order an amount equal to the loss or damage proved to have been suffered by him, together with any additional amount that the court may allow not exceeding the <u>full cost to him of any investigation</u> in connection with the matter and of proceedings under this section.

…

**False or misleading representations**

**52 (1)** No person shall, for the purpose of promoting, directly or indirectly, the supply or use of a product or for the purpose of promoting, directly or indirectly, any business interest, by any means whatever, knowingly or recklessly make a representation to the public that is false or misleading in a material respect.

…

**False or misleading representation — electronic message**

**(2)** No person shall, for the purpose of promoting, directly or indirectly, any business interest or the supply or use of a product, knowingly or recklessly send or cause to be sent in an electronic message a representation that is false or misleading in a material respect.

## Circumvention of Technological Measures in Canadian Copyright Law

11.     A true, complete, and correct copy of the Federal Court of Canada decision in *1395804 Ontario Ltd. (Blacklock's Reporter) v. Canada (Attorney General),* 2024 FC 829 is accessible from the Canadian Legal Information Institute website at

https://canlii.ca/t/k4zfr. In paragraph 109 and thereafter, the court discusses the technological protection measures under Canadian copyright law.

**Procedure in the Federal Court of Canada**

12.     A true, complete, and correct copy of an article titled "*Low-cost procedures for effective copyright litigation*" authored by Smart & Biggar – a leading IP firm in Canada dated July 4, 2013 and downloaded on March 9, 2026 is attached to this declaration as **Exhibit E.**. The relevant portions of the article states the following:

> **Summary proceedings**
>
> Section 34(4)(a) of the Act provides that proceedings for infringement of copyright or moral rights may be commenced by way of application rather than by way of a more complicated action. Further, motions for summary judgment and summary trial can be brought in most courts in Canada, including in the Federal Court, which hears most IP matters in Canada.
>
> In proceedings brought by way of an application, as well as in summary judgment and summary trial motions, evidence is filed by affidavit. Although the affiants are subject to cross-examination, there is generally no live testimony of witnesses at the hearing, nor wide-ranging discoveries like in proceedings brought by way of an action. As such, Canadian copyright litigation can be conducted quickly and cost-efficiently.

13.     A true, complete, and correct copy of the "*Settling intellectual property disputes in court*" printed on March 9, 2026, from the Canadian Intellectual Property Office website at https://ised-isde.canada.ca/site/canadian-intellectual-property-office/en/settling-intellectual-property-disputes-court is attached to this declaration as **Exhibit F.**.

**Plaintiff's Initial Disclosures**

14.     A true, complete, and correct copy of the Plaintiff's Initial Disclosures in this case is attached to this declaration as **Exhibit G.**.

**Plaintiff's Company's Two Copyright Cases before this Court**

15.     A true, complete, and correct copy of the Complaint in *Executive Lens LLC, v. Lee Rapkin*, Case No: 5:25-cv-06048-NC is attached to this declaration as **Exhibit H.**.

16.     A true, complete, and correct copy of the Complaint in *Executive Lens LLC, v. Robert Alan Reed*, Case No: 5:25-cv-07150-SVK is attached to this declaration as **Exhibit I.**.

**YouTube's Terms of Service**

17.     A true, complete, and correct copy of YouTube's Terms of Service, printed on February 20, 2026, from https://www.youtube.com/t/terms?hl=en&override_hl=1 is attached to this declaration as **Exhibit J.**.

18.     A true, complete, and correct copy of YouTube's article titled "*Watch videos offline with YouTube Premium*", printed on March 9, 2026, from https://support.google.com/youtube/answer/11977233 is attached to this declaration as **Exhibit K.**.

**Expected Deposition Costs for this Case**

19.     The Defendants will likely notice or subpoena for the deposition of the following persons:

    a.  **Plaintiff, Christopher J. Cordova**

    b.  **Joshua Abrams**, an associate of the Plaintiff who appears to have encouraged the Plaintiff to file DMCA notices.

    c.  **Theresa Neal**, Plaintiff's ex-girlfriend that was actively involved in the Plaintiff's YouTube channel, and may have evidence on ownership and authorship of the Plaintiff's videos.

    **d.** **Plaintiff's Mother**, whose name Defendants will obtain at a later time, and was the person that managed Plaintiff's YouTube channel when he was in jail or custody.

    e. **Johnny Bravo**, owner/operator of the YouTube Channel (https://www.youtube.com/@johnnybravo303), a previous associate of the Plaintiff.

    f. **@MexicanLongHair**, owner/operator of the YouTube Channel at https://www.youtube.com/c/mexicanlonghair, a previous associate of the Plaintiff.

    g. **Reagan Benson**, owner/operator of the YouTube Channel at http://youtube.com/@ReganBenson, a previous associate of the Plaintiff.

20.    The Defendants intend to conduct the seven depositions above, for which the Defendants will need a court reporter and videographer, and for which it will need to order transcripts. In the interests of efficiency, the Defendants plan to conduct the depositions remotely using CourtCall. Attached to this declaration as **Exhibit L.** is CourtCall's price list for remote depositions.

**CourtCall Remote Deposition**

$650 for 3.5 hours, $150 for each additional hour (estimated at $1,100 per deposition)

**Transcript**

$7.15 per page reported estimated 30 pages/hour (estimated at $1,394.25 per deposition)

21.    As such, the reasonably anticipated costs for the depositions and transcripts are **<u>$17,459.75.</u>**

**Expected Attorneys Fees for the Upcoming Major Steps**

22.    The Defendants anticipate the following major steps and motions for this case, with the estimated hours of attorney work required:

     a.    **Motion for *forum non conveniens* and security for costs**: 20 hours

     b.    **Motion for summary judgment:** 40 hours

     c.    **Settlement conference, including settlement conference statements:** 15 hours.

     d.    **Requesting discovery and requests to admit, and responding to same:** 20 hours.

     e.    **Defendants' depositions, including preparation and conducting each deposition:** 12 hours each deposition, for each of the seven depositions above.

     f.    **Plaintiff's depositions, including preparation and attendance, for each deposition:** 10 hours each deposition, for both individual Defendants.

     g.    **Trial preparation, including pre-trial conference and the two-day bench trial:** 50 hours.

23.    As such, the reasonably anticipated attorney work for the aforementioned work is 249 hours. The Defendants request an hourly rate for the work performed by his attorney at $330.00USD per hour. The total would be **82,170** in attorney's fees for the major steps that is expected to be performed up to and including the trial.

DECLARATION OF SIMON LIN ISO DEFENDANTS' MOTION FOR DISMISSAL FOR *FORUM NON CONVENIENS* OR ALTERNATIVELY POSTING OF A BOND PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE 1030; Page 11/12

**Transcript from the Plaintiff's Sentencing in the Criminal Proceeding**

24.        Attached to this declaration as **Exhibit M.** is a transcript from *United States of America v. Christopher J. Cordova*, Case No: 1:22-po-07015-MEH.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 10th day of March 2026.

_Simon Lin_

Simon Lin

# EXHIBIT A

E

# WIPO





**SCCR/13/2**
**ORIGINAL:** English
**DATE:** November 9, 2005

**W O R L D   I N T E L L E C T U A L   P R O P E R T Y   O R G A N I Z A T I O N**

GENEVA

## STANDING COMMITTEE ON COPYRIGHT
## AND RELATED RIGHTS

### Thirteenth Session
### Geneva, November 21 to 23, 2005

SURVEY OF NATIONAL LEGISLATION ON VOLUNTARY REGISTRATION
SYSTEMS FOR COPYRIGHT AND RELATED RIGHTS

*prepared by the Secretariat*

SURVEY OF NATIONAL LEGISLATION ON VOLUNTARY REGISTRATION
SYSTEMS FOR COPYRIGHT AND RELATED RIGHTS

I.     INTRODUCTION

   A.     Background

   During the seventh session of the Standing Committee on Copyright and Related Rights (SCCR) which took place from May 13 to 17, 2002, several Member States proposed that the Secretariat prepare studies on, among other issues, voluntary copyright registration systems. For the eighth session of the Committee, the Secretariat prepared a list of all the new issues proposed for future review and possible action by the Committee.  The list of new issues, contained in the document entitled "A short description of possible subjects for future review by the Standing Committee" (SCCR/8/2) included reference to "voluntary recordal systems", as follows: "Article 5(2) of the Berne Convention states that "the enjoyment and the exercise of copyright shall not be subject to any formality.  This is one of the fundamental principles of the Convention.  It establishes that protection may not be made conditional on the observance of any formality.  However, in certain countries party to the Berne Convention, the national copyright law provides facilities to national and/or foreign creators and copyright owners for registering their works through a voluntary recordal system (…) ."

   At the eighth session of the SCCR, which took place from November 4 to 8, 2002, several Member States expressed support for a study on the issue of voluntary recordal systems.  It was stated that studies in this area could help Member States to systematize the issues involved and get a better sense of whether and how voluntary recordal systems might further their national interests.  Some delegations highlighted the importance of the issue in connection to the fight against piracy.

   Based on these discussions in the seventh and eighth sessions of the SCCR,  the WIPO Secretariat has prepared a comparative study of the legislation and practice in certain Member States concerning voluntary copyright registration systems.

   B.     The International Legal Framework

   The prohibition of formalities for copyright protection is the result of an historical process.  Before the 1886 Berne Convention for the Protection of Literary and Artistic Works (the 1886 Act of the  Berne Convention) entered into force, each country had its own rules for recognition of copyright in a work.  Consequently, authors had to comply with formalities on a country-by-country basis.  The Berne Convention introduced the principle that authors in Union countries need only comply with the formalities imposed by the country of origin of a work.  This rule was replaced in the 1908 Berlin revision of the Convention by the current principle of formality-free protection, reflected in Article 5(2) of the present Paris Act 1971, which reads as follows:

   *The enjoyment and the exercise of these rights shall not be subject to any formality; such enjoyment and such exercise shall be independent of the existence of protection in the country of origin of the work (…)*

SCCR/13/2
page 3

Formalities are conditions or measures which must be fulfilled in order for the work to enjoy copyright protection.  Formalities do not include conditions related to the creation of the work (such as the substantive condition that a production must be original in order for it to qualify as a protected work) or the fixation thereof (a possible condition under national law).  The registration and deposit of the original or a copy, and the requirement that a notice of copyright be placed on the work, are typical examples of formalities.  According to the Guide to the Copyright and Related Rights Treaties Administered by WIPO [1] "if registration only has the effect of a rebuttable presumption that the facts registered are valid, it is not a formality (unless it is still applied in a way that, in spite of the original legal regulation, it becomes a *de facto* formality, because, for example, courts only deal with any infringement case if a certificate of such a registration is presented).  Also, if deposit is a mere administrative obligation (with the objective of maintaining an appropriate national library or archive of published works) with some administrative sanctions for non-fulfillment, leaving the possibility of enjoyment and exercise of copyright intact, it is not against the principle of formality-free protection.(page 41)"

Formality-free protection is closely linked to the principle of independence of protection in Art. 5 (2) of the Berne Convention: "Such enjoyment and such exercise shall be independent of the existence of protection in the country of origin of the work." The most relevant example of the case where a work is not protected in the country of origin, but may be protected in the country where protection is claimed is where, in the country of origin, a formality is applied as a condition of protection.  This is possible, since, under the Berne Convention[2] it is not an obligation in the country of origin to apply the Convention to domestic works, and thus formalities may be prescribed for them.  However, as a consequence of the application of the two principles mentioned, no formalities may exist in the country foreign Union country where protection is claimed.

In the field of related rights, the International Convention for the Protection of Performers, Producers of Phonograms and Broadcasting Organizations (the Rome Convention, 1961) provides that phonograms are protected abroad without the need to comply with any formality.  Nevertheless, if, as a condition of protecting the rights of producers of phonograms or of performers in relation to phonograms, a country requires compliance with formalities, these are fulfilled if all commercial copies of the published phonogram or its packaging bear a notice consisting of the symbol "P" (the letter P in a circle), accompanied by the year date of the first publication (article 11 of the Rome Convention).  The Phonograms Convention concluded in 1971 contains in its article 5 a similar provision.  It should be noted that article 62.1 of the Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPS Agreement) and article 20 of the WIPO Performances and Phonograms Treaty (WPPT) contains the same principle of formality-free protection.

While respecting the principles established in the Berne Convention, several Berne Union members have established national registration systems for copyright and sometimes also for related rights.  In the view of these Member States,  registration facilitates the exercise of copyright and related rights, by providing right owners with a simple and effective means to clearly establish authorship and/or ownership of rights.  In this context, registration is seen as contributing to the protection of moral and economic rights and the fight against

---

[1] Mihaly Ficsor.  Guide to Copyright and Related Rights treaties administered by WIPO, Geneva 2003. WIPO Publication  No. 891 (E)

[2] Art. 5 paragraph (3)

piracy.  On the other hand, by helping to identify works and other subject matter, as well as the corresponding authorship and/or ownership, registration can facilitate access to and use of protected subject matter.  Registration can also help to delimit the public domain (e.g., by providing information concerning expiry of the term of protection), and consequently facilitate access to creative content for which no authorization from the right owner is needed.

National recordation systems often hold valuable information on creativity, both from a legal and economic standpoint.  As an office of record, a copyright registry can make available certificates of registration, certified copies of registry documents that provide, with varying legal effect, important information on a work or other subject matter, its author or, through a documented chain of transfer, its present ownership.  The information contained in national registries is not only valuable in legal and economic relations but may also serve the public interest by providing a source of national statistics on creativity and culture.  Finally, national registries may constitute a repository of cultural and historical heritage, as they represent collections of national creativity, including works and other creative contributions.

Due to the wealth of information they manage and their experience on copyright matters, national registration bodies sometimes are given additional competences in the field of copyright and related rights, for example in areas such as mediation and arbitration, the granting and administering of compulsory licenses, and advising the Government or other public authorities on copyright issues.

## II.    ADVANTAGES AND CHALLENGES OF COPYRIGHT REGISTRATION

In recent years a number of issues have been raised concerning registration of copyright and related rights in the evolving digital environment.  Some commentators have highlighted the important role that registration could play beyond its traditional functions in facilitating the exercise of rights, i.e. as a means to prove the existence of the work and/or its ownership. In this context the focus has been placed on the potential for registration to address some of the problems related to use of creative content.  One concern relates to whether copyright imposes inappropriate burdens on users, including subsequent creators, in regard to works in respect of which the copyright owner can not be located (recently, such works have been termed "orphan works").  An often-cited example is where a creator seeks to incorporate an older work into a new one (whether visual, musical or textual) but despite her best efforts is unable to identify or locate the copyright owner(s).  Moreover, identification of the work or other subject matter can be complex as digital technology allows content to be recast into a variety of forms, while multimedia production combines completely different types of subject matter into a single embodiment.

It is clear that rights management information has potential to facilitate the exercise of copyright and related rights in the digital environment.  Under some models proposed, digital rights management (DRM) systems would be able not only to identify right owners and monitor use of content, but also process authorizations and remuneration[3].  However it is not clear whether current copyright registration systems might have a role to play in the design and operation of future DRM systems.

---

[3] For a detailed explanation of Digital Rights Management (DRM) please refer to the Study on Current Developments in the Field of Digital Rights Management, prepared by Mr. Jeffrey P. Cunard; Mr. Keith Hill, and Mr. Chris Barlas: http://www.wipo.int/documents/en/meetings/2003/sccr/doc/sccr_10_2_rev.doc

In the digital environment users are no longer passive recipients of creative output but play an increasingly interactive role. Technology enables users to engage in a dynamic relation with both past and present creativity, blurring the previous boundaries between creation and use. In order to allow full interaction with past creations, peer users and creators, clearer delimitation of the public domain may prove important and useful. The uncertainty created by copyright in orphan works may have the potential to undermine the economic incentives to create by imposing additional costs on subsequent creators wishing to use material taken from existing works. Subsequent creators may be dissuaded from creating new works incorporating parts of existing works the owner of which cannot be found, because they cannot afford the risk of potential liability, including possible litigation. Further, the public interest may also be harmed when works cannot be made available to the public due to uncertainty over their copyright ownership and status, even where no living person or legal entity is asserting claims to ownership of copyright, or where the owner has no objection to such use.

In addressing the issue of orphan works, several alternatives have been proposed which confer a more or less central role on registration. Specific legislation has been enacted in at least one country (Canada) while others, like the United States of America, are in the process of assessing whether specific measures are needed[4]. The following trends illustrate the complexity of an issue where legal, technological and economic considerations intersect in a rapidly evolving scenario:

1)     The copyright law in Canada has a specific provision permitting anyone who seeks permission to make use of a copyright work and cannot locate the copyright owner, to petition the Canadian Copyright Board for a license. The Copyright Board makes a determination as to whether sufficient effort has been made to locate the owner. If so, the Copyright Board may grant a license for the proposed use. It will set terms and fees for the proposed use of the work in its discretion and will hold the fees collected in a fund from which the copyright owner, if he or she ever makes a claim, may be paid. Under this approach a limitation on remedies is imposed on right owners whose works are orphaned. Users can be confident that their use of the work will not subject them to the full range of remedies for infringement under the Copyright Act, but only an amount akin to a usage fee. At the same time, copyright owners would not be concerned about the inadvertent loss of rights from failure to pay the fee or take other requisite action.

While there are many ways to locate a copyright owner it is clear that for countries where a registration system exists, search of registrations could play a conspicuous role in both locating the copyright owner and in assessing whether sufficient efforts have been made to that effect.

---

[4] The US Copyright Office is examining the issues raised by "orphan works," i.e., copyrighted works whose owners are difficult or even impossible to locate. The Copyright Office requested comments from all interested parties on whether there are compelling concerns raised by orphan works that merit a legislative, regulatory or other solution, and what type of solution could effectively address these concerns without conflicting with the legitimate interests of authors and right holders. Some of the alternative proposals for dealing with orphan works listed in this document are taken from background information made public by the Copyright Office in the course of this process.

2)    While the Canadian experience demonstrates a "case-by case" or "ad hoc" approach, a "formal" approach for dealing with orphan works relies directly on registration. It could adopt several variants, as detailed in the Notice of Inquiry published by the US Copyright Office on January this year[5].  Under one of them the Copyright registering body will establish a filing system whereby the potential users would be required to file their intent to use a work, the owner of rights of which cannot be located.  Under other models, right owners and not users, would be subject to registration of their claims.

Techniques like the Canadian mechanism and the possibilities under study in the United States must be tested against international obligations that prohibit formalities as a condition for the "enjoyment and exercise of copyright".  As explained above that test precludes proposals based on mandatory registration.  Optional solutions are based on conferring additional benefits – such as damages or a specific penalty for willful use of the work – to right owners having registered their works or other related matter.  In such a system if the user failed to check the registry she will be prevented from claiming that the work was orphaned. Another important issue is whether a time requirement should be imposed in order to be able to consider a work or other subject mater as orphaned.  The search for clear, objective criteria for the determination of a certain lapse of time, or duration for deeming a work as "orphanable" appears as especially complex.  The same can be said of other related issues, such as fixing the initial time for counting such a period.

III.    Methodology and Structure

The present Survey of National Legislation on Voluntary Registration Systems for Copyright and Related Rights ("the Survey") has been prepared by the WIPO Secretariat in cooperation with its Member States.  A questionnaire covering the main issues related to voluntary registration systems for copyright and related rights was circulated to fourteen WIPO Member States from different regions of the world and having copyright registration systems.  The Secretariat received replies from twelve Member States, namely: Argentina, Canada, China, Colombia, Germany, Hungary, India, Japan, Mexico, the Philippines, Spain, and the United States of America.

The Survey is of an informative, descriptive nature.  It will help Member States to evaluate different systems of copyright registration and the prospects for evolution in the new digital environment, where an increasing need exists to easily identify creative content and monitor its use.  In its present form, the survey includes detailed information on a number of issues, including, among others:

-    The legal status of the registering body
-    The subject matter of registration
-    The scope of registration
-    Requirements for registration
-    Legal effects of registration
-    Availability of information in tangible (deposit of works) and digital formats and
-    Search facilities and statistical information.

---

[5] http://www.copyright.gov/fedreg/2005/70fr3739.html

The information provided by Member States has been structured in three sections. The first relates to institutional questions, the second to legal issues and the third to procedure. The Survey contains three Annexes. The questionnaire is reproduced in Annex I , relevant statistics are contained in Annex II , and individual responses from the countries are presented in Annex III.

## IV.   SUMMARY OF RESPONSES TO THE SURVEY QUESTIONS:

The summary covers the information obtained from each country with respect to the institutional, legal and procedural questions..

I.   <u>Institutional questions</u>

*1.   What is the name and legal status of the copyright registering/recording body in your country?*

In most cases, the copyright registering bodies are institutions, which belong to the executive branch of the central government.  In a few cases the registry is part of the legislative or judicial powers.  In some cases the registration system is decentralized and registration is undertaken to a certain extent by local authorities.

In Argentina, the name of the entity responsible for copyright registration is the National Copyright Directorate, a National Public Administration body, attached to the Secretariat of Judicial Policy and Legislative Matters of the Ministry of Justice, Security and Human Rights.

In Canada, the Copyright Office is responsible for registering copyright.  The Copyright Office is attached to the Canadian Patent Office and is under the jurisdiction of the Department of Industry.

In Mexico, the registering entity is the National Copyright Institute, Directorate of the Public Copyright Registry.  This is a decentralized body attached to the Secretariat of Public Education.

In Colombia the National Copyright Registry belongs to the National Directorate on Copyright, which is an autonomous entity integrated into the Ministry of Justice and Internal Affairs.

In India the registering entity is the Copyright Office, Ministry of Human Resource Development.

In Japan, the Agency for Cultural Affairs, Ministry of Education, Culture, Sports, Science and Technology, (ACA) is the registering entity.  A legal person, established under the provisions of the civil law, the Software Information Center (SOFTIC), has been created to register computer programs.

In Spain, the name of the registering entity is the General Intellectual Property Registry, comprising in turn the Central Registry, Territorial Registries and a Coordination Commission.  The Central Registry is attached to the Ministry of Culture of the Central

Administration, with registration powers for those Autonomous Communities that have not had their own Registry transferred, while the Territorial Registries are attached to the Autonomous Communities to which said Registry has already been transferred. The Coordination Commission operates as a collegiate body for the unification of criteria.

In Germany, for anonymous and pseudonymous works a register called "Register of anonymous and pseudonymous works" is kept at the German Patent and Trademark Office, Federal Ministry of Justice.

In China, the copyright registering bodies are the China Copyright Protection Center (CCPC), the provincial copyright administrations, and the copyright administrations in the autonomous regions and the municipalities directly under the central government as well as the registering institutions designated by them.  The CCPC  is an institution under the National Copyright Administration of China (NCAC).  It is entrusted by NCAC to take care of the registration of copyright of computer software and other works.  The provincial copyright administrations in various provinces, autonomous regions and municipalities are responsible for the registration of copyright of various works except computer software, the China Copyright Protection Center being the software registration institution.

The registering entities in the Philippines are the National Library and the Supreme Court of the Philippines Library.

In the United Stated of America, the copyright registering body is the U.S Copyright Office, a department of the Library of Congress.

There is not a public copyright registration system in Hungary but, as in other countries, works can be recorded in the database of collecting societies.  Two collecting societies undertake this activity in Hungary: Society Artijus Hungarian Bureau for the protection of Authors' Rights and the Hungarian Society for the protection Audiovisual of Authors' and Producers Rights, Filmjus.  The other collecting societies do not keep any record of the works.


2.     *Is the copyright registry interconnected to any other copyright data system?*

According to the responses, the copyright registering bodies are not interconnected to other copyright data systems provided either by public or private entities.  The registration system of Spain provides interconnectivity between the Territorial Registries and the Central Registry, allowing the system to share information on a national basis.

II.    Legal questions

*1.    What kind of copyright works can be registered/recorded?  Is the
registration/recordation process different for each type of copyrighted work?  Please describe
the differences, if any.*

Most of the replies imply that all protected works can be registered and refer to the
general notion of literary and artistic works, which, along the lines of the Berne Convention is
defined in the national law by means of an open, non exhaustive list of productions in the
literary, artistic and scientific domain.

Argentina, China, Colombia, Hungary, Japan, Mexico, the Philippines and the United
States of America have expressly included in this list computer programs or computer
software as copyright works subject to registration.

In Germany, only protected literary, scientific and artistic works that have been
published as anonymous or pseudonymous works can be recorded.  The only purpose of this
voluntary registration is to apply the regular duration of copyright protection to anonymous
and pseudonymous works

The registration process in the different countries is basically the same for each category
of works.  Nevertheless, for the registration of computer programs or software, a different
process has been established in China and Japan as explained in the corresponding response
(Annex III).

*2.    Can the subject matter of related rights (e.g., performances, broadcasts, sound
recordings) also be registered/recorded?  If yes, is there a different registration/recordation
process than for works protected by copyright?*

In Canada, Japan, the Philippines and Spain the object of related rights can also be
registered.  The registration process is similar to the one set up for works.

In China there is, so far, no relevant provision in the Copyright law on the registration
of the subject matter of related rights.

In Colombia phonograms are subject to registration.  The procedure to that effect is
different in that the information requested from the right owner is not the same, as detailed in
the corresponding response (Annex III).  In Mexico videograms, phonograms and books are
also subject to registration of related rights.  In India, sound recordings are subject to
registration, as detailed in the corresponding response (Annex III).

The U.S Copyright law does not distinguish between copyright and related rights,
therefore performances, broadcasts and sound recordings are registered as copyright works if
they meet the general conditions for protection of the same.  The registration requirements are
the same as for other copyrighted works.  In Argentina, only phonograms are registered, given
that the law includes them as protected works and the law refers only to the registration of
works.  There is no difference in the registration process between phonograms and other types
of works.

*3.    Is copyright registration/ recordation mandatory or voluntary in the following circumstances?*

    *(a)    Recognition of creation?*
    *(b)    Transfer of rights?*
    *(c)    Initiation of judicial proceedings?*
    *(d)    Other changes in title/ownership (such as leasing)?*

*If your country has a mandatory registration/recordation system, please describe any legal sanction(s) for non-compliance.*

    *(a)    Recognition of creation?*

None of the countries surveyed have established a mandatory registration system for the purpose of recognition of creation.  It can be noted that in Argentina registration of a published national work is compulsory for the publisher and that the lack of registration does not affect the recognition of moral rights, as detailed in the corresponding response (Annex III).

    *(b)    Transfer of rights?*

The replies have shown that the recording of transfer of rights is done on a voluntary basis.  In Colombia, any contract transferring copyright or related rights shall be recorded as a condition for publicity and enforceability *vis a vis* third parties.  Also in Mexico, contracts through which economic rights  are transferred are subject to recordation.  In some countries, such as Canada, recordation of a license or assignment has a number of advantageous consequences for the rightowner.  In the United States of America, where a document that refers to registered work is recorded, recordation constitutes constructive notice of the facts stated in the document.  A recorded document also receives priority over conflicting transfers or exclusive licenses that have not been recorded**.**

    *(c)    Initiation of judicial proceedings?*

In general terms legislation in the countries concerned do not establish registration as a prerequisite or obligation for the initiation of court proceedings.

In the United States of America, registration is voluntary for initiation of proceedings related to foreign works, but it is mandatory for national works in order to institute legal action.  In such cases the court has no jurisdiction until a registration has been filed and, in certain cases, completed, as detailed in the corresponding response (Annex III).

In Canada, the registration of copyright creates certain advantages to an applicant involved in litigation including that a certificate of registration of copyright is evidence that copyright subsists and a presumption that the person registered is the owner of the copyright.

*(d)    Other changes in title/ownership (such as leasing)?*

With respect to the change of ownership, the general rule of voluntary recordation applies.  However Mexican law provides that the acts, agreements and contracts through which rights are transferred shall be recorded in Copyright Registry to have effect *vis a vis* third parties.  This requirement does not apply to mere licenses for the use of copyrighted subject matter.

*If your country has a mandatory registration/recordation system, please describe any legal sanction(s) for non-compliance*

As stated above, a mandatory registration system of copyright has not been established in any of the countries concerned.

In several countries such as Canada and the United States of America, the registration system provides, rather than legal sanctions, additional benefits.  In the United States of America registration prior to infringement or within three months of publication enables a court to award the litigant extraordinary remedies (i.e., statutory damages and attorneys fees) when the copyright owner prevails in an infringement action.The court is without jurisdiction to award such damages in the absence of timely registration although it may award actual damages, profits and other remedies.

*4.    What is the legal effect of registration?*

*(a)    Copyright?*
*(b)    Related rights?*

In general, the legal effect of registration of copyright or related rights is to establish the presumption that the facts and acts recorded are true, unless proven otherwise.

In Argentina, the legal effect of registration is to establish  a rebuttable presumption (*iuris tantum)* of authorship.  In Canada the registration of copyright, as detailed in the corresponding response, has a number of legal consequences.  It has to be noted that a certificate of registration is evidence that copyright subsists in the work and that the person registered is the owner of the copyright unless evidence to the contrary is furnished.  Moreover, where copyright is registered at the time of infringement, the defendant is deemed to have had reasonable grounds for suspecting that copyright subsisted.

In China, a copyright registration certificate is a preliminary proof of the registered items, and it has a similar effect to that of a manuscript as evidence in a court proceeding.  Registration in Colombia, both in the case of copyright and related rights,  does not create an intellectual property right.  It does, however, provide the rightholder with a means of proof of her right.

In Hungary, the certificate delivered by the collecting societies assists the authors in claiming their authorship and identification of their works in case of litigation.

In India, the Register of Copyright serves as *prima facia* evidence of the particulars recorded therein.  Certified copies are admissible evidence in all courts without further proof of production of the original.

In Japan, unless there is evidence to the contrary, the respective registered dates shall be taken as the dates of creation of the work and first publication of the same.  The registered person is presumed to be the author of the work.  Registering the transfer helps to oppose third parties claims, both regarding copyright and related rights.  In Mexico registration of copyright and related rights establishes a presumption that the facts and acts recorded are true, unless proven otherwise.  All entries exclude the rights of third parties.  In the case of dispute, the effects of registration are suspended until the competent authority reaches a final resolution

In Spain, registration provides, both for copyright and related rights,  a presumption of authorship, unless proof to the contrary is provided.  In the United States of America registration made before or within the first five years after publication provides *prima facie* evidence of the truth of the facts stated in the copyright certificate and *prima facie* evidence of the validity of the claim.  As detailed in the corresponding reply registration of renewal claims within the year before expiration of the original term is also entitled to *prima facie* evidence of the claim's validity and veracity.  Registration of a renewal claim within the year before expiration of the original term also entitles the owner to further license the use of a derivative work prepared under a previous license or transfer.

In the Philippines, registration regarding copyright and related rights is purely for the purpose of recording the date of deposit of the work and is not conclusive as to ownership or term of protection or existence of the rights.  In Germany the purpose or registration is to establish the term of copyright protection for anonymous and pseudonymous works.

*5.    Do courts in your country recognize copyright registrations effected by public authorities in other countries?  If yes, is recognition automatic or is a local procedure required to validate or otherwise give effect to the foreign registration?*

From the responses received it can be noted that, in general, courts recognize copyright registrations effected by public authorities in other countries subject, in most of the countries, to the accomplishment of various formalities.

In Argentina, in cases where a registration from another country is submitted as a means of proof, the courts shall deem it valid  once the general requirements for the acceptance of any foreign document submitted as documentary evidence have been complied with.

In Canada recognition of foreign registrations of copyright is not automatic and must be proved in Canadian courts in accordance with the rules of evidence and procedure.  However, effect will be given to copyright registered by public authorities in certain other countries by virtue of the Copyright Act which extends national copyright protection to Berne Union members , WTO Members and Universal Copyright Convention members and in other cases as detailed in the corresponding response (Annex III).

In China, the courts can decide to recognize the copyright registration.  To this effect, the relevant party shall provide, at least, a notarial deed and a verification, which may be issued by a notary public and the Embassy of the foreign country where the registration

certification has been issued.  In the Philippines, the documents shall also be authenticated as detailed in the corresponding answer (Annex III)

In Japan, courts recognize registration automatically.  In Mexico documents from abroad which are submitted for the purposes of verifying the ownership of copyright or related rights, shall not require legalization for the purposes of their registration.  Their translation, truthfulness and authenticity are the responsibility of the applicant.

There is no provision in the United States of America  copyright statute to recognize copyright registrations effected by public authorities in other countries, nor have any case been found that recognizes foreign copyright registration.  No sufficient data are available regarding court decisions in Spain on this matter.

In Hungary, registration is accepted as evidence of the existence and the date of creation and ownership of the work, due to the free system of evidence applicable in procedure laws.  There is no legal procedure to validate the registration made by foreign authorities, but it can be accepted as evidence.


III.    Procedural questions

1.    What are the requirements for registration?

(a)    Is there a deposit requirement, that is, must a fixed copy of the work be submitted with registration/recordation form?

As detailed in the corresponding responses ( Annex III) the deposit of a fixed copy of the work together with a registration form is mandatory in most of the countries concerned.  However, in Canada and Germany the applicant does not submit a copy of the work.  In Japan, this obligation only concerns computer programs.  In the Philippines the mandatory deposit relates only to certain works as detailed in the corresponding response and it may be done on a voluntary basis in other cases.

The main purpose of the deposit is to provide  evidence of the existence of the work or other subject matter over which authorship or ownership is claimed.  Deposit of the work can serve other, ancillary purposes such as the establishment of a national archive or library of the artistic and literary works published in the country concerned.


(b)    Is there a registration/recordation fee?  If so, how much is the registration/recordation fee?

In Colombia registration services are provided free of charge.  In the rest of countries the recordation fees vary widely  from one country to another, as shown in the corresponding answers in the questionnaires (Annex III).


(c)    What is the average time taken to complete the registration/recordation process?

The average time needed for registration of copyright in the different countries varies largely as detailed in the respective responses.  These differences may be largely due to the

different nature of registration in the jurisdictions concerned. In some countries, such as Canada, China, Colombia, Germany, Mexico and Japan two to four weeks are needed. At present in India, the average time taken to complete the process is five to six months but with the recent computerization of the Copyright Office, this period will be reduced to a minimum. In the United Sates of America, it takes an average of 105 days. In the Philippines, the recordation process is completed in ten days and in Hungary, Artijus registers a work in half an hour. In Spain, the maximum period established by the Registration Regulations to resolve any application for registration is six months. In Argentina, the registration of an unpublished artistic and literary work is completed at the actual time of submission. In case of published works, the time involved in the registration is estimated at one week.

2.      *Is there a different registration/recordation process for domestic as opposed to foreign works or objects of related rights?*

In all countries concerned the registration process for domestic and foreign works or objects of related rights is the same. In Colombia, as stated in the corresponding response, some specific formalities apply to the documentation requirements for registration of foreign works.

3.      *Are the files stored in digital form?*

The information submitted with the work is stored in digital format in Argentina, Canada, Germany, Mexico, Spain and the United States of America. India is in the process of digitizing the files. In Hungary, Filmjus stores the data in digital format and Artisjus does so at the request of the rightholder. In China and Japan, the information related to computer programs is stored in a digital database.

4.      *Search facility of the registration/recordation system:*

    (a)      *Does the system have a publicly available search facility? Are there restrictions on access?*
    (b)      *Is the search facility available online in real time?*

The registration systems of Argentina, Colombia ,Germany and Hungary do not have a publicly available search facility.

The Canadian Copyright office provides an Internet search facility for registrations from 1991 to date (available on line in real time) and in the search room on microfiches, microfilm or registers.

As detailed in the corresponding response the website of the CPPC contains information related to the registration of works, recordation of copyright license contracts and copyright transfers that the public can search and access on line. The CPPC is organizing this information in order to make it accessible in real time. A computer software information searching system has already been established, which covers basic information on registrations by the CPPC, but not registrations effected by local copyright administrations.

In India, search facility is available without restriction ,subject to the payment of a nominal fee, but not yet online in real time.

In Japan, search facility is publicly available without restriction regarding only computer software.  The facility is not available online in real time but information from the last six months is made available in dedicated terminals at the premises of the registering body (SOFTIC).

In the Philippines, the National Library has developed an index card search facility available to the public and the development of a computerized search facility is ongoing.

In Spain, registrations entries are public and search facility is available online in real time once the right is registered.

In the United States of America, information prior to 1978 is available for public search in the Copyright Office.  For records from 1978 to date, the online search system, as detailed in the corresponding answer, is available on real time without restriction from its website.

> *(c)    Is access granted to the fixed copy of the work registered?*
> *(d)    Does the general public have access to other documents submitted?*

As detailed in the respective answers  (Annex III), in most cases the public has no access to the fixed copy of the work registered.  Accessibility of  other related documents varies widely in the countries concerned.  In Argentina access to registered published works is guaranteed and the public may request information concerning the procedures carried out by the registering body.  In China, access is granted to the publicly available information on works registered, including the sample of a work.  As to the file of registration of computer software, the member of the public may access the electronic documentation in PDF format of the registration of software copyright.  The general public (except applicants) has no access to the other material submitted by the applicant, except the information on registration of computer software.  If inquiring about the computer software registration information, the public shall provide an acceptable reason to access to the electronic documentation in PDF format and the copy of the registered material under the supervision of the staff of the registering body.  However, the reproduction of registered material is prohibited.

In Canada, public access is limited to documentation related to registration.  The registering body does not keep copies of works.  In the Philippines, all copies of works registered and deposited, except unpublished works, are open to public inspection subject to the accomplishment of some formalities.

In Colombia, access to registered works is limited to right owners or to the person designated by judicial authorities.  In principle the public can only access, under the circumstances detailed in the corresponding response, other general documentation related to the registration.

In the United States of America, persons who are not copyright owners are granted access to works under prescribed circumstances; and under supervision they may inspect a copy of a deposited work.  Upon payment of applicable service fees, the general public may request other documents, for example, correspondence submitted in connection with registration, or application forms.  In exceptional cases, upon a showing of good cause, the Register may grant special permission to obtain access to in process files.  In Spain, access to

SCCR/13/2
page 16

the work is limited to rightowners and access to other documents is limited to people who can prove a legitimate interest.  In Germany, any person may access certain information from the Registry as detailed in the corresponding response (Annex III).  In Hungary, access to registered information varies, as explained in the corresponding response, for the two private registering entities.

5.    *Please provide statistics on following registrations/recordations:*

    (a)    *Number per statistical period (last five years)*

    (b)    *Number of inquiries/requests for information filed per statistical period (last five years).*

    Statistics are presented in Annex II .

                    [Annexes follow]

SCCR/13/2

ANNEX I

## QUESTIONNAIRE ON REGISTRATION/RECORDATION SYSTEM

### I.    INSTITUTIONAL QUESTIONS

1.    What is the name and legal status of the copyright registering/recording body in your country?

2.    Is the copyright registry interconnected to any other copyright data system?

### II.    LEGAL QUESTIONS

1.    What kind of copyright works can be registered/recorded?  Is the registration/recordation process different for each type of copyrighted work?  Please describe the differences, if any.

2.    Can the subject matter of related rights (e.g., performances, broadcasts, sound recordings) also be registered/recorded?  If yes, is there a different registration/recordation process than for works protected by copyright?

3.    Is copyright registration/ recordation mandatory or voluntary in the following circumstances?

      (a)    Recognition of creation?
      (b)    Transfer of rights?
      (c)    Initiation of judicial proceedings?
      (d)    Other changes in title/ownership (such as leasing)?

    If your country has a mandatory registration/recordation system, please describe any legal sanction(s) for non-compliance.

4.    What is the legal effect of registration?

      (a)    Copyright?
      (b)    Related rights?

5.    Do courts in your country recognize copyright registrations effected by public authorities in other countries?  If yes, is recognition automatic or is a local procedure required to validate or otherwise give effect to the foreign registration?

SCCR/13/2
Annex I, page 2

## III.  PROCEDURAL QUESTIONS

1.    What are the requirements for registration?

(a)    Is there a deposit requirement, that is, must a fixed copy of the work be submitted with registration/recordation form?
(b)    Is there a registration/recordation fee?  If so, how much is the registration/recordation fee?
(c)    What is the average time taken to complete the registration/recordation process?

2.    Is there a different registration/recordation process for domestic as opposed to foreign works or objects of related rights?

3.    Are the files stored in digital form?

4.    Search facility of the registration/recordation system:

(a)    Does the system have a publicly available search facility?  Are there restrictions on access?
(b)    Is the search facility available online in real time?
(c)    Is access granted to the fixed copy of the work registered?
(d)    Does the general public have access to other documents submitted?

5.    Please provide statistics on following registrations/recordations:

(a)    Number per statistical period (last five years)
(b)    Number of inquiries/requests for information filed per statistical period (last five years).


[Annex II follows]

SCCR/13/2
Annex II, page 1



This chart reflects the number of registrations in a five year period ; countries that did not provide this information do not appear.

SCCR/13/2

Annex II, page 2

**Copyright Registration inquiries/request of Information (five year period 1998-2002)**



This chart reflects the number of Registration inquiries/request of Information in a five year period; countries that did not provide this information do not appear.

ANNEX III

REPLIES TO THE QUESTIONNAIRE ON REGISTRATION/RECORDATION SYSTEM

ARGENTINA

I.    INSTITUTIONAL QUESTIONS

The name of the body responsible for copyright registration is the National Copyright Directorate, a National Public Administration body, attached to the Secretariat of Judicial Policy and Legislative Matters of the Ministry of Justice, Security and Human Rights of Argentina.

Registration is not interconnected with other copyright registration systems.

II.    LEGAL QUESTIONS

Scientific, literary and artistic works are registered, including writings of any kind and duration, and comprise source and object computer programs, compilations of data or other materials, dramatic works, musical and dramatico-musical compositions, cinematographic, choreographic and pantomime works, as well as works of drawing, painting, sculpture and architecture; models and works of arts or science applied to commerce or industry, printed matter, plans and maps, three-dimensional art, photographs, recordings and phonograms, and finally any scientific, literary, artistic or educational production, irrespective of its method of reproduction (Article 1 of Law No. 11.723).

It should be noted that the list contained in the Article in question is merely illustrative, and now other original creations, not expressly provided for in the Law, are registered, such as webpages, multimedia and other audiovisual works which are not cinematographic.

The registration process is basically the same for each type of work.  The form to be submitted varies and it should be noted that the required data are different according to the type of work and the number of accompanying copies, four in the case of literary works, apart from luxury editions or those with fewer than 100 copies, in which case a single copy is attached, three in the case of phonograms, and one for videograms and computer programs.

2.    Within the subject matter of related rights (performances, phonograms and broadcasts), only phonograms are registered, given that Article 1 of Law No. 11.723 includes them as protected works and the Law refers only to the registration of works.  There is no difference in the registration process between phonograms and the remaining works.

3.    The deposit of unpublished works is voluntary (Article 62 *in fine* of Law No. 11.723) and represents a means of proof of authorship and a particular date of creation.

The registration of a <u>published national work</u> is compulsory for the publisher (Article 57).  The lack of registration does not affect the exercise of the rights of paternity and integrity of the work and its defense in courts of law.  However, such a lack of registration suspends the exercise of the economic rights over the publication until such time has that requirement has been complied with (for example, a parallel edition not authorized by the author but which respects his authorship and the integrity of the work is considered lawful in the case of failure to register).

For that reason:

(a)    the creation may be recognized by any means of proof, including in the form of registration;

(b)    the transfer of rights made effective by means of contracts does not require the work to be registered.  The requirement for such registration is the duty of the parties who sign the respective contract;

(c)    the work does not need to be registered in order to launch court proceedings;

(d)    the changes in ownership based on contracts do not require the work to be registered.  The requirement for such registration is the duty of the parties who sign the respective contracts.

4.    (a)    The legal effect of registration is to constitute a presumption *iuris tantum* of authorship;

(b)    the same applies for phonograms considered to be works under Law No. 11.723.

5.    National courts do not require copyright registration from third countries bound by the Berne Convention or the Universal Copyright Convention, in order to protect the work.

In cases where an author's registration from another country is submitted as proof, the courts shall accept it once the requirements of any foreign document offered as documentary evidence, or certification of the signature and legalization, have been complied with.

III.    PROCEDURAL QUESTIONS

1.    Requirements for registration

(a)    A publisher is obliged to deposit four copies of the national edition of a literary work with the following bodies:  one copy for the National Library, another copy for the Library of the National Congress, the third for the National General Archive and the fourth, which is deposited with the National Copyright Directorate (DNDA), as a registration copy.  In the case of a luxury edition or one with fewer than 100 copies, only the registration copy is deposited.

For phonograms, three copies are deposited with the National Library, National General Archive, and a registration copy with the DNDA.

For computer programs, videograms and data compilations only the registration copy is required.

For cinematographic works, the photographs of the main scenes of the film are deposited, together with the plot, dialog or music, and also the name of the script writer, composer, director, main artists and the length of the film are given (Article 10, Decree No. 41.233/34).

In the case of sculptures, drawings and paintings a photograph is deposited together with an account of the work (Article 11, Decree No. 41.233/34).

For photographs, plans, maps and recordings, the relevant copies are deposited and, as regards non-printed dramatic or dramatico-musical works, the copy certified by the author, composer and impresario of the premises where the work was performed is deposited.

In the case of an unpublished work, a copy of the original is deposited in a closed and sealed envelope, which is deposited with the DNDA for a three-year period, said period being renewed at the author's request.

In all cases, the copy or specimen of the work must be accompanied by the respective registration form.

(b)    A registration fee does exist and is paid to the National Arts Foundation.  The amount of the fee is fixed by Resolution No. 380/91 of the Ministry of Justice, a copy of which is attached.

In addition to the fee, the user acquires the registration form.  Such forms are provided by the Cooperating Bodies, Argentinian Society of Authors and Musical Composers (SADAIC) for unpublished and published musical works and their contracts, the Argentinian Book Chamber (CAL) for published literary works and their contracts, the Argentinian Chamber of Producers of Phonograms and Videograms (CAPIF) for phonograms, or audiovisual works and their contracts, unpublished literary and artistic works and periodicals, and the Chamber of Software Companies and Services (CESSI) for computer programs, databases and their contracts.

(c)    The time involved in a registration process is as follows:  for unpublished artistic and literary works submitted to the DNDA, the process is completed at the actual time of submission (the depositor submits his work with the duplicate of the form on which the registration number and date are indicated, and he retains the original of said form with the same data).  In the case of works registered within Argentina the process is conducted by mail, for which reason its duration cannot be estimated.

In case of published works, copies of which are submitted to the Cooperating Bodies (SADAIC, CAPIF, CESSI and CAL), the period between the submission of the works and the submission of the original form with the registration number and date to the depositor is estimated at one week.

2.    Foreign works are expressly exempt from the obligation to register (Article 13 of Law No. 11.723).  In cases where publishers or foreign authors wish to register such works, the same procedure as for national works is followed and only the registration copy is required.

SCCR/13/2
Annex III, page 4

As regards phonograms, see the information provided in I.2, III.1(a), (b) and (c), and it should be noted that phonograms are considered to be works, in accordance with Article 1 of Law No. 11.723.

3.    The main data contained in the forms attached to the deposited copies are stored in digital format in the DNDA database.  The attached registration copies are deposited with the DNDA.

4.    Search facility of the registration/recordation system

     (a)    The system is operated only by DNDA staff.

     (b)    The search facility is available only to DNDA staff.

     (c)    Access to registered published works is guaranteed.  The registration copy is that submitted to the courts as evidence in case of disputes.

     (d)    The general public may request information concerning the procedures carried out with the DNDA.

5.    Statistics

     (a)    Registration of works (unpublished and published), contract and periodicals

          1998 – 57,806
          1999 – 58,174
          2000 – 59,622
          2001 – 56,092
          2002 – 50,794

     (b)    Request for information on registration (judicial advisory services and offices):

          1998 – 2,681
          1999 – 2,835
          2000 – 3,093
          2001 – 2,734
          2002 – 1,969

TARIFFS OF THE NATIONAL COPYRIGHT DIRECTORATE

Ministry of Justice Resolution No. 380/91

Article 1.  The tariffs paid to the National Copyright Directorate shall be fixed in accordance with Decree No. 993/78, in relation to the items contained in Annex I of this Resolution.

Article 2.  The new tariffs shall come into force from the date on which they are published.

1.    Works specified in Article 1 of Law No. 11.723, excluding those works subject to special taxes under this Decree.

| | |
|---|---|
| 1.1  Unpublished:  for every three years they remain deposited for safe keeping | $ 0.62 |
| 1.2  Published:  by means of printing, on the value of the works (two per thousand)<br>With a minimum rate of | 2%<br>$ 4.11 |

2.    Works of fine art:  three-dimensional works, models and any work applied to trade or industry.

| | |
|---|---|
| 2.1  Unpublished:    for every three years they remain deposited for safe keeping | $ 2.06 |
| 2.2  Published：    by means of printing, on the commercial value of the publication (four per thousand)<br>With a minimum rate of | 4%<br>$ 10.28 |
| 2.3  Where the value cannot be determined, a fixed fee shall be paid of | $ 20.56 |

3.    Published works:  by means of public or stage, radio or television performance

| | |
|---|---|
| 3.1  Musical works | $ 1.03 |
| 3.2  Theatrical works:  for profit-making purposes | $ 2.06 |
| 3.3  Theatrical works:  for non-profit purposes | $ 0.62 |
| 3.4  Works of commercial advertising | $ 20.56 |

4.    Cinematographic works

SCCR/13/2
Annex III, page 6

| | |
|---|---|
| 4.1  Published:  on industrial cost (three per thousand) | 3% |
| 4.2  Published:  for national production of newsreels, cartoons, with minimum duration of two acts (two per thousand)<br>With a minimum rate of | 2%<br>$ 20.56 |
| 4.3.  Published:  for national educational production (one per thousand)<br>With a minimum rate of | 1%<br>$ 10.28 |

5.      Discs and works embodied by means of recording, perforation or electromagnetic processing (discs, perforated music, tapes, reels, magnetic wires or similar procedures)

| | |
|---|---|
| 5.1  Of common type with two recorded works | $ 1.03 |
| 5.2  With four recorded works | $ 2.06 |
| 5.3  With more than four recorded works | $ 6.17 |

6.      Periodicals (newspapers, journals and periodicals published in the country, registration renewable annually according to number of copies)

| | |
|---|---|
| 6.1  Up to 5,000 copies | $ 6.17 |
| 6.2  5,001 to 50,000 copies | $ 10.28 |
| 6.3  50,001 to 100,000 copies | $ 20.56 |
| 6.4  More than 100,000 copies | $ 102.79 |

7.      Legal and other administrative proceedings

| | |
|---|---|
| 7.1  Registration of general or special powers | $ 2.06 |
| 7.2  Rules or lists of members, societies or associations representing authors or their right holders | $ 4.11 |
| 7.3  Contracts, one per cent of that amount.<br>Shares of less than ten cents shall not be calculated.<br>Where a contract has a fixed and a non-fixed portion, one per cent will be paid on the fixed portion, with a minimum rate of | $ 4.11 |
| 7.4  Contracts where the value is not expressed or it is impossible to determine it | $ 6.17 |
| 7.5  Registration of pseudonyms | $ 2.06 |
| 7.6  For a statement of certificate of registration of each | |

| | |
|---|---|
| work or of each unpublished work deposited, at the request of the courts or interested party | $ 0.41 |
| 7.7  For the annotation of seizures or inhibitions or the lifting thereof | $ 1.03 |
| 7.8.  For the recording of acts subsequent to registration, not covered by points 7.6 and 7.7 | $ 0.62 |
| 7.9  For the dispatch of certificates for each registered contract | $ 1.03 |
| 7.10  For all information requested or consultations on titles of periodicals, number of editorials, registered works or pseudonyms (for each title or name consulted) | $ 0.41 |
| 7.11  For entry in the Register of Publishers | $ 4.11 |
| 7.12  For annotation in the Register of Foreign Works (on the commercial value) 0.2 per cent<br>With a minimum rate of | 2%<br>$ 4.11 |
| 7,13  For each photocopied sheet dispatched, a fixed fee will be charged of | $ 0.12 |
| 7.14  For opening an envelope of an unpublished work and drawing-up of a certificate | $ 0.21 |
| 7.15  For the return of an unpublished work and drawing-up of a certificate | $ 0.21 |
| 7.16  For any other procedure not previously provided for a fee will be charged of | $ 1.03 |

CANADA

## I    INSTITUTIONAL QUESTIONS

1.    What is the name and legal status of the copyright registering/recording body in your country?

In Canada, the Copyright Office is responsible for registering copyright.  The Copyright Office is attached to the Canadian Patent Office and is under the jurisdiction of the Department of Industry, Government of Canada.

2.    Is the copyright registry interconnected to any other copyright data system?

No.

## II    LEGAL QUESTIONS

1.    What kind of copyright works can be registered/recorded? Is the registration/recordation process different for each type of copyrighted work?  Please describe the differences, if any.

The following kinds of copyright works may be registered in Canada:

* literary
* musical
* artistic
* dramatic

The registration process is the same for each of the above-mentioned works.

2.    Can the subject matter of related rights (e.g. performances, broadcasts, sound recordings) also be registered/recorded?  If yes, is there a different registration/recordation process than for works protected by copyright?

The following kinds of related rights may be registered in Canada:

* performer's performance
* sound recordings
* communication signals

The registration process is the same for each of the above-mentioned related rights.

3.    Is copyright registration/recordation mandatory or voluntary in the following circumstances?

(a)    Recognition of creation?
(b)    Transfer of rights?
(c)    Initiation of judicial proceedings?
(d)    Other changes in title/ownership (such as leasing?)

Recognition of creation in Canada does not depend on registration or any other formal act.  Copyright subsists automaticaly without any act beyond the creation of an original literary, musical, dramatic or artistic work in the circumstances set out in section 5 of the *Copyright Act.*

Registration of copyright or an assignment of copyright, or a licence granting an interest in copyright or granting a security interest is permissive and not compulsory in Canada.  However, the registration of copyright, an assignment or licence will have a number of consequences under the Canadian *Copyright Act*, which are advantageous to the copyright owner.

Registration of copyright is not required for the initiation of judicial proceedings.  However, the registration of copyright creates certain advantages to an applicant involved in litigation including that a certificate of registration of copyright is evidence that copyright subsists and a presumption that the person registered is the owner of the copyright.

4.    What is the legal effect of registration?

(a)    Copyright?
(b)    Related rights?

The registration of copyright also has a number of legal consequences under the Canadian *Copyright Act,* which are advantageous to the copyright owner, including:

(a)    Admissibility of copies - a certified copy of an entry on the Register of Copyrights is admissible in courts in Canada without further proof or production of originals.

(b)    Certificate of Registration as Evidence - A certificate of registration of copyright is evidence that copyright subsists in the work and that the person registered is the owner of the copyright, unless evidence to the contrary is furnished.  In the absence of registration, the presumptions set out in the *Copyright Act* relating to ownership apply.  Specifically, the Canadian *Copyright Act* provides, subject to certain exceptions[1], that the author, performer, maker, or broadcaster, as the case may be, is the first owner of copyright.

(c)    Certificate of Registration as Notice - Where copyright is registered at the time of infringement, the defendant is deemed to have had reasonable grounds for suspecting that copyright subsisted.

5.    Do courts in your country recognize copyright registrations effected by public authorities in other countries?  If yes, is recognition automatic or is a local procedure required to validate or otherwise give effect to the foreign registration?

---

[1]   The exceptions include engravings, photographs or portraits, works made in the course of employment and works created by or for the Federal Crown

Recognition of foreign registrations of copyright is not automatic in Canada and must be proved in Canadian courts in accordance with the rules of evidence and procedure. However, effect will be given to copyright registered by public authorities in certain other countries by virtue of Section 5 of the *Copyright Act* which extends national copyright protection to Berne Convention countries, WTO Members and UCC countries and also extends protection to works which may not have been protected previously when a country becomes a Berne Convention country or a WTO member.   The Minister of Industry may also extend the benefit of the *Copyright Act* and copyright protection to countries that are not a Berne Convention country, WTO Member or UCC country.


III    PROCEDURAL QUESTIONS

1.    What are the requirements for registration?

(a)    Is there a deposit requirement, that is, must a fixed copy of the work be submitted with registration/recordation form?

(b)    Is there a registration/recordation fee?  If so, how much is the registration/recordation fee?

(c)    What is the average time taken to complete the registration/recordation process?

(i)    No, the copyright office does not accept copies of the works
(ii)    Yes, there is.  If applied on line fee is $50.00, by mail or fax it is $ 65.00 per work.
(iii)    2 to 4 weeks, when application is complete

2.    Is there a different registration/recordation process for domestic as opposed to foreign works or objects of related rights?


No

3.    Are the files stored in digital form?

Yes, they are

4.    Search facility of the registration/recordation system:

(a)    Does the system have a publicly available search facility?  Are there restrictions on access?

(b)    Is the search facility available online in real time?

(c)    Is access granted to the fixed copy of the work registered?

(d)    Does the general public have access to other documents submitted?

(i)    Yes public can search on Internet for registrations from 1991 to date and in the search room on microfiches, microfilm or registers. There o restrictions on access.

SCCR/13/2
Annex III, page 11

(ii)    Yes, but only from 1991 to date.

(iii)   No because we don't keep copies of the works.

(iv)    Public have access only to what is in the register.

5.    Please provide statistics on followings registrations/recordations:

(a)    Number per statistical period (last five years)
(b)    Number of inquiries/requests for information filed per statistical period
(last five years)

From January 1, 1999 to January 1, 2004

(a)    15403

(b)    2035

CHINA


I.    INSTITUTIONAL QUESTIONS

1.    What is the name and legal status of the copyright registering/recording body in your country?

        In China, the copyright registering/recording bodies are China Copyright Protection Center, the provincial copyright administrations, and the copyright administrations in the autonomous regions and the municipalities directly under the central government as well as the registering/recording institutions designated by them.

        China Copyright Protection Center is an institution under the National Copyright Administration of China (NCAC). It is entrusted by NCAC to take care of the registration of copyright of computer software and other works. The provincial copyright administrations in various provinces, autonomous regions and municipalities under the central government are responsible for the registration of copyright of various works except computer software in their region.

        Regulations on Computers Software Protection promulgated by the State Council of the People's Republic of China provides that a software copyright owner may register with the software registration institution recognized by the copyright administration department of the State Council.  Measures of Registration of Computers Software issued by the NCAC in 2002 designated the China Copyright Protection Center as the software registration institution.

2.    Is the copyright registry interconnected to any other copyright data system?

        No.


(a)    LEGAL QUESTIONS

1.    What kind of copyright works can be registered/recorded? Is the registration/recordation process different for each type of copyrighted work? Please describe the differences, if any.

        All kinds of copyright works provided for under Article 3 Chinese Copyright Law can be registered. The registration process of computer software is different from other type of copyrighted work. According to Regulations on Computers Software Protection, not only the computer software copyright, but also the exclusive licensing contract or a transfer contract of software copyright may be registered with the software registration institution recognized by the copyright administration department of the State Council. The registration of computer software copyright, the exclusive licensing contract or a transfer contract of software copyright is carried out independently in accordance with Regulations on Computers Software Protection and Measures of Registration of Computers Software while the registration of other type of copyrighted work follows the procedure provided for in Measures of Voluntary Registration of works issued by NCAC in December 1994.

It should be noted that both Measures of Registration of Computers Software and Measures of Voluntary Registration of works are the departmental regulations released by the NCAC.

2.    Can the subject matter of related rights (e.g., performances, broadcasts, sound recordings) also be registered/recorded? If yes, is there a different registration/recordation process than for works protected by copyright?

There is no relevant provision in the Chinese Copyright Law and Measures of Voluntary Registration of works on the registration of the subject matter of related rights so far. However, the new Measures of Registration of Works or the amendment to the current Measures is under the consideration, which may refer to this aspect.

3.    Is copyright registration/recordation mandatory or voluntary in the following circumstances?

(a)    Recognition of creation?
(b)    Transfer of rights?
(c)    Initiation of judicial proceedings?
(d)    Other changes in title/ownership (such as leasing)?

In China, copyright emerges automatically when the work is created. There is no requirement of any formalities such as registration as the basis of copyright protection. Therefore, copyright registration/recordation in the above four circumstances is completely voluntary. Right owners or contract parties, on the voluntary basis, do copyright registration/recordation of various categories of works, including computer software as well as an exclusive licensing contract or a transfer contract of software copyright, through the application.

4.    What is the legal effect of registration?

The legal effect of registration is as follows:

A copyright registration certificate issued by the copyright registration institution is a preliminary proof of the registered items, and it has the similar effect as the manuscript, original copy, publication of a work or the contract of rights business, which can be used as a proof of evidence to the court. It is also the requested attachment to be submitted together with other documents for the application of copyright recordation in the Customs.

5.    Do courts in your country recognize copyright registrations effected by public authorities in other countries? If yes, is recognition automatic or is a local procedure required to validate or otherwise give effect to the foreign registration?

It depends on courts decision. To make the copyright registration recognized by the court, the relevant party shall provide, at least, a notarial deed and a verification, which may issued by notary public and the Embassy of that foreign country in China respectively, of the authenticity of the registration certification issued by public authorities in other country.

## II.    PROCEDURAL QUESTIONS

1.    What are the requirements for registration?

    (a)    Is there a deposit requirement, that is, must a fixed copy of the work be submitted with registration/recordation form?

    Yes, there is a deposit requirement. A copy of the work, either fixed on paper media, or in electronic version, or on audiovideo material, is required to be submitted with registration form.

    (b)    Is there a registration/recordation fee? If so, how much is the registration/recordation fee?

    The registration fee of computer software copyright is paid according to the standard approved by relevant government authority, and no difference between Chinese and foreign copyright owners. The registration fee of software copyright is RMB300 per piece (application fee RMB250, certification fee RMB50); registration fee of software copyright contract is RMB30 per piece (application fee RMB300, certification fee RMB 50).

    There is no unified criterion of registration fee on the registration/recordation of other works, since the registration/recordation has been done by the China Copyright Protection Center, the local copyright administrations and the institutions designated by them respectively. The coordination on this issue and unification of the criterion is under the consideration of the copyright Administration now.

    (a)    What is the average time taken to complete the registration/recordation process?

    According to Measures of Voluntary Registration of works, it takes 1 month to complete the registration process, starting from the time when all required registration material has been received by the registration institution.

    According to Measures of Registration of Computers Software , it needs 60 days to approve and complete the registration process, however, in practice, the average time to complete the registration process generally is controlled to be within 30 days.


2.    Is there a different registration/recordation process for domestic as opposed to foreign works or object of related rights?

    No, there is no difference.


3.    Are the files stored in digital form?

    No, the files are not stored in digital form yet except the computer software. Referring to the computer software, there is an established information system consisting the electronic documentation in PDF format and basic information of registration of computer software copyright.

4.      Search facility of the registration/recordation system:

Does the system have a publicly available search facility? Are there restrictions on access?

The website of the China Copyright Protection Center (CPPC) includes the irregular updated information concerning the registration of copyright of works, recordation of copyright license contract and copyright transfer contract to which the general public can easily access.

Currently, the CPPC has primarily established a complete Computer Software Copyright Registration Information Searching System, which unloaded basic information on the registration of computer software from 1992 to 2000 to the Internet for the public to use, and there is no restriction on access.

It should be noted that the information offered by CPPC only includes the information on registration of computer software and other works prosecuted by the CPPC, not include the information on registration of works (except computer software) prosecuted by the local copyright administrations. And there is no interconnection between the data system of those copyright registries yet.

a)      Is the search facility available online in real time?

No.  However, the basic information of copyright registration filed in the CPPC can be searched in real time, and the search facility will be available online in real time with the establishment and improvement of the registration/recordation information system.

b)      Is access granted to the fixed copy of the work registered?

The access is granted to the publicly available information on works registered, including the sample of a work.

As to the file of registration of computer software, the member of the public shall come to the CPPC and fulfill the formality required by the CPPC to have an access to the electronic documentation in PDF format of the registration of software copyright. This is aim to keep secrete of the content of software in the relevant material submitted to the Registry.

a)      Does the general public have access to other documents submitted?

The general public (except applicants) has no access to the other material submitted by the applicant, except the information on registration of computer software. If inquiring about the computer software registration information, the public shall present the acceptable reason to the CPPC to have an access to the electronic documentation in PDF format of the registration of software copyright and the copy of the registered material under the supervision of the staff of the CPPC, however, the reproduction of registered material is prohibited.

5       Please provide statistics on following registrations/recordations:

    a)      Number per statistical period (last five years)
    As the local copyright administrations also handle the registration of copyright of works in their region and the data system between them and the CPPC is not connected, the number of nationwide registration is not available currently. The interconnection between the data systems of various Registries is under the preparation now.

    According to the CPPC, the number of registration of works (except computer software) from foreign countries, Hong Kong, Macao and Taiwan is about 1000 piece or series since June 2000.

    As to the computer software, the number is 35,000 pieces covering both international and national applications since 1992 when the Registration system of Computer Software is established. The number of last five years is as follows:

| Year | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| Number of pieces | 997 | 1577 | 3383 | 7293 | 8909 |

    a)      Number of inquired/requests for information filed per statistical period (last five years).

    According to the CPPC, the public started to have access to the information filed on the registration of software copyright since 1992. The number of the public inquiring the information on registration of other works increased rapidly after the information on the registration of software copyright has been uploaded on to the Internet. The inquires directly addressed to the CPPC requesting the registration file of computer software or the electronic documentation in PDF format of registered software and requesting the search report issued by the CPPC is about 2000 pieces, and the number of the last five years is as follows:

| Year | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| Number of pieces | 97 | 42 | 121 | 270 | 450 |

COLOMBIA

## I.    INSTITUTIONAL QUESTIONS

1.    What is the name and legal status of the copyright registering/recording body in your country?

In Colombia the name of the system is National Register of Copyright.

The National Register of Copyright of Colombia is a duty entrusted to the Special Administrative Unit of the National Directorate of Copyright (hereinafter DNDA), a public-law body attached to the Ministry of Interior and Justice.

2.    Is the copyright registry interconnected to any other copyright data system?

The National Register of Copyright of Colombia, under the authority of the DNDA, is not interconnected to any other copyright databases.

## II.    LEGAL QUESTIONS

1.    What kind of copyright works can be registered/recorded?  Is the registration/recordation process different for each type of copyrighted work?  Please describe the differences, if any.

Type of works:

The protection provided by the applicable copyright and related rights legislation in Colombia, with respect to protected works, covers all the literary and artistic works which may be reproduced or disclosed in any form or by any means known or to be made known. The works referred to in Article 4 of Decision 351 of the 1993 Common Provisions on Copyright and Neighboring Rights of the Andean Community of Nations are those which are entered in the National Register of Copyright, as listed below:

   (a)   *Works expressed in writing, that is books, pamphlets and any other kind of work expressed in letters, signs or conventional marks;*

   (b)   *Lectures, addresses, sermons and other works of the same nature;*

   (c)   *Musical compositions with or without words;*

   (d)   *Dramatic and dramatico-musical works;*

   (e)   *Choreographic and mimed works;*

   (f)   *Cinematographic works and other audiovisual works expressed by any process;*

   (g)   *Works of fine art, including drawings, paintings, sculptures, engravings and lithographs;*

SCCR/13/2
Annex III, page 18

(h)    *Works of architecture;*

(i)    *Photographic works and those expressed by processes analogous to photography;*

(j)    *Works of applied art;*

(k)    *Illustrations, maps, sketches, plans, diagrams and three-dimensional works relating to geography, topography, architecture or science;*

(l)    *Computer programs or software;*

(m)    *Anthologies or compilations of assorted worksand also databases which, by the selection and arrangement of their contents, constitute personal creations.*

Recordation process

As regards the recordation process, it is relevant to a state that this is governed by Decree 460 of 1995[6], in which it is stipulated that the registration of literary and artistic works with the DNDA, in relation to the above-mentioned works, is identical for each work, although the requirements for the entry of each work vary according to the category.

Article 8 of Decree 460 of 1995 states that, in order to enter literary and artistic works in the National Register of Copyright, the interested party shall observe the formats produced for that purpose by the DNDA, in which the following information shall be provided:

(a)    *The name, nationality, identification document and habitual residence of the author or authors of the work, and also the date of the death and pseudonym where this is applicable.*

*In relation to pseudonymous works, the name of the publisher entitled to exercise the author's economic rights shall be stated, unless the pseudonym is registered in accordance with the provisions relating to the civil status of persons, in which case the rights shall belong to the author.  In this event, a copy of the individual declaration of the pseudonym made to a notary shall be attached.*

*For anonymous works, it shall only be necessary to indicate the name of the publisher who shall exercise the rights until the author decides to emerge from anonymity;*

(b)    *Title of the work and previous works, where applicable;*

(c)    *An indication should be given as to whether the work is unpublished or published, original or derived, individual or collective, produced in collaboration, a translation, and in general any character which it may possess;*

(d)    *Year of creation;*

---

[6]  Governing the National Register of Copyright and Regulating Statutory Deposit

*(e)    Name, nationality, identification document and usual address of the applicant, stating whether he is acting on his own behalf or as a representative of another person, in which case proof of his representation shall be attached;*

*(f)    Where an entry is to be made for an owner of economic rights other than the author, his name or trade name shall be mentioned, according to the case, and the document providing proof of how he acquired such rights shall be supplied.*

■    Additional requirements

If the request for registration relates to published literary works, including computer programs, audiovisual works or phonograms, a copy of the work or production shall be submitted to the DNDA Registration Office (Article 8(2) of Decree 460 of 1995).

Published literary work:  where the literary work is published, the following shall be indicated (Article 9 of Decree 460 of 1995).

*(a)    Date and country of its first publication;*

*(b)    Name or firm name of the publisher and printer, and also his address;*

*(c)    Publication number and print run;*

*(d)    Size, number of pages, ordinary or deluxe edition and other circumstances helping to identify the work perfectly.*

Unpublished literary work:  where the literary work is unpublished, the DNDA Registration Office shall be supplied, together with the appropriate registration format, with a copy of the work, without amendments, mutilations, marks or interline notes, and shall be duly bound.  If the work is a manuscript, this shall be attached in a clear and legible form (Article 10 of Decree 460 of 1995).

Musical work:  in the case of a musical work with or without words, the type and musical rhythm to which the music belongs shall also be mentioned, and a copy of the score, and where appropriate the words, attached (Article 11 of Decree 460 of 1995).

Audiovisual work:  in relation to audiovisual works (Article 12 of Decree 460 of 1995), in addition to what is mentioned in Article 8 of Decree 460 of 1995, the following should be indicated:

*(a)    The name and address of the director, author of the script or libretto, author of the musical work and author of the drawings in the case of an animated film;*

*(b)    Name and address of the audiovisual producer;*

*(c)    The name of the main artists;*

*(d)    Nationality, end date, length and duration;*

*(e)    A brief account of the plot, dialogue, scenario and music.*

Artistic work:  for the registration of artistic works (Article 13 of Decree 460 of 1995), such as pictures, sculptures, paintings, drawings, engravings, photographic works and those expressed by processes analogous to photography, in addition to the information requested in Article 8 of Decree 460 of 1995, a complete and detailed description shall be made in writing of the work to be registered, so that it may be distinguished from another work of the same kind.  In addition to the registration format, as many photographs as are necessary to identify it perfectly or a copy of the work shall be attached.

Works of architecture, engineering, maps, sketches and three-dimensional works relating to geography, engineering, topography and architecture or the sciences in general (Article 14 of Decree 460 of 1995):  mention shall be made, in addition to the information requested in Article 8 of Decree 460 of 1995, of the class of work in question and a description of the characteristics identifying the work also given.  Similarly, as many photographs as are necessary to identify its essential elements or a copy of the work shall be attached.

Dramatic work:  for the registration of works in scenes such as theater plays, mimed works, choreographic, dramatic or dramatico-musical works (Article 15 of Decree 460 of 1995), in addition to the provisions of Article 8 of Decree 460 of 1995, the format already established by the National Directorate of Copyright shall include details of the class of work in question, its duration and a brief description of its content.  In addition to that information, a written extract or summary of the work or a copy of it shall be attached, as appropriate.

Software:  for the purposes of entry in the National Register of Copyright of computer programs, one of the following three items shall be attached:  (i)  the computer program;  (ii) additional material; or (iii) a description of the program.

2.    Can the subject matter of related rights (e.g. performances, broadcasts, sound recordings) also be registered/recorded?  If yes, is there a different registration/recordation process than for works protected by copyright?

Phonograms are entered in the National Register of Copyright of Colombia.  The difference with the registration process for the literary and artistic works described in the previous section varies depending on the information provided.

In accordance with Article 16 of Decree 460 of 1995, for the registration of phonograms the pre-established format designed for that purpose by the DNDA must be submitted and must contain the following information:

(a)    *Title of the phonogram;*

(b)    *Name, identification and address of the phonographic producer;*

(c)    *Year of first fixation;*

(d)    *Title of the works fixed on the phonogram and their authors;*

(e)    *Name of the artists or performers;*

(f)    *Indication of whether the phonogram is published or unpublished;*

*(g)    Name, identification document and habitual residence of the applicant, stating whether he is acting on his own behalf or as a representative of another person, in which case proof of his representation shall be attached.*

3.    Is copyright registration/recordation mandatory or voluntary in the following circumstances?

(a)    Recognition of creation?

In accordance with Decision 351 of 1993 of the Andean Community of Nations and Law No. 23 of 1982 (Article 9), it is established that the registration with the DNDA of works and other productions covered by copyright and neighboring rights does not itself confer rights nor is it compulsory;  consequently, the fact that a work is not registered is not an obstacle in stating that it is not protected, since the failure to register does not prevent the enjoyment and exercise of rights.

That being the case, the registration of works in Colombia is not compulsory.  In accordance with Articles 52 and 53 of Andean Decision 351 of 1993, the registration of works does not itself confer rights other than a merely declaratory right, as specified by the relevant rules in the following terms:

*"Article 52.- The protection afforded to literary and artistic works, performances and other productions covered by copyright and neighboring rights, in accordance with this Decision, shall not be subject to any kind of formality.  Consequently, failure to register shall not prevent the enjoyment or exercise of the rights recognized in this Decision".*

*"Article 53.- Registration shall be merely declaratory and shall not itself confer rights. Nevertheless, entry in the Register shall constitute a presumption that the facts and acts recorded in it are true, in the absence of proof to the contrary.  Any entry shall be without prejudice to the rights of third parties".*

(b)    Transfer of rights?

The instruments and contracts relating to copyright and related rights must be entered in the National Register of Copyright as a condition of publicity and enforceability on third parties, as specified by Article 6 of Law 44 of 1993 which states:

*"Any instrument by which copyright or neighboring rights are disposed of, and any other instrument or contract associated with such rights, shall be entered in the National Register of Copyright as a condition of publicity and enforceability on third parties".*

(c)    Initiation of judicial proceedings?

Not compulsory.

(d)    Other changes in title/ownership (such as leasing)?

Not compulsory.

(e)    If your country has a mandatory registration/recordation system, please describe any legal sanction(s) for non-compliance.

Not applicable.

4.    What is the legal effect of registration?

(a)    Copyright?
(b)    Related rights?

For both copyright and related rights, the effect of registration is to provide the owners of copyright and related rights with a declaratory means of proof that does not itself confer rights, as per Article 53 of Andean Decision 351 of 1993.

5.    Do courts in your country recognize copyright registrations effected by public authorities in other countries?  If yes, is recognition automatic or is a local procedure required to validate or otherwise give affect to the foreign registration?

Article 230 of the Political Constitution of Colombia states that in their rulings judges shall be subject only to the rule of law, such that, in order to accept a means of proof, it must satisfy the requirements established by the law.

In this connection, the public documents granted in a foreign country, as a form of registration of copyright or related rights, issued by a public official or with his participation, must be submitted having been duly authenticated by the consular officer or diplomatic agent of the Republic of Colombia and, failing that, by the same person from a friendly nation, as a result of which it is presumed that they have been granted in accordance with the law of the respective country.  The signature of the consular officer or diplomatic agent shall be guaranteed by the Ministry of Foreign Affairs of Colombia and, in the case of consular officers of a friendly country, shall be authenticated in advance by the competent official of that country and, those of the other country, by the Colombian consular officer (Article 259 of the Code of Civil Procedure).

If the country which issues such a document is party to the European Convention on the Abolition of Legalization of Documents executed by Diplomatic Agents or Consular Officers"[7], adopted in the Hague on October 5, 1961, it shall attach only the certificate of authentication.

III.    PROCEDURAL QUESTIONS

1.    What are the requirements for registration?

See response to II.1

---

[7]Convention on the Abolition of Legalization of Documents executed by Diplomatic Agents or Consular Officers, adopted in the Hague on October 5, 1961, which was approved by the Republic of Colombia in Law 455 of August 4, 1998.

(a)    Is there a deposit requirement, that is, must a fixed copy of the work be submitted with the registration/recordation form?

For all registration applications, a copy of the work or a copy in the case of phonograms must be submitted.

(b)    Is there a registration/recordation fee?  If so, how much is the registration/recordation fee?

Registration processing is free of charge.

(c)    What is the average time taken to complete the registration/recordation process?

The duration of processing is fifteen (15) working days from the day following the filing of the application.


2.    Is there a different registration/recordation process for domestic as opposed to foreign works or objects of related rights?

(a)    For the registration of the agreements or contracts concluded by Colombian collective management societies with their foreign counterparts, it will be necessary to submit an authentic copy of the document.  If the instrument to be registered were adopted abroad or in a language other than Spanish, the relevant requirements as determined by the Code of Civil Procedure shall be observed.

(b)    For the registration of general powers, if the power were granted abroad or in a language other than Spanish, the relevant requirements established by the Code of Civil Procedure shall be observed.

3.    Are the files stored in digital form?
Search facility of the registration/recordation system:
Does the system have a publicly available search facility?  Are there restrictions on access?
Is the search facility available online in real time?

Such a possibility does not currently exist.

Is access granted to the fixed copy of the work registered?

The reproduction (copying) of published or unpublished works and consultation of registered unpublished works may only be carried out by the authors of those works, by their lawful successors who have proof of their status, and by the judicial authorities or any party authorized to do so by the authors.

(d)    Does the general public have access to other documents submitted?

Only a copy of the registration.  A copy of the unpublished work is received only by the author and provided this is expressly stated in the application.  As regards the copies of registered contracts, a copy shall be received only where this is expressly requested for the purposes of publicity and enforceability on third parties.

5.    Please provide statistics on the following registrations/recordations.

| SUMMARY REGISTRATION OF WORKS (1997 – *2003) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Class of Works | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | *2003 |
| Published works | 842 | 786 | 1,040 | 853 | 746 | 860 | 608 |
| Unpublished works | 3,283 | 3,801 | 6,554 | 6,201 | 5,653 | 6,089 | 4,675 |
| Unpublished works | 1,281 | 1,458 | 1,978 | 1,667 | 1,309 | 1,321 | 1,164 |
| Artistic and musical | 2,627 | 3,192 | 3,257 | 3,628 | 4,644 | 5,884 | 4,760 |
| Audiovisual | 28 | 35 | 41 | 35 | 75 | 147 | 98 |
| Phonograms | 306 | 323 | 208 | 415 | 343 | 544 | 543 |
| Software | 255 | 728 | 529 | 495 | 610 | 802 | 556 |
| TOTAL | 8,622 | 10,323 | 13,607 | 13,294 | 13,380 | 15,647 | 12,404 |

    *2003 Registration of works up to September 2003

GERMANY

## I.    INSTITUTIONAL QUESTIONS

1.    What is the name and legal status of copyright registering/recording body in your country?

For anonymous and pseudonymous works there is a register called "Register of anonymous and pseudonymous works."  It is kept at the Patent Office (*Deutsches Patent – und Markenamt*) since September 17, 1965 pursuant to §§ 138(1) and 66 of the German Copyright Law (*Gesetz über Urheberrecht und verwandte Schutzrechte – Urheberrechtsgesetz*).

2.    Is the copyright registration interconnected to any other copyright data system?

No.

## II.    LEGAL QUESTIONS

1.    What kind of copyright works can be registered/recorded?  Is the registration/recordation process different for each type of copyright work?  Please describe difference, if any.

2.    Can the subject matter of related rights (e.g. performances, broadcasts, sound recordings) also be registered/recorded?  If yes, is there a different registration/recordation process than for works protected by copyright?

3.    Is the copyright registration/recording mandatory or voluntary?

4.    What is the legal effect of registration?

In Germany, copyright protection in principle exists from the point of creation of the work and is not subject to any formality.  Therefore, no registration is required.  The mentioned register is for anonymous and pseudonymous works.  Only protected literary, scientific and artistic works, that have been established as anonymous or pseudonymous works, can be registered.  There is not differentiation by type of work.  The registration is voluntary.  The only purpose of the register is to apply the regular duration of copyright protection to anonymous and pseudonymous works.

The relevant provisions of German Copyright Law read as follows (non-official translation):

Article 66.  Anonymous and Pseudonymous Works

(1)    In the case of anonymous and pseudonymous works, copyright shall expire 70 years after publication.  However, it shall expire as soon as 70 years after creation of the work if the work was not published within that time limit.

(2)  If the author discloses his identity within the time limit specified in paragraph (1), first sentence, or if the pseudonym assumed by the author leaves no doubt as to his identity, the duration of copyright protection shall be calculated in accordance with Articles 64 and 65. The same shall apply if within the time limit specified in paragraph (1), first sentence, the true name of the author is submitted for entry in the Register of anonymous and pseudonymous works (Article 138).

(3)  The author, or after his death his legal successor (Article 30) or the executor (Article 28(2)), shall be entitled to perform the actions under paragraph (2).

Article 138 Register of Anonymous and Pseudonymous Works

(1)  The Register of anonymous and pseudonymous works for the entries set out in Article 66(2), second sentence, shall be kept at the Patent Office. The Patent Office shall effect the entries without verifying the applicant's entitlement or the accuracy of the information submitted for entry.

(2)  If entry is refused, the applicant may petition for a decision by the courts. The petition shall be heard by the Provincial High Court having jurisdiction for the district in which the Patent Office has its headquarters and which shall give a reasoned decision. The petition shall be made in writing to the Provincial High Court. The decision of the Provincial High Court shall be final. In other respects, judicial procedure shall be governed by the provisions of the Law on Matters of Voluntary Jurisdiction. The courts costs shall be governed by the Regulations on Costs; the fees shall be determined by Article 131 of the Regulations on Costs.

(3)  The entries shall be published in the Bundesanzeiger. The cost of publication shall be paid in advance by the applicant.

(4)  Any person may inspect the Register of Authors. Extracts from the Register shall be issued on request.

(5)  The Federal Minister for Justice shall be empowered to issue statutory orders

1.  regulating the form of the application and the maintenance of the Register of Authors;

2.  ordering the imposition of charges (fees and expenses) to cover administrative costs relating to the entry, the issuing of a certificate of entry and the issuing of other extracts or their certification, and regulating matters concerning the party liable for costs, the time at which charges are due, the obligation of payment in advance, exemption from charges, limitation,, the procedure for the fixing of charges, and legal remedies against the fixing of charges.

(6)  Entries made with the Leipzig City Council under Article 56 of the Law on Copyright in Works of Literature and Music of June 19, 1901, shall remain effective.

5.    Do courts in you country recognize copyright registrations effected by public authorities in other countries?

Under German Copyright Law no registration, fixation or application is required. That is why there is no room for validation of foreign registrations.  Regular rules for proof of evidence apply and parties may also use foreign registrations as - disprovable - evidence for circumstances in dispute.


III.    PROCEDURAL QUESTIONS

1.    What are the requirements for registration?

(a)    Is there a deposit requirement, that is, must a fixed copy of the work be submitted with registration/recordation form?

There is no deposit requirement.  The applicant does not submit a copy of the work.

(b)    Is there a registration/recordation fee?  If so, how much is the registration/recordation fee?

Under Article 5 of the statutory order regarding the register of anonymous and pseudonymous works registration fee is 12 Euro per work.  If the author applies for registration of several works at the same time, registration fee is reduced as follows:

| | |
|---|---|
| First work | 12 Euro |
| Second to tenth work | 5 Euro per work |
| From eleventh work on | 2 Euro per work |

The cost of publication as well as the cost of registration certification are paid by the applicant.  At the time being a registration certification is 15,50 Euro.

(c)    What is the average time taken to complete the registration/recordation process?

If applicant provides all necessary information and pays the cost of publication in advance, application may be completed within roundabout two weeks.  In reality missing information and payments extend time of application.

2.    Is there a different registration/recordation process for domestic as opposed to foreign works?

There is no different registration process for foreign works, that are protected in Germany.

3.    Are files stored in digital form?

The register itself is kept in digital form since January 1, 2002, in addition to the paper based version.  The files regarding the procedure of application are not digitalized.

4.    Search facility of the registration/recordation system:

SCCR/13/2
Annex III, page 28

Any person may inspect the register and ask for an extracts from the register.  There is no publicly available or online search facility.  If you look at the numbers in answer to question III.5., it becomes obvious, that there is no need for such facilities. Fixed copies are not submitted to the register.

5.    Please provide statistics on following registrations/recordations:

In the last 5 years less than 100 works have been registered.  From that figure you may see, that this register is of minor importance.

HUNGARY

## I.    INSTITUTIONAL QUESTIONS

1.    What is the name and legal status of the copyright registering/recording body in your country?

There is no central copyright registering body in Hungary.  The works can be registered in the database of the collecting societies (Society Artisjus Hungarian Bureau for the Protection of Authors' Rights;  Hungarian Society for the Protection of Audio-visual Authors' and Producers' Rights) if the author decide to do so. Other collecting societies (Hungarian Bureau for the Protection of Performers' Rights, EJI; Hungarian Alliance Of Reprographic Rights; Reprographic Society of the Hungarian Book and Periodical Writers and Publishers) don't keep any record of works.

2.    Is the copyright registry interconnected to any other copyright data system?

No, it is not.


## II.    LEGAL QUESTIONS

1.    What kind of copyright works can be registered/recorded?  Is the registration/recordation process different for each type of copyrighted work?  Please describe the differences, if any.

As regards the activity of Artisjus, non-theatrical musical works are to be documented for collective administration purposes under the statutes and other internal regulations of Artisjus.  Other kind of works can be deposited to assist to presume authorship and date creation.  These can be

- Literary works (of fiction, trade, science, journalism, etc.)
- Speeches delivered in public and fixed on video or sound carrier or in writing
- Computer program creations (either application programs or operation systems) and related documentation
- Dramas, musico-dramatical works, ballets and pantomime
- Theatrical musical works with or without words
- Radio an television plays
- Cinematographic creations and other audiovisual works
- Drawings, paintings, sculptures, engravings, creations produced by lithography and designs thereof
- Artistic photographs
- Maps and other cartographic creations
- Architectural creations and designs thereof, and designs of building complexes and town planning projects
- Designs of engineering structures
- Architectural creations and designs thereof, and designs of building complexes ad town planning projects
- Designs of engineering structures
- Applied art creations and designs thereof

- Costume and scenery designs
- Industrial art designs

Three-dimensional works can be registered in two-dimensional layout.

At the same time audiovisual works or their screenplays or synopses can be registered at Filmjus too.

The registration process is the same for all categories of works.

2.    Can the subject matter of related rights (e.g., performances, broadcasts, and sound recordings) also be registered/recorded?  If yes, is there a different registration/recordation process than for works protected by copyright?

No, it can not.

3.    Is copyright registration/ recordation mandatory or voluntary in the following circumstances?

(a)    Recognition of creation? Voluntary
(b)    Transfer of rights? ---
(c)    Initiation of judicial proceedings? ---
(d)    Other changes in title/ownership (such as leasing)? ---

If your country has a mandatory registration/recordation system, please describe any legal sanction(s) for non-compliance. ---

4.    What is the legal effect of registration?

(a)    Copyright?
(b)    Related rights?

It has no direct legal effect whatsoever, copyright is acknowledged by the creation of work, but the copyright certificate provided by the collecting societies aims at assisting the authors in claiming their copyright in litigation and the identification of work.

5.    Do courts in your country recognize copyright registrations effected by public authorities in other countries?  If yes, is recognition automatic or is a local procedure required to validate or otherwise give effect tot he foreign registration?

Registration is accepted as evidence of the existence and the date of creation and the right-ownership of the work, due to the free system of evidence applicable in our procedure laws.  In case of in the country of registration copyright is acknowledged by registration, the Hungarian courts consider the registered work as a work protected by copyright.  There is no legal procedure to validate the registration made by foreign authorities.

III.    PROCEDURAL QUESTIONS

1.    What are the requirements for registration?

    (a)    Is there a deposit requirement, that is, must a fixed copy of the work be submitted with registration/recordation from?

    Yes, there is.  As regards the procedure of Filmjus, a copy of the work has to be provided for it, personally by the author.  The author has to certify his identity.  Following the certification of identity, the registration is made immediately.  A registration number is matched to the work.  The author receives a copyright certificate.  Following the registration, the copy of the registered work is sent back to the author in a closed and stamped envelope.

    (b)    Is there a registration/recordation fee?  If so, how much is the registration/recordation fee?

    Concerning the registration system of Artisjus, the recordation fees are as follows:

| | |
|---|---|
| Musical works (collective administration) | HUF 560 per work |
| Other works (only registration) | HUF 7500 per work |
| Record of copy of the works | HUF 8750 per work |
| (All fees inclusive of VAT) | |

    The registration fee is HUF 1200 per year at Filmjus.  There is no registration fee for the members of Filmjus.

    (c)    What is the average time taken to complete the registration/recordation process?

    It is about half an hour in the practice of Artisjus.

2.    Is there a different registration/recordation process for domestic as opposed to foreign works or objects of related rights?

    No, there is not.

3.    Are there files stored in digital form?

    If the client wishes to have, Artisjus will store the work in this form.  The data of the work and the author are stored in a digital form in the database of Filmjus.

4.    Search facility of the registration/recordation system:

    (a)    Does the system have a publicly available search facility?  Are there restrictions on access?
    (b)    Is the search facility available online in real time?
    (c)    Is access granted to the fixed copy of the work registered?
    (d)    Does the general public have access to other documents submitted?

    Information can be asked from Artisjus for in person or in writing, not online.  There is no access to the fixed copy of the work and other documents submitted.  The

registration system of Filmjus is open to the public, provided that a legal interest is certified by the claimant.  It is not available to the public.  By virtue of the Copyright Certificate the author authorizes Filmjus to provide the following data: the name of the author, the title of the registered work, the genre of he work, its length and the date of publication if the work was already published.  Other data or documents concerning the registered works are not available to the public.

5.    Please provide statistics on following registrations/recordations:

(a)    Number per statistical period (last five years)

| YEAR | NUMBER OF REGISTERED WORKS BY ARTISJUS |
|---|---|
| 1999 | 643 |
| 2000 | 596 |
| 2001 | 605 |
| 2002 | 624 |
| 2003 /until the 30th of October/ | 517 |

| YEAR | Number of registered works by Filmjus |
|---|---|
| 1999 | 7 |
| 2002 | 14 |
| 2001 | 12 |
| 2002 | 36 |
| 2003 /until today/ | 52 |

(b)    Number of inquiries/requests for information filed per statistical period (last five years).

An average of 30 inquiries arrive a day at Artisjus, but there were no requests for providing information about the registered data by Filmjus.

SCCR/13/2
Annex III, page 33

INDIA

I.    INSTITUTIONAL QUESTIONS

1.    What is the name and legal status of the copyright registering/recording body in your country?

Name of the body: Copyright Office, Ministry of Human Resource Development Government of India

Address:    B-2/W-3, Curzon Road Barracks,
            Kasturba Gandhi Road
            New Delhi-110001

2.    Is the copyright registry interconnected to any other copyright data system?

        No.

II.    LEGAL QUESTIONS

1.    What kind of copyright works can be registered/recorded?  Is the registration/recordation process different for each type of copyrighted work?  Please describe the differences, if any,

        Copyright registration is done for the following categories of works:

        (a)    Original literary, dramatic and musical and artistic works;
        (b)    Cinematographic films; and
        (c)    Sound Recording.

        Registration process is similar for all categories

2.    Can the subject matter related to rights (e.g. performances, broadcasts, sound recordings) also be registered/recorded?  If yes, is there a different registration/recordation process than for works protected by copyrights?

        Sound recording is treated as a category for which registration is done.  Performances, broadcasts and similar subjects related to copyrights are not registered separately but copyright is considered as a bundle of rights with include the rights to perform, broadcast, reproduce etc.  Also, broadcasters have broadcast reproduction right and performers have performers right but these are not subject to registration.

3.    Is copyright registration/recordation mandatory or voluntary in the following circumstances;

        (a)    Recognition of creation?                    Voluntary
        (b)    Transfer of rights?                         Voluntary
        (c)    Initiation of judicial proceedings?         Voluntary

(d)    Other changes in title/ownership (ship as leasing)?        Voluntary

Registration is not mandatory.  However, the entries in the Register of Copyrights maintained by the Copyright Office serve as prima facie evidence in any court of law.

4.    What is the legal effect of registration?

(a)    Copyright?

The Register of Copyrights maintained by the Copyright Office serve as prima facie evidence of the particulars entered in it and certified copies or extracts of such entries are admissible in evidence in all Courts without further proof of production of the original.

(b)    Related rights?

For all related rights treated within the copyright of a work, the same rule as given (a) is applicable.

5.    Do courts in your country recognize copyright registrations effected by public authorities in other countries?  If yes, is recognition of a foreign registration.?

No separate local procedure is prescribed for recognition of a foreign registration. However, the terms of such registration will be generally governed by the Copyright laws in India.


III.    PROCEDURAL QUESTIONS

1.    What are the requirements for registration?

(a)    Is there a deposit requirements, that is, must a fixed copy of the work be submitted with registration/recordation from?

Not mandatory.  But copies of the work are required to be enclosed with the application submitted for registration to verify the particulars.  In case of unpublished documented works and sound recordings, a copy of the work with the seal of copyright office is returned to the applicant and another copy is kept in the office for record, if such copies are made available.

(b)    Is there a registration/recordation fee?  If so how much is the registration/recordation fee?

Yes.  The prescribed fee schedule is given at Annex-I.

(c)    What is the average time taken to complete the registration/recordation process?

At present, it takes about 5-6 months to complete the registration process.  However, with the recent computerization and networking implemented in the copyright office, this period is sought to be reduced to the minimum.  A cooling period of 30 days has been prescribed in the Indian Copyright Rules so as to enable other parties concerned with the work applied for registration of copyright, to lodge objections, if any.

2.    Is there a different registration/recordation process for domestic as opposed to foreign works or objects related to rights?

No.  All works belonging to member-countries of WIPO are treated as similar to Indian works as per the International Copyright Order, 1999.

3.    Are the files stored in digital form?

No. We process on to digitize files.

4.    Search facility of the registration/recordation system:

(a)    Does the system have a publicly available search facility?  Are there restrictions to access?

Search facility is available.  No restrictions except charging a nominal fee.

(b)    Is the search facility available online in real time?

Not yet.

(c)    Is access granted to the fixed copy of the work registered?

Yes, if available.

(d)    Does the general public have access to other documents submitted?

No.

5.    Please provide statistics on following registration/recordations :

(a)    Number per statistical period (last five years)

| Year | No. of works registered |
|------|-------------------------|
| 1998 |                         |
| 1999 | 3707                    |
| 2000 | 1563                    |
| 2001 | 3195                    |
| 2002 | 4973                    |
| 2003 | 4682                    |

(b)    Number of inquiries requests for information filed per statistical period (last five years)?

About 20.000 per year

SCCR/13/2
Annex III, page 36

<u>Fee Schedule</u>
(As prescribed under the Indian Copyright Rules)

1.         For an application for registration of copyright of

     (a)    Literary, Dramatic, Musical or Artistic work         Rs. 50 per work

     (b)    Provided that in respect of an artistic work         Rs. 400 per work
which is used or is capable of being used in relation
to any goods.

2.    For an application for change in particulars of
copyright entered in the Register of Copyrights
in respect of

     (a)    Literary, Dramatic, Musical or Artistic work    Rs. 50 per work
     (b)    Provided that in respect of an artistic       Rs. 200 per work
work which is used or is capable of being
used in relation to any goods

3.    For an application for registration of copyright         Rs. 600 per work
of a Cinematograph Film

4.    For an application for registration changes             Rs. 400 per work
in particulars of copyright entered in the
Register of Copyrights in respect of cinematograph film

5.    For an application for registration of copyright         Rs. 400 per work
in a sound recording

6.    For an application for registration of changes           Rs. 200 per work
in particulars of copyright entered in the Register
of copyrights in respect of a sound recording

JAPAN


I.    INSTITUTIONAL QUESTIONS

1.    What is the name and legal status of the copyright registering/recording body in your country?

For all copyrighted work but computer program works

Name:  Agency for Cultural Affairs, Ministry of Education, Culture, Sports, Science and Technology, Government of Japan (ACA)
Legal Status: State Organization

For computer program works
Name: Software Information Center (SOFTIC)
Legal Status: A legal person established under the provision of Article 34 of the Civil Law. In 1987, ACA notified that the Commissioner designated SOFTIC as registration agency.

<relevant provisions>
Article 78bis. of  Copyright Law
Other than those provided for in this Section, matters relating to registrations of program works shall be provided by another law.

        Article 5 of Law on Exceptional Provisions for the Registration of Program Works

        (a)    The Commissioner of the Agency for Cultural Affairs may entrust a person designated by the Commissioner (hereinafter referred to as "designated registration organ") with the whole or a part of program registration business as well as business carried out upon demand mentioned in Article 2, paragraph (2), or in Article 78, paragraph (3) of the Copyright Law and business of public notice mentioned in the preceding Article (hereinafter referred to as "registration business").

        (b)    Designation mentioned in the preceding paragraph shall, as provided by Ministry of Education and Science Ordinance, be made upon application of a person who intends to conduct registration business.

        (c)    In case where the Commissioner of the Agency for Cultural Affairs entrusts the designated registration organ with registration business, he shall no longer conduct such registration business as conducted by that organ.

        (d)    For the application of the provisions of Article 2, paragraph (2), Article 3 and the preceding Article as well as the provisions of Article 78, paragraphs (1) to (3) of the Copyright Law to the case where the designated registration organ conducts registration business, "the Commissioner of the Agency for Cultural Affairs" in these provisions (except Article 78, paragraph (2) of that Law) shall read "the designated registration organ", and "when having made a registration mentioned in Article 75, paragraph (1)" in Article 78, paragraph (2) of that Law shall read "when the designated registration organ has made a registration mentioned in Article 75, paragraph (1)".

2.    Is the copyright registry interconnected to any other copyright data system?

No, it isn't.


II.    LEGAL QUESTIONS

1.    What kind of copyright works can be registered/recorded?

All kinds of copyrighted works can be registered.

Is the registration/recordation process different for each type of copyrighted work?
Please describe the differences, if any.

Concerning the computer program works, it needs to submit fixed copies of
works.

2.    Can the subject matter of related rights (e.g., performances, broadcasts, sound
recordings) also be registered/recorded?

Yes, it can.

If yes, is there a different registration/recordation process than for works protected
by copyright?

The registration process of related rights is same as that for copyrighted works.

3.    Is copyright registration/ recordation mandatory or voluntary in the following
circumstances?

(a)    Recognition of creation?

Voluntary registration is available in recognition of creation of only computer
program works.

(b)    Transfer of rights?

It is voluntary.

(c)    Initiation of judicial proceedings?

N/A

(d)    Other changes in title/ownership (such as leasing)?

Voluntary registration is available concerning changes in registered item.

If your country has a mandatory registration/recordation system, please describe
any legal sanction(s) for non-compliance.

N/A (Japan has only voluntary system)

4.    What is the legal effect of registration?

(a)    Copyright?

<u>Registering date of creation (only SOFTIC)</u>

Unless there is contrary evidence, the registered date shall be taken as the date of creation of the work.

<u>Registering date of first publication</u>

Unless there is contrary evidence, the registered date shall be taken as the date of first publication or first making public of the work.

<u>Registering real name</u>

The registered person is assumed to be the author of the work.

<u>Registering assignment etc. of copyright</u>

In case of transfer of rights, a third party may be opposed through registration.

<u>Registering the establishment of publishing right etc.</u>

In case of transfer of rights, a third party may be opposed through registration.

(b)    Related rights?

<u>Registering transfer etc. of related rights</u>

In case of transfer of rights, a third party may be opposed through registration.

5.    Do courts in your country recognize copyright registrations effected by public authorities in other countries?

Yes, they do.

If yes, is recognition automatic or is a local procedure required to validate or otherwise give effect to the foreign registration?

In Japan, courts recognize registrations automatically.


III.    PROCEDURAL QUESTIONS

1.    What are the requirements for registration?

(a)    Is there a deposit requirement, that is, must a fixed copy of the work be submitted with registration/recordation form?

Regarding registration of computer program works, applicant needs to submit fixed copies of works.

(b)    Is there a registration/recordation fee?  If so, how much is the registration/recordation fee?

Registration license tax is need as follows;
Registering real name:  9,000 yen
Registering the date of first publication (first making public):    3,000 yen
Registering transfer etc. of copyright and related rights:    18,000 yen
Registering establishment of publishing right:   30,000 yen
Registering establishment of right of pledge:    4/1000 of amount of debts.

(c)    What is the average time taken to complete the registration/recordation process?

From application for the registration to completion,
ACA: it takes about 1 month
SOFTIC: it takes about 3 weeks

2.    Is there a different registration/recordation process for domestic as opposed to foreign works or objects of related rights?

No, there isn't.

3.    Are the files stored in digital form?

Only SOFTIC stores the registered information (other than fixed copy of work) in digital form.

4.    Search facility of the registration/recordation system:

Only SOFTIC provided search facility.

(a)    Does the system have a publicly available search facility?

Yes, it does.

Are there restrictions on access?

No, there are not.

(b)    Is the search facility available online in real time?

The facility is not available online in real time, but through SOFTIC's computers. SOFTIC's website places the data of last six months' registration, which is searchable by using search system on the website.

(c)    Is access granted to the fixed copy of the work registered?

No, it isn't. Only courts can obtain the fixed copy.

    (d)    Does the general public have access to other documents submitted?

The general public cannot access to application form and attached documents submitted, but can browse the fixed copy of original record of registration and so on.

5.    Please provide statistics on following registrations/recordations:

    (a)    Number per statistical period (last five years)
    (b)    Number of inquiries/requests for information filed per statistical period (last five years).

**Number of Application for Registration per Statistical Period**

Agency for Cultural Affairs

| classification | 1998 | 1999 | 2000 | 2001 | 2002 | Total |
|---|---|---|---|---|---|---|
| registering a real name | 12 | 41 | 13 | 38 | 42 | 146 |
| registering the date of first publication of works | 116 | 245 | 132 | 141 | 242 | 876 |
| registering the date of first making public of works | 122 | 195 | 196 | 259 | 193 | 965 |
| registering transfer of copyright | 149 | 258 | 104 | 494 | 237 | 1242 |
| registering establishment of pledge | 57 | 29 | 1 | 0 | 0 | 87 |
| application for change of registration | 11 | 5 | 473 | 4 | 69 | 562 |
| application for delation of registration | 48 | 12 | 0 | 1 | 23 | 84 |
| application for correction of registration | 0 | 3 | 0 | 0 | 0 | 3 |
| registration of trust | 0 | 0 | 0 | 0 | 0 | 0 |
| registration of restraint on alienation of copyright | 1 | 0 | 0 | 0 | 4 | 5 |
| registration of restraint on alienation of copyright | 1 | 0 | 0 | 0 | 0 | 1 |
| registration of establishment of publishing right | 0 | 5 | 7 | 13 | 8 | 33 |
| registration of related rights | 15 | 31 | 1 | 0 | 1 | 48 |
| Total | 532 | 824 | 927 | 950 | 819 | 4052 |

| | 1998 | 1999 | 2000 | 2001 | 2002 | Total |
|---|---|---|---|---|---|---|
| grant of transcript (abstract) of register | 180 | 225 | 173 | 157 | 54 | 789 |
| browse of transcript of register | 8 | 2 | 15 | 6 | 14 | 45 |

**Number of Application for Registrations per Statistical Period**

SOFTIC ( Software Information Center, Japan)

**Types of registration**

| Type | FY 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| Registration of the date of creation | 372 | 360 | 321 | 369 | 438 |
| Registration of the date of first | 8 | 16 | 15 | 7 | 3 |
| Registration of the true name | 0 | 0 | 5 | 0 | 0 |
| Registration of copyright (in case of copyright transfer, etc.) | 96 | 99 | 128 | 90 | 136 |
| Total(*) | 476 | 475 | 469 | 466 | 577 |

**Categories of program**

| Category | FY1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| System program | 75 | 57 | 38 | 50 | 38 |
| General purpose application program | 125 | 90 | 100 | 81 | 108 |
| Special purpose application program | 215 | 253 | 223 | 270 | 321 |
| Total(*) | 415 | 400 | 361 | 401 | 467 |

 (*) The total number of applications for program registration exceeds the total number of its categories of program, because some programs are counted in two or more different types.

**Registration from abroad**

| Country / Region | FY1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| U.S.A. | 5 | 7 | 6 | 0 | 0 |
| United Kingdom | 1 | 1 | 0 | 0 | 0 |
| Israel | 0 | 0 | 0 | 0 | 0 |
| Korea | 0 | 1 | 4 | 0 | 2 |
| Switzerland | 0 | 0 | 0 | 0 | 0 |
| Spain | 0 | 0 | 0 | 0 | 0 |
| China | 3 | 1 | 5 | 0 | 1 |
| Germany | 0 | 0 | 0 | 0 | 0 |
| France | 0 | 0 | 0 | 0 | 0 |
| Australia | 0 | 6 | 0 | 0 | 0 |
| Greece | 0 | 0 | 1 | 0 | 0 |
| Total | 9 | 16 | 16 | 0 | 3 |

 A fiscal year (FY) starts in April and ends in March of the next year.

**Number of Requests for Information Filed per Statistical Period**

| Year | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| number of requests | 83 | 238 | 130 | 185 | 109 |

MEXICO

I.    INSTITUTIONAL QUESTIONS

1.    What is the name and legal status of the copyright registering/recording body in your country?

The body is known as the National Copyright Institute, Directorate of the Public Copyright Registry.  This is a decentralized body attached to the Secretariat of Public Education (Article 208, Federal Copyright Law-LFDA).

2.    Is the copyright registry interconnected to any other copyright data system?

No.

II.    LEGAL QUESTIONS

1.    What kind of copyright works can be registered/recorded?  Is the registration/recordation process different for each type of copyrighted work?  Please describe the differences, if any.

Original and derived works belonging to the following branches:

    I.    Literary;
    II.    Musical, with or without lyrics;
    III.    Dramatic;
    IV.    Dance;
    V.    Pictorial or drawing;
    VI.    Sculptural and three-dimensional;
    VII.    Caricatural and strip cartoon;
    VIII.    Architectural;
    IX.    Cinematographic and other audiovisual works;
    X.    Radio and television programs;
    XI.    Computer programs;
    XII.    Photographic;
    XIII.    Works of applied art including graphic or textile design, and
    XIV.    Compilations, comprising collections of works such as encyclopedias, anthologies and works or other elements such as databases, provided that said collections, in terms of their selection or the arrangement of their content or subject matter, constitute an intellectual creation (Articles 13, 163(I) and (II), LFDA).

The registration process is the same for all categories.

2.    Can the subject matter of related rights (e.g., performances, broadcasts, sound recordings) also be registered/recorded?  If yes, is there a different registration/recordation process than for works protected by copyright?

Yes, videograms, phonograms and books may also be entered in the Registry (Article 57(V), Regulations under the Federal Copyright Law-RLFDA).

SCCR/13/2
Annex III, page 45

The process of registration is the same as that for the registration of copyright works.

3.    Is copyright registration/recordation mandatory or voluntary in the following circumstances:

(a)    Recognition of creation

In this case, it is voluntary, although the LFDA indicates that the recognition of copyright and related rights does not require registration or documentation of any kind, and is not subject to any formality being completed (Article 5, LFDA).

(b)    Transfer of rights

In this case, the LFDA states that the acts, agreements and contracts through which economic rights are transferred shall be entered in the Public Copyright Registry so that they may take effect against third parties (Article 32, LFDA).

(c)    Initiation of judicial proceedings

In this regard, the LFDA does not establish the idea of obligation and therefore the principle is followed whereby the recognition of copyright and related rights does not require registration or documentation of any kind, and is not subject to any formality being completed (Articles 5 and 213, LFDA).

(d)    Other changes in title/ownership (such as leasing)?

As mentioned previously, in the case of transfer of rights their registration is required, however, in the case of licenses for use the Copyright Law does not establish any obligation to register.

If your country has a mandatory registration/recordation system, please describe any legal sanction(s) for non-compliance.

4.    What is the legal effect of registration?

(a)    Copyright?
(b)    Related rights?

The Public Copyright Registry is designed to guarantee the legal security of authors, holders of related rights and holders of respective economic rights, together with their legal successors, and also to provide appropriate publicity for works, acts and documents by means of their registration. Entries in the Registry establish the presumption that the facts and acts recorded therein are true, unless proven otherwise. All entries exclude the rights of third parties. In the case of dispute, the effects of registration shall be suspended until such time as a firm resolution is reached by the competent authority (Articles 162 and 168, LFDA).

5.    Do courts in your country recognize copyright registrations affected by public authorities in other countries?  If yes, is recognition automatic or is a local procedure required to validate or otherwise give effect to the foreign registration?

Yes, they are recognized provided that in Mexico the protection granted by the LFDA is granted to works from the time when they are fixed on a material carrier and the recognition of copyright and related rights does not require registration or documentation of any kind, nor is it subject to any formality being completed (Article 5, LFDA).

Furthermore, the RLFDA state that documents from abroad which are submitted for the purposes of verifying the ownership of copyright or related rights, shall not require legalization for the purposes of their registration. Their translation, truthfulness and authenticity are the responsibility of the applicant (Article 61, RLFDA).

III.   PROCEDURAL QUESTIONS

1.   What are the requirements for registration?

(a)   Is there a deposit requirement, that is, must a fixed copy of the work be submitted with registration/recordation form?

Yes, the author must submit two equal copies of the work to be registered and, at the end of the process, one copy is returned to him duly labeled with the registration data, and the other copy remains permanently in the possession of the National Copyright Institute as evidence of registration.

The copies of the work must be submitted on a material carrier chosen by the author, provided that the carrier allows the work to be handled.

(b)   Is there a registration/recordation fee?  If so, how much is the registration/recordation fee?

Yes, currently the fee stands at $128.00 (one hundred and twenty eight pesos 00/100 m.n.).  This amount is updated twice yearly.

(c)   What is the average time taken to complete the registration/recordation process?

The Registry has two weeks, from the time the application is received, to make the appropriate ruling (Article 58, RLFDA).

2.   Is there a different registration/recordation process for domestic as opposed to foreign works or objects of related rights?

The process does not differ, although the Copyright Law provides that foreign authors or rightholders and their legal successors shall enjoy the same rights as Mexican authors (Article 7, LFDA).

3.   Are the files stored in digital form?

Yes, the National Copyright Institute currently has a digitalization system, by means of which the files relating to the registrations of works are stored in digital form.

4.   Search facility of the registration/recordation system:

(a)    Does the system have a publicly available search facility?  Are there restrictions on access?

Yes, in accordance with the LFDA the Registry is obliged to supply the persons who so request with information on the registrations and the documents entered in the Registry (Article 164(II), first paragraph, LFDA).

Yes, restrictions exist in relation to computer programs, publishing contracts and unpublished works, and copies may be obtained only with the consent of the holder of the economic right, or by court order (Article 164(II), first paragraph, LFDA).

(b)    Is the search facility available online in real time?

No, it is not available on the Internet.

(c)    Is access granted to the fixed copy of the work registered?

No, such a service is not available.

(d)    Does the general public have access to other documents submitted?

Yes, with the restrictions previously mentioned.  Similarly, where the person requires a copy of the documentary evidence of registration, the Institute dispatches a certified copy, but under no circumstances allows originals to be removed from the Registry and, in the case of works fixed on material carriers other than paper, the applicant shall provide the technical means required for duplication (Article 164(II), LFDA).

5.    Please provide statistics on following registrations/recordations:

(a)    Number per statistical period (last five years)

| | |
|---|---|
| 1998 | 19,574 registered works |
| 1999 | 26,141 registered works |
| 2000 | 25,814 registered works |
| 2001 | 27,492 registered works |
| 2002 | 28,741 registered works |

(b)    Number of inquiries/requests for information filed per statistical period (last five years)

| | |
|---|---|
| 1998 | 1,259 searches for records contained in the Registry |
| 1999 | 1,785 searches for records contained in the Registry |
| 2000 | 2,223 searches for records contained in the Registry |
| 2001 | 2,203 searches for records contained in the Registry |
| 2002 | 7,049 searches for records contained in the Registry |

THE PHILIPPINES

I.    INSTITUTIONAL QUESTIONS

1.    What is the name and legal status of the copyright registering/recording body in your country?

    The copyright registering/recording entities in the Philippines are the National Library and the Supreme Court of the Philippines library.

2.    Is the copyright registry interconnected to any other copyright data system?

    The copyright registry is not currently interconnected to any other copyright data system.

II.    LEGAL QUESTIONS

1.    What kind of copyright works can be registered/recorded?  Is the registration/recordation process different for each type of copyrighted work?  Please describe the differences, if any.

    The Intellectual Property Code of the Philippines (Republic Act No. 8293) provides that "Literary and artistic works, hereinafter referred to as 'works', are original intellectual creations in the literary and artistic domain protected from the moment of their creation and shall include in particular:

    (a)    Books, pamphlets, articles and other writings;
    (b)    Periodicals and newspapers;
    (c)    Lectures, sermons, addresses, dissertations prepared for oral delivery, whether or not reduced in writhing or other material form;
    (d)    Letters;
    (e)    Dramatic or dramatico-musical compositions; choreographic works or entertainment in dumb show;
    (f)    Musical compositions, with or without words;
    (g)    Works of drawing, painting, architecture, sculpture, engraving, lithography or other works of art; models or designs for works of art;
    (h)    Original ornamental designs or models for articles of manufacture; whether or not registrable as an industrial design, and other works of applied art;
    (i)    Illustrations, maps, plans, sketches, charts and three-dimensional works relative to geography, topography, architecture or science;
    (j)    Drawings or plastic works of a scientific or technical character;
    (k)    Photographic works, including works produced by a process analogous to photography; lantern slides;
    (l)    Audiovisual works and cinematographic works and works produced by a process analogous to cinematography or any process for making audio-visual recordings;
    (m)    Pictorial illustrations and advertisements
    (n)    Computer programs; and
    (o)    Other literary, scholarly, scientific and artistic works."  (Sec. 172.1)

The IP Code likewise provides that "The following derivative works shall also be protected by copyright;

    (a)    Dramatizations, translations, adaptations, abridgments, arrangements, and other alterations of literary or artistic works; and
    (b)    Collections of literary, scholarly or artistic works, and compilations of data and other materials which are original by reason of the selection or coordination of arrangement of their contents."(Sec. 173)

    The Copyright Safeguards and Regulations dated 5 July 1999 provides that: "Sec. 6. Works that May be Registered and Deposited.  The following works may be registered and deposited;

    (a)    Dramatic or dramatic-musical compositions, choreographic works or entertainment in shows;
    (b)    Photographic works including works produced by a process analogous to photography, lantern slides;
    (c)    Audiovisual works and cinematographic works and works produced by a process analogous to cinematography or any process for making audio-visual recordings;
    (d)    Pictorial illustrations and advertisements;
    (e)    Computer programs;
    (f)    Other literary, scholarly, scientific and artistic works;
    (g)    Sound recordings;
    (h)    Broadcast recordings."(Rule 5)

    The National Library has issued Copyrights Safeguards and Regulations which provides for, among others, the registration and deposit of work and the procedure for the same and the effectivity and effects of Registration and Deposit.  The Regulations provide for the mandatory deposit of the following: books; pamphlets; articles and other writings periodicals and newspapers; lectures; sermons; addresses; dissertations prepared for oral delivery whether or not reduced in writing or other material form; letters; musical compositions with or without words; works of drawing; painting, architecture; sculpture; engraving; lithography or other works of art; models or designs for works of art; original ornamental designs or models for articles of manufacture, whether or not registrable as an industrial design and other works of applied art; illustrations; maps; plans; sketches; charts and three-dimensional works relative to geography; topography; architecture or science; and drawings or plastic works of a scientific or technical character.

    The same Regulations provide for the voluntary deposit of the following: Dramatic or dramatic-musical compositions, choreographic works or entertainment in shows; Photographic works including works produced by a process analogous to photography, lantern slides; Audiovisual works and cinematography or any process for making audiovisual recordings; Pictorial illustrations and advertisements; Computer programs; Other literary, scholarly, scientific and artistic works; Sound recordings; and Broadcast recordings.

2.    Can the subject matter of related rights (e.g. performances, broadcasts, sound recordings) also be registered/recorded?  If yes, is there a different registration/recordation process than for works protected by copyright?

    Yes, the subject matter of related rights may be registered.  There is no difference in the registration process for works protected by copyright and those involving related rights.

3.    Is copyright registration/recordation mandatory or voluntary in the following circumstances?

    (a)    Recognition of creation?
    (b)    Transfer of rights?
    (c)    Initiation of judicial proceedings?
    (d)    Other changes in title/ownership (such as leasing?)

If your country has a mandatory registration/recordation system, please describe any legal sanction (s) for non-compliance.

a)    The principle observed in this jurisdiction is that works are protected by the sole fact of their creation (Sec. 172.2 IP Code).  However, the IP Code requires the mandatory deposit of works stated in the first paragraph of the answers to question II. 1 above, for the purpose of completing the records of the National Library and Supreme Court Library.

b)    Section 182 of the IP Code provides that "an assignment or exclusive license may be filed in duplicate with the National Library upon payment of the prescribed fee for registration in books and records kept for the purpose.  Upon recording, a copy of the instrument shall be returned to the sender with a notation of the fact of record.  Notice of the record shall be published in the IPO Gazette."  It is apparent that from the use of the phrase "may be filed", the intent of the law is not to make recordation a mandatory requirement.

c)    There are no rules providing that registration is a pre-requisite to the initiation of judicial proceedings.

d)    There is likewise no provision in the law making registration mandatory in other changes of title/ownership.

4.    What is the legal effect of registration?

    a)    Copyright?
    b)    Related rights?

The registration and deposit of works (such as those protected by copyright and those involving related rights) are purely for the purpose of recording the date of registration and deposit of the work and shall not be conclusive as to the copyright ownership or the term of copyrights or the rights of the copyright owner, including neighboring rights (Section 2, Rule 7, Copyright Safeguards and Regulations).

5.    Do courts in your country recognize copyright registrations effected by public authorities in other countries?  If yes, is recognition automatic or is a local procedure required to validate or otherwise give effect to the foreign registration?

Yes, Philippine courts are mandated to apply international treaties entered into or ratified by the Philippines.  These treaties have the force and effect of a law within the Philippines.  According to Sec. 4, Rule 6 of the Copyright Safeguards and Regulations, however, all certifications and documents which are executed outside the Philippines shall be duly authenticated by either the proper diplomatic or consular representative of the

Philippines, or by a notary public authorized to authenticate documents under the law of the country in which the certification and documents are executed.


## III. PROCEDURAL QUESTIONS

1.    What are the requirements for registration?

    (a)    Is there a deposit requirement, that is, must a fixed copy of the work be submitted with registration/recordation form?

    Section 4, Rule 5 of the Copyright Safeguards and Regulations provides that; "Works shall be Registered and Deposited.  Two (2) copies or reproductions of the following classes of works, and transfers and assignments related thereto, shall be registered and deposited with the TNL Copyright Division and another two (2) copies with the SCL;

        (a)    Books, pamphlets, articles and other writings;
        (b)    Periodicals and newspapers;
        (c)    Lectures, sermons, addresses, dissertations prepared for oral delivery whether or not reduced in writing or other material form;
        (d)    Letters;
        (e)    Musical compositions with or without words

    Section 5 of the same rules states that: "Replicas and Pictures.  For practical purposes, only replicas and pictures of the following classes of works, shall be registered and deposited with TNL Copyright Division:

        (a)    Works of drawing, painting, architecture, sculpture, engraving, lithography or other works of art, models or designs for works of art;
        (b)    Original ornamental designs or models for articles of manufacture, whether or not registrable as an industrial design, and other woks of applied art;
        (c)    Illustration, maps, plans, sketches, charts and three-dimensional works relative to geography, topography, architecture or science;
        (d)    Drawings or plastic works of a scientific or technical character."

    Section 6 of the Rules states that: The following works may be registered and deposited: dramatic or dramatic-musical compositions, choreographic works or entertainment in shows; photographic works including works produced by a process analogous to photography, lantern slides; audiovisual works and cinematographic works and works produced by a process analogous to cinematography or any process for making audio-visual recordings; pictorial illustrations and advertisements; computer programs; other literary, scholarly, scientific and artistic works; sound recordings; and broadcast recordings.

    (b)    Is there a registration/recordation fee?  If so, how much is the registration/recordation fee?

        Yes, the recordation fee is 120 pesos (roughly 2.2 US dollars) for each application.

(c) What is the average time taken to complete the registration/recordation process?

It takes ten (10) days on the average to complete the processing of the application.

2.     Is there a different registration/recordation process for domestic as opposed to foreign works or objects of related rights?

The procedure for the registration for domestic and foreign works is the same.

3.     Are the files stored in digital form?

No.

4.     Search facility of the registration/recordation system:

(a)     Does the system have publicly available search facility?  Are there restrictions on access?

The National Library presently has an index card search facility available to the public and the development of a computerized search facility is ongoing.

(b)     Is the search facility available online in real time?

None.

(c)     Is access granted to the fixed copy of the work registered?

According to Section 1, Rule 9, "all copies of works registered and deposited with TNL and the SCL are deemed the property of the Philippine government.  All copies of works registered and deposited with TNL and the SCL, except for unpublished works, shall be open to public inspection, subject to the following conditions;

> (a)     The Director of TNL, may open to public inspection only copies of deposited works that are fragile, rare, frequently used, or in other similar conditions;
> (b)     Under no circumstances will the public be allowed to reproduce any of the works during inspection;
> (c)     A written request signed by the interested party shall be submitted to TNL at least one (1) day prior to the requested inspection, and shall specify the work to be inspected, his/her purpose, his/her principal together with the proper authorization from the principal if he/she is an agent or representative, and the preferred date and time of inspection;
> (d)     Upon approval of the request and payment of the inspection and handling fees, the interested party, on the date and time specified shall be accompanied by a designated TNL Copyright employee to an inspection officer to ascertain that the party does not have in his/her possession any camera, video or any other gadget for reproduction, and thereafter to the custodian of the work;
> (e)     The custodian shall designate the place for inspection after the party has signed the inspection register, and the work will thereafter be brought to

SCCR/13/2
Annex III, page 53

the party by a TNL Copyright employee who shall remain to watch and ensure that the work or any part thereof is not copied and remains intact during the entire period of inspection.

SPAIN

I.    INSTITUTIONAL QUESTIONS

1.    What is the name and legal status of the copyright registering/recording body in your country?

The name is the General Intellectual Property Registry, comprising in turn the Central Registry, Territorial Registries and a Coordination Commission.  The Central Registry is attached to the Ministry of Education, Culture and Sport of the Central Administration, with registration powers for those Autonomous Communities that have not had their own Registry transferred, while the Territorial Registries are attached to the Autonomous Communities to which said Registry has already been transferred.  The Coordination Commission operates as a collegiate body for the unification of criteria.

The validity of registry entries is the same for all the Registries.

The Registry is governed by the Law on Intellectual Property (Royal Legislative Decree No. 1/1996, of April 12), Articles 144 and 145, and by the Registration Regulations (Royal Decree No. 281/2003, of April 12).

2.    Is the copyright registry interconnected to any other copyright data system?

An interconnection exists between the ten Territorial Registries and the Central Registry.

II.   LEGAL QUESTIONS

1.    What kind of copyright works can be registered/recorded?  Is the registration/recordation process different for each type of copyrighted work?  Please describe the differences, if any.

Any copyright over literary, artistic or scientific creations may be registered, provided that this does not infringe the national and international intellectual property rules laid down nor those contained in the Registration Regulations.

In basic terms, a different procedure does not exist for each type of creation, other than those derived from the formal differences regarding the request and rule-related models applicable to each case.

2.    Can the subject matter or related rights (e.g. performances, broadcasts, sound recordings) also be registered/recorded?  If yes, is there a different registration/recordation process than for works protected by copyright?

Related rights can be registered.  The fundamental difference as regards copyright relates to the original entry, which varies in one or other case.

SCCR/13/2
Annex III, page 55

3.    Is copyright registration/recordation mandatory or voluntary in the following circumstances?

    (a)    Recognition of creations?
    (b)    Transfer of rights?
    (c)    Initiation of judicial proceedings?
    (d)    Other changes in titles/ownership (such as leasing)?

If your country has a mandatory registration/recordation system, please describe any legal sanction(s) for non-compliance.

Registration is voluntary in all cases.

4.    What is the legal effect of registration?

    (a)    Copyright?
    (b)    Related rights?

What registration provides is a means of proof, i.e. a presumption of authorship, unless proof to the contrary is provided.  This applies both to copyright and related rights.

5.    Do courts in your country recognize copyright registrations effected by public authorities in other countries?  If yes, is recognition automatic or is a local procedure required to validate or otherwise give effect to the foreign registration?

There is insufficient data regarding the court decisions taken on this matter.


III.    PROCEDURAL QUESTIONS

1.    What are the requirements for registration?

(a)    Is there a deposit requirement, that is, must a fixed copy of the work be submitted with registration/recordation form?

Yes.  A copy of works whose rights are to be registered must be provided;  if the copy is in paper form, it must be bound and paginated.  Electronic copies are also acceptable, which can be examined by the Registry:  diskette, CD, DVD and videotape.

(b)    Is there a registration/recordation fee?  If so, how much is the registration/recordation fee?

Yes.  The fee for an application for entry in the Central Register is 11.26 euros, although each Autonomous Community has the power to establish its own rates in relation to the Territorial Registries subject to its administrative authorities.

(c)    What is the average time taken to complete the registration/recordation process?

The maximum period established by the Registration Regulations to resolve any application for registration is six months.

2.    Is there a different registration/recordation process for domestic as opposed to foreign works or objects of related rights?

    No.

3.    Are the files stored in digital form?

    The copy provided is stored in the same form in which it was submitted; the file generated is archived in paper form.  The data are stored in a computer database.

4.    Search facility of the registration/recordation system:

    (a)    Does the system have a publicly available search facility?  Are there restrictions on access?

    Registration entries are public and are produced by issuing certificates, valid as evidence; ordinary notes, simple information notes and computer access.

    Is the search facility available online in real time?

Yes, if a right is already registered.  This is not the case, however, for the record procedure.

(b)    Is access granted to the fixed copy of the work registered?

    Only to persons providing proof of authorship or that they hold the rights of exploitation.

(c)    Does the general public have access to other documents submitted?

    Only those people providing proof of direct or legitimate interest.

5.    Please provide statistics on the following registrations/recordations:

    (a)    Number per statistical period (last five years)

               1998:.............37,752
               1999:.............32,546
               2000:.............27,947
               2001:.............25,110
               2002:............ 30,891

    (b)    Number of inquiries/requests for information filed per statistical period (last five years)

|  | Certificates | Ordinary notes | Copies of work |
|---|---|---|---|
| 1998:.............139 | 49 | 4 | |
| 1999:.............243 | 448 | 11 | |
| 2000:.............431 | 520 | 54 | |
| 2001:.............343 | 478 | 50 | |
| 2002:.............261 | 384 | 24 | |
| Total............1,417 | 1,879 | 143 | |

UNITED STATES OF AMERICA

I    INSTITUTIONAL QUESTIONS

1.    What is the name and legal status of the copyright registering/recording body in your country?

The copyright registering body in the United States of America is the U.S. Copyright Office. It administers the U.S. copyright law under Chapter 7 of title 17, U.S.C., which gives the Register of Copyrights the responsibility of performing all administrative functions and duties contained in title 17, including inter alia, registration and recordation. See 17 U.S.C. § 701.  The Copyright Office is a department of the Library of Congress.

2.    Is the copyright registry interconnected to any other copyright data systems?

No.  The Copyright Office registry of registrations and recordations is not connected to external copyright data systems, such as those maintained by private music performing rights or mechanical rights organizations except to the extent those bodies provide links to the Copyright Office home page.  The copyright registry is interconnected within the Copyright Office data system to the extent that the registration and recordation files, along with other databases, are available to the public from the Copyright Office home page. Other computer files include, for example, files concerning notices of intention to enforce copyrights (GATT filings), Online Service Providers, and Vessel Hull Designs.  See the Copyright Office website, at www.loc.gov/copyright, "Search Copyright Records", where the public may conduct online searches.


II.    LEGAL QUESTIONS

1.    What kind of copyright works can be registered/recorded?  Is the registration/ recordation process different for each type of copyright work? Please describe the differences, if any.

(a)    Kinds of works registrable/recordable

Under section 410 of the copyright law, the categories of original works of authorship that can be registered include (1) literary works, including computer programs; (2) musical works; (3) dramatic works; (4) choreography and pantomime; (5) pictorial, graphic and sculptural works; (6) motion pictures and other audiovisual works; (7) sound recordings; and (8) architectural works. 17
U.S.C. §§ 102(a), 410. Compilations and derivative works that constitute original works of authorship are also registrable. 17 U.S.C. § 103.

A document may be recorded relating to any kind of copyrighted work. See the discussion at section (c) below.

(b)    Whether the registration, recordation process differs for each type of work

Neither the registration nor the recordation process differs according to the type of work protected by copyright.  Different statutory provisions apply to registration of mask works and

vessel hull designs, which are subject to sui generis protection, See Chapters 9 and13 of title 17. These works are registered according to their respective statutory provisions. At the end of the registration process, the Library of Congress may add some copyright deposits to its collections. The Library of Congress does not generally add mask works or vessel hull designs to its collections.

(c)    Differences, if any

Having stated that there is no difference in the registration/recordation process for different types of works, there is a basic distinction in U.S. copyright law between registration and recordation. Registration differs from recordation in that copyrighted works are registered; documents–original written instruments relating to copyright, such as assignments–are recorded. Claims to copyright are submitted to the Copyright Office on prescribed forms and entered into Copyright Office records after clearing the examination process. Documents are submitted to the Copyright Office for recordation and returned to the submitter after microfilming. Documents are not examined for legal sufficiency, but to be recordable, a document must contain the proper signature or signatures, be complete by its terms, and be capable of imaging. See Circular 12, "Recordation of Transfers and Other Documents."

2.    Can the subject matter of related rights (e.g., performances, broadcasts, sound recordings) also be registered/recorded?

U.S. copyright law does not make a distinction between "copyright" and "related rights." Performances, broadcasts and sound recordings are subject to copyright protection, as with the other types of authorship, to the extent the subject matter is fixed in a tangible medium of expression and meets the requirements of originality. Fixation in a copy or phonorecord is a condition of U.S. federal copyright. 17 U.S.C. § 102 (a). The registration and recordation requirements for such subject matter is the same as described for other copyrighted works.

If yes, is there a different registration/recordation process than for works protected by copyright?

The registration and recordation procedures are the same for sound recordings as for other works.

3.    Is copyright registration/recordation mandatory or voluntary in the following circumstances?

(a)    Recognition of creation?

In this circumstance, copyright registration is voluntary. Federal copyright recognizes creation automatically at the time a work is fixed in tangible form. 17 U.S.C. § 102. Copyright registration is permissive at any time during the subsistence of the copyright term. 17 U.S.C. § 408(a). Recordation of a document relating to copyright is not mandatory to recognize creation.

(b)    Transfer of rights?

Copyright registration and recordation are voluntary in regard to transfer of rights. Under section 205(c) of the copyright law, however, recordation in the Copyright Office provides additional benefits. Where a document that refers to a registered work is recorded, recordation constitutes constructive notice of the facts stated in the document. A recorded document also receives priority over conflicting transfers or exclusive licenses that have not been recorded. 17 U.S.C. §§205(d) and 205(e).

(c)     Initiation of judicial proceedings?

Registration is voluntary for initiation of proceedings related to non-U.S. works. 17 U.S.C. 411(a). For United States works, as this term is defined in Section 101, registration is mandatory in order to institute legal action; in such cases, the court has no jurisdiction until registration has at least been filed, and sometimes completed. In all cases where a registration has been attempted and refused, the copyright owner is entitled to institute a legal action for infringement. 17 U.S.C. § 411(a). The cases are not uniform, so that in some districts the court will accept a case where registration has been filed but not completed, in others, the court will expect a registration to have issued. These requirements do not apply to section 106(A) rights (moral rights) in works of visual arts, as defined in 17 U.S. C. § 101.

Recordation of a transfer is not mandatory in order to initiate judicial proceedings.

(d)     Other changes in title/ownership (such as leasing)?

Recordation of leases or other changes in title or ownership is not mandatory.

If your country has a mandatory registration/recordation system, please describe any legal sanction(s) for non-compliance.

Rather than legal sanctions, the registration system provides additional benefits for works that are registered. For example, registration prior to infringement or within three months of publication enables a court to award the litigant extraordinary remedies, i.e., statutory damages and attorney's fees, when the copyright owner prevails in an infringement action. 17 U.S.C. § 412. The court is without jurisdiction to award such damages in the absence of timely registration, although the court may award actual damages, profits and other remedies, under Chapter 5 of the Copyright Act.

4.     What is the legal effect of registration?

(a)     Copyright?

Registration made before or within the first five years after publication provides prima facie evidence of the truth of the facts stated in the copyright certificate and prima facie evidence of the validity of the claim. 17 U.S.C. § 410. Registration of renewal claims within the year before expiration of the original term is also entitled to prima facie evidence of the claim's validity and veracity. 17 U.S.C.§304(a)(4). Registration of a renewal claim within the year before expiration of the original term also entitles the owner to further license the use of a derivative work prepared under a previous license or transfer. Id.

(b)    Related rights?

Related rights are treated the same as copyright to the extent that those rights constitute authorship which is fixed in tangible form.

5.    Do courts in your country recognize copyright registrations effected by public authorities in other countries?  If yes, is recognition automatic or is a local procedure required to validate or otherwise give effect to the foreign registration?

There is no provision in the U.S. copyright statute to recognize copyright registrations effected by public authorities in other countries.  Nor have any cases been found that recognize foreign copyright registration. An owner of a foreign work need not register his or her claim in the United States or elsewhere in order to bring suit in U.S. courts. 17 U.S.C. § 411(a).  Registration in the United States, however, does provide additional benefits.  See the discussion following question II.3(d) and II. 4.


III.    PROCEDURAL QUESTIONS

1.    What are the requirements for registration?

Three elements are required for U.S. registration:  1) a completed registration form; 2) a fee; and 3) a complete copy or phonorecord, or identifying material.  These elements must generally be submitted in the same package and mailed to the Register of Copyrights at 101 Independence Ave. SE, Washington, DC 20559-6000.  The Copyright Office prescribes different forms for different types of works, e.g. Form TX, for literary works;  Form PA, for works of the performing arts; Form SR, for sound recordings; and Form VA, for works of visual arts.  See our website for additional information concerning these and other prescribed registration forms.

(a)    Is there a deposit requirement, that is, must a fixed copy of the work be submitted with registration/recordation form?

For original or basic registrations, a fixed copy, phonorecord, or identifying material for the work must be deposited.  Only one deposit copy or phonorecord of the first published edition is required for registration of works first published outside the United States.  In general, two deposit copies or phonorecords are required for works first published in the United States. 17 U.S.C. §408(b)(3).  No deposit is required for renewal registration, per se.  However, a deposit is required for renewal of works that were not registered during the original term.  No deposit is required for a supplementary registration (Form CA), which aims to correct or amplify a basic registration.

The provision of fixed representations of the copyrighted work is governed by regulations.  The regulations also govern mandatory deposit for the Library of Congress, which may be combined with registration. See 17 U.S.C. § 407; 37 C.F.R. 202.19-202.21.  Additionally, the deposit requirements are detailed in Copyright Office circulars pertaining to specific types of works, e.g., Circular 40a, Deposit Requirements for Visual Arts Material; Circular 50, Musical Compositions; and Circular 56, Copyright for Sound Recordings.

The Copyright Office website provides further information concerning specific procedures and forms, including instructions on how to complete forms. No deposit of the work is required to be submitted for recordation of documents. An original, signed document or a verified copy of the document itself must be submitted in such cases.

(b)    Is there a registration/recordation fee? If so, how much is the registration/recordation fee?

The fee for basic registration is $30 dollars, payable in U.S. funds. The fee for renewal registration is $60, with an additional $30 fee for an addendum when no original registration was made. The fee for supplementary registration is $100. The basic fee for recordation is $80 for a document listing one title. For documents listing multiple titles a $20 fee is added per group of 10 titles or fewer.

The fee is usually submitted by check, or U.S. bank draft, although entities may establish a deposit account, into which remitters pay for copyright service fees in advance. See Circular 4, on our website.

(c)    What is the average time taken to complete the registration/recordation process?

The Copyright Office's average time for completion of a registration is 90 days. The average time taken to complete the recordation of a document is 105 days.

2.    Is there a different registration/recordation process for domestic as opposed to foreign works or objects of related rights?

The registration and recordation processes for domestic works are the same as for foreign works.

3.    Are the files stored in digital form?

Since 1978, registration and recordation cataloging information has been stored in digital form. Cataloging information concerning works registered before 1978 is stored on catalog cards in the Copyright Office. In addition, tangible copies of the deposits and forms themselves are stored in the form submitted. The Copyright Office is developing a new electronic system as part of a reengineering program that began in 2000. One of the goals is to receive more registration submissions for processing and storage in digital form. The system is expected to be fully implemented in 2006.

4.    Search facility of the registration/recordation system: Does the system have a publicly available search facility? Are there restrictions on access?

The Card Catalog of pre-1978 records is available for public search in the Copyright Office during business hours. For records from 1978 to present, the online search system, including the Copyright Office History Monograph file (registrations), and the Copyright Office History Documents file (recordations), is available from our website. There are no restrictions on access to these files.

(a)    Is the search facility available online in real time?

Yes.  There is a time lag of approximately 90 days between the cataloging of the record and the appearance of the record in the online registration system.  Information about the records is available by telephone prior to availability of the catalog record.

(b)    Is access granted to the fixed copy of the work registered?

Copyright owners are granted access to the fixed copy of their registered work and may receive reproductions without restriction. 37 C.F.R. § 201.2(d).  Persons who are not copyright owners are granted access to works under prescribed circumstances. Id. Compendium of Copyright Office Practices, Compendium II,  §§ 1901 ff.(1988).  Under supervision, these parties may inspect a copy of a deposited work and take limited notes during inspection, but may not make copies. Id.  Upon submission of a litigation statement involving a work, a party to a lawsuit or that person's legal representative may obtain a copy of the work.  Additionally, a court may order the Copyright Office to produce a copy of the work. 37 C.F.R.§ 201.2(d)(2).

(c)    Does the general public have access to other documents submitted?

Upon payment of applicable service fees, the general public may request other documents, for example, correspondence submitted in connection with registration, or application forms.  Access to materials while they are being processed, that is, prior to registration or refusal of registration, is prescribed.  In exceptional cases, upon a showing of good cause, the Register may grant special permission to obtain access to in process files. Access to certain materials submitted in connection with registration–financial information, for example, is generally not available.  Nor is access granted to information concerning the privacy of individuals or internal business matters relating to Copyright Office procedures. See 37 C.F.R. § 201.2 and the Compendium of Copyright Office Practices, Compendium II, at §§ 1902.08, 1903.

5.    Please provide statistics on the following registrations/recordations:

(a)    Number per statistical period (last five years)

The number of registrations of claims to copyright made over the last five years is 2,766,935.

The number of recordations of documents pertaining to copyright made over last five years is 77,192.

(b)    Number of inquiries/requests for information filed per statistical period (last five years).

The number of non-fee information service requests filled over the last five years is 1,880,015.

[End of Annex III and of document]

# EXHIBIT B

# A guide to copyright

# On this page

- Understanding copyright — The basics
  - Protect your valuable creations
  - Copyright: Definition and Applicability
  - Benefits of registration
  - Term of protection
  - Works of Crown copyright
  - Applying for registration of copyright
  - Fees
  - Corresponding with the Canadian Intellectual Property Office (CIPO)
  - Electronic services
- Copyright information — Beyond the basics
  - Anonymity in Registration
  - Copyright Notice
  - Assignments and licences
  - Additional contacts and information
- Frequently Asked Questions

# Understanding copyright — The basics

This guide is intended as an introduction to copyright and copyright registration. It is not a complete text on the law regarding copyright.

Please note that, if your particular situation requires specific legal advice, you should consult a lawyer specializing in intellectual property (IP) law, or a legal clinic focused on IP.

# Protect your valuable creations

A poem, painting, musical score, computer program—all are valuable creations, although perhaps no one can measure their worth. Some works may earn a lot of money in the marketplace, while others earn none at all.

The purpose of the *Copyright Act* is to further the public interest by promoting the creation and dissemination of works of the arts and intellect, and to allow creators a just reward for their creations.

Regardless of their merit or commercial value, Canadian law protects all original literary, dramatic, musical and artistic works, provided the conditions set out in the *Copyright Act* have been met. This means that if you own the copyright to a poem, song or other original work, you have rights but these rights are balanced with various conditions and exceptions to copyright which limit its length and applicability under certain conditions.

People sometimes confuse copyright with patents, trademarks, industrial designs and integrated circuit topographies. Like copyright, these are forms of IP and are covered in their own legislative acts. For more information on different types of IP, consult the Canadian Intellectual Property Office (CIPO)'s Education, tools, and resources section.

## Copyright: Definition and applicability

Copyright applies to original literary, dramatic, musical and artistic works that are in a fixed material form (i.e., written, recorded) and means that a copyright owner has:

- the sole right to produce or reproduce that work or a substantial part of it in any material form
- the sole right to perform that work or any substantial part of it in public
- if the work is unpublished, the right to publish it or any substantial part of it

Copyright protection applies to all original literary, dramatic, musical and artistic works provided the conditions set out in underline section 5 of the Copyright Act have been met. Each of these general categories covers a wide range of creations, including:

- literary works such as books, pamphlets, computer programs, software and other works consisting of text
- dramatic works such as motion picture films, plays, screenplays and scripts
- musical works such as musical compositions with or without words
- artistic works such as paintings, drawings, maps, photographs, sculptures and plans

Copyright's balance means it is subject to certain exceptions, which are found throughout Part III of the Copyright Act. These exceptions allow copyrighted works to be copied without authorization or payment under certain conditions or for specific purposes (for example: educational purposes, shifting a work from an obsolete form to a modern form, or for accessibility purposes). For more information on exceptions within the *Copyright Act* and to determine if they are applicable to you, please consult a lawyer specializing in IP law, or a legal clinic focused on IP.

Copyright also applies to other subject-matter, as described below, though the associated rights may differ somewhat.

- Performers' performances, meaning any of the following:
  - a performance of an artistic, dramatic or musical work, whether or not the work was previously recorded and whether or not the work's term of copyright protection has expired
  - a recitation or reading of a literary work, whether or not the work's term of copyright protection has expired

- an improvisation of a dramatic, musical or literary work, whether or not the improvised work is based on a pre-existing work
- sound recordings, meaning recordings consisting of sounds, whether or not a performance of a work, but excluding any soundtrack of a cinematographic work where it accompanies the cinematographic work
- communication signals, meaning radio waves transmitted through space without any artificial guide, for reception by the public

For more detailed information about rights and exceptions relating to subject-matter other than works, please consult <u>Part II of the Copyright Act, R.S.C., 1985, c. C-42</u> or consult a lawyer specializing in IP law, or a legal clinic focused on IP.

## The conditions for copyright

### Works

One of the conditions for copyright is that where the author of the work must have been, at the date of the making of the work, a citizen or subject of, or a person ordinarily resident in, Canada or a country with which Canada has certain treaty obligations. (A treaty country is defined as a Berne Convention country, a Universal Copyright Convention country or a World Trade Organization member.) For more information, please consult section 5 of the *Copyright Act* or seek assistance from a lawyer specializing in IP law or a legal clinic focused on IP.

### Subject-matter other than works

For detailed information about how Canadian copyright law protects performers' performances, sound recordings and communication signals, please consult <u>Part II of the Copyright Act</u>, or seek the assistance of a lawyer specializing in IP law, or a legal clinic focused on IP.

# Benefits of registration

The *Copyright Act* states that a certificate of registration of copyright is evidence that the copyright subsists and that the person registered is the owner of the copyright. This evidence may be challenged in a court proceeding.

In administering the Copyright Registry, CIPO does not verify or examine the claims made in applications for copyright registration. Likewise, it is not responsible for monitoring registered works and how people use them, and it cannot guarantee the legitimacy, ownership, authorship or originality of a work.

# Term of protection

Generally, copyright lasts for the life of the author, the remainder of the calendar year in which the author dies, and for 70 years following the end of that calendar year. Therefore, protection will expire at the end of the 70th calendar year after the author dies.

Before December 30, 2022 , the general term of protection was 50 years after the death of the author. On December 30, 2022 , this term was extended to 70 years after the death of the author. The extension of this term does not have the effect of reviving copyright in works for which protection expired prior to January 1, 2023 .

There are some exceptions to the general term of copyright protection, including:

- Crown copyright
- works of joint authorship
- works where the identity of the author is unknown
- posthumous works, i.e., works that have not been published, performed in public or communicated to the public by telecommunication during

the author's lifetime
- subject-matter other than works (such as performer's performances, sound recordings and communication signals)

For more information, please consult the Copyright Act or seek the assistance of a lawyer specializing in IP law, or a legal clinic focused on IP.

## Works of Crown copyright

Crown copyright applies to government works (prepared or published by or under the direction or control of the Crown). Copyright in these works lasts for the remainder of the calendar year in which the work is first published and for 50 years after that.

The Government of Canada has policies in place to facilitate use of Crown works as dissemination of these works is often in the public interest. The Reproduction of Federal Law Order allows reproduction of federal laws, regulations and court decisions under certain conditions. Federal websites and documents may have policies regarding the use(s) of such works that may be consulted to better understand allowable uses.

## Applying for registration of copyright

Find step-by-step instructions on preparing and filing your application for registration on our Registration of copyright page.

## Fees

Visit CIPO's fees page for details on copyright registration fees or contact the Client Service Centre for additional information and guidance.

## Corresponding with CIPO

Visit CIPO's correspondence procedures page for more information.

For information on how to correct errors with your copyright application or registration, please refer to the Requesting a certificate of correction page.

## Electronic services

Visit CIPO's forms page to find out about services offered online and to access forms you can complete and send by regular mail or by facsimile.

# Copyright information — Beyond the basics

## Anonymity in registration

If you are the author and owner of the copyright work and you wish to remain anonymous, you may use a pseudonym in place of your name when applying for copyright registration. Note that you must still include a complete mailing address.

If you have any questions about the use of a pseudonym, you should seek the services of a lawyer specializing in IP law, or a legal clinic focused on IP.

## Copyright notice

Marking a work with the copyright symbol is not mandatory under Canadian copyright law but some other countries do require it. The copyright notice consists of the symbol ©, the name of the copyright owner and the year of first publication.

Including a copyright notice serves as a general reminder to everyone that the work is protected by copyright. You can use this symbol even if the work is not registered.

# Assignments and licences

For information on assignments and licences, consult CIPO's <u>Transfer ownership page</u>.

# Additional contacts and information

## Copyright Board of Canada

56 Sparks Street, Suite 800

Ottawa, Ontario K1A 0C9

Tel.: 613-952-8621

Fax: 613-952-8630

<u>www.cb-cda.gc.ca</u>

The Copyright Board of Canada is the regulatory body that approves tariffs that establish royalties for the use of copyright works whose rights are managed by a collective society. The Board may also supervise agreements or licences between users and licensing bodies and issue licences where a copyright owner cannot be located.

## Court orders

The procedure for obtaining court orders is outlined in the *Federal Courts Rules*, available through any local public library or bookstore selling government publications, and on the <u>Department of Justice Canada</u> website.

## Library and Archives Canada

Under the <u>Library and Archives of Canada Act</u> and the <u>Legal Deposit of Publications Regulations</u>, publishers making publications available in Canada are obliged to send copies of their publications to Library and Archives Canada generally within 1 week of the date they are published.

For more information, please contact:

Legal Deposit

Library and Archives Canada

395 Wellington Street

Ottawa, Ontario K1A 0N4

Tel: 819-997-9565

Toll-free number for Canada: 1-866-578-7777

Fax: 819-997-7019

www.collectionscanada.gc.ca

# Frequently asked questions

Expand all    Collapse all

▼ What is copyright?

Copyright is a type of IP protection provided to original literary, musical, dramatic and artistic works. A copyright owner enjoys several rights including the right to prevent others from reproducing the owner's work or copying any substantial part of it. Copyright law also applies to performers' performances, sound recordings and communication signals.

▼ What is not protected by copyright?

Ideas, facts, short and 1-word titles, and works that are not fixed in a material form (i.e., works that have not been written down or recorded in a somewhat permanent format) are not protected by copyright. Additionally, works which are not "original" (i.e, works whose creation did not involve the exercise of skill and judgment) cannot be protected by copyright law.

## ▼ Do I need to register my copyright in order for my work to be protected? What are the benefits of copyright registration?

No, a work is protected by copyright law the moment it is created and fixed in a material form. Registering your work with CIPO is voluntary, but can be beneficial. The certificate of registration is evidence that copyright subsists in the work and that the person registered is the owner of the copyright. This evidence may, however, be challenged in a court proceeding.

Please note that CIPO does not verify or examine the claims made in applications for copyright registration. Likewise, it is not responsible for monitoring registered works and how people use them, and it cannot guarantee the legitimacy, ownership, authorship or originality of a work.

## ▼ How long does copyright last?

Generally, copyright lasts for the life of the author, the remainder of the calendar year in which the author dies, and for 70 years following the end of that calendar year. Therefore, protection will expire at the end of the 70th year after the author dies.

## ▼ What happens when copyright protection ends or expires?

When copyright protection expires, works fall into the public domain and are free to be used and enjoyed by anyone without the need to acquire permission. For example, William Shakespeare's plays are part of the public domain, and therefore everyone may produce or publish them without having to acquire permission or pay royalties.

## ▼ Do I need to mark my work with the copyright symbol?

No, Canadian copyright law does not require marking a work with the copyright symbol (©) for the work to be protected. Nonetheless, there are benefits to including a copyright notice on your work. For instance, it serves as a deterrent to unauthorized reproduction and as a reminder that copyright is claimed in the work. In case of a lawsuit, the copyright symbol could also be used as evidence against someone claiming to be an "innocent infringer". Additionally, since there are some jurisdictions that do require works to be marked, it may be prudent to include a copyright notice when putting them online or making them available in a foreign jurisdiction. For further information, please consult a lawyer specializing in IP law or a legal clinic focused on IP.

Generally, a copyright notice consists of the symbol ©, the name of the copyright owner and the year of first publication. For example, "© Jane Doe, 2019". The copyright symbol may be used even if the work has not been registered.

▼ Someone infringed my copyright. What can I do?

Copyright infringement occurs where a person does anything only a copyright owner is allowed to do, without their permission. Infringement may include acts such as copying, performing, selling/distributing or posting your work on the internet without your permission. CIPO does not offer advice as to whether a particular act constitutes infringement. For assistance with such issues please consult a lawyer specializing in IP law or a legal clinic focused on IP.

▼ How can I register the copyright in my work?

To register your copyright you must file an application accompanied by the appropriate fee with CIPO, a federal agency responsible for the administration and processing of IP rights in Canada, including the registration of copyrights.

You can file your application for copyright registration with CIPO electronically, by mail or by fax.

▼ Is there a way to ensure my copyright is protected internationally?

While there is no international copyright registration system, there are international treaties, such as the Berne Convention and the World Intellectual Property Organization Copyright Treaty, that extend copyright protection to foreign jurisdictions without having to register your copyright. These international agreements require member states to grant authors the same rights as if the work was created within the member's jurisdiction.

▼ Do I need to send CIPO a copy of my work for registration?

No, CIPO does not require a copy of the work for registration. CIPO does not accept copies of works submitted with copyright application forms at the time of filing, nor after registration. CIPO does not verify or examine the claims made in applications for copyright registration and it cannot guarantee the legitimacy, ownership, authorship or originality of a work.

However, under the *Library and Archives of Canada Act* and the *Legal Deposit of Publications Regulations*, Canadian publishers are obliged to send copies of their publications to Library and Archives Canada within 1

week of the date they are published. Note that depositing published materials with Library and Archives Canada does not constitute or convey formal copyright registration or protection.

▼ How do I register an assigned copyright?

To register an assignment, a copy of the original transfer agreement or a photocopy signed by both parties must be filed with CIPO along with the prescribed fee. You must also include the names or the registration numbers of the affected works. Requests may be submitted by mail, by fax or online.

▼ What are moral rights? What does it mean to waive my moral rights?

Copyright law in Canada grants authors moral rights in addition to copyright in their works. Moral rights are concerned with the natural and inherent rights of a creator, and include the right of anonymity (the right of the author to remain anonymous); the right of integrity (to prevent distortion, mutilation or modification of the work); and the right of association (to be credited for the work).

Moral rights cannot be assigned or transferred, but can be waived. Even if an author decides to assign their copyright in a work, the author continues to hold the moral rights to the work, unless they formally waive their moral rights. By formally waiving moral rights, an author no longer has the rights outlined above. Once moral rights are waived, they cannot be reacquired.

▼ I have a question about copyright. Who do I contact?

**If you have a question concerning copyright registration(s) and applications to register:**

Please contact CIPO's Client Service Centre, where experienced information officers can answer your queries on copyright registration and applications to register.

1. Toll-free from anywhere in Canada and the United States: 1-866-997-1936
2. International calls only: 1-819-934-0544
3. TTY (cannot receive voice calls on this line): 1-866-442-2476

If you have a question concerning copyright tariffs and tariff proceedings:

Please contact the Copyright Board of Canada, a Government of Canada administrative agency which, among other things, sets the royalties to be paid for certain uses of works protected by copyright.

1. Email: secretariat@cb-cda.gc.ca
2. Telephone: 1-613-952-8621
3. Fax: 1-613-952-8630

If you have any other general questions related to copyright:

Please contact the Copyright Policy Branch of the Department of Canadian Heritage, a Government of Canada department that promotes access to quality copyright information so that Canadians may better understand and apply the legislation, regulations and processes governing copyright.

1. Email: PCH.info-info.PCH@canada.ca
2. Telephone: 1-819-997-0055
3. Toll-free: 1-866-811-0055 (the toll-free lines have agents available to answer your questions, Monday to Friday, 8 a.m. to 5 p.m. Eastern Time)
4. TTY (cannot receive voice calls on this line): 1-888-997-3123

Please note that none of these organizations has a mandate to give legal advice to private persons, corporations or government agencies.

**Date modified:**

2024-10-15

# EXHIBIT C

# What you should know about copyright



## What is copyright?

Copyright is the exclusive legal right to produce, reproduce, publish or perform an original literary, artistic, dramatic or musical work. While there is no international copyright registration system, there are international treaties, such as the Berne Convention and the World Intellectual Property Organization Copyright Treaty, that extend copyright protection to foreign jurisdictions without having to register your copyright. Registering your work with the Canadian Intellectual Property Office (CIPO) is voluntary.

Did you know that all original literary, artistic, dramatic and musical works are protected by copyright laws, provided the conditions set out in the *Copyright Act* have been met, the moment the work is created and fixed in a material form? The copyright protection exists in Canada during your lifetime and for 70 years following your death. After that, the work

becomes part of the public domain, accessible for anyone to use. This is true for most works, but there are exceptions for works like <u>Crown copyright, works with joint authorships and works with unknown authors</u>.

# What is the difference between authorship and ownership?

Authorship refers to the original creators of a work, such as writers, artists or composers.

Usually, the creators of the work are the owners of the copyright. However, if that work is made in the course of employment, it is typically the employer, or any other legal entity such as a film studio or a publishing house, that owns the copyright, either per the <u>Canadian Copyright Act</u> provisions or through a transfer of ownership, such as an <u>assignment</u>. When you own the copyright, you control how it is used in order to protect its value. Others who want to copy the work without infringing on your rights can request in writing to license or buy the work.

# What are moral rights?

In Canada, copyright laws give authors 2 types of rights: economic rights and moral rights. Moral rights focus on a creator's inherent rights, which includes the right to stay anonymous or use a pseudonym, the right to protect the work from distortion and the right to be credited for the work. Even if an author decides to assign their copyright ownership, the author continues to hold the moral rights to the work, unless they formally waive those rights.

# What are the benefits of copyright registration?

By registering your copyright, you receive a certificate issued by CIPO. The registration can become valuable evidence to support that copyright exists and that the registrant is the owner of the work. A registration can be useful in a <u>cease and desist letter</u>, or if you have to enforce your copyright in a lawsuit against an alleged infringer, especially if the infringing party pleads they were unaware of any copyrights in the infringed work due to the lack of registration.

## What do I need to register a copyright?

To register a copyright, an application must include:

- the title of the work
- the category of copyright-eligible works to which it belongs (i.e. literary, artistic, dramatic or musical work)
- the date and place of first publication (if it is published)
- the name and complete mailing address of the copyright owner
- the name of the author of the work
- a declaration that the applicant for copyright is either the author of the work, the copyright owner, an assignee of the copyright or a person to whom an interest in the copyright has been granted by licence

If you're ready to register your copyright, start your <u>e-filing application</u> now or check out our <u>guide to copyright</u>.

# Copyright law in Canada and the United States

## Did you know?

In 2022, CIPO registered <u>9,536 copyright claims</u>, which is only a fraction of the copyrights registered with the U.S. Copyright Office, which registered <u>486,589 claims (PDF Version, 36 page, 11.3 MB)</u>. This can be explained by the difference in laws: even if a copyright is automatic, a registered claim may be required to process an infringement case in a United States court or the Copyright Claims Board. In fact, many Canadians register their copyright in the United States due to <u>local requirements in the United States</u>.

# How are copyright laws made and managed in Canada?

- Canadian intellectual property (IP) laws are federal. To become law, legislation must be approved by Parliament as per <u>the legislative process</u>.
- The <u>Copyright Act</u> is the responsibility of the Minister of Innovation, Science and Industry. It also has the support of the Minister of Canadian Heritage about the cultural aspects of copyright. Both departments support the development and implementation of the copyright framework.
- Global Affairs Canada administers <u>trade aspects of the IP rights</u>. This is often done through international negotiations.
- CIPO administers and processes the <u>registration of copyrights</u>.

# Copyright, artificial intelligence and data

Recent advancements in artificial intelligence (AI) and data technologies will have an impact on how copyright is governed in Canada, spurring many questions about subjects like generative AI and copyright. One question that arises is, can AI generated content be copyrighted?

The Government of Canada continues to amend the Copyright Act for the benefit of all Canadians. The Consultation on Copyright in the Age of Generative Artificial Intelligence focused on the impacts of recent developments in AI on the creative industries and the economic impacts that these technologies could have on Canadians. The findings will help determine whether change is required to further reinforce copyright policy for an evolving Canadian economy. Stakeholder feedback will also inform the government's policy development.

The U.S. Copyright Office published a guide on AI generated content (PDF Version, 9 page, 188 kB) , which states that for a work to be copyrightable, it requires human authorship. When AI receives solely a prompt from a human and produces complex written, visual or musical works in response, the traditional elements of authorship are determined and executed by the technology; there is therefore not enough human authorship involved, and it cannot be copyrighted. If the user transforms the AI-generated material in a substantively creative way, then it becomes eligible for copyright.

To learn more about these copyright issues, you can listen to episode 15 of Canadian IP Voices.

# Liked this post?

Subscribe to our newsletter for more tips on how IP works, register for a free webinar with us or consider talking to one of our IP advisors to learn how IP works in your business.

## Related links

- Guide to copyright
- Copyright factsheet
- Canadian IP Voices podcast
    - Episode 11 - copyright, procedures and licences needed to play someone else's music in a commercial situation (related article: Using someone's music in business)
    - Episode 8 - copyright and social media content (related article: Influencer infringement)
    - Episode 16 - best practices for using open source software (related article: Let's talk about open source software)
    - Episode 15 - how to protect training data used in the creation of AI systems (related article: Understanding artificial intelligence)

**Date modified:**

2024-05-03

# EXHIBIT E

# Damages for Intellectual Property Infringement in Canada

By: **Christopher Heer**, **Ian Goodman**, **Malcolm Harvey**, **Rares Minecan** | Last updated: January 15, 2025

The recoverable damages amount is often a key factor in a plaintiff's decision to pursue litigation in the first place. Potential litigants commonly ask, "How much can I recover?" The answer can depend on several factors, including the specific intellectual property rights in issue, the extent and duration of the infringement and the evidence supporting the potential plaintiff's losses. Regardless of the rights under consideration, the overarching purpose of damages awards is to compensate the plaintiff for its losses.

## Patents

A patent gives the patent owner the right to exclude others from making, using, or selling the invention. Under the *Patent Act*, infringers are liable to the patentee for all damage sustained by the patentee after grant of the patent as a result of the infringement. Most often, damages awards for patent infringement are based on: (a) profits lost by the patentee as a result of the infringer's activity, or (b) a reasonable royalty rate for an appropriate licence.

### Profits lost by the patentee

In an effort to compensate a plaintiff for its losses, courts consider the profits the plaintiff would have made but for the infringing activity of the defendant. Determining the sales (and subsequently, profits) that a patentee would have made in the absence of infringement involves consideration of a hypothetical scenario in which the infringing product never entered the marketplace—sometimes referred to as the "but for world". The Federal Court has considered the following factors when determining the likely outcome of such a scenario:

- the presence of competing products in the market;
- the advantages of the patented product over competing products;
- the advantages of the infringing product over the patented product;
- the patentee's market position;
- the infringer's market position;
- the patentee's market share before and after the infringing product entered the market;
- the size of the market before and after the infringing product entered the market; and
- the capacity of the patentee to produce additional products.

When calculating lost sales, courts in Canada also consider the defendant's ability to utilize a non-infringing alternative instead of infringing. Awarding the patentee full damages without properly considering the market impact of competition from a lawful alternative may result in the patentee recovering more than it might have in the absence of infringement. Relevant inquires are: (a) what non-infringing alternative could and would the defendant (or others) have sold in the "but for world", and (b) to what extent would this competition have affected the patentee's sales.

Lastly, a patentee may recover for all damages flowing from infringement of the patent, provided that the act of infringement occurs in Canada. For example, a patentee may recover damages based on lost profits for the sale of infringing products manufactured in Canada but sold elsewhere.

### Reasonable royalty rate

Damages may also be calculated on the basis of a reasonable royalty rate, which reflects the infringer's cost of obtaining an appropriate licence rather than infringing the patent. Damages based on a reasonable royalty rate are awarded, in part, to recognize that each

sale by an infringer is still an illegal transaction, regardless of whether such a sale would have impacted the patentee's profits.

The awarded royalty amount is based on a hypothetical negotiation between the parties – the analysis considers the licensor's minimum willingness to accept and the licensee's maximum willingness to pay. The hypothetical negotiation is considered as of the beginning of the infringing activity, and a one-time hypothetical negotiation may be appropriate even where there have been separate instances of infringing activity.

The *Patent Act* also allows patentees to obtain "reasonable compensation" for activity that: (a) occurred after the patent application was laid open for public inspection but *before* the patent was ultimately granted, and (b) would have constituted infringement if the patent was granted. The reasonable compensation referred to in the *Act* has been interpreted by courts to mean a reasonable royalty rate.

Lost profits and a reasonable royalty rate are mutually exclusive approaches to determining damages for patent infringement. However, a court may utilize both separately where, for example, the patentee's lost profits are connected to some, but not all, of the infringer's activity or sales – a reasonable royalty rate may then be calculated for infringing sales that the plaintiff would not have otherwise made.

## Trademarks

A registered trademark gives the trademark owner the exclusive right to use the trademark throughout Canada, exclude others from selling, distributing or advertising any goods or services in association with the same or a confusingly similar trademark or trade name, and exclude others from manufacturing, causing to be manufactured, possessing, importing, exporting or attempting to export any goods in association with the same or a confusingly similar trademark or trade name, for the purpose of their sale or distribution. Damages amounts in trademark disputes can often be difficult to quantify. How does one attach a specific dollar value to the loss of a trademark's distinctiveness or depreciation of goodwill associated with a trademark?

In response to this difficulty, courts have awarded "nominal" damages where the plaintiff is unable to provide evidence of specific losses suffered. If there has been infringement, courts must use best efforts to ascertain appropriate damages, regardless of the difficulty in doing so, and are permitted to apply ordinary business knowledge and common sense. Further, although more typically associated with punitive damages, the need for deterrence has also been considered in compensatory damages awards in trademark disputes.

In select scenarios, other approaches may be used to calculate damages awards:

### Counterfeit goods cases

In cases involving counterfeit goods, courts have calculated damages by multiplying a nominal amount for each act of infringement or turnover of counterfeit inventory. The Federal Court of Appeal has stated that damages awarded on this basis are supported where: (a) the defendants are uncooperative, (b) proof of actual damages is difficult, and (c) it is hard to estimate the harm done to the trademark owner's goodwill through the sale of inferior quality counterfeit goods. Documented purchases, offers for sale or observations of counterfeit items may all constitute individual acts of infringement when calculating damages based on this approach.

As might be expected, damages awards in decisions involving counterfeit goods can be much greater than those of other trademark matters; these awards can extend into six figures and, in rare instances, have totalled over $1M.

### es involving a "hybrid approach"

Recently, some courts have adopted a "hybrid approach" – this involves using less-than-ideal financial data as a baseline to then calculate a type of "per incident" award that is also justifiable as a global compensatory award. The court may use its discretion to make

adjustments as necessary. For example, in *Biofert Manufacturing Inc v Agrisol Manufacturing Inc*, 2020 FC 379, the Court awarded an amount for the period of infringement in issue that took into consideration the defendant's specific infringing activity on a month-by-month basis.

## Copyright

A copyright holder has the sole right to produce or reproduce a work or a substantial part of it in any form. It also includes the right to perform the work or any substantial part of the work, and the right to publish an unpublished work or any substantial part of it. Under the *Copyright Act*, a successful plaintiff may elect compensatory damages *and* an accounting of the defendant's profits, provided that such profits are not already included as part of the damages award. Like damages awards in many trademark disputes, damages awards in copyright disputes may not be readily calculable. Nonetheless, courts must do the best they can as a matter of common sense and, in any event, may still award a nominal amount.

### Statutory damages

At any time before final judgment is rendered, a plaintiff may elect statutory damages instead of damages and profits. A successful plaintiff need not prove the extent of its losses to obtain statutory damages. As a result, statutory damages may be preferable where a plaintiff is either unable or unwilling to prove the full extent of its losses.

If the infringement was for commercial purposes, then, subject to applicable exceptions, a court may award from $500 to $20,000 for all infringements relating to *each* work in issue. That is, statutory damages for commercial infringement are awarded on the basis of each work infringed. A court may, in select circumstances, exercise its discretion to award less than the minimum statutory amount of $500. A court exercising such discretion must consider the good faith or bad faith of the defendant, the conduct of the parties before and during the proceedings and the need to deter further infringement.

For example, in *Trader Corp v CarGurus, Inc*, 2017 ONSC 1841, the Ontario Superior Court of Justice awarded $2 for each of the 152,532 infringed photos, which totalled $305,064. The Court readily concluded that an award reflecting the minimum statutory damages amount per work infringed – $76,266,000 – would have been grossly out of proportion to the infringement in issue. Nonetheless, courts have awarded the maximum statutory amount of $20,000 for serious acts of infringement that often involve further aggravating factors, such as repeat infringement, large profits earned by the infringer or breach of a court order.

If the infringement was for non-commercial purposes, then a court may award from $100 to $5,000 in statutory damages for all infringements relating to all works in issue – the award cannot exceed $5,000, regardless of the number of works infringed.

While the provisions of the *Copyright Act* governing statutory damages do not address actual damages, an award of statutory damages should correlate to some degree with the plaintiff's actual losses. More broadly, courts should assess all of the circumstances in order to yield a just result.

## Punitive damages

In Canada, punitive damages are considered an exceptional remedy, regardless of the intellectual property rights in issue. They are awarded where a party's conduct has been malicious, oppressive and high-handed, offends the court's sense of decency, and represents a marked departure from ordinary standards of decent behaviour.

The purpose of punitive damages is to deter the defendant and others from similar conduct in the future rather than compensate the plaintiff for losses suffered. Punitive damages may be awarded in addition to compensatory or statutory damages, as the case may be, but only where compensatory (or statutory) damages alone would be insufficient to deter future misconduct.

### Plaintiff's Duty to Mitigate

In some cases, it may have been possible for the plaintiff to take reasonable actions to limit the losses it suffered from the defendant's infringement. In the Canadian legal system, this is referred to as a plaintiff's duty to mitigate. The burden of proof for establishing that a plaintiff has failed to mitigate is on the defendant, who must prove both that mitigation was possible in the first place, and subsequently, that the plaintiff did not make reasonable efforts to mitigate.

What does reasonable mitigation look like? The Court of Appeal in *Apotex v Canada* 2017 FCA 73 stipulated that a plaintiff is not entitled to recover compensation for a loss that could have been avoided by taking reasonable action. Subsequently, any loss is disallowed when the loss flows from the plaintiff's inaction, as opposed to the defendant's wrongdoing. The court goes on to say that what constitutes a reasonable action is dependent on the particular circumstances of the plaintiff and the case.

### Conclusion

A clear understanding of obtainable remedies, including the likelihood and quantum of a possible damages award, is key to making an informed decision to pursue, defend or settle a dispute. If you are facing or contemplating intellectual property litigation, please contact us for a complimentary and confidential initial telephone appointment with a member of our team.

**Related resources:**

Intellectual Property Litigation FAQ

I Think My Intellectual Property Rights Are Being Infringed; What Now?

What to Do If You Have Received a Cease and Desist Letter

Privacy | Terms of Use | Site Map
25 Adelaide Street East, Suite 1000, Toronto ON M5C 3A1 Canada | p 416-546-7303
© 2025 Christopher Heer Professional Corporation operating as Heer Law

# EXHIBIT E

Federal Court                                    Cour fédérale

Date: 20240531

Docket: T-1862-15

Citation: 2024 FC 829

Ottawa, Ontario, May 31, 2024

**PRESENT:   The Honourable Mr. Justice Roy**

 BETWEEN:

### 1395804 ONTARIO LTD, operating as BLACKLOCK'S REPORTER

**Plaintiff/
Respondent on Motion**

**and**

### ATTORNEY GENERAL OF CANADA

**Defendant/
Moving Party**

**and**

### SAMUELSON-GLUSHKO CANADIAN INTERNET POLICY & PUBLIC INTEREST CLINIC

**Intervener/
Respondent on Motion**

## <u>JUDGMENT AND REASONS</u>

2024 FC 829 (CanLII)

[1]     The Attorney General of Canada [AGC], the Defendant in the action launched by 1395804 Ontario Ltd, operating as Blacklock's Reporter [hereinafter "Blacklock's Reporter" or "BR" or "Plaintiff/Respondent on Motion"], is the Moving Party seeking a summary judgment against the Plaintiff.

[2]     This matter turns on a subscription to Blacklock's Reporter, which is a subscription-based news corporation based out of Ottawa. An officer at Parks Canada purchased a $148 subscription to Blacklock's Reporter, using a Parks Canada Agency credit card and address. Blacklock's Reporter launched against the Defendant, acting on behalf of Parks Canada, an action alleging that officers at Parks Canada used the subscription in a way that is contrary to the *Copyright Act*, (RSC 1985, c C-42) [the *Act*] by obtaining, reading and distributing news articles without proper authorization.

[3]     However, as I will explain, the matter in dispute reached the Court in a rather tortuous way. While Blacklock's Reporter discontinued its action, the Defendant raced to the Court in order to counterclaim against the Plaintiff. The Attorney General also brought a summary judgment motion pursuant to Rule 213 of the Rules of the Federal Courts (SOR/98-106). That constitutes the matter which is before the Court. As a result, Blacklock's Reporter is now the "Plaintiff/Respondent on Motion", while the Attorney General, acting on behalf of the original Defendant, is now the "Defendant/Moving Party".

2024 FC 829 (CanLII)

2024 FC 829 (CanLII)

## I.    How did we get here?

[4]    Blacklock's Reporter chose to discontinue its action against Parks Canada on July 6,

2020. Nevertheless, the Defendant sought to keep some of the matters that would have been

included in the discontinued action alive by serving an amended Statement of Defence and

Counterclaim on Sunday, July 5, 2020. It was filed with the Court on July 7. However,

Blacklock's Reporter argued that its discontinuance of its action resulted in the motion for

summary judgment being without object.

[5]    I pause to give some more background to these proceedings. A number of actions against

federal departments and Crown corporations have been launched by BR. They all allege

copyright infringement, but the facts in each such action were found to be different by Case

Management Judge Tabib, in her Order of March 3, 2016 (T-1862-15). She found that the news

articles were different and often involved different authors as well as different acts of

infringement, including the copying and transmission to others within the entity. There are also

similarities between the cases: the theory of the case for the Plaintiff in each case appears to be

similar. The Defendants were all claiming to be operating on the basis of fair dealing (*Copyright

Act*, s 29) in that the subscriptions purchased were used to share within the organization articles

to conduct research, media monitoring, verification of accuracy or consideration of whether a

response was required.

[6]    Associate Judge Tabib determined that the pending actions were to be stayed, in spite of

BR's resistance, until after one of those actions, involving the Department of Finance

(T-1391-14), was finally concluded. The Case Management Judge held the faint hope that case T-1391-14 would lead to "a very high likelihood that it will lead to a significant narrowing of the issues" (Order of March 3, 2016, p 6/7). Associate Judge Tabib alluded to the possible application of the principles of issue estoppel in a number of future cases.

[7]    Blacklock's Reporter challenged the ruling. In a Judgment dated June 27, 2016 (2016 FC 719), Gascon J found that the appeals had to be dismissed, with costs amounting to $10,500 to be paid by BR (Order of August 16, 2016). Gascon J indicated in his Judgment of June 2016 that BR complained that Associate Judge Tabib speculated on the question of the application of the doctrine of issue estoppel, a matter that was argued before this Court in this case. He disposed of the issue as follows: "This statement clearly indicated that *issue estoppel* could help streamline cases where the AGC is a Defendant, but it did not suggest or imply that this doctrine could apply to the other Defendants" (para 63).

[8]    The Department of Finance case, the so-called "test case", was decided on November 10, 2016. It did resolve little concerning the other pending cases. The next one in the queue was the one involving Parks Canada. The matter of filing an amended Statement of Defence and Counterclaim by the AGC in the Parks Canada case was challenged by Blacklock's Reporter. By an Order dated April 29, 2021, Case Management Judge Molgat found that the Statement of Defence and Counterclaim should be allowed to proceed, following written submissions made by the parties.

2024 FC 829 (CanLII)

[9]     We learn from the Order that the summary judgment motion made by the AGC was the sticking point. The AGC's contention was that the motion would help resolve related actions. The genesis of what became the amended notice of motion for summary judgment after the events of July 2020 is found in the AGC's motion for summary judgment. The AGC sought the dismissal of the parts of the Plaintiff's claim that relate to the contention that there was a breach in this case of technological protection measures (TPMs, as per section 41 et al of the *Copyright Act*). The AGC was also asking for an order confirming that the use of articles obtained through a subscription constitutes "fair dealing" in the circumstances of the case: there was therefore no violation of the *Act*, says the AGC. That is because "fair use" is an exception to the TPM provisions. The obtaining of a subscription gives access to a password that can be shared in pursuit of the "fair use".

[10]     It is reported in the Order of April 29, 2021, that, leading up to the kerfuffle in early July 2020, Blacklock's Reporter gave instructions to counsel "to proceed to the case management conference without a timetable for the summary judgment motion in Parks Canada (T-1862-15)" (Order of April 29, 2021, p 4/14). It appears that there were discussions between the parties to consider such motion.

[11]     There were no further developments until April 2020. Blacklock's Reporter requested a case management conference advising that "Blacklock's is inclined to forego the summary judgment motion in Parks Canada (T-1862-15) and have Health Canada (T-117-17) proceed" (Order of April 29, 2021, p 4/14). The AGC submitted a detailed timetable for his motion for summary judgment in this case. That led to a CMC on July 3, 2020, where the Case Management

Judge advised that an Order establishing a timetable for the motion for summary judgment would be issued. It is then that Blacklock's Reporter, through its counsel, announced that it would discontinue its action against Parks Canada.

[12]    Following the incidents of early July 2020, the issue became whether the motion for summary judgment should proceed. That takes us to the Order of April 2021. Case Management Judge Molgat had to adjudicate whether the counterclaim was still alive in spite of the discontinuance of the "main action". Associate Judge Molgat found that the amended motion record of August 27, 2020 (an amended Statement of Defence and Counterclaim had come on the heels of the events of July 3 to 6, 2020) was alive and well. Recognizing that a discontinuance ends the proceedings (*Olumide v Canada*, 2016 FCA 287), that result would be attained only if the discontinuance is filed prior to the counterclaim. The counterclaim had been served on Blacklock's Reporter on Sunday, July 5, prior to the discontinuance of July 6; at any rate, the "Counterclaim was served and was submitted for filing, with proof of service, prior to service of the Discontinuance by the Plaintiff, and they were properly entered and filed by the Registry in the same sequence" (Order of April 29, 2021, p 9/14).

[13]    The Case Management Judge then proceeded to dispense with compliance with Rule 172 and grant leave *nunc pro tunc*. Associate Judge Molgat wrote at p 12/14:

> Apart from the prospect of now facing a counterclaim and the motion for summary judgment filed, the Plaintiff has not demonstrated that it will suffer prejudice or injustice if leave to file the Counterclaim is granted or dispensed with. In all the circumstances, I conclude that it is in the interest of justice and in the spirit of Rule 3 and the simplified rules to do so. The requirement to obtain leave to file the Counterclaim will therefore be dispensed with.

2024 FC 829 (CanLII)

…

> Given the potential for the motion to dispose of most if not all of the Related Actions, I am satisfied that allowing the motion to proceed is the option that best achieves the interest of justice and the just, most expeditious and least expensive determination of the issues.

[14]    Blacklock's Reporter appealed the Order of the Case Management Judge. Madam Justice McDonald heard the appeal and dismissed it on August 25, 2021 (2021 FC 872).

[15]    McDonald J found that the fact that the Amended Statement of Defence and Counterclaim was filed prior to the notice of discontinuance allowed for the motion for summary judgment to proceed. My colleague wrote: "If the discontinuance was filed before the Counterclaim was filed, the action would have been concluded and the summary judgment motion could not proceed. Whereas, if the Counterclaim was filed first, the Discontinuance would not apply to the claims advanced in the Counterclaim" (para 5). In the result, there is discontinuance of Blacklock's Reporter's action, but the AGC's motion remains alive and was heard by the Court. However, the nature and quality of the evidence to be adduced was not known at the time. Whether a decision on the motion for summary judgment would help streamline the process concerning the other lawsuits was not a certainty, but rather a hope.

[16]    As already alluded to, there are a number of related actions launched by Blacklock's Reporter against various federal government departments and agencies. Indeed the first such action, involving the Department of Finance and alleging a violation of the *Act* by obtaining, reading and distributing articles without authorization, was dismissed in November 2016. The other related actions are held in abeyance. The matters to be addressed in this case may have an

impact in the other Court cases still pending. At least, that is the contention of the AGC. The motion seeks declarations concerning three distinct matters:

1. The Terms and Conditions relative to the subscription to gain access to a website in order to have available articles. The subscription is offered and sold by the Plaintiff.

2. The use made of articles accessed by Parks Canada, said by the Defendant to constitute "fair dealing" in accordance with s 29 of the *Copyright Act* RSC 1985, c C-42.

3. Do the activities conducted by Parks Canada, i.e. the sharing of a password required to access articles from the Plaintiff's website, constitute circumvention of technological protection measures taken by the Plaintiff?

II.    <u>The parties</u>

[17]    The Respondent on the motion, an Ontario numbered company operating as Blacklock's Reporter, is an online news corporation based in Ottawa. It makes available articles on a subscription basis via its website. BR covers politics, legislation, parliamentary committees, the federal bureaucracy as well as the courts. It has court cases pending concerning various departments and agencies. The first such court action was with respect to civil servants in the Department of Finance. It appears that this first test case did not resolve much as a second case, involving officers at Parks Canada, was litigated until a discontinuance intervened. Nevertheless, the Crown kept some matters alive in the hope of getting some declarations that could then be used in other litigation between Blacklock's Reporter and various defendants.

2024 FC 829 (CanLII)

[18]     This case involves the Parks Canada Agency which is established pursuant to the *Parks Canada Agency Act* (SC 1998, c 31). The Agency is made a body corporate, under the responsibility of the Minister of the Environment, "that may exercise powers and perform duties and functions only as an agent of Her Majesty in right of Canada" (s 3). The long preamble to the *Act* speaks of the purpose of the Agency to be to ensure "that Canada's national parks, national historic sites and related heritage areas are protected and presented for this and future generations and in order to further the achievement of the national interest as it relates to those parks, sites and heritage areas and related programs". The Agency has the power to enter into contracts, to acquire property, sell, loan, exchange or dispose of any personal property or moveables acquired, or deal in the intellectual property controlled or administered by it (s 8). Legal proceedings may be brought or taken by or against the Agency in the name of the Agency (s 18).

[19]     Following this Court's decision on the ability of the AGC to counterclaim in spite of the discontinuance of the underlying action, the Samuelson-Glushko Canadian Internet Policy and Public Interest Clinic [CIPPIC] sought to intervene in this matter, pursuant to Rule 109 of the *Federal Courts Rules*. The Case Management Judge's Order of January 21, 2022 notes the opposition to the intervention by Blacklock's Reporter while the AGC supported it. The Court granted leave to intervene.

[20]     What prompted the Court to grant leave was Blacklock's Reporter's contention that access to its online articles was performed through the circumvention of its TPM, that being contrary to s 41.1(1)(a) of the *Act*. Indeed, does fair dealing constitute an exception to the TPM

2024 FC 829 (CanLII)

provisions, assuming that the required password can be a technological protection measure as the notion is defined. Here is how Associate Judge Molgat justified the intervention:

> **CONSIDERING** that the issues raised involve the rights of owners of copyright on one hand and the rights of users on the other, and that the interplay between the Act's anti-circumvention provisions and an affirmative defence of fair dealing with potentially broad implications for users' rights appears not to have been the subject of previous decisions, the Court is satisfied that CIPPIC has a genuine interest in the matter;

> **CONSIDERING** CIPPIC's public interest mandate, institutional expertise and experience, the Court is of the view that CIPPIC has much insight into the area of copyright law and policy, including the reach of the anti-circumvention provisions in the Act, and the scope of fair dealing, as it has demonstrated in a number of interventions before this Court, the Federal court of Appeal and the Supreme Court of Canada.

The CIPPIC abided perfectly by the terms of the Order granting it leave. Its intervention was of great assistance to the Court.

III.    <u>The original test case</u>

[21]    Many Court cases were held in abeyance while an initial Court case was before the Federal Court (Order of Case Management Judge Tabib, March 3, 2016). That case involved the Department of Finance, represented as it should by the Attorney General of Canada. It is *1395804 Ontario Ltd (Blacklock's Reporter) v Canada (Attorney General)*, 2016 FC 1255, [2017] 2 FCR 256 [*Department of Finance*]. As we shall see, the AGC relies significantly on the findings made by Mr. Justice Robert Barnes. The matter was not appealed by Blacklock's Reporter (the awarding of the costs in favour of the Defendant (2016 FC 1400) was appealed and the appeal was dismissed from the Bench (2017 FCA 185).

[22]    In that first case, Blacklock's Reporter alleged that Department of Finance officials violated its copyright by obtaining, reading and distributing the Plaintiff's articles without authorization. The AGC argued, successfully, that the use made constituted fair dealing in accordance with s 29 of the *Act*.

[23]    Our Court found that BR was using a "paywall" in order to protect its news copy. The paywall is referred to as the requirement to pay a subscription which allows for the use of a password to gain access to articles located on a website. There is no description or explanation as to what constitutes a password from a technical standpoint. In fact, there is no indication that access to a password was used by Finance officials.

[24]    There is a description of how a subscription can be acquired through an online application. Single subscriptions, without the need to acknowledge and accept any terms of use, are available. The Court notes that the application "refers to the purchase of custom bulk rates for institutional subscribers who would like to distribute or share Blacklock's content in-house" (para 5). Furthermore, the Court acknowledges that at the bottom of the application form, there is a "reference to "Terms and Conditions" but these are not particularized and would only be seen by a subscriber following a search of Blacklock's website" (para 5). As we shall see later, that corresponds to the evidence available in the instant case.

[25]    The facts in the Finance case differ somewhat from those in this case, as the articles which were made the subject of BR's action in infringement were acquired by someone outside of the Department of Finance. Nevertheless, the articles were made available within Finance.

2024 FC 829 (CanLII)

[26]    BR's managing editor, Mr. Tom Korski, was writing an article which he titled "$30,000,000 Sugar Tax is averted". As part of his process, Mr. Korski interviewed the President of the Sugar Institute; he also sought to get information about tariff changes from an official at the Department of Finance. In spite of comments made by the Finance official, the article improperly attributed "did not comment" from the Department.

[27]    Following a chain reaction, Mr. Korski sent the President of the Sugar Institute an e-mail comprising a digest of his article, which prompted the President to acquire a subscription to access the said article. The President then pasted the article in an e-mail sent to a Finance official in the International Trade Policy Division. The President wrote to the Finance official that she was not pleased with the "spin" put on the conversation she had with BR's managing editor.

[28]    Two days later, a second article was posted online. Once again, an unfavourable light was cast on the Department of Finance in an article whose title was "It didn't make any sense". The President, using the password, accessed the article and sent the second article to the same Finance official. As in this case, the President of the Sugar Institute testified being unaware of the Terms and Conditions: the President never thought she could be infringing BR's copyright by sending the articles to the Finance official.

[29]    Within Finance, the articles were shared between officials with a direct interest with a view to possible corrections. In the end, none were made. Blacklock's Reporter sued, seeking $17,209.10 in damages.

2024 FC 829 (CanLII)

[30]    Our Court found that the Defendant, the AGC on behalf of the Department of Finance, was entitled to the protection afforded by s 29 of the *Act*: its use of the articles constituted fair dealing for the purpose of research, private study, education, parody or satire. Fair dealing does not infringe copyright. In the view of Barnes J, "the fair dealing protection so obviously applicable to the acknowledged facts of this case that the litigation should have never been commenced let alone carried to trial" (Supplemental Judgment and Reasons as to costs, 2016 FC 1400, at para 18).

[31]    Indeed, in the appeal concerning costs, the Court of Appeal noted "(t)he Federal Court considered the issues before it – here, primarily the issue of fair dealing – to be well-settled in the jurisprudence and, thus, neither novel nor of public significance" (para 5).

[32]    I turn to the analysis conducted in the "test case" involving the Department of Finance. Having reviewed the facts of the case, our Court acknowledged that the copyrighted material had been used by the Department without payment and without consent. Accordingly, it was for the AGC to establish that the use made was covered by s 29, the fair dealing provision which reads as follows:

| **Research, private study, etc.** | **Étude privée, recherche, etc.** |
| --- | --- |
| **29** Fair dealing for the purpose of research, private study, education, parody or satire does not infringe copyright. | **29** L'utilisation équitable d'une oeuvre ou de tout autre objet du droit d'auteur aux fins d'étude privée, de recherche, d'éducation, de parodie ou de satire ne constitue pas une violation du droit d'auteur. |

2024 FC 829 (CanLII)

The reach of s 29 is broad and fair dealing is not an exception to a right conferred on copyright holders by law. It is inherent to the scheme, thereby striking a balance between owners and users. In this oft-quoted passage, Professor Vaver summarized the state of the law in his *Intellectual Property Law: Copyright, Patents, Trade-marks* (Toronto: Irwin Law 2nd ed, 2011):

> The *Copyright Act* lets users carry on a wide range of activities without needing to worry about copyright. What the Act specifically permits is not an infringement. Whoever does a permitted act is not just taking advantage of a limitation, exception, exemption, defence, "loop-hole," or gracious indulgence extended by a copyright owner. He is exercising a right inherent in the balance the *Copyright Act* strikes between owners and users. Both owner and user rights must receive the fair and balanced reading that befits remedial legislation. User rights need to be as liberally interpreted as owner rights are, lest copyrights become "instruments of oppression and extortion"" and unduly interfere with people's rights to deal as they wish with their own tangible property. [Footnotes omitted]

(p 215)

[33]    The leading authority on what constitutes fair dealing continues to be *CCH Canadian Ltd v Law Society of Upper Canada*, 2004 SCC 13, [2004] 1 SCR 339 [*CCH*]. The case concerned the reproduction by the Law Society of reported cases, statute, regulation or limited selection of text from a treatise at the Great Library at Osgoode Hall operated by the Law Society. In a unanimous decision authored by Chief Justice McLachlin, the Supreme Court ruled that the reproduction constitutes "research" in accordance with s 29. For our purposes, it will suffice to refer to only a few findings made by the Supreme Court and considered fully by Barnes J.

[34]    At paragraph 48 of *CCH*, the Supreme Court establishes the fundamental principles and underpinnings of the law:

- fair dealing is an integral part of the scheme; it is not a defence;

2024 FC 829 (CanLII)

- "in order to maintain the proper balance between the rights of a copyright owner and users' interests, it must not be interpreted restrictively".

[35]     Evidently, pursuant to s 29, there must be a dealing which falls within one of the purposes identified in the section. It must also be fair. In the case at bar, as well as in *CCH*, the dealing was said to be for research. At paragraph 51 of *CCH*, the Court writes:

> 51     The fair dealing exception under s. 29 is open to those who can show that their dealings with a copyrighted work were for the purpose of research or private study.  "Research" must be given a large and liberal interpretation in order to ensure that users' rights are not unduly constrained.  I agree with the Court of Appeal that research is not limited to non-commercial or private contexts. The Court of Appeal correctly noted, at para. 128, that "[r]esearch for the purpose of advising clients, giving opinions, arguing cases, preparing briefs and factums is nonetheless research."  Lawyers carrying on the business of law for profit are conducting  research within the meaning of s. 29 of the *Copyright Act*.

[36]     It is without difficulty that our Court found that the use made of the BR's articles was for the purpose of research: "There is no question that the circulation of this news copy within the Department was done for a proper research" (para 33). In so doing, our Court considered and applied the other leading case concerned with s 29, the unanimous decision in *Society of Composers, Authors and Music Publishers v Bell Canada*, 2012 SCC 36, [2012] 2 SCR 326 [*SOCAN*]. In *SOCAN*, the Court confirmed and reaffirmed at paragraph 11 that "(i)n order to maintain the proper balance between these interests [the balance between protection and access], the fair dealing provision "must not be interpreted restrictively": CCH, at para 48." The *SOCAN* Court found that allowing previews of musical works by consumers before making a purchase did constitute research and, therefore, s 29 could apply if that dealing for the purpose of research was fair.

[37]    The *SOCAN* Court endorsed and applied the six fairness factors for guidance developed in *CCH*: "the purpose, character, and amount of the dealing; the existence of any alternatives to the dealing; the nature of the work; and the effect of the dealing on the work" (para 14). The *SOCAN* Court reviewed the six factors and concluded that the dealing (for the purpose of research) was fair.

[38]    Barnes J conducted his own review of fairness factors. I reproduce most of paragraph 36 of his Judgment in view of the importance the findings will have on the outcome of the case:

> [36]    In finding the scope of use of the articles to be fair I have considered the following factors, all of which favour the Defendant's position:
>
> (a)    The articles were legally and appropriately obtained by [XXX] who was a paid subscriber to Blacklock's. Blacklock's website was not hacked or accessed by illicit means. In the result, the articles were no longer behind Blacklock's paywall when the Department obtained them.
>
> (b)    [XXX] sent the articles to [Departmental officials] for a legitimate business reason (i.e., to protect her business reputation and to manage her working relationship with the Department);
>
> (c)    The Department received the articles unsolicited and used them (i.e., read them) for a legitimate business purpose (i.e., to consider whether the stories required a response or correction);
>
> (d)    The articles were circulated among only six Department officials all of whom had a reason to see them;
>
> (e)    No commercial advantage was sought or obtained by the Department's use of the articles nor were they republished in any form;
>
> (f)    The two articles represented only a small fraction of the protected news copy on Blacklock's website and

2024 FC 829 (CanLII)

one of them was shortly-after publically exposed on Blacklock's website;

(g)    The articles contained information obtained from the Department in response to Mr. Korski's queries. As a source, the Department had a direct and immediate interest in their content. Indeed, a finding of copyright infringement against a news source for the simple act of reading the resulting copy is likely to have a chilling effect on the ability of the press to gather information. Such a result cannot be in the public interest;

(h)    [Departmental officials] had a reasonable basis for their concern that the articles misrepresented some of the information they had conveyed to Mr. Korski and that a correction might be warranted. The involvement of their colleagues in a possible follow-up was, in the circumstances, reasonable;

(i)    Neither [XXX] nor the Department were aware of, or agreed to, Blacklock's Terms and Conditions. In any event and as noted below, those provisions did not unambiguously prohibit the circulation of Blacklock's copy for personal or non-commercial purposes. If [XXX], as a subscriber, had the right to use and distribute the articles for a non-commercial purpose, those who received the articles lawfully could reasonably expect to enjoy the same privilege;

(j)    What occurred here was no more than the simple act of reading by persons with an immediate interest in the material. The act of reading, by itself, is an exercise that will almost always constitute fair dealing even when it is carried out solely for personal enlightenment or entertainment; and

(k)    While the public interest is served by the vigilance of the press, copyright should not be a device that serves to protect the press from accountability for its errors and omissions. The Department had a legitimate interest in reading the articles with a view to holding Blacklock's to account for its questionable reporting.

2024 FC 829 (CanLII)

[39]    Before concluding the review of the law and findings made by our Court in the

Department of Finance "test case", a reference to some further observations and findings is

apposite. The relevance of a paywall and of terms and conditions to applying the fair dealing

provision is recognized. However, the copyright's owner must not only establish some

prohibition, but it must be shown that the person involved was aware of the limitations. "All that

is required is an acknowledgement at the time of acquiring access that the terms in question were

read and accepted." (para 38). That was not done and the subscriber had no reason to think a

violation of the *Act* would occur by sharing articles of special and direct interest with people

affected by them. Indeed, the Terms and Conditions were found by our Court to be ambiguous

which results in the drafter of the conditions to be bound to the most favourable interpretation to

the user of the copy:

> [42]    I do not accept that [the subscriber] or the Department
> should be taken to be aware of Blacklock's web-based terms of
> use. But even if they had been aware they would have been no
> further ahead. Blacklock's Terms and Conditions contain a
> material ambiguity concerning downstream distribution. On the
> one hand they seemingly prohibit distribution by subscribers but,
> on the other, they permit it for personal, or non-commercial uses:
> [Footnote omitted]

The use made of the articles was found to be for a non-commercial purpose.

[40]    In the result, our Court dismissed the action. The AGC urges this Court, in spite of the

discontinuance of the underlying court action, to issue a declaration of rights to the effect that

there is room for rectification of the Terms and Conditions, that not only is there no breach of

copyright on the basis of the facts in the underlying action, but also there is no infringement of

technological protection measures [TPM], in the form of a password that was required to gain

access to articles on Blacklock's Reporter's website.

2024 FC 829 (CanLII)

IV.    <u>The facts in this case</u>

A.    *Notice of Motion*

[41]    The Fresh as Amended Notice of Motion sets the framework to be used by the AGC to get the declarations sought. The AGC asserts:

a)    the Terms and Conditions of the subscription were ambiguous and unenforceable; at any rate they should be interpreted in favour of Parks Canada. No adequate notice was given. The Terms and Conditions of the subscription allowed the distribution of articles within Parks Canada without infringing on the copyright or circumventing the alleged TPM;

b)    the use made of the articles constitutes fair dealing;

c)    Parks Canada acquired an institutional subscription, thus allowing the further distribution of the articles, as an officer of Blacklock's Reporter represented to Parks Canada that the subscription was for the benefit of Parks Canada;

d)    sharing the password as part of fair dealing does not constitute a circumvention of the TMP. There was no intention to circumvent in gaining access in these circumstances. At any rate, the public servants were permitted to share the password, under the Terms and Conditions, to access the articles from the website: thus there was no circumvention of the TPM.

2024 FC 829 (CanLII)

B.     *The evidence*

[42]     It should be stressed at the outset that it is largely unknown what specific evidence was before our Court in the case involving public servants from the Department of Finance. Some of it was mentioned by Barnes J, but it is less than clear, as we shall see, whether the issues with respect to the copyright infringement, and the existence of fair dealing, can be readily disposed of on the basis of the doctrines of issue estoppel and *res judicata* where the actual evidence is not sufficiently spelled out. That is not to say that the findings made are of no assistance. They are. The question is rather whether the test for issue estoppel is met (*Danyluk v Ainsworth Technologies Inc*, 2001 SCC 44, [2001] 2 SCR 460 [*Danyluk*]), including the exercise of discretion by the Court.

[43]     The Moving Party, the AGC, forcefully suggested that BR's *modus operandi* is akin to "copyright trolling", which is described as copyright holders using the threat of litigation to generate revenue. BR is accused of publishing inaccurate, deceptive or inflammatory articles. Then, "teasers" are sent to federal entities to entice a purchase of a subscription. The terms and conditions are ambiguous and are buried in the webpage. The AGC contends that after a few months, BR files access to information requests to assess the amount of sharing of articles. I indicated during the hearing of the case that without the evidence of a pattern repeating itself – evidence that was not present in the case – I was not inclined to consider any further an allegation of "copyright trolling", perhaps with a view to implying an abuse of copyright. Having considered again the evidence before the Court, I continue to disregard such assertions.

2024 FC 829 (CanLII)

[44]    Media relations is undoubtedly a role that is played at Parks Canada. The media coverage is monitored; if there are media pieces that contain erroneous or misleading information, a decision must be made on whether or not a response or correction is warranted. As related by one of three Parks Canada employees who testified by affidavit in this case, Mr. Frédéric Baril, that may well require that the content of media pieces be shared with experts and other employees within the organization. To put it simply, Mr. Baril's evidence, which remained uncontradicted, is that media monitoring is part and parcel of the activities of federal entities, which includes Parks Canada.

[45]    Mr. Baril, who was the manager of the unit with Parks Canada that gained access to some articles from BR through a subscription (le Directeur des Services ministériels et médiatiques), testified more specifically that Parks Canada's interest in media reporting is with a view to correcting erroneous or misleading information: he provided examples of such occurrences involving Blacklock's Reporter's articles. Moreover, Mr. Baril stated that the only articles from BR, which were accessed by Parks Canada and shared within the organization, were articles related to the Agency's mandate and activities. There were fifteen. He said that, typically, managers and senior employees would receive e-mails from BR referring to contents that were either deceitful or misleading, or alarmist. They required consultations within Parks Canada to formulate an appropriate response as a governmental organization. In a word, Parks Canada's interest in articles published by BR was limited to those involving the Agency and the sharing of them, and only them, was limited to the personnel that might contribute to a response or further communication, if needed (see, for instance, Exhibit C to Frédéric Baril's Affidavit, Moving Party's Record, p 127 et al).

[46]    The sharing of articles could also happen, according to Mr. Baril, with central agencies when the mandate or responsibilities of other governmental entities are engaged. The limited and occasional sharing would help ensure a coordinated response or position on behalf of the government.

[47]    The second Parks Canada official who testified (affidavit and cross-examination on her affidavit) was Ms. Genevieve Patenaude. She was the official who purchased the subscription which allowed Parks Canada to have the password to gain access to the articles of interest to it.

[48]    Ms. Patenaude, a media relations officer at Parks Canada, was instructed to purchase a subscription to Blacklock's Reporter for the benefit of the entity she worked for, the Parks Canada Agency. That was on September 18, 2013.

[49]    Ms. Patenaude testified at length on how she proceeded to acquire a subscription. She testified that between January 2013 and December 2015, media relations officials received numerous requests from BR for information. Having experience with the purchase of subscriptions for Parks Canada, she went to the Blacklock's Reporter website to acquire a subscription.

[50]    Ms. Patenaude stated in her affidavit, and never moved from her position on cross-examination, that the Blacklock's Reporter webpage she accessed indicated only one type of subscription which was made available. According to her affidavit (Moving Party's Motion Record, p 1156 and following), she accessed a webpage which had the same information as that

2024 FC 829 (CanLII)

found at her Exhibit A. Exhibit A contains the home page for the Blacklock's Reporter website and a page with the title "Membership Levels" for those who wish to subscribe. That was actually a page retrieved by using the Wayback Machine, a device used frequently in litigation which archives historical information on the web. Ms. Patenaude said that was the page she saw in September 2013. As a matter of fact there is no indication on that page of more than one membership level, although the title "Membership Levels" appears on the page. On the same line where the level Blacklock's Reporter appears, there is a link in light blue font entitled "I want Blacklock's Reporter". Ms. Patenaude clicked on that link.

[51]    As part of Exhibit A, there is at the bottom of the home page the words "Terms and Conditions" in relatively small font: the words were inconspicuous although visible. When the purchase was made, the witness testified that she was unaware of their existence: it was in black font: indeed it was not identified as a link as oftentimes such a link is in light blue. Not only was the link not obvious, but there was no indication that there was a connection with institutional subscriptions. As I read Ms. Patenaude's testimony, she was not aware of terms and conditions and these were not brought to the attention of the person who is interested in purchasing a subscription. She says that "I was not asked to acknowledge them, which is unlike what most vendors require. I also understood that a purchase of a "Blacklock's Reporter" subscription, the only subscription available on the webpage, was an institutional subscription" (Genevieve Patenaude's Affidavit, para 8).

[52]    Ms. Patenaude proceeded to fill out the form called "Membership Checkout" with information relating to Parks Canada and the Agency's credit card number; she identified the

purchase as a Parks Canada purchase. The form that was filled out by Ms. Patenaude was not in evidence. Instead, the available form was retrieved from the Wayback Machine. It is striking that the form produced in Exhibit A, which contains the membership levels item, is dated December 2013. The price associated with the only level, "Blacklock's Reporter", is $157. However, the Membership Checkout form reproduced at Exhibit C of Ms. Patenaude's affidavit indicates the price of membership to be $314, twice the amount posted in December 2013. That may well suggest that the Checkout form came later than December 2013.

[53]    The version found in Exhibit C includes words Ms. Patenaude asserts were not on the form she filled out. They are: "For institutional subscribers who would like to share or distribute content in-house, please contact manager Holly Doan for custom bulk rates at _____". Ms. Patenaude remained adamant on cross-examination that the words must have been added some time after she completed the purchase on September 18, 2013.

[54]    Shortly after the purchase was completed, BR sent an e-mail to Parks Canada (that was the e-mail address put on the Membership Checkout form) confirming the subscription purchase. The e-mail (Exhibit O to the affidavit of Frédéric Baril) announces that the membership account is now active. It reads as follows:

2024 FC 829 (CanLII)

Thank you for your membership to Blacklock's Reporter. Your membership account is now active.

Below are details about your membership account and a receipt for your initial membership invoice.

Account: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Membership Level: ▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓

Membership Fee: The price for membership is **$148.00. For institutional subscribers who would like to share or distribute content in-house, please contact manager** ▓▓▓▓▓▓▓ **for custom bulk rates at** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

(emphasis added)

[55]     Ms. Patenaude testified concerning the words that I underlined. Here is what she declared at paragraph 12 of her affidavit:

> 12.     The email contained new information, namely that "institutional subscribers who would like to share or distribute content in-house" should contact a manager at Blacklock's for custom bulk rates. The information was provided after I made the purchase and after it had been accepted by Blacklock's. In any event, I understood the word "bulk subscriptions" to mean that if Parks Canada wanted to share the articles widely, beyond the Parks Canada organization, it was required to contact a manager at Blacklock's. I understood "institutional subscription" to mean a subscription available to Parks Canada as a whole, which is not dissimilar to what if [*sic*] offered by other media outlets in the marketplace.

[56]     The witness also testified concerning the Terms and Conditions. She stated that she did not see them at the time of purchase and they were not brought to her attention. The contentious paragraphs from the Terms and Conditions are reproduced here:

> You acknowledge and agree one subscription is allotted per subscriber. Distribution of articles, photographs, images, writings or other content of any kind by a single subscriber by paper, electronic file, disc, intranet or any and all methods is not permissible. For purchase of bulk subscriptions, see "Contact".

2024 FC 829 (CanLII)

> Reproduction, duplication, or distribution of Blacklock's Reporter and/or all or any part of its content for anything other than your personal, non-commercial use is a violation not only of these Terms and Conditions but also of copyright laws unless you have written permission from Blacklock's Reporter. The content on Blacklock's Reporter is made available to you for non-commercial, personal, or educational purposes only …

The witness testified that the paragraphs are the same as those considered by Barnes J in the *Department of Finance* case. Barnes J, at paragraphs 42-43 of his Judgment, found that those same paragraphs from the Terms and Conditions were ambiguous about the downstream distribution because they permit distribution for personal or non-commercial use. The interpretation of the clause must be the one most favourable to the user as it is the drafter who created the ambiguity. As the distribution in the *Department of Finance* case was for a non-commercial purpose, it must be seen as being permitted.

[57]    Finally, Ms. Patenaude testified that the sharing of articles was very limited within Parks Canada. It was to allow access to articles for work related to Parks Canada's mandate. There was never any intention to avoid or by-pass any paywall: it was simply to validly access the content. She uses her affidavit to introduce into evidence an exchange of e-mails between another communications officer at Parks Canada and one of BR's owners where BR acknowledges that Parks Canada had a subscription. The exchange is found at Exhibit J to Frédéric Baril's affidavit, which is faithfully reproduced:

Documents released under the *Access to Information Act*.
Documents communiqués en vertu de la *Loi sur l'accès à l'information*.

Re: Parks Canada GetsAttaboy

to:andrew.campbell@pc.gc.ca                    02/07/2014 11:37 AM

History:        This message has been forwarded.

Dear Mr Campbell,
No inducement to purchase is required as Parks Canada is already a subscriber. The emails are an advisory when your organization is cited or quoted. Blacklock's is not a blog. Communications between public officials and news organizations are not covered by the Act. Wrong on all counts.
Regards,

Publisher
Blacklock's Reporter
O.

On Jul 2, 2014, at 9:31 AM, andrew.campbell@pc.gc.ca wrote:

Holly,                                                              s.19(1)

This constitutes illegal spam. There is no unsubscribe and you are certainly marketing to me to purchase your blog.

Andrew Campbell

From:
Sent: 02/07/2014 09:11 AM AST
Subject: Parks Canada Gets Attaboy

[58]    I now turn to the evidence offered on behalf of Blacklock's Reporter. It consists for all intents and purposes in the affidavit of Mr. Tom Korski, together with a number of exhibits and the cross-examination on his affidavit. He is the managing editor of Blacklock's Reporter, as well as a director and officer of the corporate entity.

[59]    Mr. Korski described the BR operation as consisting of articles made accessible on the Blacklock's Reporter's website once a subscription has been purchased. That is what has been referred to, as I understand it, as the "paywall". Most of the articles on the website can be accessed solely if a subscription has been purchased, although a small number may be accessible without it.

2024 FC 829 (CanLII)

[60]    The witness described how someone could purchase a subscription directly from the website. Although the website then used on September 18, 2013, could not be retrieved, Mr. Korski relied on the Wayback Machine, which he describes as "an internet archiver which permits the recall of earlier websites" (Mr. Korski's affidavit, para 10), to refer to BR websites which were in existence around the time Parks Canada purchased its subscription.

[61]    There is no dispute as to how Parks Canada, or any potential subscriber, could purchase a subscription. There was a tab on the website page which simply indicates "Subscribe now". Once clicking on the tab, the subscriber is taken to a page called "Membership Levels". On that page there is only one membership level. The subscriber must then click on "I want Blacklock's Reporter", which is a link to another page: Membership Checkout. There is a controversy in this case concerning the content of the Membership Checkout page. Mr. Korski contends that the following words were on the page since July 2013. I reproduce again the sentence for convenience: "For institutional subscribers who would like to share or distribute content in-house, please contact manager Holly Doan for custom bulk rates at _____". There is no direct evidence as to what the web page in use on September 18, 2013 consisted of other than the testimony of Ms. Patenaude, who purchased the subscription on behalf of Parks Canada. She is adamant that the words were not present on the Membership Checkout page in use on September 18: she said that she would remember such presence and she was not shaken on cross-examination. Mr. Korski for his part relies on two e-mails. One from himself to someone presented as an IT consultant, instructing that some additions be made to what Mr. Korski referred to as the "website payment page". The exchange of e-mails is appended as Exhibit F to Mr. Korski's affidavit. I reproduce the exchange as found in the Exhibit:

2024 FC 829 (CanLII)

---------- Forwarded message ----------
From: "Thibaut Revenaz" <thibaut@glebemedia.ca>
Date: Jul 4, 2013 2:40 PM
Subject: Re: Blackie's Before I Forget
To: "TOM KORSKI" <korski1949@rogers.com>
Cc:

Hi Tom,

I've made the changes.

Cheers,

Thibaut

On Sat, Jun 29, 2013 at 9:07 AM, TOM KORSKI <korski1949@rogers.com> wrote:

Hi Thibaut: forgive my note on a Saturday. I have been meaning to send this and just had a moment now. I'd like to change some scripting on the website payment page. I didn't see the appropriate page to change the text, and hesitate to blunder around the dashboard in the manner of a bull in a china shop. The text follows. It differentiates between personal and bulk subscriptions, gives Holly's contact info for institutional subscribers and updates the HST status of BC. Thanks a lot for making these changes, and have a great weekend.

Regards

Tom

You have selected the **Blacklock's Reporter** membership level.

*Blacklock's* never stores credit card information. We never renew a subscription without your OK. All payments are securely encrypted via Stripe.com, the foremost payment processor used by Canadian business today.

The price for a personal membership is **$148.00**. For institutional subscribers who would like to share or distribute content in-house, please contact manager Holly Doan for custom bulk rates at 613-422-6823, holly@blacklocks.ca.

Customers in Canada will be charged all applicable taxes (Newfoundland & Labrador, Nova Scotia, New Brunswick and Ontario billing addresses will be charged HST, all other provinces and territories will be charged GST.) Membership expires after 1 year.

[62]    As I noted during the hearing, there are obvious issues with Exhibit F. First and foremost

is the fact that the sender of the e-mail bearing the date of July 4, 2013, never testified. This is

pure hearsay. If one were to rely on the principled way of admitting hearsay evidence, BR would

2024 FC 829 (CanLII)

have had to establish necessity and reliability. That was not shown on this record. There was no explanation for the words "Forwarded message" at the top of the Exhibit. The subject of the e-mail (Re: Blackie's Before I Forget) is unexplained. There is no way of knowing to what the sender was referring to when he says "I've made the changes". Indeed, this exhibit is no more than a rather crude "cut and paste". As I inquired at the hearing, it is quite evident that Mr. Korski's e-mail contains on its face two different fonts, one for the message to Thibaut and the font for the message to be added to the Membership Checkout page.

[63]    In the circumstances, the Court would have to prefer the testimony of Ms. Patenaude. Be that as it may, there is probably not much in the end that rides on resolving the controversy. That is because the issues of what did Ms. Patenaude know, and when did she know it, are in the end relevant to the extent of whether Parks Canada operated within the confines of s 29 of the *Act*, the fair dealing provision. On the evidence before the Court, there is no doubt that Ms. Patenaude was acting in good faith and that she sought to acquire the only membership available.

[64]    Mr. Korski's affidavit continues to note that an automatically generated message followed shortly after Ms. Patenaude purchased the subscription. It also refers to an e-mail the following day which merely welcomes the new subscriber. In both cases, the e-mail message is sent to "pc.media@pc.gc.ca", the e-mail address for Parks Canada Media.

[65]    The affidavit goes on to argue that the Terms and Conditions are clear and unambiguous as Mr. Korski claims that they were drawn to the attention of Parks Canada.

2024 FC 829 (CanLII)

[66]     A few paragraphs of the affidavit are dedicated to the technological protection measures Mr. Korski claims are used by BR. Once again, the paragraphs are more argumentative than informative. The affidavit states that the protection consists of a password that is required to gain access to articles. There is no information concerning what constitutes a password or the system used by BR. In fact, on cross-examination, Mr. Korski readily acknowledged that "I actually don't know how the IT works" (question 63) and "I have never bought a password Mr. Gay" (question 67). There is no evidence on this record of how the IT works or, for that matter, what was the actual password used by Parks Canada. One would have thought that it is relevant to whether or not there may have been circumvention of a technological protection measure where the means to gain access are only through the use of a password.

[67]     Finally, Mr. Korski testified concerning the use made by BR of the *Access to Information Act*, RSC 1985, c A-1, to "monitor" the use made of the subscriptions. The affidavit contends that some fifteen articles, all relating to Parks Canada business, were shared with individuals within the organization.

V.     Supplementary submissions

[68]     The Court raised after hearing the parties for three days whether the use of the summary judgment was the appropriate mechanism to seek and obtain wide ranging declarations in view of the discontinuance of the original action and the evidentiary record before the Court. Furthermore, the issue of the use of *issue estoppel*, as proposed by the Moving Party, the AGC, was also raised by the Court as requiring further submissions (Direction of June 12, 2023).

[69]     Additional submissions were submitted by the AGC on June 30, 2023, and Blacklock's Reporter on July 21, 2023.

[70]     The AGC argued that summary judgment is available despite the discontinuance of the main action. The counterclaim is a separate action which allows for a motion for summary judgment. In the case at bar, the conditions for summary judgment are met because the issues raised are capable of resolution as permitting a fair and just adjudication. Indeed, there is no genuine issue for trial in that there is sufficient evidence to adjudicate the dispute. Specifically it is argued that issues relating to terms and conditions, fair dealing and circumvention of technological protection measures can be decided on this record, as the parties have put their best foot forward. On that last issue, the AGC suggests that not only is the Court equipped to consider his main contention, that is that the use of a password does not equate with circumvention, but also that a password, as such, is not a technological protection measure. As we shall see, the Court declines to address that issue because there is no need to deal with it since the password was in fact used. Additionally, there is in this case a complete lack of evidence as to what constitutes a password, and in particular what constitutes the password used in this case.

[71]     Summary judgment, says the AGC, is expeditious and cost effective. It seems, however, that this constitutes an attempt to use, as much as possible, declarations to be made in this case in a number of other cases involving the Crown and Blacklock's Reporter. There may be some issues that can translate into declarations to be useful in other litigation, but, as we shall see, the issues to be resolved are also a function of the facts proven in this case which may or may not be present in other cases. In fact, the Court is limited by the record available.

2024 FC 829 (CanLII)

[72]    The AGC asserts that the test for being granted declaratory relief is met. He uses the

judgment in *Ewert v Canada*, 2018 SCC 30, [2018] 2 SCR 165, at para 81:

> [81]    A declaration is a <u>narrow remedy</u> but one that is available
> without a cause of action and <u>whether or not any consequential</u>
> <u>relief is available</u>: *Manitoba Metis Federation Inc. v. Canada*
> *(Attorney General)*, 2013 SCC 14, [2013] 1 S.C.R. 623, at
> para. 143; P. W. Hogg, P. J. Monahan and W. K. Wright, *Liability*
> *of the Crown* (4th ed. 2011), at p. 37; L. Sarna, *The Law of*
> *Declaratory Judgments* (4th ed. 2016), at p. 88; see also *Federal*
> *Courts Rules*, SOR/98-106, r. 64. A court may, in its discretion,
> grant a declaration where it has jurisdiction to hear the issue, where
> the dispute before the court is real and not theoretical, where the
> party raising the issue has a genuine interest in its resolution, and
> where the respondent has an interest in opposing the declaration
> sought: see *Daniels v. Canada (Indian Affairs and Northern*
> *Development)*, 2016 SCC 12, [2016] 1 S.C.R. 99, at para. 11;
> *Canada (Prime Minister) v. Khadr*, 2010 SCC 3, [2010] 1 S.C.R.
> 44, at para. 46; *Solosky v. The Queen*, [1980] 1 S.C.R. 821, at
> pp. 830-33.

> (my emphasis)

[73]    Finally, it is contended that the Crown is indivisible, such that the doctrine of *issue*

*estoppel* may be available in appropriate cases. I note that whether or not findings in this case

may be used in future cases is to be decided in future cases if they satisfy the *Danyluk* test.

[74]    As expected, Blacklock's Reporter takes a different view. It asserts that summary

judgment is to be restricted to questions of law and contract interpretation. There should not be

declarations where there is no practical effect. BR cites the case of *Daniels v Canada (Indian*

*Affairs and Northern Development)*, 2016 SCC 12, [2016] 1 SCR 99, at para 11. However, I note

that the Supreme Court rather refers to "practical utility", not "practical effect as between the

parties". On the basis that it claims that no practical effect as between the parties, BR considers

the matter moot.

[75]    Given that the case management judge has allowed the motion for summary judgment to proceed, and in view of that decision having been confirmed on appeal, BR states that these decisions are not binding on this Court. There are no authorities offered in support of such bold proposition. BR accuses the AGC of ignoring the discontinuance in this case. With all due respect, it will be the Plaintiff who ignores that the issue was front and centre before the case management judge and the Federal Court Justice on appeal. They both ruled that the matter should proceed.

[76]    Blacklock's Reporter concedes nevertheless that summary judgment is available in whole or in part. For instance, the Court may entertain granting summary judgment on issues "where there would be a collateral consequence of the outcome of a decision" (factum, para 17). As such, the only issues to be considered are questions of law or concerning the interpretation of contracts as they may impact the related actions launched by BR.

[77]    BR challenges the AGC's assertion that the indivisibility of the Crown applies to Parks Canada. It reads the statute creating Parks Canada as suggesting that it is distinct from the Crown. Parks Canada, as a body corporate created pursuant to s 3 of the *Parks Canada Agency Act*, SC 1998, c 31, is not a department of government. It has the power to enter into contracts, acquire property, sue or be sued. That, says Blacklock's Reporter, does not correspond at all with a department such as the Department of Finance. Parks Canada has a measure of independence.

[78]    The issue of indivisibility of the Crown was raised in the context of applying the doctrine of *issue estoppel* in this case and other cases involving Blacklock's Reporter. One of the

2024 FC 829 (CanLII)

conditions for *issue estoppel* to be successfully invoked is that the parties to the judicial decision or their privies are the same in the proceedings in which estoppel is raised. If the parties are not the same, there will be no estoppel. Moreover, Blacklock's Reporter argues that the facts in the *Department of Finance* case are not nearly identical to the facts in the case at bar, as argued by the AGC. The same question, another pre-condition to estoppel according to *Danyluk* (that the same question has been decided), was not decided in the *Department of Finance* case where the facts are significantly different, BR says. There was no purchase of a subscription by the Department of Finance, and accordingly they never went through the checkout process, nor did they receive a follow-up e-mail; the sharing of articles did not involve the use of a specific password; in fact, there was no password in the possession of Finance officials. At any rate, even if the three pre-conditions were met, which include the same person and the same question, BR urges the Court to exercise its discretion, which undoubtedly exists, to decline to apply the doctrine of *issue estoppel* in this case.

[79]    In view of the supplementary submissions made by the parties, some things have been clarified. First, the Court must address the issues on the basis of the evidence before the Court and not be tempted to decide more than is appropriate. For instance, the AGC was suggesting that the Court issue a declaration on the ability for a password to constitute a technological protection measure. The case before the Court is actually that the password obtained through a subscription was used to gain access to material for the purpose of conducting activities said to be covered by s 29 of the *Act*. The password was used, it was not hacked. Moreover, there is no evidence whatsoever about the password in this case, or passwords in general. The Court was urged by BR and the intervener to refrain from entering that field without any expert evidence.

2024 FC 829 (CanLII)

[80]    The AGC wants the Court to issue a declaration concerning three questions in order to dispose of, or truncate, matters in other lawsuits launched against some other entities. The Court, in my view, must show prudence: the tail should not be wagging the dog. The Court, in its recognized discretion, should consider the matters raised on their own merit. If they can be used in the future, as was the case with the Judgment involving the Department of Finance, so be it. But the Court should resist the temptation to seek to be helpful. It should limit itself to the facts as proven to decide the issues on the basis available.

[81]    A case in point is the use that can be made of the doctrine of *issue estoppel*. The Court raised at the end of the hearing the question of the indivisibility of the Crown. The point of the matter was whether Parks Canada, a body corporate with the ability to enter into contracts with a department or agency of the Government of Canada (among others), as well as any other government, person or organization, can be equated with departments with a view to satisfying one of the three pre-conditions for *issue estoppel*. The specificity of Parks Canada Agency was not addressed. Furthermore, as pointed out by BR, while the AGC suggested that the fact situation in the *Department of Finance* case was nearly identical to that in the case at hand, so that the second *Danyluk* condition can be satisfied, that may not be so. There are some similarities, but the facts may prevent the use of the doctrine.

[82]    Conversely, Blacklock's Reporter's attempt at challenging this Court's judgment granting leave for the motion for summary judgment to proceed because of its discontinuance of the main action cannot be entertained. This Court has twice concluded that the motion could proceed in spite of the discontinuance of the main action. Collateral attacks cannot be entertained.

2024 FC 829 (CanLII)

[83]    All in all, this suggests that the Court should address the issues within the confines of the evidence presented. It will not seek to go beyond the four corners of the case. If declarations are to be issued, they must be with respect to the case effectively before the Court. There should not be an attempt to resolve cases that are not before the Court on facts that are unknown. This case is not to become a reference at large concerning questions the Moving Party would wish decided in the hope that declarations "will have immediate legal and practical utility and settle questions that have been the subject of proceedings between parties spanning six to nine years" (AGC's factum, para 23). If that is the result achieved with declarations that are deemed possible on the basis of the record before the Court, that will benefit other cases. That may yet be possible although the facts in the other cases are not known, let alone proven. There exist inherent limits to what can be achieved with a summary judgment in the context of the adversarial system of adjudication where the evidentiary record is as limited as it is here.

VI.    <u>Analysis</u>

[84]    There are three questions the AGC wishes for the Court to specifically opine on and issue declarations. They are:

- There was no binding agreement between the parties, or there was a unilateral mistake on the part of Parks Canada, thus opening the door to rectification;

- Parks Canada did not infringe Blacklock's Reporter's copyright; and

- No circumvention of Technological Protection Measures occurred in this case.

I shall address the issues in turn.

2024 FC 829 (CanLII)

A.    *Rectification*

[85]    Parks Canada contends that it did not consent to the purchase of a subscription for a single user. As we saw, the officer who purchased the subscription on behalf of the Parks Canada Agency, Ms. Patenaude, never read the Terms and Conditions, gave electronically Parks Canada's coordinates to BR and paid for the subscription using a credit card of Parks Canada. Ms. Patenaude testified that being taken from Blacklock's Reporter's home page (which has a link to "Subscribe Now") to a page called "Membership Levels", she purchased the only level available. Again, there is a link to "Subscribe Now". She was taken to another page called "Membership Checkout". That is where the information about the subscriber, including the e-mail address of Parks Canada, is registered.

[86]    The form used on September 18, 2013, is not available and was not produced. That much is clear. There was a controversy as to what was the content of the Membership Checkout form seen and used. Blacklock's Reporter argued that some words on the form should have attracted Ms. Patenaude's attention to the sentence already referred to twice at paragraphs 53 and 61. Ms. Patenaude was adamant that those words were not on the form she filled out electronically. She would have remembered them. Blacklock's Reporter cross-examined the affiant extensively, without success.

[87]    In an attempt to counter her testimony, BR offered Exhibit F to the affidavit of Tom Korski (reproduced at para 61). It is one page where appears an e-mail message from Mr. Korski with the date of June 29, 2013, and a response five days later. Clearly, the one page is the result

2024 FC 829 (CanLII)

of a cut and paste exercise. In his e-mail Mr. Korski gives an explanation for the text that follows, which he would want his IT consultant to insert in the "website payment page". He writes that "I didn't see the appropriate page to change the text". The actual text to be inserted is obviously in a different font than the font of the e-mail itself. We are not enlightened by the response of the consultant some five days later. The e-mail says very little, if anything. The response bears as a subject "Re: Blackie's Before I Forget". The text is minimal and the configuration of the responding e-mail are reproduced for ease of reference:

> Hi Tom,
>
> I've made the changes.
>
> Cheers,
>
> Thibaut

The author of the e-mail did not testify.

[88]    As stated before, I have concluded that, on a balance of probabilities, the testimony of Ms. Patenaude has to be preferred. She faced cross-examination and her testimony resisted the test. On the other side, the evidence is hearsay and, indeed, there is no way of knowing what the consultant could be referring to: what changes? That constitutes the evidence before the Court. Accordingly, I conclude that the checkout form on the day the purchase of a subscription was completed did not have the words made the subject of contestation.

[89]    Shortly after the subscription's purchase was completed, an e-mail to the address pc.media@pc.gc.ca was automatically generated. It welcomes the new subscriber and announces that "Your membership account is now active". It also provides billing information in the following form:

Below are details about your membership account and a receipt for your initial membership invoice.

Account: ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

Membership Level: ▨▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨ ▨

Membership Fee: The price for membership is **$148.00**. For institutional subscribers who would like to share or distribute content in-house, please contact manager▨▨▨▨▨▨▨ for custom bulk rates at ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

[90]    Ms. Patenaude testified that, with the transaction completed, she quickly concluded that the billing instruction did not apply to her because she was not concerned with "custom bulk rates". The subscription was purchased for the purpose of validating articles published by BR where Parks Canada was the subject of the articles. I accept her evidence. Common sense and human experience lead to that conclusion. The witness was instructed to purchase a subscription by her bosses in the media area of Parks Canada. As Frédéric Baril testified, media monitoring is key. He confirmed that the use made of the subscription was exclusively for the purpose of considering articles published about the Agency. In the period between January 2013 and September 2013, e-mails sent by BR to managers and other employees of BR referred to information that typically was misleading and alarmist concerning the Agency and its activities. The e-mails asked for an official reaction. The very nature of these e-mails called for some sharing of information with colleagues in order to formulate an adequate response. Mr. Baril's testimony was not challenged. I accept Mr. Baril's evidence. It provides the context in which Ms.

2024 FC 829 (CanLII)

Patenaude made the purchase and the purpose of the purchase, the whole being corroborated by the use made of the access to the BR website granted through the subscription.

[91]    However, that does not make the case for the remedy sought by the AGC. The contention is that the terms of the agreement between BR and Ms. Patenaude, on behalf of Parks Canada, "were buried deep in the Blacklock's webpage, barely perceivable to the naked eye and were never pointed out to the purchaser. In these circumstances, there was no consent by Parks Canada and there is no binding contract" (Moving Party's memorandum of fact and law, para 43). I cannot accept that contention. For starters, the mention of the terms and conditions was not buried deep in the webpage. The words were in my estimation plainly visible although inconspicuous. What is true is that Ms. Patenaude did not see them or did not pay attention to them but, as I pointed out during the hearing, Ms. Patenaude had purchased subscriptions before. She was not a neophyte. Terms and conditions were not a novelty. Could BR have made the matter clearer by requiring a purchaser to click on an "I accept" button? Most probably. But that does not justify suggesting that Blacklock's Reporter fostered ambiguities, as argued by the AGC, or never making it clear what type of subscription was being purchased. There was one level of membership and that did not deviate. That is the evidence before the Court and, in my view, it is insufficient to infer some nefarious purpose on the part of Blacklock's Reporter.

[92]    Had Ms. Patenaude been curious enough, she would have clicked on the button "Terms and Conditions" and, right upfront, she would have read the paragraphs already reproduced in these Reasons for Judgment (para 56). Although it is reasonable to believe the reference to "Terms and Conditions" could have been clearer including by requiring a subscription purchaser

2024 FC 829 (CanLII)

to acknowledge having read them and agreed to them, that does not lead to a conclusion that BR misrepresented the subscription that was being purchased. Misrepresentation implies a measure of intent to deceive. The reference to the terms and conditions on the form was inconspicuous. But the Court cannot infer on this record an intent to deceive. Ms. Patenaude is to be considered as a rather experienced and somewhat sophisticated participant. Indeed, she remembered quite vividly that the checkout form did not have the words which would have caught her attention. It seems to me that we are faced with instructions that are less than clear which led to an honest mistake on the part of the subscriber.

[93]    The theory of the case of the Moving Party has been from the beginning that the actions of BR are "akin to "copyright trolling"" (Moving Party's memorandum of fact and law, para 1). On this record, this is a contention this Court is not able to accept. As said, and repeated, by the Supreme Court of Canada, "evidence must always be sufficiently clear, convincing and cogent" (*F.H. v McDougall*, 2008 SCC 53, [2008] 3 SCR 41, para 46; *Canada (Attorney General) v Fairmont Hotels Inc*, 2016 SCC 56, [2016] 2 SCR 720, para 36 [*Fairmont Hotels*]). The *Fairmont Hotels* Court went on to acknowledge that where rectification is sought, evidence exhibiting a high degree of clarity, persuasiveness and cogency is typically required (para 36). The evidence on this record is not clear, convincing and cogent. It is one thing to recognize ambiguities generating honest mistakes. It is quite another to conclude, as urged by the Moving Party, that BR fostered ambiguities.

[94]    The Court is equally unable to follow the Moving Party's contention that BR ought to have known of the mistake which, in turn, disallows resistance to a suit for rectification. In order

2024 FC 829 (CanLII)

to have the declaration sought, the Moving Party must establish the evidence which will be sufficient. In my view, this record does not support that theory of the case.

[95]    The *Fairmont Hotels* Court found that "(r)ectification is limited to cases where the agreement between the parties was not correctly recorded in the instrument that became the final expression of their agreement" (para 3). That demonstration has not been made. As a result, the declaration sought for the rectification "by striking down those parts of the Terms and Conditions that do not conform with Parks Canada's understanding of what it was purchasing, namely that an institutional subscription was purchased allowing for the sharing of articles and password" (Moving Party's memorandum of fact and law, para 95) is not allowed.

B.    *Fair Dealing*

[96]    In my view, Parks Canada did not infringe Blacklock's Reporter's copyright. This conclusion is largely based on the findings made in the *Department of Finance* case, as the facts in both cases lead to the same conclusion.

[97]    There is in this case clear evidence that Parks Canada acquired the subscription that was made available in order to gain access to articles produced by Blacklock's Reporter. It used it exclusively for a purpose consonant with the fair dealing provision of the *Act*, in line with the use made of BR's articles in the Blacklock's Reporter Judgment rendered by my former colleague, Barnes J (*Department of Finance*).

2024 FC 829 (CanLII)

[98]     I have already explained at some length the findings made in that earlier case, as well as referring to the leading case law that applies to s 29 of the *Act* (see in particular this Judgment's paragraphs 32 to 37). There is evidently no need to reprise that which has already been covered.

[99]     It bears repeating, nevertheless, that as stated by the Supreme Court in *CCH*, the fair dealing in a case like ours requires that the dealing is for the purpose of research, and that it be fair (para 50). In the case involving the Department of Finance, Barnes J concluded that the very same type of activities in that case as in the case at hand constituted dealing for the purpose of research, one of the purposes recognized by section 29 to constitute a dealing. Indeed the Supreme Court considered that ""Research" must be given a large and liberal interpretation in order to ensure that users' rights are not unduly constrained" (para 51). There is no reason to depart from the conclusion reached in the *Department of Finance* case (para 33) where Barnes J concluded that the same kind of activities as those proven in the case at bar constituted a proper research purpose.

[100]    The *Copyright Act* does not define what will be fair; but the Supreme Court supplied a list of factors which provide "a useful analytical framework to govern determinations of fairness in future cases" (*CCH*, para 53). I have reproduced at paragraph 38 herein the findings of our Court in the *Department of Finance* case. They encompass the factors identified by the Supreme Court to determine fairness: purpose of the dealing; character of the dealing (multiple copies distributed); amount of dealing (including the importance of the work), alternatives to dealing; nature of the work (published or confidential); effect of the dealing on the work. The Supreme Court stressed that the identified factors may be more or less important, to the point of being

2024 FC 829 (CanLII)

2024 FC 829 (CanLII)

close to irrelevant in some contexts. Conversely other factors may be relevant in some different contexts.

[101]   The comparison of the eleven factors considered in the *Department of Finance* case and the case at bar convinces this Court that the dealing in this case is fair:

    a)    BR's website was not hacked or accessed by illicit means. A subscription was purchased;

    b)    the subscription was used for a legitimate business reason, that is to identify articles targeting Parks Canada to seek to protect its reputation and to correct mistakes, errors or misrepresentations in the public interest;

    c)    the use made by Parks Canada was limited to its valid business purpose;

    d)    the circulation of the articles was limited to persons who needed to know for business reasons linked to the Agency's core mandate;

    e)    there was no commercial advantage either sought or obtained by Parks Canada;

    f)    a small number of articles (15) was shared among a small number of relevant officials for the specific business reasons linked to the Agency's mandate;

    g)    as established in the uncontradicted testimony of Mr. Frédéric Baril, there was a reasonable basis for concern between January 2013 and September 2013 about articles which contained citations seen as misleading and alarmist which called for the sharing with appropriate officials;

    h)    as in the *Department of Finance* case, the Terms and Conditions were not ignored. They were not known. Justice Barnes noted: "In any event, and as noted below, those provisions did not unambiguously prohibit the circulation of Blacklock's copy

for personal or non-commercial purposes" (para 36). I agree with my former colleague. I will come back to the issue about the Terms and Conditions;

i)    this constitutes the simple act of reading by officials with an immediate interest in the articles for business related reasons. There is no evidence that this was in the nature of a frolic in territory protected by copyright. This is the very purpose of the balance that includes fair dealing;

j)    there is a significant public interest in reading articles with a view to protecting the public, and the press, against errors and omissions.

[102]   Much debate between the parties centred on the Checkout form, the e-mail of September 18, 2013, which confirmed that a subscription had been purchased and the account was immediately active, and the Terms and Conditions. All three seek to limit the distribution of articles. But they use different formulations, and none of them is unambiguous.

[103]   As seen earlier, Ms. Patenaude testified that the words (see paras 53 and 61 of these Reasons for Judgment) were not on the Checkout form she filled out on September 18, 2013. On balance, her testimony must be preferred. There is no need to consider the language further.

[104]   It is accepted that the Terms and Conditions are the same in the case at bar as in the *Department of Finance* case. The Court in the latter case took issue with the fact that something as simple as an acknowledgement that the terms and conditions have been read and accepted was not present. Barnes J wrote at paragraph 37 that "the owner of copyright must establish that the terms of use actually prohibit the access or distribution in question and that the person involved

2024 FC 829 (CanLII)

was aware of the limitations". That was a failure of BR in the *Department of Finance* case as well as in the case at bar. There was no reason to think that sharing a very limited number of articles to a limited number of officials solely interested in the content for business reasons having to do with the Agency's mandate and reputation could constitute somehow a violation of the *Act*. I appreciate that the intent to violate is not a constituent element of a breach, but the actions guided by fair dealing, which are for a purpose clearly recognized by copyright law, are protected from liability. Once again, fair dealing is an integral part of the *Act*: it is not merely a defence.

[105]   But there is more. Barnes J found that the Terms and Conditions contain a material ambiguity in that distribution is seemingly prohibited while distribution is said to be a violation of the *Act* "for anything other than your personal, non-commercial use" (Terms and Conditions, 5th para). Barnes J read the two terms, "personal" and "non-commercial", disjunctively. I agree. Personal and non-commercial are two very different concepts. As a matter of fact the very next sentence from the Terms and Conditions speaks of the content being made available "for non-commercial, personal, or educational purposes only". Surely the three nouns refer to distinct notions or concepts. The Supreme Court seems to have had the same understanding of the difference between the two when the Chief Justice wrote for a unanimous Court in *CCH* that "I agree with the Court of Appeal that research is not limited to non-commercial or private contexts" (para 51).

[106]   The invoice sent to Ms. Patenaude shortly after sending the filled out Checkout form and concluding the agreement between the parties referred to "institutional subscribers who would

like to show or distribute content in-house, please contact manager _____ for custom bulk rates
…". Again, none of the terms used is defined. For instance, there is only one type of subscriber:
what is an "institutional subscriber" other than a subscriber who happens to be an institution of
some sort? What is a "bulk subscription"? What constitutes "distribution" or share? And how
about "custom bulk rates"? Indeed, Ms. Patenaude testified that when she saw these words
shortly after the contract was completed and the account was indicated as being active, she
believed this did not apply to the subscription just purchased and, in particular, the words
"custom bulk rates" had no application (cross-examination of Genevieve Patenaude, questions
103-107-108-109-116). That is reasonable. The drafter of the Terms and Conditions and the
invoice of September 18, 2013, is bound by the interpretation most favourable to the user. That
finding by Barnes J applies equally in this case.

[107]   These instruments did not dissipate the confusion. The lack of definition of what
constitutes "distribution", "bulk subscription" in the Terms and Conditions and "bulk rates" in
the invoice makes it impossible to know what the limitations may be, especially in the context of
the limited use made of the password and the access to articles for a purpose recognized as fair
dealing. The very notion of "bulk", whether it be "bulk subscription" or "custom bulk rates"
suggests a large quantity, some magnitude which obviously does not correspond to what might
be required to satisfy the requirements for fair dealing. Large scale distribution for a purpose
other than the kind of legitimate reasons encountered in this case runs the risk of not qualifying
under s 29. As aptly remarked  by Barnes J, "subscribers and downstream users are subject to the
obligations imposed on them by the Act. But at the same time they enjoy the considerable
protection afforded to them under the statutory fair dealing provisions" (para 44).

2024 FC 829 (CanLII)

[108]   Nothing in these Reasons for Judgment should be taken as condoning practices which contravene the *Copyright Act* in the guise of monitoring at large the media. The *CCH* Court expressly observed that "whether some thing is fair is a question of fact and depends on the facts of each case" (para 52). It is rather that the activities conducted by Parks Canada after obtaining, in a licit fashion, articles directly related to its mandate and its operations constitute, as in the *Department of Finance* case, fair use. Different facts may generate different outcomes.

C.   *Technological Protection Measures*

[109]   The Plaintiff in this case argued that it was Parliament's intent to prevent the use of copyrighted works from infringing activities if they sought to circumvent technological protection measures. This results from a chapter introduced in Part IV of the *Copyright Act* (Remedies) in 2012.

[110]   The Moving Party, the AGC, seeks a third declaration. The subscription, he says, allowed for the sharing of articles and, accordingly, there is no breach of any technological protection measure [TPM]. In any event, the sharing of a password, which appears to have taken place to some extent in this case, does not constitute circumvention of the TPM. Moreover, the fair dealing provisions of the *Act* are such that there was no circumvention under the *Copyright Act*.

[111]   As I pointed out at the hearing of this matter, the issue raised clearly lacks any evidence of a technical nature. There is no evidence of the extent of the use of the password associated with the subscription purchased on September 18, 2013. There is no evidence either of what a "password" is and what it was in this case: thus, there was no expert evidence led by either party

2024 FC 829 (CanLII)

on what, in this case, constitutes the TPM. The *Act* requires that the TPM be "effective" (in French, "efficacement"). The absence of evidence may well be significant if the facts of this case require an understanding of what a "password" is. What appears clear, however, is that there was no "hacking", whatever that may mean from a technical standpoint. In the context of this case, it is taken as meaning that the password was not discovered by force, whether that be by trial and error or otherwise. In other cases, courts have declined to address issues concerning TPM without a solid evidentiary base (*Wiseau Studio LLC et al v Harper*, 2020 ONSC 2504, 174 CPR (4th) 262; *Allarco Entertainment 2008 Inc v Staples Canada ULC*, 2021 ABQB 340). It follows that this Court must also be circumspect in addressing what appears to be a novel issue, especially in view of the Plaintiff having chosen to discontinue its action.

[112]   Before going any further, I reproduce the provisions that most prominently apply. I begin with the prohibition against circumvention.

| Prohibition | Interdiction |
|---|---|
| **41.1 (1)** No person shall | **41.1 (1)** Nul ne peut : |
| **(a)** <u>circumvent a technological protection measure within the meaning of paragraph (a) of the definition *technological protection measure* in section 41</u>; | **a)** <u>contourner une mesure technique de protection au sens de l'alinéa a) de la définition de ce terme à l'article 41</u>; |
| **(b)** offer services to the public or provide services if | **b)** offrir au public ou fournir des services si, selon le cas : |
| **(i)** the services are offered or provided primarily for the purposes of circumventing a | **(i)** les services ont pour principal objet de contourner une mesure technique de protection, |

2024 FC 829 (CanLII)

2024 FC 829 (CanLII)

technological protection
measure,

**(ii)** the uses or purposes
of those services are not
commercially significant
other than when they are
offered or provided for
the purposes of
circumventing a
technological protection
measure, or

**(ii)** les services n'ont
aucune application ou
utilité importante du
point de vue commercial
si ce n'est le
contournement d'une
mesure technique de
protection,

**(iii)** the person markets
those services as being
for the purposes of
circumventing a
technological protection
measure or acts in
concert with another
person in order to market
those services as being
for those purposes; or

**(iii)** il présente — lui-
même ou de concert
avec une autre personne
— les services comme
ayant pour objet le
contournement d'une
mesure technique de
protection;

**(c)** manufacture, import,
distribute, offer for sale or
rental or provide —
including by selling or
renting — any technology,
device or component if

**c)** fabriquer, importer,
fournir, notamment par
vente ou location, offrir en
vente ou en location ou
mettre en circulation toute
technologie ou tout
dispositif ou composant si,
selon le cas :

**(i)** the technology,
device or component is
designed or produced
primarily for the
purposes of
circumventing a
technological protection
measure,

**(i)** la technologie ou le
dispositif ou composant
a été conçu ou produit
principalement en vue de
contourner une mesure
technique de protection,

**(ii)** the uses or purposes
of the technology, device
or component are not
commercially significant
other than when it is

**(ii)** la technologie ou le
dispositif ou composant
n'a aucune application
ou utilité importante du
point de vue commercial

used for the purposes of circumventing a technological protection measure, or

**(iii)** the person markets the technology, device or component as being for the purposes of circumventing a technological protection measure or acts in concert with another person in order to market the technology, device or component as being for those purposes.

si ce n'est le contournement d'une mesure technique de protection,

**(iii)** il présente au public — lui-même ou de concert avec une autre personne — la technologie ou le dispositif ou composant comme ayant pour objet le contournement d'une mesure technique de protection.

**Circumvention of technological protection measure**

**(2)** The owner of the copyright in a work, a performer's performance fixed in a sound recording or a sound recording in respect of which paragraph (1)(a) has been contravened is, <u>subject to this Act and any regulations made under section 41.21</u>, entitled to all remedies — by way of injunction, damages, accounts, delivery up and otherwise — that are or may be conferred by law for the infringement of copyright against the person who contravened that paragraph.

**Contournement de la mesure technique de protection**

**(2)** Sous réserve des autres dispositions de la présente loi et des règlements pris en vertu de l'article 41.21, le titulaire du droit d'auteur sur une oeuvre, une prestation fixée au moyen d'un enregistrement sonore ou un enregistrement sonore est admis, en cas de contravention de l'alinéa (1)a) relativement à l'oeuvre, à la prestation ou à l'enregistrement, à exercer contre le contrevenant tous les recours — en vue notamment d'une injonction, de dommages-intérêts, d'une reddition de compte ou d'une remise — que la loi prévoit ou peut prévoir pour la violation d'un droit d'auteur.

(my emphasis)

2024 FC 829 (CanLII)

The chapter on TPM runs for some fourteen sections, including a number of exceptions to the prohibition against circumventing TPM:

> Section 41.11: Law enforcement and national security / Enquêtes;
>
> Section 41.12: Interoperability of computer programs / Interopérabilité;
>
> Section 41.13: Encryption research / Chiffrement;
>
> Section 41.14: Personal information / Renseignements personnels;
>
> Section 41.15: Security / Sécurité;
>
> Section 41.16: Persons with perceptual disabilities / Personnes ayant une déficience perceptuelle;
>
> Section 41.17: Broadcasting undertaking / Entreprises de radiodiffusion;
>
> Section 41.18: Radio apparatus / Appareil radio;
>
> Section 41.19: Reduction of damages / Annulation ou réduction de dommages-intérêts;
>
> Section 41.2: Injunction only remedy / Cas où le seul recours est l'injonction;
>
> Section 41.21: Regulations / Règlements;
>
> Section 41.22: Prohibition – rights management information / Interdiction : information sur le regime des droits.

[113]   It goes without saying that the definition of what Parliament considers a "technological protection measure" and what constitutes the prohibited circumvention are critical to understanding the prohibition:

| **Definitions** | **Définitions** |
|---|---|
| **41** The following definitions apply in this section and in sections 41.1 to 41.21. | **41** Les définitions qui suivent s'appliquent au présent article et aux articles 41.1 à 41.21. |
| **circumvent** means, | **contourner** |
| **(a)** in respect of a technological protection | **a)** S'agissant de la mesure technique de protection au |

2024 FC 829 (CanLII)

measure within the meaning of paragraph (a) of the definition *technological protection measure*, to descramble a scrambled work or decrypt an encrypted work or to otherwise avoid, bypass, remove, deactivate or impair the technological protection measure, unless it is done with the authority of the copyright owner; and

sens de l'alinéa a) de la définition de ce terme, éviter, supprimer, désactiver ou entraver la mesure — notamment décoder ou déchiffrer l'oeuvre protégée par la mesure — sans l'autorisation du titulaire du droit d'auteur;

**(b)** in respect of a technological protection measure within the meaning of paragraph (b) of the definition *technological protection measure*, to avoid, bypass, remove, deactivate or impair the technological protection measure. (*contourner*)

**b)** s'agissant de la mesure technique de protection au sens de l'alinéa b) de la définition de ce terme, éviter, supprimer, désactiver ou entraver la mesure. (*circumvent*)

**technological protection measure** means any effective technology, device or component that, in the ordinary course of its operation,

**mesure technique de protection** Toute technologie ou tout dispositif ou composant qui, dans le cadre normal de son fonctionnement :

**(a)** controls access to a work, to a performer's performance fixed in a sound recording or to a sound recording and whose use is authorized by the copyright owner; or

**a)** soit contrôle efficacement l'accès à une oeuvre, à une prestation fixée au moyen d'un enregistrement sonore ou à un enregistrement sonore et est autorisé par le titulaire du droit d'auteur;

**(b)** restricts the doing — with respect to a work, to a performer's performance fixed in a sound recording

**b)** soit restreint efficacement l'accomplissement, à l'égard d'une oeuvre,

2024 FC 829 (CanLII)

2024 FC 829 (CanLII)

| or to a sound recording — of any act referred to in section 3, 15 or 18 and any act for which remuneration is payable under section 19. (*mesure technique de protection*) | d'une prestation fixée au moyen d'un enregistrement sonore ou d'un enregistrement sonore, d'un acte visé aux articles 3, 15 ou 18 ou pour lequel l'article 19 prévoit le versement d'une rémunération. (*technological protection measure*) |
| --- | --- |

[114]   The TPM must be a technology, device or component that must be effective in controlling access to the work or restricting the doing of some act. The notion of effective applies to technology, device or component. Whether the TPM is alleged to be a technology, a device or a component, each must be "effective"; the qualifier does not apply only to the technology. If there were to be any ambiguity in the English version, the uncertainty is removed in the French version. Already in 1891, the equal authenticity of both versions of legislation was recognized (*The Canadian Pacific Railway Co v Robinson*, [1891] 19 SCR 292). The principle has translated into seeking to reconcile the two versions of legislation. The modern leading case on the interpretation of bilingual legislation remains *R v Daoust*, [2004] 1 SCR 217, where the Court says:

> 28      We must determine whether there is an ambiguity, that is, whether one or both versions of the statute are "reasonably capable of more than one meaning": *Bell ExpressVu*, *supra*, at para. 29.  If there is an ambiguity in one version but not the other, the two versions must be reconciled, that is, we must look for the meaning that is common to both versions:  Côté, *supra*, at p. 327.  The common meaning is the version that is plain and not ambiguous: Côté, *supra*, at p. 327; see *Goodyear Tire and Rubber Co. of Canada v. T. Eaton Co.*, [1956] S.C.R. 610, at p. 614; *Kwiatkowsky v. Minister of Employment and Immigration*, [1982] 2 S.C.R. 856, at p. 863.

The Court went on to find that if both versions are ambiguous, the common meaning will normally be the narrower version. The unambiguous version will usually carry the day. We must also determine if the common meaning is consistent with Parliament's intent. It seems to me that there is no doubt that Parliament intended that the effectiveness of the measure must apply to the technology, device or component, and not only for the technology to be effective but not the device or the component. The French version makes it clear that the common meaning must prevail as it also conforms with Parliament's intent (*Schreiber v Canada (Attorney General)*, [2002] 3 SCR 269, at para 56).  That is because the structure of the French version of the definition of "technological protection measure" is different. The English structure may leave the impression that only the technology must be effective as the qualifier "effective" may be associated with technology only. Not so in the French version. The equivalent of "effective" ("efficacement") is found in paragraphs (a) and (b) of the definition and it is made clear that it is the controlling of the access to a work or the restricting of the use with respect to a work that must be "effective" ("efficacement"), whether the measure is technology, device or component.

[115]   Similarly, in both versions the common meaning of "effective" and "efficacement" implies some certainty about producing the desired effect. According to the Canadian Oxford Dictionary (Oxford University Press Canada 2001), the first meaning of "effective" is "having a definite or desired effect"; its second is "impressively powerful in effect". A third meaning is presented as being "actual, existing in fact rather than officially or theoretically". "Efficace", on the other hand, is defined in Le Petit Robert de la langue française as "qui produit l'effet qu'en attend".

2024 FC 829 (CanLII)

[116]   Blacklock's Reporter takes the view that a password fits squarely within the meaning of a TPM because, it says, it is an effective technology to control access. Fair dealing is not applicable in the context of circumvention because allowing it would be disregarding clear parliamentary direction. I cannot share that point of view.

[117]   In this case, the Court granted leave to the Samuelson-Glushko Canadian Internet Policy and Public Interest Clinic [CIPPIC] to intervene in this matter, being supported by the AGC (Order of Case Management Judge Molgat, January 21, 2022). The Court wrote at page 4 of 7:

> **CONSIDERING** CIPPIC's public interest mandate, institutional expertise and experience, the Court is of the view that CIPPIC has much insight into the area of copyright law and policy, including the reach of the anti-circumvention provisions in the Act, and the scope of fair dealing, as it has demonstrated in a number of interventions before this Court, the Federal Court of Appeal and the Supreme Court of Canada.

CIPPIC duly limited itself to arguing that sections 41 and 41.1 of the *Act* do not restrict fair dealing and that employing a validly obtained password to access content does not satisfy the requirements of the definition of "circumvent".

[118]   The Court has carefully reviewed the submissions of counsel for BR, the AGC and CIPPIC, and has listened again to the recording of the hearing of this case. As a matter of fact, I was somewhat dubious that the procedural vehicle of a motion for summary judgment, for an outcome constituted of declarations, was completely appropriate on a record comprised of limited affidavits when one of the important issues being debated was what constitutes a technological protection measure, without any expert evidence as to what constitutes a password.

2024 FC 829 (CanLII)

2024 FC 829 (CanLII)

[119]   As a result, the issue must be circumscribed to the limited evidence brought forward by the parties. Hence, it has been established to the Court's satisfaction that Parks Canada purchased the only type of subscription made available by Blacklock's Reporter. That subscription gave Parks Canada access to a password which was used to gain access to some articles published by BR which concerned Parks Canada's mandate and operations. The evidence does not establish if the sharing required to conduct the research undertaken by Parks Canada in its monitoring of articles was done by sharing the password, sharing copies of articles through e-mails or in paper format. There appears, however, to be common ground that there was some sharing of the password. The Court is satisfied that the use made of the articles accessed through the validly obtained password constituted, on the facts in this record, fair dealing according to section 29 of the *Act*. Fundamentally, Parks Canada did not circumvent what is presented as an effective TPM. It used the password licitly obtained for the purpose for which it was created: gaining access to articles located on a website. Once the articles were obtained, they were used in a manner consistent with recognized fair dealing.

[120]   In fairness, BR was essentially reacting to the arguments put forth by CIPPIC. It remains, however, that its counter arguments were suffused with various concepts that were not defined or do not find support in our law. Thus, repeatedly BR referred to a "paywall" being circumvented. The paywall is equated with a TPM that is circumvented because the paywall is meant to "prevent access without an authorized username and a password" (Blacklock's Reporter's response to CIPPIC memorandum of fact and law, para 31; see also para 42). First, "paywall" is not defined. Second, it would appear doubtful that a paywall is strictly speaking a TPM, as stated at paragraph 31. That conflates the means and the end. Rather the TPM used is the means to the

2024 FC 829 (CanLII)

end, which may be a so-called "paywall" or something else. It is the technology, device or component created that results in a paywall. In other words, the TPM exists for a purpose, but it is only the means to satisfy a purpose that may be a paywall. It is the means that is not to be circumvented whether that be technology, device or component. Barnes J in the *Department of Finance* case said that "(t)he suggestion that Blacklock's business model cannot survive in the face of the minor and discrete use that took place here is essentially an admission that the market places little value on Blacklock"s work-product … It also goes without saying that whatever business model Blacklock's employs it is always subject to the fair dealing rights of third parties" (para 45). I certainly share that view. A paywall may be the result of some technology, device or component, but it is not the technology, device or component. The paywall is not the TPM. It protects against unauthorized intrusions and is part of a business model. That protection is not jeopardized by Parks Canada purchasing a subscription for the purpose of research constituting fair dealing. In the case at bar, there is no circumvention of a TPM simply because the password was not circumvented: it was properly obtained and used for a legitimate purpose.

[121]   BR argued that Parliament's intention was to empower owners to protect the works with any technological tool at their disposal (para 32). That cannot be accurate because that would not account for the requirement that the technology, device or component be effective. What constitutes effective technology, device or component in this case is not addressed. More importantly, clear language would be expected to displace altogether the fair dealing protection.

[122]   On a number of occasions, BR speaks of fair dealing as being a defence against infringement (para 21, for instance). Fair dealing has been found by authorities binding on this

Court to be an integral part of a scheme, not a mere exception to the scheme or a defence to an infringement. It must be accounted for in considering the TPM provisions.

[123]   The Court has accordingly considered the matter on the basis of the record as it is, i.e. on the basis that the access to the articles was valid because it was done through the use made of a validly acquired password. BR asserts at paragraph 23 of its response to the CIPPIC memorandum of fact and law that "a copyright owner has the right to control access to its work, and should not be deprived of asserting infringement if its work was unlawfully accessed. Likewise, a user should not be able to benefit from illicit activity". The difficulty with such a statement is not that it may not be true: it may. It is rather that it must be shown that the activity was illicit.

[124]   The AGC contends that, given that the use of the password was in the context of fair dealing, with a password legally obtained, there cannot be liability under subsection 41.1(1) of the *Act*. At any rate, circumvention was never established.

[125]   CIPPIC's submissions were more fulsome. Fundamentally, it argues that the TPM provisions do not apply to restrain fair dealing; using a validly obtained password to access content is not circumvention. I agree. I would add nonetheless that how the password was obtained is significant as this may prevent a user from invoking the fair dealing provisions of the *Act*. Obtaining content by descrambling a signal or decrypting a communication may render invoking fair dealing very difficult to establish successfully. It is telling in my view that s 41.11(1) of the *Act* provides for an explicit exception for law enforcement and national security

2024 FC 829 (CanLII)

against liability for circumvention. But this is not the case before this Court. Our case is much more straightforward in my estimation and it is limited to a very narrow scenario.

[126]   As pointed out earlier, the *Act* provides for a careful balance between the rights of owners of the works who must receive a just reward, especially because of the access now possible for copyrighted content in the digital world, and the use that must be possible to make in the public interest (*CCH*, para 23). This is integral to the needed balance between owners and users. That balance has been part of our law for two decades and Parliament was fully aware of its existence. Fair dealing was not a blank cheque before the amendments of 2012 brought about the TPM provisions, and there is no indication that the balance was to be upended in one direction or the other. That would be the effect of the interpretation suggested by BR.

[127]   Not only would the upending of the balance require some clear signal from Parliament, which we cannot find in the text, context, structure or even history, but the text of the prohibition against circumvention points in the opposite direction. Section 41.1 establishes a prohibition against circumvention. Subsection (2) provides specifically that the owner of the copyright in a work is entitled to all remedies conferred by law for the infringement of copyright. However, the law is careful to stress that the entitlement to remedies is "subject to this Act and any regulations made under section 41.21". The ability to claim a remedy for circumvention is limited by the words of the Statute because, as I read it, the scheme of the *Act* continues to prevail.

[128]   For our purposes, it suffices to note, as we are invited to do so by CIPPIC, that paragraph 49 of *CCH* establishes the principle that "as an integral part of the scheme of

2024 FC 829 (CanLII)

copyright law, the s 29 fair dealing exception is always available". The Supreme Court goes on

to use as an example a library that can always use s 29; if unable to satisfy the requirements, it

could turn on the library exemption of s 30.2. Specific exemptions for TPM do not, on that

reasoning, displace the fundamental pillar of copyright law that is fair dealing. If there is fair

dealing, there is no infringement. Actually, the structure of the *Act* itself places the TPM

provision in the part of the *Act* interested in the remedies for infringement (s 41.1(2)).

[129]   Blacklock's Reporter asserted that "the aforementioned tabulated conditions illustrate

Parliament's clear overall reluctance to reward any user who fails to properly acquire or access a

work" (Blacklock's Reporter's response to CIPPIC's memorandum of fact and law, para 13).

The same argument is found at paragraph 9. The argument cannot hold if the access was licit:

here, the password was acquired regularly. The fair dealing right is meant to be robust. One of

the purposes of the fair dealing right is to bring balance to copyright law and avoids allowing a

monopoly over the use of the works (*CCH*, para 70). If such an important balance were to be

altered as suggested by BR, Parliament would have been explicit.

[130]   What is the purpose then of the TPM provision? The proverbial "elephant in the room"

question was in my view completely answered by CIPPIC at paragraph 42 of its submissions,

which I reproduce here:

> 42.   The TPM Provisions' purpose was to better enable digital
> copyright owners to enforce copyright in the online
> environment. They provide an additional remedial arrow in
> the copyright owner's quiver where an infringement occurs
> in a digital context "to better address the challenges and
> opportunities of the Internet". They were not intended to
> **effectively enlarge** copyright protection for digital works by

2024 FC 829 (CanLII)

2024 FC 829 (CanLII)

> allowing owners to employ TPMs to defeat fair dealing, an
> inherently non-infringing activity. [footnotes omitted]

Fair dealing precludes liability under the *Act*. Other sources of liability may be created, including

by contract. If the goal of the TPM provisions was to allow copyright owners the ability to

unilaterally not only to alter the balance, but to change it completely in the face of the state of

copyright law, the expectation can only be that Parliament would have said so. It did not.

[131]   In view of the conclusion that I have reached on the issue of whether fair dealing and

TPM were meant to co-exist in some harmony so long as the dealing is fair, which includes

obviously how access to the work has been accomplished and the use of the content that

followed, the balance between owners of copyrights and potential users of the works remains

preserved. The ability of copyright owners to protect against the distribution of their works,

which is made so much more broad scale in the digital world, is now a reality. But that cannot be

if the cost is to negative fair dealing. Accordingly I see no need to consider the issue of the

constitutionality of a TPM regime that would be divorced from Parliament's jurisdiction over

copyrights (*Constitution Act, 1867*, s 91(23)).

[132]   There remains the issue of whether a "password" is a technological protection measure,

which requires that the technology, device or component be effective to control access to the

work. The definition of "circumvent" requires that the person in breach of the prohibition must

descramble or decrypt or to otherwise avoid, bypass, remove, deactivate or impair the

technological protection measure in order to gain access. It stands to reason that the starting point

has to be what is the technology, device or component at issue in this case before seeking to

address whether it is effective or not. There is not a paucity of evidence: there is instead a complete absence on the record before the Court.

[133]   There is no need to consider any further the circumvention of the password because, in this case, there is no evidence of descrambling, decrypting or to otherwise avoid, bypass, remove, deactivate or impair the TPM since the password was acquired and used for the purpose for which it was created, i.e. gain access to articles. Only CIPPIC submitted dictionary definitions of the various actions constituting circumvention of access. That, in my view, could not justify offering a declaration of what constitutes circumvention given the list of actions found in the definition of the term. It will suffice to conclude that the very use of the password, which arguably could constitute a TPM, can hardly be the circumvention of itself when used as it was meant to be used.

VII.    <u>Conclusion</u>

[134]   Given that there is no liability involved in these proceedings as the original action has been discontinued, the Moving Party, the AGC, seeks declarations in his motion for summary judgment. In his prayer for relief, the AGC asks specifically for a declaration:

a)    that there be rectification by the Court, striking down those parts of the Terms and Conditions that do not conform with Parks Canada's understanding that it was purchasing an institutional subscription allowing the sharing of articles and passwords;

2024 FC 829 (CanLII)

b)   that Parks Canada was entitled to share articles for institutional use. To the extent that the subscription was an individual subscription, the articles and their circulation were subject to fair dealing and, accordingly, there is no breach of copyright;

c)   that, to the extent that the subscription was not an institutional subscription, the sharing of a password is not a circumvention of the technology protection measures of the *Copyright Act*;

d)   that, at any rate, if there was a breach of the TPM provisions, they were inconsequential to the extent they are subject to fair dealing. No damages are accordingly payable.

[135]   For the reasons developed in the preceding paragraphs, and, fundamentally, in view of the record available to the Court, the Court is not disposed to grant rectification in this case.

[136]   Nonetheless, the AGC, on behalf of Parks Canada, is entitled to the declaration that, having purchased the only type of subscription offered which allowed the acquisition of a password needed to access articles produced by Blacklock's Reporter, Parks Canada's use of the password in the circumstances of this case constitutes fair dealing under section 29 of the *Copyright Act*.

[137]   On the issue of the alleged contravention of the TPM provisions of the *Copyright Act*, the AGC is entitled to the limited declaration that the licit acquisition and use of a password, if it is otherwise a technological protection measure, does not constitute the circumvention of the technological protection measures of the *Copyright Act*. The evidentiary record in this case does

2024 FC 829 (CanLII)

not permit the Court to consider if a password constitutes an effective technology, device or component. At any rate, such finding is not needed here in view of the facts.

[138]   The Order granting the intervention of the Samuelson-Glushko Canadian Internet Policy & Public Interest Clinic [CIPPIC] provided specifically that the "CIPPIC shall not seek or be made subject to any Order for costs". As to the AGC and 1395804 Ontario Ltd, operating as Blacklock's Reporter, in view of the divided success on the motion for summary judgment, there shall be no Order for costs.

2024 FC 829 (CanLII)

## JUDGMENT in T-1862-15

**THIS COURT'S JUDGMENT is the following:**

1.    It is hereby declared that, having purchased the only type of subscription available, which was allowing the acquisition of the password needed to access articles produced by Blacklock's Reporter, Parks Canada's use of the password in the circumstances of this case constitutes fair dealing under section 29 of the *Copyright Act*.

2.    It is hereby declared that the licit acquisition and use of a password, if it is otherwise a technological protection measure, does not constitute the circumvention of the technological protection measures of the *Copyright Act*.

3.    There is no order as to costs.

"Yvan Roy"
_____
Judge

2024 FC 829 (CanLII)

**FEDERAL COURT**

**SOLICITORS OF RECORD**

**DOCKET:**              T-1862-15

**STYLE OF CAUSE:**      1395804 ONTARIO LTD, operating as BLACKLOCK'S
                         REPORTER v ATTORNEY GENERAL OF CANADA
                         AND SAMUELSON-GLUSHKO CANADIAN
                         INTERNET POLICY & PUBLIC INTEREST CLINIC

**PLACE OF HEARING:**    OTTAWA, ONTARIO

**DATE OF HEARING:**     JUNE 7-9, 2023

**JUDGMENT AND REASONS:**  ROY J.

**DATED:**               MAY 31, 2024

**APPEARANCES**:

Scott Miller                                    FOR THE PLAINTIFF/
Deborah Meltzer                          RESPONDENT ON MOTION

Alexander Gay                                  FOR THE DEFENDANT/
                                                      MOVING PARTY

James Plotkin                                FOR THE INTERVENER/
Christian Clavette                        RESPONDENT ON MOTION

**SOLICITORS OF RECORD**:

MBM Intellectual Property Law               FOR THE PLAINTIFF/
LLP                                      RESPONDENT ON MOTION
Barristers and Solicitors
Ottawa, Ontario

Attorney General of Canada                  FOR THE DEFENDANT/
Ottawa, Ontario                                    MOVING PARTY

Gowling WLG (Canada) LLP                    FOR THE INTERVENER/
Barristers and Solicitors                RESPONDENT ON MOTION
Ottawa, Ontario

2024 FC 829 (CanLII)

2024 FC 829 (CanLII)

# EXHIBIT F



**IP Insights**

## Low-cost procedures for effective copyright litigation .

July 04, 2013

Canada is home to very attractive options for those contemplating the initiation of copyright infringement proceedings.

For example, the Canadian *Copyright Act* (the "*Act*") contains specific provisions that enable copyright owners to obtain highly cost-effective relief for infringement claims. These special provisions relate to:

1. the availability of summary proceedings in copyright infringement matters, namely applications and robust summary judgment and trial procedures in actions; and

2. the availability of statutory damages that simplify the assessment of damages to be awarded.

## Summary proceedings

Section 34(4)(a) of the *Act* provides that proceedings for infringement of copyright or moral rights may be commenced by way of application rather than by way of a more complicated action. Further, motions for summary judgment and summary trial can be brought in most courts in Canada, including in the Federal Court, which hears most IP matters in Canada.

In proceedings brought by way of an application, as well as in summary judgment and summary trial motions, evidence is filed by affidavit. Although the affiants are subject to cross-examination, there is generally no live testimony of witnesses at the hearing, nor wide-ranging discoveries like in proceedings brought by way of an action. As such, Canadian copyright litigation can be conducted quickly and cost-efficiently.

## Statutory damages

The *Act* also contains statutory damages provisions that allow the plaintiff to elect to recover compensation per work infringed – as opposed to compensation for actual damages (and/or the infringer's profits) – based on the number of infringing copies. Statutory damages eliminate the difficult exercise of establishing the quantum of damages the plaintiff suffered or the quantum of illegitimate profits derived by the defendant from the infringement.

In particular, section 38.1(1) provides that statutory damages may be awarded by the court "in a sum of not less than $500 and not more than $20,000" for each work infringed with the *proviso* that, pursuant to section 38.1(3), even the minimum amount can be lowered on the basis of proportionality of damages to the infringing activity "as the court considers just."

As an example, in a recent case Smart & Biggar handled in the Federal Court – *Adobe Systems Incorporated, Microsoft Corporation and Rosetta Stone Ltd v Dale Thompson*, 2012 FC 1219 – the Court granted summary judgment, including broad injunctive relief and a monetary award of well over $400,000 on a motion for summary trial based on affidavit

**SMART & BIGGAR**

⚙ Member of the IPH network

evidence filed by the plaintiffs. Maximum statutory damages were awarded in respect of unauthorized reproduction of software works proven to have been reproduced without authority through purchases made by the plaintiffs and unauthorized reproduction of cover art from software products of the plaintiffs by the defendant on the Internet.

## Conclusion

The availability of statutory damages and efficient enforcement options may make copyright infringement an attractive cause of action, even where infringement of other forms of intellectual property such as trademarks is the primary concern. IP rights holders hoping to deal with an infringement matter should always consider possible copyright claims and the options offered by the Canadian *Copyright Act*, which can provide fast and simple procedures for addressing infringement of their rights.

*The preceding is intended as a timely update on Canadian intellectual property and technology law. The content is informational only and does not constitute legal or professional advice. To obtain such advice, please communicate with our offices directly.*

**RELATED SERVICES**

• Copyright & Digital Media

# EXHIBIT G

# Settling intellectual property disputes in court

Litigation is at the most involved (and potentially aggressive) end of the spectrum of potential enforcement activities. While litigation is often the last resort in a failed negotiation, it can be a very effective enforcement tool. However, litigation can also be expensive, complex and time-consuming.

In intellectual property (IP) litigation, both parties present their cases in court to a judge, who then hands down a ruling. It is common for cases that go to litigation to end up being settled before the end of a trial.

## Questions to consider before litigation

- Is litigation a feasible option for you in terms of costs and time?
- What is your likelihood of success?
- What exclusive IP rights do you have available to enforce?
- What are the possible defences available to the infringer, and what are their chances of success?
- Is there enough evidence to be gathered of the infringing activity?
- What is the expected relief (e.g. an injunction, monetary damages, destruction of the infringing product), and is it recoverable?
- What are the potential costs of litigating, and what are the potential costs of not litigating (e.g. loss of goodwill or reputation, encouraging future infringers)?
- Have you exhausted potential alternatives, such as mediation or arbitration?

## Courts in Canada

There are 2 court systems that generally deal with IP matters in Canada:

- the Federal Court system
- the provincial courts system

Some IP matters can only be tried in the Federal Court, and others can only be tried in the provincial courts. Generally speaking, disputes involving the infringement of patents, copyright and trademarks can be tried in either court system, whereas an action to invalidate IP rights must be brought before the Federal Court. Therefore, choosing in which court to commence your proceeding becomes a strategic decision. In some instances, you may be required to litigate in both court systems.

For **multi-jurisdictional disputes**, weigh the pros and cons of litigating in Canada versus abroad or using alternative dispute resolution, particularly arbitration.

## Federal Court

Courts can only try matters over which they have jurisdiction. Only the Federal Court has the jurisdiction to impeach, invalidate or expunge IP registrations. The Federal Court has the exclusive jurisdiction to decide the following types of cases:

### Patents

- cases in which a party wants to impeach or annul a patent
- cases in which a party wants to vary or expunge any entry in the records of the Patent Office relating to the title to a patent
- cases involving conflicting patent applications
- cases in which a party wants to appeal a decision of the Commissioner of Patents refusing to grant a patent

### Copyright

- cases in which a party wants an entry in the copyright register made, expunged, varied or rectified
- cases involving conflicting copyright registrations

## Trademarks

- cases involving conflicting trademark registrations
- cases in which a party wants an entry in the trademark register made, expunged, varied or rectified

## Advantages of the Federal Court

- The judges are more experienced with pure IP matters.
- The Federal Court maintains registries across the country.
- Cases can often be more quickly heard and appealed.
- Orders from the Federal Court are enforceable Canada-wide.

# Provincial superior courts

Provincial courts deal mostly with criminal and private law cases (e.g. breach of contract), but they can also try certain types of IP cases. Provincial courts may be the only option for disputes that are largely contractual in nature or based on complicated commercial activities, such as a breach of confidence arising from a departing employee. If your IP dispute is based on any of these causes of action, you must go through the provincial courts system.

Examples: ownership disputes based on employment contracts, breaches of non-disclosure or license agreements, misappropriation of trade secrets

# Small claims court

A quick, easy and less expensive way for litigants to enforce their IP rights in court is through an action in small claims court. This is a specialized branch of the provincial courts system.

A small claims court proceeding is only an option for a plaintiff seeking monetary relief within the monetary limit of their respective provincial small claims court. Each province and territory has a capped monetary amount that can be claimed for damages. In Ontario, the small claims court has the jurisdiction to hear cases involving claims for $35,000 or less, while Alberta has the highest capped monetary amount in the country, at $50,000.

# Get professional help

Solving conflicts involving IP rights is often complex. Consult an IP professional, such as an IP agent or lawyer, to discuss the next steps if you believe your IP rights are being infringed upon.

If IP infringement is happening in another country, a Canadian IP professional may be able to coordinate with an IP professional in the other country to enforce your IP rights.

Search for an IP professional

**Date modified:**
2021-06-28

# EXHIBIT H

RANDALL S. NEWMAN (SBN 190547)
Attorney at Law
99 Wall St., Suite 3727
New York, NY 10005
212.797.3735
rsn@randallnewman.net

*Attorney for Plaintiff,*
 *Christopher J. Cordova*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

CHRISTOPHER J. CORDOVA,

       Plaintiff,

    vs.

JONATHAN HUDON-HUNEAULT,
NNEKA OHIRI,

      Defendants.

Case No. 25-cv-04685-VKD

**PLAINTIFF'S INTIAL DISCLOSURES**

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, Plaintiff, Christopher J. Cordova ("Plaintiff") makes the following initial disclosures (the "Disclosures").

1.    Rule 26(a)(1)(A)(i) – The name and, if known, the address and telephone number of each individual likely to have discoverable information, along with the subjects of that information, that the disclosing party may use to support his or her claim or defenses, unless the use would be solely for impeachment.

| Name | Contact Information | Subject |
|---|---|---|
| Christopher J. Cordova | c/o Randall S. Newman, Esq. 99 Wall Street, Suite 3727 New York, NY 10005 (212) 797-3735 | Plaintiff's DMCA notices to YouTube; Plaintiff's copyrights and YouTube videos. |
| Jonathan Hudon-Huneault | c/o Steven C. Vondran, Esq. 620 Newport Center Dr., Suite 1100 Newport Beach, CA 92660 (949) 945-8700 | Defendants' copying of Plaintiff's videos; Defendants' infringement of Plaintiff's videos; Defendants' use of video-ripping or other circumvention software to obtain Plaintiff's videos from YouTube; Defendants' profits from infringing videos. |
| Nneka Ohiri | c/o Steven C. Vondran, Esq. 620 Newport Center Dr., Suite 1100 Newport Beach, CA 92660 (949) 945-8700 | Defendants' copying of Plaintiff's videos; Defendants' infringement of Plaintiff's videos; Defendants' use of video-ripping or other circumvention software to obtain Plaintiff's videos from YouTube; Defendants' profits from infringing videos. |
| David R. Coulter | 38241 Lakeshore Blvd., Apt. 703 Willoughby, OH 44094 (216) 526-8294 | Defendants' use of video-ripping or other circumvention software. |

2

**PLAINTIFF'S INITIAL DISCLOSURES**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2.      Rule 26(a)(1)(A)(ii)–A copy, or a description by category and location of all documents, electronically stored information, and tangible things that the disclosing party has in his or her possession, custody, or control and may use to support his or her claims or defenses, unless the use would be solely for impeachment.

| Categories of Documents | Location |
|---|---|
| Plaintiff's correspondence with YouTube regarding copyrights | c/o Randall S. Newman, Esq.<br>99 Wall Street, Suite 3727<br>New York, NY 10005<br>(212) 797-3735 |
| Plaintiff's copyright registration certificates | c/o Randall S. Newman, Esq.<br>99 Wall Street, Suite 3727<br>New York, NY 10005<br>(212) 797-3735 |
| Plaintiff's YouTube videos | c/o Randall S. Newman, Esq.<br>99 Wall Street, Suite 3727<br>New York, NY 10005<br>(212) 797-3735 |
| Defendants' DMCA counternotices | c/o Randall S. Newman, Esq.<br>99 Wall Street, Suite 3727<br>New York, NY 10005<br>(212) 797-3735 |

3.      Rule 26(a)(1)(A)(iii)– A computation of each category of damages claimed by the disclosing party.

| Category of Damages | Amount | Computational Basis |
|---|---|---|
| Plaintiff's actual damages and Defendants' profits from copyright infringement | To be determined following discovery | 17 U.S.C. § 504(b) |
| Actual and/or statutory damages for circumvention of technological protection measures | To be determined following discovery | 17 U.S.C. §§ 1203(c)(2) and 1203(c)(3) |
| Damages incurred by Plaintiff as a result of Defendants' material misrepresentations in DMCA counter-notices | To be determined following discovery | 17 U.S.C. § 512(f) |
| Attorneys' Fees and costs | To be determined following judgment | 17 U.S.C. § 512(f) and 17 U.S.C. § 1203(b)(5) |

3

**PLAINTIFF'S INITIAL DISCLOSURES**

4.      Rule 26(a)(1)(A)(iv)– For inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment:

N/A

Dated:  October 28, 2025

/s/ Randall S. Newman
Randall S. Newman, Esq. (SBN 190547)
99 Wall Street, Suite 3727
New York, NY 10005
(212) 797-3735
rsn@randallnewman.net

*Attorney for Plaintiff,*
*Christopher J. Cordova*

**PLAINTIFF'S INITIAL DISCLOSURES**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the below date, I served the foregoing document via email on the following:

Steven C. Vondran, Esq.
620 Newport Center Dr., Suite 1100
Newport Beach, CA 92660
(949) 945-8700
steve@vondranlegal.com

Dated:      October 28, 2025              s/ Randall S. Newman
                                          Randall S. Newman

**PLAINTIFF'S INITIAL DISCLOSURES**

# EXHIBIT I

RANDALL S. NEWMAN (SBN 190547)
Attorney at Law
99 Wall St., Suite 3727
New York, NY 10005
212.797.3735
rsn@randallnewman.net

*Attorney for Plaintiff,*
*Executive Lens LLC*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| EXECUTIVE LENS LLC,<br><br>    Plaintiff,<br><br>vs.<br><br>LEE RAPKIN and JOHN DOE dba "the Exposer" www.youtube.com@1aAudits Exposé,<br><br>    Defendant. | Case No.<br><br>**COMPLAINT FOR:**<br><br>1. **Misrepresentation, 17 U.S.C. § 512(f);**<br><br>2. **Declaration of Copyright Infringement**<br><br>**JURY TRIAL DEMANDED** |

1

**COMPLAINT**

Plaintiff, Executive Lens LLC ("Plaintiff"), files this action against Lee Rapkin ("Attorney Rapkin") and John Doe d/b/a "the Exposer" (the "Exposer") who operates the 1a Audits Exposé YouTube channel located www.youtube.com@1aAuditsExposé (The "Exposé Channel") and alleges as follows:

## INTRODUCTION

1.      This case is about the widespread abuse of the Digital Millennium Copyright Act's counter-notice process by individuals—and, disturbingly, even licensed attorneys—seeking to keep infringing "reaction channel" videos monetized on the YouTube platform.

2.      Over the past several years, a growing number of YouTube channel creators have built their channels on the unauthorized use of copyrighted footage from creators who actually produce original content. These channels repost others' work without permission, add little or no transformation, and monetize the stolen material through YouTube's Partner Program under the guise of "fair use."

3.      While some "reaction" videos have been upheld as fair use, courts have emphasized that such videos must include structured critique, frequent interjections, and a transformative purpose. This case involves an emerging model of "mockumentary-style" infringement in which the so-called "creator" splices Plaintiff's original footage with TV and movie clips purely to mock and ridicule, believing that stacking multiple layers of infringement somehow adds up to fair use.

4.      When copyright owners like Plaintiff submit takedown notices under 17 U.S.C. § 512(c), these infringing channels often retaliate by filing false counter-notices under § 512(g), swearing under penalty of perjury that their use is protected by fair use.

5.      Many of these counter-notices are false. They are submitted by individuals who have not reviewed the videos, do not understand the law, or are gambling that the copyright owner will not bother to sue.

6.      The abuse has become so rampant that anonymous creators now enlist attorneys to file false counter-notices on their behalf.

**COMPLAINT**

7.     In this case, Attorney Rapkin, a lawyer admitted to the Quebec bar in 2024 and practicing at BLP Avocats in Montréal, submitted a blanket counter-notice on behalf of The Exposer. The counter-notice purportedly covered 17 videos: 16 YouTube shorts and one long-form video (the "17-Videos").[1]

8.     In that counter-notice, Attorney Rapkin swore under penalty of perjury that each of the 17-Videos were "significantly transformed by detailed editing and elaborate commentary throughout the videos".

9.     That statement was materially false. At least eight of the videos contain no commentary at all—not a single word. The remaining videos include publicly available footage and token additions such as unrelated clips from movies and television shows, which serve only to mock the subject and do not transform the underlying work. Not a single one of the 17-Videos includes anything close to "elaborate commentary," as Attorney Rapkin falsely claimed under penalty of perjury.

10.    Plaintiff brings this action under 17 U.S.C. § 512(f) to hold both Attorney Rapkin and The Exposer accountable for knowingly and materially misrepresenting the legal basis of their counter-notice—and to prevent the reinstatement of the 17-Videos on YouTube.

11.    Attorney Rapkin used the same boilerplate justification across all 17 takedown disputes, submitting a blanket counter-notice despite the factual differences among the videos. This demonstrates a deliberate scheme to preserve monetized content while shielding the true identity of the infringer.

12.    In fact, on a recent livestream, The Exposer openly bragged about hiding behind his lawyer and a corporation to avoid accountability for the blatant misuse of Plaintiff's footage.

---

[1] The counter-notice lists 16 URLs, not 17.

**COMPLAINT**

13. This action seeks to expose The Exposer, hold both him and Attorney Rapkin responsible for their misconduct, and prevent the reinstatement of the 17-Videos on YouTube.

## JURISDICTION AND VENUE

14. This action arises under the Copyright Act, 17 U.S.C. § 101 *et seq.*, and includes a claim for Declaratory Relief under 28 U.S.C. § 2201.

15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

16. Attorney Rapkin consented to jurisdiction in the Northern District of California pursuant to 17 U.S.C. § 512(g)(3)(D) by submitting a DMCA counter-notification to YouTube. She did so knowingly, using her law firm email and digital signature. Her consent binds her to this forum regardless of her location or bar admission status. Plaintiff notes that such consent is a statutory prerequisite for a valid counter-notification under § 512(g).

17. The Exposer likewise consented to jurisdiction in this District under 17 U.S.C. § 512(g)(3)(D) by submitting the counter-notice to YouTube.

18. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1400(a) because both Attorney Rapkin and The Exposer consented to jurisdiction in this District under 17 U.S.C. § 512(g)(3)(D).

## PARTIES

19. Plaintiff is a Colorado limited liability company and the sole owner of the copyrights in the videos published on the YouTube channels "Denver Metro Audits" and "Denver Metro Audits 2.0" (@DenverMetroAudits; @Denvermetroaudits2.0).

20. Attorney Rapkin is an attorney admitted to the Quebec bar in 2024, with no known experience in United States copyright law. Attorney Rapkin submitted a DMCA counter-notice in the course and scope of her employment with the Canadian law firm BLP Avocats, using her firm email and contact information. Plaintiff reserves the right to name BLP Avocats as a defendant after further discovery.

4

**COMPLAINT**

21. Defendant John Doe, operating under the alias "The Exposer," runs a YouTube channel located at @1aAuditsExposé.

22. The Exposer's YouTube channel is a textbook example of an anonymous "reaction" channel—that is, a channel that creates no original content of its own, but instead lifts copyrighted footage from others, overlays superficial or token commentary (if any), and attempts to pass it off as transformative. The Exposer never appears on camera, and until recently, his location was completely unknown.

23. The Exposer claims that his channel exists to "expose the grift" of First Amendment auditors ("Auditor(s)"). In reality, the channel monetizes stolen footage from those very same Auditors, ironically engaging in the exact behavior it purports to criticize. It is not journalism. It is not commentary. It is copyright infringement disguised as fair use, wrapped in a mask of moral outrage.

## FACTUAL ALLEGATIONS

24. YouTube is the largest video-sharing platform in the world and operates under the framework established by the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512.

25. The DMCA provides a process by which copyright owners may request the removal of infringing content through a notice-and-takedown mechanism. If the platform receives a valid takedown notice, it typically disables access to the allegedly infringing material.

26. The DMCA also allows the alleged infringer to submit a counter-notification claiming that the use is authorized, lawful, or otherwise non-infringing. If the copyright owner does not initiate a federal lawsuit within 10 business days of receiving a counter-notice, YouTube is required by law to restore access to the disputed content pursuant to 17 U.S.C. § 512(g).

27. This statutory framework places the burden on copyright owners, particularly small independent creators and small publishers, to enforce their rights through litigation.

**COMPLAINT**

28.     Infringers like The Exposer exploit this imbalance by targeting small creators who lack the resources to initiate a lawsuit after receiving a counter-notice.

29.     In practice, this loophole allows anonymous, foreign-run, monetized YouTube channels to exploit copyrighted material created in the United States by invoking "fair use" without consequence or oversight.

30.     In recent years, "fair use" has become a catchall defense on YouTube—used not to support legitimate critique, but to excuse the wholesale misappropriation of others' creative work.

31.     The Auditor community on YouTube consists of small independent content creators who film interactions with government officials in public spaces to promote transparency and assert constitutional rights, primarily the First Amendment. These creators act as citizen journalists, watchdogs, and public advocates, documenting real-time government conduct and holding public officials accountable through video.

32.     The Auditor movement has grown into a powerful and controversial force on social media. Auditors regularly publish their videos to YouTube channels, where they have collectively attracted millions of subscribers and billions of views. These creators often operate under channel names or aliases and have become recognizable figures in the digital civil rights ecosystem.

33.     Plaintiff owns all copyrights to the videos uploaded to the YouTube channels "Denver Metro Audits" (@DenverMetroAudits) and related channels, which collectively have over 250,000 subscribers and more than 600 videos. The works have generated over 115 million views and sustained public engagement on issues of constitutional importance.

34.     A genre of YouTube creators known as "auditor trolls" has emerged in response. These creators produce reaction-style videos targeting Auditors. While they purport to offer criticism or commentary, their actual content typically consists of mockery, personal insults, and superficial narration that does not engage with the substance of the original videos. Their focus is ridicule, not critique.

**COMPLAINT**

35.     The Exposer's YouTube channel is a textbook example of such misuse. It provides no new message, no added insight, and no transformation of purpose. It simply repackages Plaintiff's footage with ridicule and pop culture references to attract viewers and generate revenue from Plaintiff's content. The Exposer creates no original content. He steals it and splices it together for ad revenue.

36.     These additions rarely engage with the subject matter or journalistic value of Plaintiff's works. Instead, The Exposer mocks Auditors personally—their voices, mannerisms, appearances, emotional reactions, and private lives.

37.     The Exposer has created at least 31 videos using Plaintiff's copyrighted footage: 19 YouTube shorts and 12 long-form videos.

38.     On July 4, 2025, Plaintiff's assignor filed DMCA takedown notices with YouTube requesting removal of 27 of the 31 videos (16 shorts and 11 long-form videos).

39.     YouTube complied and removed all 16 shorts and one long-form video. The Exposer made the other 10 long videos and 3 shorts private after receiving the strikes. A list of URLs for the 17-Videos that were removed by YouTube is attached as **Exhibit A**.

40.     Despite repeated communications, YouTube refused to remove the 10 long-form videos that had been made private. YouTube appears to have determined—possibly via an automated process—that these videos were protected under fair use. This determination was made outside the DMCA safe-harbor and without judicial input. It is not the role of anonymous YouTube staff to resolve the legal question of fair use under U.S. copyright law.

41.     On July 14, 2025, Attorney Rapkin submitted a blanket DMCA counter-notice on behalf of The Exposer purportedly covering all 17-Videos (16 shorts and 1 long-form). (the "Counter-Notice"). A copy of the Counter-Notice is attached hereto as **Exhibit B.**[2]

---

[2] Although the Counter-Notice purports to cover URLs for 17 videos, only 16 URLs were listed on the Counter-Notice.

**COMPLAINT**

42. In the Counter-Notice, Rapkin swore under penalty of perjury that the videos were removed "by mistake or misidentification" and that each was "significantly transformed by detailed editing and elaborate commentary throughout." These assertions were materially false.

43. In reality, the 16 counter-noticed shorts fall into three categories, none of which support a fair use defense:

44. Category 1: Short Videos with No Commentary Whatsoever (8 videos): These shorts consist entirely of Plaintiff's copyrighted footage, often paired with other copyrighted material (e.g., movie or television clips) for mockery. There is not a single word of narration, commentary, or critique in these videos, directly contradicting Rapkin's blanket claim under penalties of perjury of "elaborate commentary throughout."

45. Category 2: short Videos Featuring Publicly Available Government Footage (3 videos)[3]: These shorts depict public meetings or hearings that were already published by government entities on their official YouTube channels such as the City of Englewood, Colorado. Rather than using those public sources, the Exposer copied Plaintiff's original curated footage for convenience, better audio/video quality, or camera angles, none of which justify appropriation under fair use.

46. Category 3: Short Videos with Trivial or Token Commentary (6 videos): These shorts include brief and meaningless phrases or sarcastic clips from copyrighted movies and TV shows. None of these qualify as "elaborate commentary throughout" — the phrase Rapkin certified under penalty of perjury in the blanket Counter-Notice.

47. The sole long-form video in question rips off Plaintiff's footage and mashes it together with at least 14 clips from *Ren & Stimpy*, *Futurama*, *The Simpsons*, *The Office*, and *Extra*. That is not fair use—it is a highlight reel of copyright infringement. Stitching together other people's IP like a digital ransom note does not magically make it transformative.

---

[3] One Short Video falls into Categories 1 and 2 as it has no commentary and public domain footage was available

**COMPLAINT**

48.     Despite these clear deficiencies, Attorney Rapkin submitted the blanket Counter-Notice declaring that all 17-Videos were "significantly transformed by detailed editing and elaborate commentary throughout."

49.     As discussed above, that statement was knowingly false.

50.     The Counter-Notice was part of a coordinated scheme to preserve monetized infringing content while concealing the identity of the true channel operator. Attorney Rapkin submitted the false Counter-Notice under penalty of perjury as required by 17 U.S.C. § 512(g).

51.     Plaintiff now seeks damages, attorneys' fees, declaratory and injunctive relief for Attorney Rapkin and The Exposer's material misrepresentations in the Counter-Notice submitted to YouTube.

## FIRST CAUSE OF ACTION

### Misrepresentation in Counter-Notifications under the DMCA
### (17 U.S.C. § 512(f))

52.     Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 51.

53.     Section 512(f)(2) of the Copyright Act provides, in relevant part, that "***any person*** who knowingly materially misrepresents under this section . . . that material was removed or disabled by mistake or misidentification, shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer, by any copyright owner…who is injured by such misrepresentation..." (emphasis added).

54.     The Counter-Notice submitted by Attorney Rapkin and The Exposer was false, and knowingly so at the time it was filed. Attorney Rapkin falsely represented, under penalty of perjury: (1) that each of the 17-Videos "was significantly transformed by detailed editing and elaborate commentary throughout"; and (2) that each video was protected by fair use and removed "due to a mistake or misidentification." These statements were materially false. At least eight of the Videos

**COMPLAINT**

contain no commentary whatsoever, and none was transformed by detailed editing or any meaningful commentary.

55.     Attorney Rapkin made these knowingly false statements in an effort to preserve or re-monetize the 17-Videos on the Exposé Channel.

56.     As a direct result of the Defendants' material misrepresentations, Plaintiff was forced to initiate this action to prevent YouTube from restoring the 17-Videos. Plaintiff is entitled to recover damages, costs, and attorneys' fees under 17 U.S.C. § 512(f).

57.     Plaintiff is further entitled to injunctive relief barring YouTube or its agents from restoring the 17-Videos to public view.

## SECOND CAUSE OF ACTION

### Declaration of Copyright Infringement, 28 U.S.C. § 2201

### (Against the Exposer)

58.     Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 57.

59.     An actual and justiciable controversy exists between Plaintiff and The Exposer concerning The Exposer's use of the 17-Videos.

60.     Plaintiff contends that The Exposer's use of the 17-Videos is not protected under 17 U.S.C. § 107.

61.     The Exposer believes that his use of the 17-Videos is protected by 17 U.S.C. § 107 as he stated in the Counter-Notification.

62.     The Exposer had said on multiple occasions that he wants to re-post the 17-Videos on his YouTube channel if permitted by YouTube. Therefore, there is a case or controversy between the parties.

63.     Plaintiff seeks a judicial declaration under 28 U.S.C. § 2201 that the Exposer's use of the 17-Videos is not protected by 17 U.S.C. § 107.

64.     Plaintiff also seeks an injunction restraining YouTube and the Exposer from restoring the 17-Videos listed on **Exhibit A** to the Exposer's YouTube channel.

**COMPLAINT**

1

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Executive Lens LLC, prays for judgment against Defendant as follows:

A.     That judgment be entered in favor of Plaintiff and against Attorney Rapkin and The Exposer for monetary damages caused by their knowing material misrepresentations in the Counter-Notice pursuant to 17 U.S.C. § 512(f);

B.     That the Court enter a declaratory judgment that The Exposer's use of the 17-Videos is not protected by 17 U.S.C. § 107;

C.     A permanent injunction enjoining the Exposer from further use of the 17-Videos and requiring YouTube to remove the 17-Videos and prevent further dissemination;

D.     An award of attorneys' fees and costs pursuant to 17 U.S.C. § 512(f)(2);

E.     Any other relief the Court deems just and proper.

## JURY TRIAL DEMANDED

Dated:  July 17, 2025

/s/ Randall S. Newman
Randall S. Newman, Esq. (SBN 190547)
99 Wall Street, Suite 3727
New York, NY 10005
(212) 797-3735
rsn@randallnewman.net

*Attorney for Plaintiff,*
*Executive Lens LLC*

---

11

**COMPLAINT**

## **EXHIBIT A**

## **LIST OF URLs PURPORTEDLY SUBJECT TO COUNTER-NOTICE**

### **Short Form Videos**

1. https://youtube.com/shorts/aIa1JUqSUd4?si=S6uQNRkxSSsyk_0j
2. https://youtube.com/shorts/6iZ83Pe4NoQ?si=c3fL1Z3np-0meofK
3. https://youtube.com/shorts/g1x8N1QdWN0?si=9E8btOBA3jkC5Ksx
4. https://youtube.com/shorts/FEDB48NK3pg?si=z3H9Vrc4c02134lz
5. https://youtube.com/shorts/19QF4uG_2gg?si=s8T-NdSY6nOmNd_Y
6. https://youtube.com/shorts/1qZ8ujLW9i0?si=YuGlA-hMULmpm13O
7. https://youtube.com/shorts/Hj-0PFw-l-g?si=unQyL7iIWj_OVQhs[1]
8. https://youtube.com/shorts/VMB9VUnc_jk?si=qaisFQfknhODb1hA
9. https://youtube.com/shorts/REcICenk5Io?si=cNgJgN_lWk0EckGa
10. https://youtube.com/shorts/_QdhTfh-r8M?si=QpssuQ7TKiHk-PBb
11. https://youtube.com/shorts/Gs96tu40z8M?si=ERXTFgEMNLqgTP2M
12. https://youtube.com/shorts/yjClhLsOQpk?si=PiyYFQKcjXX8N4jA
13. https://youtube.com/shorts/4iVWR3Gsdyk?si=uHJVS-4HjQ-CA2p5
14. https://youtube.com/shorts/nEd1KW-A3kU?si=Qt64MtFls2Ja-zSP
15. https://youtube.com/shorts/9FK-VCcV6xE?si=S0Rmd1RffKNB2l01
16. https://youtube.com/shorts/yQMwzdlodCo?si=tNzM3mLttAYZj4gM

### **Long Form Video**

17. https://youtu.be/dDKRME4f7Dw?si=-s4VzpDgtXrt8HWV

---

[1] This URL was not included in the July 14, 2025 Counter-Notice.



DMCA Lawyer <thedmcalawyer@gmail.com>

---

**Fwd: [53K3YSEI324SZPPLIO7B2CRNQY] New Copyright Counter Notification**
1 message

**Denver Metro Audits** <denvermetroaudits@gmail.com>
To: DMCA Lawyer <thedmcalawyer@gmail.com>

Tue, Jul 15, 2025 at 9:28 AM

---------- Forwarded message ----------
From: **YouTube Copyright** <youtube-disputes+0uk5svpi4y2vs0h@google.com>
Date: Mon, Jul 14, 2025 at 11:44 AM
Subject: Re: [53K3YSEI324SZPPLIO7B2CRNQY] New Copyright Counter Notification
To: <denvermetroaudits@gmail.com>



We received a counter notification (below) in response to a copyright removal request that you submitted. A counter notification is a legal request for YouTube to reinstate a video that was removed due to a copyright removal request.

You have **10 US business days** to reply to this counter notification. Your response **must include evidence that you've taken legal action against the uploader** to keep the content from being reinstated to YouTube. Usually, evidence would include a lawsuit against the uploader, which names the YouTube URL(s) at issue and seeks a court order to restrain the alleged infringement.

**Evidence should be submitted by replying directly to this email**. Do not send your reply to copyright@youtube.com.

After 10 US business days, if we don't get a response from you, the content at issue may be reinstated to YouTube. You can find more information about the legal action you must take and what evidence is acceptable in our Help Center.

- The YouTube Team

Counter Notification as follows:

Videos included in counter notification:

- http://www.youtube.com/watch?v=19QF4uG_2gg
- http://www.youtube.com/watch?v=1qZ8ujLW9i0
- http://www.youtube.com/watch?v=4iVWR3Gsdyk
- http://www.youtube.com/watch?v=6iZ83Pe4NoQ
- http://www.youtube.com/watch?v=9FK-VCcV6xE
- http://www.youtube.com/watch?v=FEDB48NK3pg
- http://www.youtube.com/watch?v=Gs96tu40z8M
- http://www.youtube.com/watch?v=REcICenk5Io
- http://www.youtube.com/watch?v=VMB9VUnc_jk
- http://www.youtube.com/watch?v=_QdhTfh-r8M
- http://www.youtube.com/watch?v=ala1JUqSUd4
- http://www.youtube.com/watch?v=dDKRME4f7Dw
- http://www.youtube.com/watch?v=g1x8N1QdWN0
- http://www.youtube.com/watch?v=nEd1KWA3kU
- http://www.youtube.com/watch?v=yQMwzdIodCo
- http://www.youtube.com/watch?v=yjCIhLsOQpk

Display name of uploader:

To whom it may concern,

We are the legal counsel representing the rights and interests of the owner of the channel 1A Audits Exposé (https://www.youtube.com/channel/UCX9F1a1qde5JspqdeCQlpoA), who received 17 copyright strikes since July 7th from the same claimants. Our client respectfully maintains that each of the videos in question fully complies with YouTube's guidelines and is protected under fair use.

Our client believes the content was removed by mistake or misidentification, as there is no valid basis for a copyright infringement claim. Furthermore, it is our client's good faith belief that the claimant filed the takedown not due to any actual copyright violation, but rather for retaliatory or personal reasons, effectively using the copyright system as a tool of censorship. Our client believes that his videos were protected by fair use for the following reasons.

**The copyright-claims videos:**

- Were used to analyze, demonstrate, and criticize their questionable and debatable content (educational purpose).
- Were significantly transformed by detailed editing and elaborate commentary throughout the videos (commentary and criticism).

EXHIBIT B - Page 1 of 3

- Were used for parody, creating humorous or satirical works that comment on the original (parody and pastiche).

**Legal statements:**

- *"I consent to the jurisdiction of the Federal District Court for the district in which my address is located, or if my address is outside of the United States, the judicial district in which YouTube is located, and will accept service of process from the claimant."*
- *"I swear, under penalty of perjury, that I have a good faith belief that the material was removed or disabled as a result of a mistake or misidentification of the material to be removed or disabled."*

**Statement to the claimant:**

The videos targeted by the strikes are in compliance with YouTube's guidelines and fair use rules; the videos are completely transformed by an elaborate editing and commentary throughout. They were also used for educational purposes and for parody by creating humorous and satirical works that comment on the original. Furthermore, our client truly believes that those claims were sent as a retaliatory gesture for personal reasons, effectively using the copyright system as a tool of censorship. For these reasons, we kindly request that you remove the claims, allowing the Channel 1A Audits Exposé to continue its work and exercise its freedom of speech.

Our client once again provides the following videos and links that have been taken down due to this copyright strike:

**Video title:** When DMA promises to not bother you while bothering you

**Video url:** https://www.youtube.com/watch?v=6iZ83Pe4NoQ

**Video title:** When Regan Benson opened a speech with her own personal style

**Video url:** https://www.youtube.com/watch?v=_QdhTfh-r8M

**Video title:** When a frauditor goes with the same old script

**Video url:** https://www.youtube.com/watch?v=g1x8N1QdWN0

**Video title:** When DMA knows more than a law firm (part 1)

**Video url:** https://www.youtube.com/watch?v=19QF4uG_2gg

**Video title:** When DMA knows more than a law firm (part 2)

**Video url:** https://www.youtube.com/watch?v=1qZ8ujLW9i0

**Video title:** When Denver Metro Audit & Regan are asked to leave (part 2)

**Video url:** https://www.youtube.com/watch?v=9FK-VCcV6xE

**Video title:** When DMA shows his journalist skills

**Video url:** https://www.youtube.com/watch?v=FEDB48NK3pg

**Video title:** When DMA gets mad at you, it's time for name and badge number

**Video url:** https://www.youtube.com/watch?v=nEd1KW-A3kU

**Video title:** This frauditor tries to visit a mental institute

**Video url:** https://www.youtube.com/watch?v=dDKRME4f7Dw

**Video title:** When Denver Metro Audits needs more YouTube content

**Video url:** https://www.youtube.com/watch?v=yQMwzdlodCo

**Video title:** When Denver Metro Audit and Direct D wont be accountable (PART 2)

**Video url:** https://www.youtube.com/watch?v=4iVWR3Gsdyk

EXHIBIT B - Page 2 of 3

**Video title:** When Regan Benson finished a speech with her own personal style

**Video url:** https://www.youtube.com/watch?v=REcICenk5Io

**Video title:** When Regan Benson loves to play the victim card

**Video url:** https://www.youtube.com/watch?v=VMB9VUnc_jk

**Video title:** When DMA shows the council how delusional he is (PART 1)

**Video url:** https://www.youtube.com/watch?v=aIa1JUqSUd4

**Video title:** When Denver Metro Audit & Regan are asked to leave (part 1)

**Video url:** https://www.youtube.com/watch?v=yjCIhLsOQpk

**Video title:** When DMA takes "control" of a situation
**Video url:** https://youtube.com/shorts/Gs96tu40z8M

**Video title** When Denver Metro Audit and Direct D won't be accountable (PART 2)
**Video url:** https://youtube.com/shorts/4iVWR3Gsdyk

As such, we believe the resubmission of the counter-notification was filed correctly, and we request that the content be reinstated. Please let us know if any further information is required.

Best regards,

Me Lee Rapkin

*Avocate / Lawyer*

**Courriel:** lee@blpavocats.com

**Bureau:** (514) 396-5005

439, rue Saint-Pierre, Montréal, Québec, H2Y 2M8

1aauditsexpose@gmail.com

Help Center • Email Options

You received this email to provide information and updates around your YouTube channel or account.

YouTube

© 2021 Google LLC d/b/a YouTube, 901 Cherry Ave, San Bruno, CA 94066

EXHIBIT B - Page 3 of 3

# EXHIBIT J

RANDALL S. NEWMAN (SBN 190547)
Attorney at Law
99 Wall St., Suite 3727
New York, NY 10005
212.797.3735
rsn@randallnewman.net

*Attorney for Plaintiff,*
*Executive Lens LLC*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EXECUTIVE LENS LLC, | Case No. 5:25-cv-07150 |
| Plaintiff, | **COMPLAINT FOR:** |
| vs. | **1. Misrepresentation, 17 U.S.C. § 512(f);** |
| ROBERT ALAN REED and JOHN DOE dba "Frauditor Roundup" www.youtube.com@FrauditorRoundup, | **2. Declaration of Copyright Infringement** |
| Defendants. | |

**COMPLAINT**

Plaintiff, Executive Lens LLC ("Plaintiff" or "Executive Lens"), files this action against Robert Alan Reed ("Attorney Reed") and John Doe d/b/a "Frauditor Roundup" ("Roundup") (Attorney Reed and Roundup are collectively referred to as "Defendants") who operates the Frauditor Roundup YouTube channel located www.youtube.com@FrauditorRoundup (The "Roundup Channel") and alleges as follows:

## INTRODUCTION

1.      This case addresses the growing misuse of the counter-notice process under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512 *et seq*., by "reaction" channel operators who assert an unlimited version of fair use, one so overbroad that, if accepted, it would render copyright protection on YouTube meaningless.

2.      A rising class of YouTube creators has built profitable channels on wholesale appropriation of others' copyrighted works, contributing little or nothing in the way of genuine transformation. Their videos often consist of lengthy, unaltered segments of original creators' footage, broken up by occasional remarks, sound effects, or memes, and are then monetized through YouTube's Partner Program under the mantra of "fair use."

3.      While courts have upheld some reaction videos as fair use, those rulings emphasize frequent commentary, structured critique, and a transformative purpose. In contrast, many "mockumentary-style" infringers splice original footage with token interjections meant to ridicule, not analyze, stacking multiple acts of infringement as if that alone transforms the work. If this overbroad interpretation of fair use were accepted, it would effectively nullify copyright enforcement on YouTube: any user could repost entire videos, add a few quips or visual effects, and claim immunity. Such a precedent would strip creators of meaningful control over their work, undermine YouTube's enforcement system, and incentivize large-scale monetization of stolen content.

4.      This erosion of copyright protections has been fueled, in part, by systematic abuse of the DMCA's counter-notice process. When copyright owners like Executive Lens submit takedown notices under 17 U.S.C. § 512(c), reaction channel operators frequently

**COMPLAINT**

respond with boilerplate counter-notices under § 512(g), swearing under penalty of perjury that their uploads are protected by fair use.

5.     On or about August 13, 2025, Attorney Reed, a personal injury attorney with no known background in copyright law, submitted two such boilerplate counter-notices to YouTube pursuant to § 512(g)(3) on behalf of the Roundup Channel, seeking to have the videos titled *Episode 10 Failed constitutional activist DMA now failing at journalism* and *Episode 98 DMA ignorance shuts down Public Defenders Office!* restored to that channel (the "Infringing Videos") (the "Counter-Notices"). A copy of the Counter-Notices is attached hereto as Exhibit A.

6.     Attorney Reed has submitted nearly identical boilerplate counter-notices to YouTube on behalf of the Roundup Channel in the past to reinstate infringing material using copyrighted footage other than Executive Lens' footage. *See Liberty Troll LLC v. Reed*, 25-cv-06878-SVK (NDCA).

7.     The Counter-Notices claimed, under penalty of perjury, that "the entirety of the content is de facto fair use," and that "Frauditor Roundup is the owner and creator of the content uploaded," further asserting that "the clips used were provided for educational purposes and for commentary and criticism." It also stated that the material was removed "as a result of a mistake or misidentification."

8.     These conclusory statements mirror the kind of boilerplate language reaction channels (and Attorney Reed) often deploy without conducting any individualized fair-use analysis. Rather than evaluating the specific amount, substantiality, and purpose of the footage taken from Executive Lens, Reed relied on a one-size-fits-all legal script untethered from the actual content at issue.

9.     As detailed below, the Counter-Notices are materially false and were knowingly submitted to manipulate YouTube's copyright enforcement process.

10.     Executive Lens brings this action under 17 U.S.C. § 512(f) to hold Defendants accountable for knowingly and materially misrepresenting the legal basis of the Counter-

**COMPLAINT**

Notices and to ensure the permanent removal of the Infringing Videos from the Roundup Channel.

## **JURISDICTION AND VENUE**

11. This action arises under the Copyright Act, 17 U.S.C. § 101 *et seq.*, and includes a claim for Declaratory Relief under 28 U.S.C. § 2201.

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

13. This Court has personal jurisdiction over Defendants because they purposefully directed their conduct toward this District by submitting the Counter-Notices to YouTube, a company headquartered in this District, knowing that the alleged infringement dispute would be processed, reviewed, and acted upon here. Defendants knew or should have known that YouTube's copyright enforcement operations occur primarily in the Northern District of California, and that YouTube would rely on their sworn statements in determining whether to reinstate the video at issue. By initiating the counter-notice process under 17 U.S.C. § 512(g), Defendants purposefully caused effects in this District sufficient to establish specific personal jurisdiction.

14. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1400(a) because a substantial part of the events or omissions giving rise to the claim occurred in this District, including YouTube's reliance on the false Counter-Notices to reinstate the Infringing Video if Executive Lens did not file this action.

## **PARTIES**

15. Executive Lens is a Colorado limited liability company and the sole owner of the copyrights in the videos published on the YouTube channel "Denver Metro Audits" (@DenverMetroAudits) (the "DMA Channel").

16. Executive Lens is the owner, by written assignment, of the exclusive rights in and to the videos at issue in this case. The videos were originally created and published by Christopher J. Cordova ("Cordova") on the DMA Channel, and Cordova submitted the DMCA takedown notices to YouTube on or about July 13, 2025. Thereafter, Cordova

---

4

**COMPLAINT**

transferred to Executive Lens all rights, title, and interest in the works, including the right to enforce them against infringement.

17.     Attorney Reed is an attorney licensed to practice law in the State of California with an office address at 16530 Ventura Blvd., Suite 312, Encino CA 91436.

18.     Defendant John Doe, operating under the alias "Frauditor Roundup," runs a YouTube channel located at @FrauditorRoundup. Upon information and belief, Roundup monetizes the Roundup Channel through YouTube's Partner Program and coordinates with Attorney Reed to submit counter-notices designed to preserve infringing, revenue-generating content.

19.     The Roundup Channel is a textbook example of an anonymous "reaction" channel, that is, a channel that creates no original content of its own (or very little in this case), but instead lifts copyrighted footage from others, overlays superficial or token commentary, and attempts to pass it off as transformative. Roundup never appears on camera and does not create any video footage to add to the "reaction" videos. The channel's anonymity has served as both sword and shield, permitting targeted harassment of real creators while shielding the actual operator from liability

20.     The Roundup Channel exists to monetize stolen footage from other creators under the guise of fair use and admittedly "bully" other creators.

## FACTUAL ALLEGATIONS

21.     YouTube is the largest video-sharing platform in the world and operates under the framework established by the DMCA.

22.     The DMCA provides a process by which copyright owners may request the removal of infringing content through a notice-and-takedown mechanism. If the platform receives a valid takedown notice, it typically disables access to the allegedly infringing material.

23.     The statute also gives the alleged infringer a way to respond: a counter-notification claiming the use is authorized, lawful, or otherwise non-infringing. If the

**COMPLAINT**

copyright owner does not file a federal lawsuit within 10 business days of receiving a counter-notice, YouTube must restore access to the disputed content. 17 U.S.C. § 512(g).

24.     This framework shifts the burden onto copyright owners, often small creators or publishers, to file suit quickly or see their work reposted.

25.     Infringers exploit this imbalance, especially anonymous, monetized "reaction" channels, by filing boilerplate counter-notices designed to intimidate rights holders into dropping the matter.

26.     In practice, this loophole allows such channels to continue monetizing stolen content while hiding behind the mantra of "fair use," even where their videos consist largely of unaltered footage from original creators.

27.     Over time, "fair use" has become a catchall excuse on YouTube, not to support legitimate critique or commentary, but to justify wholesale misappropriation and monetization of others' work without meaningful transformation.

28.     In the context of this Complaint, the term "Auditor" refers to independent content creators who record interactions with government officials in public spaces to promote transparency, document public conduct, and assert constitutional rights, particularly those protected by the First Amendment. These creators act as citizen journalists, watchdogs, and public advocates, often filming police encounters, public meetings, and other matters of public interest, and then publishing that footage online, most prominently on YouTube.

29.     The Auditor movement has grown into a visible force on social media, drawing millions of subscribers and billions of views. Many operate under pseudonyms but have become well-known within the digital civil rights space.

30.     One such Auditor is Cordova, an activist and content creator who regularly films interactions with public officials, government employees, and law enforcement officers in the course of his advocacy work. He posts these recordings to the DMA Channel, where they serve both as a record of public conduct and as a tool to promote government transparency and accountability. Cordova's work is part of the broader Auditor movement

**COMPLAINT**

and has attracted a dedicated audience interested in constitutional rights, public oversight, and civil liberties.

31.  In response to the popularity of Auditors like Cordova, a genre of YouTube creators known as "Auditor Trolls" has emerged. These channels purport to critique Auditor content, but their focus is ridicule rather than substantive analysis. Cloaked in the trappings of commentary, these videos rely heavily on insult, mockery, and misrepresentation rather than meaningful critique or transformative discussion.

32.  The Roundup Channel is a textbook example. It provides no new message, insight, or purpose. Instead, it repackages Executive Lens' footage with occasional ridicule to attract viewers and generate ad revenue, while creating little original content of its own.

33.  Most Roundup videos are assembled from Auditors' footage downloaded in violation of YouTube's Terms of Service and federal law.

34.  The additions rarely address the subject matter or journalistic value of the original works. Instead, they mock Auditors personally and divert viewers from the original content.

35.  The Roundup Channel has repeatedly used Executive Lens' copyrighted works without permission.

### *Episode 10 Failed constitutional activist DMA now failing at journalism*

36.  Roundup posted a video titled *Episode 10 Failed constitutional activist DMA now failing at journalism* to the Roundup Channel ("Infringing Video 1").[1]

37.  Infringing Video 1 contains approximately eight minutes and forty-one seconds of footage from Executive Lens' thirteen minute and one second video titled *COP CAUGHT CHEATING ON THIS WIFE!!! With a City Council member!!!* that was posted to the DMA Channel on May 28, 2023.[2] The copied material comprises virtually the entire substance of Executive Lens' work.

---

[1] https://www.youtube.com/watch?v=JdqiluQDIpQ

[2] https://www.youtube.com/watch?v=V9H_BLd_uhs

7

**COMPLAINT**

38.     Based upon information and belief, Roundup obtained this footage from the DMA Channel in violation of YouTube's Terms of Services and in violation of federal law.

39.     Infringing Video 1 contains several uninterrupted segments of Executive Lens' footage exceeding one minute in length, with absolutely no commentary or transformation.

40.     The minimal commentary that does exist in Infringing Video 1 consists of narration, insults, and superficial asides, offering no substantive critique or analysis. Out of the eight minutes and forty-one seconds of Executive Lens' footage used, the overwhelming majority is presented without meaningful transformation, serving primarily as unaltered entertainment for Roundup's audience.

41.     Although the Infringing Video's title suggests it is about DMA failing at journalism, only a very brief portion of Executive Lens' footage actually depicts that interaction. Roundup could have conveyed the same purported point by using that brief excerpt yet instead appropriated eight minutes and forty-one seconds of Executive Lens' work, the vast majority unrelated to the stated theme, for use as filler in Infringing Video 1.

42.     This wholesale re-use is far outside the bounds of what courts have found permissible in "reaction" or "commentary" videos. Roundup's channel operates under the mistaken belief, shared by many "reaction" channels, that any amount of commentary somewhere in a video transforms *all* of the copied footage, regardless of length or placement. This lawsuit seeks to correct that misinterpretation and reaffirm that fair use has limits.

43.     On or about June 30, 2025, in a publicly viewable post on YouTube, Roundup stated, in a response to a comment "noooo, I'm pretty sure it's from the dude who thinks he's found a way to end internet bullying." This admission shows that Roundup's purpose

**COMPLAINT**

was not to provide transformative commentary or education, but to target and ridicule a particular individual. Such intent is consistent with the "mockumentary-style" harassment described above and weighs heavily against a finding of fair use.

### *Episode 98 DMA ignorance shuts down Public Defenders Office!*

44.     Roundup posted a video titled *Episode 98 DMA ignorance shuts down Public Defenders Office!* ("Infringing Video 2")[3] (Infringing Video 1 and Infringing Video 2 are collectively referred to as the "Infringing Videos").

45.     Infringing Video 2 contains approximately twenty-two minutes and fifty seconds of footage from Executive Lens' fifty-seven minute and forty second video titled *COPS CALLED & BUSINESS SHUTDOWN!!! BY Public Defenders for a CAMERA!!! Part 1* that was posted to the DMA Channel on May 19, 2024.[4] The copied material comprises virtually the entire substance of Executive Lens' work.

46.     Infringing Video 2 contains nine uninterrupted segments of Executive Lens' footage exceeding one minute in length, with absolutely no meaningful commentary or transformation. These segments run for 1:02, 1:06, 1:24, 1:29, 1:29, 1:55, 1:55, 1:56 and 3:17.

47.     The minimal commentary in Infringing Video 2 consists primarily of narration, superficial asides, and repeated crude remarks, including multiple reference to Cordova going to "pound me in the ass prison."[5] None of this provides meaningful critique or analysis. Out of the twenty-two minutes and fifty seconds of Executive Lens' footage used, the overwhelming majority is presented without meaningful transformation, serving primarily as unaltered entertainment for Roundup's audience.

---

[3]  https://www.youtube.com/watch?v=oA0FdQXChE8.

[4] https://www.youtube.com/watch?v=flfHM-PjLJk

[5] The operator of the Roundup Channel apparently believes that jokes about prison rape transform Plaintiff's footage into fair use commentary.

**COMPLAINT**

48.     This wholesale re-use is far outside the bounds of what courts have found permissible in "reaction" or "commentary" videos. Roundup's channel operates under the mistaken belief, shared by many "reaction" channels, that any amount of commentary somewhere in a video transforms *all* of the copied footage, regardless of length or placement. This lawsuit seeks to correct that misinterpretation and reaffirm that fair use has limits.

### ***The Takedowns and FALSE Counter-Notices***

49.     On or about July 13, 2025, Cordova, the original creator of the videos at issue, submitted DMCA takedown notices to YouTube pursuant to 17 U.S.C. § 512(c), identifying the Infringing Videos. Following the takedown, Cordova executed a written assignment transferring all rights, title, and interest in the videos, including the exclusive right to enforce the copyrights, to Executive Lens.

50.     YouTube complied and removed the Infringing Videos.

51.     On or about August 13, 2025, Attorney Reed, a personal injury attorney with no known background in copyright law, submitted the Counter-Notices to YouTube pursuant to 17 U.S.C. § 512(g)(3) on behalf of the operator of the Roundup Channel. In the Counter-Notices, Attorney Reed claimed the Infringing Videos fell under "de facto fair use," a phrase that appears nowhere in Title 17 or in any recognized fair use jurisprudence. A copy of the Counter-Notices is attached hereto as Exhibit "A".

52.     The Counter-Notices also asserted that "Frauditor Roundup is the owner and creator of the content uploaded," and that "the clips used were provided for educational purposes[6] and for commentary and criticism." The Counter-Notices provide no individualized analysis of the statutory fair-use factors and did not address the amount or substantiality of Executive Lens' footage used, the purpose and character of the use, or its market effect.

---

[6] It is difficult to see how repeated comments about prison rape have any educational purpose.

**COMPLAINT**

53. By signing under penalty of perjury, Attorney Reed personally adopted these statements, despite their lack of factual foundation and the absence of any legitimate legal doctrine called "de facto fair use." His reckless disregard for the truth, coupled with his certification of a fabricated legal standard, constitutes knowing and material misrepresentations under § 512(f).

54. The Counter-Notices were part of a coordinated scheme to preserve monetized infringing content. Defendants submitted the false Counter-Notices under penalty of perjury as required by 17 U.S.C. § 512(g).

55. Executive Lens now seeks damages, attorneys' fees, declaratory and injunctive relief for Defendants' material misrepresentations in the Counter-Notices submitted to YouTube.

## FIRST CAUSE OF ACTION

### Misrepresentation in Counter-Notifications under the DMCA

### (17 U.S.C. § 512(f))

56. Executive Lens incorporates by reference the allegations set forth in Paragraphs 1 through 55.

57. Section 512(f)(2) of the Copyright Act provides, in relevant part, that "***any person*** who knowingly materially misrepresents under this section . . . that material was removed or disabled by mistake or misidentification, shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer, by any copyright owner…who is injured by such misrepresentation..." (emphasis added).

58. Despite swearing under penalty of perjury, Defendants' Counter-Notices contained conclusory assertions and legal misstatements that were knowingly false when made.

59. Defendants' Counter-Notices to YouTube falsely represented, among other things: (a) that "the entirety of the content is de facto fair use," a fabricated legal standard found nowhere in Title 17 or in recognized fair-use jurisprudence;

**COMPLAINT**

(b) that "Frauditor Roundup is the owner and creator of the content uploaded" despite the fact that a substantial portion of the Infringing Videos consisted of Executive Lens' footage; (c) that "the clips used were provided for educational purposes and for commentary and criticism" when multiple uninterrupted segments, totaling several minutes, contained no commentary, critique, or educational material at all; and (d) that Reed and his client had "a good faith belief that the material was removed or disabled as a result of a mistake or misidentification," despite the Infringing Videos' wholesale incorporation of substantial amounts of Executive Lens' original works.

60.     These representations were materially false. Defendants used this language and unsupported legal conclusions without conducting any individualized fair-use analysis before swearing to them under penalty of perjury.

61.     Defendants made these misrepresentations knowingly, with the purpose of causing YouTube to reinstate the Infringing Videos and to enable continued monetization of the "Frauditor Roundup" channel.

62.     As a direct result of Defendants' material misrepresentations, Executive Lens was forced to initiate this action to prevent reinstatement of the Infringing Videos to the Roundup Channel. Executive Lens is entitled to recover damages, costs, and attorneys' fees under 17 U.S.C. § 512(f).

63.     Executive Lens is further entitled to injunctive relief restraining Defendants and YouTube from reinstating the Infringing Videos to the Roundup Channel.

## SECOND CAUSE OF ACTION

### Declaration of Copyright Infringement, 28 U.S.C. § 2201

### (Against John Doe dba Frauditor Roundup)

64.     Executive Lens incorporates by reference the allegations set forth in Paragraphs 1 through 63.

65.     Executive Lens seeks a declaration that the Infringing Videos infringe Executive Lens' copyrights in the original works, and that the Roundup Channel has no

**COMPLAINT**

right to reproduce, distribute, publicly display, or otherwise exploit the works without Executive Lens' authorization.

66.    An actual and justiciable controversy exists between Executive Lens and John Doe concerning the Roundup Channel's use of the Infringing Videos.

67.    Executive Lens contends that the Roundup Channel's use of the Infringing Videos is not protected under 17 U.S.C. § 107.

68.    Defendants assert that Roundup's use of the Infringing Videos is protected by 17 U.S.C. § 107 as stated in the Counter-Notices.

69.    Executive Lens seeks a judicial declaration under 28 U.S.C. § 2201 that the Roundup Channel's use of the Infringing Videos is not protected by 17 U.S.C. § 107.

70.    Executive Lens also seeks an injunction restraining YouTube from restoring the Infringing Videos[7] to the Roundup Channel.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Executive Lens LLC prays for judgment against Defendants as follows:

A.    That judgment be entered in favor of Executive Lens and against Defendants for monetary damages caused by their knowing material misrepresentations in the Counter-Notices pursuant to 17 U.S.C. § 512(f);

B.    That the Court enter a declaratory judgment that the Roundup Channel's use of the Infringing Videos is not protected by 17 U.S.C. § 107;

C.    A permanent injunction enjoining the Roundup Channel and any related channel from further use of the Infringing Videos;

D.    An award of attorneys' fees and costs pursuant to 17 U.S.C. § 512(f)(2);

E.    Any other relief the Court deems just and proper.

---

[7] https://www.youtube.com/watch?v=JdqiluQDIpQ
https://www.youtube.com/watch?v=oA0FdQXChE8

**COMPLAINT**

Dated: August 24, 2025

/s/ Randall S. Newman
Randall S. Newman, Esq. (SBN 190547)
99 Wall Street, Suite 3727
New York, NY 10005
(212) 797-3735
rsn@randallnewman.net

*Attorney for Plaintiff,*
*Executive Lens LLC*

**COMPLAINT**

# EXHIBIT K

 CA

# Terms of Service

## Terms of Service

Paid Service Terms of Service

Paid Service Usage Rules

Collecting Society Notices

Copyright Notices

Community Guidelines

View the Terms of Service in other languages: Français (Canada) and English

## What's in these terms?

This index is designed to help you understand some of the key updates we've made to our Terms of Service (Terms). We hope this serves as a useful guide, but please ensure you read the Terms in full.

### Welcome to YouTube!

This section outlines our relationship with you. It includes a description of the Service, defines our Agreement, and names your service provider.

### Who May Use the Service?

This section sets out certain requirements for use of the Service, and defines categories of users.

### Your Use of the Service

This section explains your rights to use the Service, and the conditions that apply to your use of the Service. It also explains how we may make changes to the Service.

### Your Content and Conduct

This section applies to users who provide Content to the Service. It defines the scope of the permissions that you grant by uploading your Content, and includes your agreement not to upload anything that infringes on anyone else's rights.

### Account Suspension and Termination

This section explains how you and YouTube may terminate this relationship.

### About Software in the Service

This section includes details about software on the Service.

### Other Legal Terms

This section includes our service commitment to you. It also explains that there are some things we will not be responsible for.

### About this Agreement

This section includes some further important details about our contract, including what to expect if we need to make changes to these Terms; or which law applies to them.

## Terms of Service

Dated: January 5, 2022

# TERMS OF SERVICE

# Welcome to YouTube!

**Introduction**
Thank you for using the YouTube platform and the products, services and features we make available to you as part of the platform (collectively, the "Service").

**Our Service**

The Service allows you to discover, watch and share videos and other content, provides a forum for people to connect, inform, and inspire others across the globe, and acts as a

distribution platform for original content creators and advertisers large and small. We provide lots of information about our products and how to use them in our Help Center. Among other things, you can find out about YouTube Kids, the YouTube Partner Program and YouTube Paid Memberships and Purchases (where available). You can also read all about enjoying content on other devices like your television, your games console, or Google Home.

**Your Service Provider**

The entity providing the Service is Google LLC, a company operating under the laws of Delaware, located at 1600 Amphitheatre Parkway, Mountain View, CA 94043 (referred to as "**YouTube**", "**we**", "**us**", or "**our**"). References to YouTube's "Affiliates" in these terms means the other companies within the Alphabet Inc. corporate group (now or in the future).

**Applicable Terms**

Your use of the Service is subject to these terms, the YouTube Community Guidelines and the Policy, Safety and Copyright Policies which may be updated from time to time (together, this "Agreement"). Your Agreement with us will also include the Advertising on YouTube Policies if you provide advertising or sponsorships to the Service or incorporate paid promotions in your content. Any other links or references provided in these terms are for informational use only and are not part of the Agreement.

Please read this Agreement carefully and make sure you understand it. If you do not understand the Agreement, or do not accept any part of it, then you may not use the Service.

# Who may use the Service?

**Age Requirements**

You must be at least 13 years old to use the Service; however, children of all ages may use the Service and YouTube Kids (where available) if enabled by a parent or legal guardian.

**Permission by Parent or Guardian**

If you are under 18, you represent that you have your parent or guardian's permission to use the Service. Please have them read this Agreement with you.

If you are a parent or legal guardian of a user under the age of 18, by allowing your child to use the Service, you are subject to the terms of this Agreement and responsible for your child's activity on the Service. You can find tools and resources to help you manage your family's experience on YouTube (including how to enable a child under the age of 13 to use the Service and YouTube Kids) in our Help Center and through Google's Family Link.

**Businesses**
If you are using the Service on behalf of a company or organisation, you represent that you have authority to act on behalf of that entity, and that such entity accepts this Agreement.

# Your Use of the Service

**Content on the Service**
The content on the Service includes videos, audio (for example music and other sounds), graphics, photos, text (such as comments and scripts), branding (including trade names, trademarks, service marks, or logos), interactive features, software, metrics, and other materials whether provided by you, YouTube or a third-party (collectively, "Content").

Content is the responsibility of the person or entity that provides it to the Service. YouTube is under no obligation to host or serve Content. If you see any Content you believe does not comply with this Agreement, including by violating the Community Guidelines or the law, you can report it to us.

**Google Accounts and YouTube Channels**
You can use parts of the Service, such as browsing and

searching for Content, without having a Google account. However, you do need a Google account to use some features. With a Google account, you may be able to like videos, subscribe to channels, create your own YouTube channel, and more. You can follow these instructions to create a Google account.

Creating a YouTube channel will give you access to additional features and functions, such as uploading videos, making comments or creating playlists (where available). Here are some details about how to create your own YouTube channel.

To protect your Google account, keep your password confidential. You should not reuse your Google account password on third-party applications. Learn more about keeping your Google account secure, including what to do if you learn of any unauthorised use of your password or Google account.

**Your Information**
Our Privacy Policy explains how we treat your personal data and protect your privacy when you use the Service. The YouTube Kids Privacy Notice provides additional information about our privacy practices that are specific to YouTube Kids.

We will process any audio or audiovisual content uploaded by you to the Service in accordance with the YouTube Data Processing Terms, except in cases where you uploaded such content for personal purposes or household activities. Learn More.

**Permissions and Restrictions**
You may access and use the Service as made available to you, as long as you comply with this Agreement and applicable law. You may view or listen to Content for your personal, non-commercial use. You may also show YouTube videos through the embeddable YouTube player.

The following restrictions apply to your use of the Service. You are not allowed to:

1. access, reproduce, download, distribute, transmit, broadcast, display, sell, license, alter, modify or otherwise use any part of the Service or any Content except: (a) as expressly authorized by the Service; or (b) with prior written permission from YouTube and, if applicable, the respective rights holders;

2. circumvent, disable, fraudulently engage with, or otherwise interfere with any part of the Service (or attempt to do any of these things), including security-related features or features that (a) prevent or restrict the copying or other use of Content or (b) limit the use of the Service or Content;

3. access the Service using any automated means (such as robots, botnets or scrapers) except (a) in the case of public search engines, in accordance with YouTube's robots.txt file; or (b) with YouTube's prior written permission;

4. collect or harvest any information that might identify a person (for example, usernames or faces), unless permitted by that person or allowed under section (3) above;

5. use the Service to distribute unsolicited promotional or commercial content or other unwanted or mass solicitations;

6. cause or encourage any inaccurate measurements of genuine user engagement with the Service, including by paying people or providing them with incentives to increase a video's views, likes, or dislikes, or to increase a channel's subscribers, or otherwise manipulate metrics in any manner;

7. misuse any reporting, flagging, complaint, dispute, or appeals process, including by making groundless, vexatious, or frivolous submissions;

8. run contests on or through the Service that do not comply with YouTube's contest policies and guidelines;

9. use the Service to view or listen to Content other than for personal, non-commercial use (for example, you may not publicly screen videos or stream music from the Service); or

10. use the Service to (a) sell any advertising, sponsorships, or promotions placed on, around, or within the Service or Content, other than those allowed in the Advertising on YouTube policies (such as compliant product placements); or (b) sell advertising, sponsorships, or promotions on any page of any website or application that only contains Content from the Service or where Content from the Service is the primary basis for such sales (for example, selling ads on a webpage where YouTube videos are the main draw for users visiting the webpage).

**Reservation**

Using the Service does not give you ownership of or rights to any aspect of the Service, including user names or any other Content posted by others or YouTube.

**Develop, Improve and Update the Service**

YouTube is constantly changing and improving the Service. As part of this continual evolution, we may make modifications or changes (to all or part of the Service) such as adding or removing features and functionalities, offering new digital content or services or discontinuing old ones. We may also need to alter or discontinue the Service, or any part of it, in order to make performance or security improvements, make changes to comply with law, or prevent illegal activities on or abuse of our systems. These changes may affect all users, some users or even an individual user. When the Service requires or includes downloadable software (such as the YouTube Studio application), that software may update automatically on your device once a new version or feature is available, subject to your device settings. If we make material changes that negatively impact your use of the Service, we'll provide you with reasonable advance notice, except in urgent

situations such as preventing abuse, responding to legal requirements, or addressing security and operability issues. We'll also provide you with an opportunity to export your content from your Google Account using Google Takeout, subject to applicable law and policies.

# Your Content and Conduct

### Uploading Content

If you have a YouTube channel, you may be able to upload Content to the Service. You may use your Content to promote your business or artistic enterprise. If you choose to upload Content, you must not submit to the Service any Content that does not comply with this Agreement (including the YouTube Community Guidelines) or the law. For example, the Content you submit must not include third-party intellectual property (such as copyrighted material) unless you have permission from that party or are otherwise legally entitled to do so. You are legally responsible for the Content you submit to the Service. We may use automated systems that analyze your Content to help detect infringement and abuse, such as spam, malware, and illegal content.

### Rights you Grant

You retain ownership rights in your Content. However, we do require you to grant certain rights to YouTube and other users of the Service, as described below.

### License to YouTube

By providing Content to the Service, you grant to YouTube a worldwide, non-exclusive, royalty-free, sublicensable and transferable license to use that Content (including to reproduce, distribute, prepare derivative works, display and perform it) in connection with the Service and YouTube's (and its successors' and Affiliates') business, including for the purpose of promoting and redistributing part or all of the Service.

**License to Other Users**

You also grant each other user of the Service a worldwide, non-exclusive, royalty-free license to access your Content through the Service, and to use that Content, including to reproduce, distribute, prepare derivative works, display, and perform it, only as enabled by a feature of the Service (such as video playback or embeds). For clarity, this license does not grant any rights or permissions for a user to make use of your Content independent of the Service.

**Duration of License**

The licenses granted by you continue for a commercially reasonable period of time after you remove or delete your Content from the Service. You understand and agree, however, that YouTube may retain, but not display, distribute, or perform, server copies of your videos that have been removed or deleted.

**Right to Monetize**

You grant to YouTube the right to monetize your Content on the Service (and such monetization may include displaying ads on or within Content or charging users a fee for access). This Agreement does not entitle you to any payments. Starting June 1, 2021, any payments you may be entitled to receive from YouTube under any other agreement between you and YouTube (including for example payments under the YouTube Partner Program, Channel memberships or Super Chat) will be treated as royalties.  If required by law, Google will withhold taxes from such payments.

**Removing Your Content**

You may remove your Content from the Service at any time. You also have the option to make a copy of your Content before removing it. You must remove your Content if you no longer have the rights required by these terms.

**Removal of Content By YouTube**

If we reasonably believe that any of your Content (1) is in breach of this Agreement or (2) may cause harm to YouTube, our users, or third parties, we reserve the right to remove or take down that Content in accordance with applicable law. We will notify you with the reason for our action unless we reasonably believe that to do so: (a) would breach the law or the direction of a legal enforcement authority or would otherwise risk legal liability for YouTube or our Affiliates; (b) would compromise an investigation or the integrity or operation of the Service; or (c) would cause harm to any user, other third party, YouTube or our Affiliates. You can learn more about reporting and enforcement, including how to appeal on the Troubleshooting page of our Help Center.

# Community Guidelines Strikes

YouTube operates a system of "strikes" in respect of Content that violates the YouTube Community Guidelines. Each strike comes with varying restrictions and may result in the permanent removal of your channel from YouTube.  A full description of how a strike affects your channel is available on the Community Guidelines Strikes Basics page. If you believe that a strike has been issued in error, you may appeal here.

If your channel has been restricted due to a strike, you must not use another channel to circumvent these restrictions. Violation of this prohibition is a material breach of this Agreement and Google reserves the right to terminate your Google account or your access to all or part of the Service.

**Copyright Protection**

We provide information to help copyright holders manage their intellectual property online in our YouTube Copyright Center. If you believe your copyright has been infringed on the Service, please send us a notice.

We respond to notices of alleged copyright infringement according to the process in our YouTube Copyright Center, where you can also find information about how to resolve a copyright strike. YouTube's policies provide for the termination, in appropriate circumstances, of repeat infringers' access to the Service.

# Account Suspension & Termination

**Terminations by You**
You may stop using the Service at any time. Follow these instructions to delete the Service from your Google Account, which involves closing your YouTube channel and removing your data. You also have the option to download a copy of your data first.

**Terminations and Suspensions by YouTube**

YouTube reserves the right to suspend or terminate your Google account or your access to all or part of the Service if (a) you materially or repeatedly breach this Agreement; (b) we are required to do so to comply with a legal requirement or a court order; or (c) we believe that there has been conduct that creates (or could create) liability or harm to any user, other third party, YouTube or our Affiliates.

**Notice for Termination or Suspension**

We will notify you with the reason for termination or suspension by YouTube unless we reasonably believe that to do so: (a) would violate the law or the direction of a legal enforcement authority; (b) would compromise an investigation; (c) would compromise the integrity, operation or security of the Service; or (d) would cause harm to any user, other third party, YouTube or our Affiliates.

**Effect of Account Suspension or Termination**

If your Google account is terminated or your access to the Service is restricted, you may continue using certain aspects

of the Service (such as viewing only) without an account, and this Agreement will continue to apply to such use. If you believe the termination or suspension has been made in error, you can appeal using this form.

# About Software in the Service

### Downloadable Software
When the Service requires or includes downloadable software (such as the YouTube Studio application), unless that software is governed by additional terms which provide a license, YouTube gives you a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software provided to you by YouTube as part of the Service. This license is for the sole purpose of enabling you to use and enjoy the benefit of the Service as provided by YouTube, in the manner permitted by this Agreement. You are not allowed to copy, modify, distribute, sell, or lease any part of the software, or to reverse-engineer or attempt to extract the source code of that software, unless laws prohibit these restrictions or you have YouTube's written permission.

### Open Source
Some software used in our Service may be offered under an open source license that we make available to you. There may be provisions in an open source license that expressly override some of these terms, so please be sure to read those licenses.

# Other Legal Terms

### Warranty Disclaimer
OTHER THAN AS EXPRESSLY STATED IN THIS AGREEMENT OR AS REQUIRED BY LAW, THE SERVICE IS PROVIDED "AS IS" AND YOUTUBE DOES NOT MAKE ANY SPECIFIC COMMITMENTS OR WARRANTIES ABOUT THE SERVICE. FOR EXAMPLE, WE DON'T MAKE ANY WARRANTIES ABOUT: (A) THE CONTENT PROVIDED THROUGH THE SERVICE; (B) THE SPECIFIC FEATURES OF THE SERVICE, OR ITS ACCURACY, RELIABILITY, AVAILABILITY, OR ABILITY TO MEET YOUR

NEEDS; OR (C) THAT ANY CONTENT YOU SUBMIT WILL BE ACCESSIBLE ON THE SERVICE.

**Limitation of Liability**

EXCEPT AS REQUIRED BY APPLICABLE LAW, YOUTUBE, ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES AND AGENTS WILL NOT BE RESPONSIBLE FOR ANY LOSS OF PROFITS, REVENUES, BUSINESS OPPORTUNITIES, GOODWILL, OR ANTICIPATED SAVINGS; LOSS OR CORRUPTION OF DATA; INDIRECT OR CONSEQUENTIAL LOSS; PUNITIVE DAMAGES CAUSED BY:

1. ERRORS, MISTAKES, OR INACCURACIES ON THE SERVICE;

2. PERSONAL INJURY OR PROPERTY DAMAGE RESULTING FROM YOUR USE OF THE SERVICE;

3. ANY UNAUTHORIZED ACCESS TO OR USE OF THE SERVICE;

4. ANY INTERRUPTION OR CESSATION OF THE SERVICE;

5. ANY VIRUSES OR MALICIOUS CODE TRANSMITTED TO OR THROUGH THE SERVICE BY ANY THIRD PARTY;

6. ANY CONTENT WHETHER SUBMITTED BY A USER OR YOUTUBE, INCLUDING YOUR USE OF CONTENT; AND/OR

7. THE REMOVAL OR UNAVAILABILITY OF ANY CONTENT.

THIS PROVISION APPLIES TO ANY CLAIM, REGARDLESS OF WHETHER THE CLAIM ASSERTED IS BASED ON WARRANTY, CONTRACT, TORT, OR ANY OTHER LEGAL THEORY.

YOUTUBE AND ITS AFFILIATES' TOTAL LIABILITY FOR ANY CLAIMS ARISING FROM OR RELATING TO THE SERVICE IS LIMITED TO THE GREATER OF: (A) THE AMOUNT OF REVENUE THAT YOUTUBE HAS PAID TO YOU FROM YOUR USE OF THE SERVICE IN THE 12 MONTHS BEFORE THE DATE OF YOUR NOTICE, IN WRITING TO YOUTUBE, OF THE CLAIM AND (B) USD $500.

**Indemnity**

To the extent permitted by applicable law, you agree to defend, indemnify and hold harmless YouTube, its Affiliates, officers, directors, employees and agents, from and against any and all claims, damages, obligations, losses, liabilities, costs or debt, and expenses (including but not limited to attorney's fees) arising from: (i) your use of and access to the Service; (ii) your violation of any term of this Agreement; (iii) your violation of any third party right, including without limitation any copyright, property, or privacy right; or (iv) any claim that your Content caused damage to a third party. This defense and indemnification obligation will survive this Agreement and your use of the Service.

**Third-Party Links**

The Service may contain links to third-party websites and online services that are not owned or controlled by YouTube. YouTube has no control over, and assumes no responsibility for, such websites and online services. Be aware when you leave the Service; we suggest you read the terms and privacy policy of each third-party website and online service that you visit.

## About this Agreement

**Changing this Agreement**

We may change this Agreement (1)to reflect changes to our Service or how we do business - for example, when we add new products or features or remove old ones, (2) for legal, regulatory, or security reasons, or (3) to prevent abuse or harm.

If we materially change this Agreement, we'll provide you with reasonable advance notice and the opportunity to review the changes, except (1) when we launch a new product or feature, or (2) in urgent situations, such as preventing ongoing abuse or responding to legal requirements. If you don't agree to the new terms, you should remove any Content you uploaded and stop using the Service.

### Continuation of this Agreement

If your use of the Service ends, the following terms of this Agreement will continue to apply to you: "Other Legal Terms", "About This Agreement", and the licenses granted by you will continue as described under "Duration of License".

### Severance

If it turns out that a particular term of this Agreement is not enforceable for any reason, this will not affect any other terms.

### No Waiver

If you fail to comply with this Agreement and we do not take immediate action, this does not mean that we are giving up any rights that we may have (such as the right to take action in the future).

### Interpretation

In these terms, "include" or "including" means "including but not limited to," and any examples we give are for illustrative purposes.

### Governing Law

All claims arising out of or relating to these terms or the Service will be governed by California law, except California's conflict of laws rules, and will be litigated exclusively in the federal or state courts of Santa Clara County, California, USA. You and YouTube consent to personal jurisdiction in those courts.

**Effective as of January 5, 2022 (view previous version)**

# EXHIBIT L

# Watch videos offline with YouTube Premium

If YouTube Premium is available in your location, you can download and watch videos on your mobile device. You can also download videos from your computer using Chrome, Edge, Firefox & Opera browsers. We hope to bring this feature to other browsers in the future.

Learn how to manage your YouTube Premium download settings or sign up for YouTube Premium to get started.



**Computer**    Android    iPhone & iPad

## Download videos to watch offline                                      ⌄

To download videos onto your computer:

1. Visit youtube.com ⧉ from your signed in YouTube Premium account.
2. Go to the Watch page of the video you'd like to download.
3. Below the video, click **Download** ⤓ .

Once the video is downloaded, the download icon will turn black below the video ⤓.

If your device loses internet connectivity while downloading videos, your progress will resume automatically once you reconnect to the internet.

## View downloaded videos                                                ⌄

To find and view videos that you've downloaded on your computer:

1. Visit youtube.com ⧉ from your signed in Premium account.
2. Click on **Downloads** ⤓ in the left menu.

## Remove individual videos from your downloads                          ⌄

You can remove videos you've downloaded in two ways:

1. Under the video player, tap **Downloaded** ⤓ next to the video you'd like to remove.
2. Click **Delete**.

Or

1. Go to your Downloads page ⧉ ⤓ .
2. Select **More** ⋮ next to the video you'd like to remove.
3. Click **Remove from downloads**.

     4. Click **Delete** in the dialog below "Delete all downloads?"

---

Remove all downloaded videos        ⌃

You can view and delete the videos you've downloaded by following these steps:

1. In the left menu, select **Downloads.**
2. Tap **Download Settings** ❯ **Delete all downloads**.
3. Click **Delete** in the dialog below "Delete all downloads?"

---

Update download settings        ⌃

Set the default quality of your downloads by going to Settings ⚙ ❯ [Downloads ↗] ❯ **Download quality**.

Higher-quality videos may consume more data, take longer to show in the Downloads section, and take up more space on your device.

## Troubleshoot issues downloading videos

- Downloaded videos can be played offline for up to 29 days. After that, you'll need to reconnect your device to the internet. Reconnecting will allow the app to check for changes to the video or its availability. If a video is no longer available for offline playback, it will be removed from your device during the next sync.
- In some countries/regions, content can be played for up to 48 hours without an internet connection. You must be signed in to your Premium account to download videos. Videos added to your downloads can be played while signed in with the same account. Some features, like commenting and liking, are only available when your device is connected to a Wi-Fi network. Learn more about [YouTube offline videos].

---

Need more help?

Try these next steps:



**Post to the help community**
Get answers from community members

# EXHIBIT M

1

1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF COLORADO

2

3  UNITED STATES OF AMERICA,     .  Case No. 22-po-07015-MEH-1
                          .

4           Plaintiff,       .

5  vs.                   .  Alfred A. Arraj Courthouse
                        .  901 19th Street

6  CHRISTOPHER J. CORDOVA,     .  Denver, CO  80294
                        .

7          Defendant.      .
                        .  September 27, 2023

8  . . . . . . . . . . . . . . . .  1:12 p.m.

9      **TRANSCRIPT OF PROCEEDINGS HELD BEFORE THE HONORABLE**
       **MICHAEL E. HEGARTY, UNITED STATES MAGISTRATE JUDGE**

10
  APPEARANCES:

11
  For the Plaintiff:         United States Attorney

12                       By:  Craig G. Fansler
                       1801 California Street

13                       Suite 1600
                       Denver, CO  80202

14                       (303) 454-0100

15  For the Defendant:         Ascend Counsel, LLC
                       By:  Edward M. Schwab

16                       2401 South Downing Street
                       Denver, CO  80210

17                       (303) 888-4407

18  Also Present:             Christopher J. Cordova

19  Court Recorder:          Clerk's Office
                       U.S. District Court

20                       901 19th Street
                       Denver, CO  80294

21
  Transcription Service:     AB Litigation Services

22                       216 16th Street, Suite 600
                       Denver, CO  80202

23                       (303) 296-0017

24

25  Proceedings recorded by electronic sound recording;
  transcript produced by transcription service.

```
 1                     (Time noted:  1:12 p.m.)

 2              THE COURT CLERK:  All rise.  Court is now in

 3    session.

 4              THE COURT:  Please be seated.  22-po-7015, United

 5    States of America versus Christopher Cordova.

 6              Please make your appearances.

 7              MR. FANSLER:  Good afternoon, Your Honor.  Craig

 8    Fansler on behalf of the United States.

 9              THE COURT:  Thank you.

10              MR. SCHWAB:  Good afternoon, Your Honor.  Milo

11    Schwab on behalf of the Defendant, Christopher Cordova, who

12    appears in person beside me.

13              THE COURT:  Thank you both.  All right.  We're

14    here for sentencing.

15              You have the floor.

16              MR. FANSLER:  Your Honor, the United States

17    recommends a $5,000.00 fine, and 20 days of imprisonment, as

18    sufficient, but not more than necessary, based on the

19    sentencing factors in Title XVIII of the United States Code,

20    sections 3553(a) and 3572(a), which relates to fines.

21              Three brief points to highlight on the 3553(a)

22    factors before I turn to the fine, Your Honor.

23              The first relates to greed.  The nature of

24    Defendant's conduct in this case is that he repeatedly put

25    his own interests over the public interests.  He didn't care
```

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 3
Case 5:25-cv-04685-VKD    Document 55-1    Filed 03/10/26    Page 262 of 318

3

1   about concerns raised by Social Security customers on August

2   2nd.  His videos show belligerence, and, frankly, animus

3   toward law enforcement officers.  He gets officers' names,

4   badge numbers, and phone numbers, so he can encourage his

5   audience to call and harass the officers and their

6   supervisors, to post on their social media pages, and to file

7   reports with their employers.

8           His actions, as seen in the trial, were calculated

9   to provoke.  He knew before he arrived at the Social Security

10  office that day that he wasn't going to follow any directions

11  or listen to anyone.  His purpose was to get viewers and

12  attention, and get arrested, and that's what he did.

13          His post-arrest conduct is especially troubling.

14  When it comes to that greed factor, it shows the same pattern

15  of caring more about fame and YouTube viewers than the people

16  that he was harming.

17          Exhibit 3 to the Government's sentencing statement

18  is a good example of that.  It's a video of one of those

19  security officers at a day care across the street from the

20  courthouse.  Basically stands outside the courthouse and

21  yells and berates that security officer for 20 minutes, and

22  posts it to his YouTube channel so he can get additional

23  donations from the same event.

24          The Government sends an addendum at ECF 26, again

25  to the same end.  It shows that on August 16th of 2023, so

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 4
Case 5:25-cv-04685-VKD    Document 95-91    Filed 03/10/26    Page 263 of 318

4

1    over a year after this conduct, he did almost the exact same

2    thing at the Colorado Springs Public Utilities Commission

3    building.  He showed the same disregard for the public and

4    law enforcement.

5        In that video, which we provide a link in our

6    sentencing statement, you'll see an individual who is

7    actually in the courtroom today who politely comes up to the

8    Defendant and asks him to stop filming him, says he doesn't

9    give him permission to film.  The Defendant yells at him and

10    does a lot of the same things he did a year earlier and

11    before the conviction in this case.

12        Second, Your Honor, turning to the lack of

13    remorse, which the Government views as especially relevant

14    here.  The record shows that he didn't learn anything from

15    his arrest or his conviction here.  He continued to celebrate

16    his crimes post-arrest and post-verdict.  He posted on

17    YouTube statements showing a complete lack of remorse.

18        Just to point out a few examples, again, exhibit

19    3, the security officer at the day care.  The video from

20    August 16th, which I just referred to.

21        And then I think related directly to the crimes

22    for which he was convicted, afterwards he posted a number of

23    short videos and recap videos where he highlighted for his

24    viewers what had gone on, why they should donate, why he was

25    in the right, why he still didn't admit that he did anything

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 5
Case 5:25-cv-04685-VKD    Document 59-1    Filed 03/10/26    Page 264 of 318

5

1   wrong.

2           And then during those videos, he also gave links

3   to his merchandise, using the same phrases he used in those

4   videos, again, to drive profits over the people and the

5   agencies and the law enforcement personnel that he had

6   antagonized over a period of time.

7           He has made -- I think it's not too strong of a

8   statement to say he's made his professional brand getting

9   arrested.  He said during the trial that his profession was

10  posting these videos.  Each arrest grosses his audience and

11  his revenues.  He has committed similar crimes four times at

12  the local level after his arrest in this case.

13          MR. SCHWAB:  Objection.  Committed is --

14          THE COURT:  Stand.

15          MR. SCHWAB:  Committed is something that is -- I

16  think he's applying two of those four committed are things

17  that he's been accused of only.  And that is a complete --

18          THE COURT:  Just clarify between convictions and

19  charges.

20          MR. FANSLER:  Sure, Your Honor.  It's all relevant

21  conduct.  He's been arrested four times.  He's been convicted

22  twice.

23          For the two recent arrests, the Government does

24  provide, just for the record today, exhibits that I believe

25  Your Honor has already seen, which is narrative descriptions

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 6
Case 5:25-cv-04685-VKD    Document 9591    Filed 03/10/26    Page 265 of 318

6

1    of those later arrests.

2            So the one on August 16th for filming inside the

3    Colorado Springs Public Utilities Commission building even

4    after he was asked to stop.

5            And the second one relating to filming while

6    officers were conducting witness and victim interviews, and

7    not moving out of the area where the ambulance was pulling

8    up.  That was on September 2nd of 2023.

9            As Your Honor is aware, during sentencing the

10   Government can provide evidence like this to the Court.  The

11   Court just needs to find by a preponderance that there is --

12   that it's relevant conduct, and that there is a minimal

13   indicia of reliability, which those narrative exhibits and

14   officer statements more than provide.

15           I do also have available two clips from the video

16   of his arrest on August 16th that show the lack of remorse.

17   I can play them for Your Honor if that would be helpful.

18           THE COURT:  Please.

19           MR. FANSLER:  Okay.  So the first clip I'm going

20   to play is from that August 16th arrest.

21       (Court confers with Court Clerk)

22           MR. SCHWAB:  Your Honor, I'm going to object to

23   the playing of a clip.  If he's going to play an interaction

24   with an individual, he needs to play the entirety for the

25   purpose of completeness, Your Honor.

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 7
Case 5:25-cv-04685-VKD    Document 59-1    Filed 03/10/26    Page 266 of 318

7

1           THE COURT:  Rule 106.

2           MR. SCHWAB:  Yes, Your Honor.

3           THE COURT:  How long is that whole video?

4           MR. FANSLER:  The whole video -- the clip I'm

5    playing is from 26:49 to 28:52, so I'd say it's probably -- I

6    think he gets arrested around the 29:30 mark.

7           The clips I was going to play were about a 2-

8    minute clip leading up to his arrest, and interaction with

9    the customers actually in the courtroom today.

10          THE COURT:  Okay.

11          MR. FANSLER:  At the beginning of the video.  It's

12   about a minute and a half.

13          THE COURT:  You can direct to play whatever you

14   want to play, in addition during your presentation.  Okay?

15          MR. SCHWAB:  All right.

16          MR. FANSLER:  So, Ms. Libid, I'm going to direct

17   to play starting at 26 minutes and 49 seconds of this clip.

18       (Video played in open Court)

19          MR. FANSLER:  So, as Your Honor will recognize, a

20   lot of the language in there very similar to what we saw in

21   the August 2nd video, stated that he just wanted to go there

22   to pick up brochures, but the Agency already told him that he

23   wasn't able to film while he was doing that.  Yet he ignored

24   the law enforcement.  He was arrested right after that, and

25   that's where the narrative picks up.

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 8
Case 5:25-cv-04685-VKD    Document 59    Filed 03/10/26    Page 267 of 318

8

1          I do note that during the clip, it looked like

2    there was an area that may have skipped.  That was taken --

3    that video was taken from Mr. Cordova's YouTube channel, so

4    that's just the way that the video was on-line.

5          The second clip I'm going to play from that is

6    from -- beginning at 4 minutes and 48 seconds.  This is the

7    interaction with the customer on the -- that he was referring

8    to in that clip, going to 6 minutes and 6 second.

9        (Video played in open Court)

10          MR. FANSLER:  So I have those clips to show -- I

11    think they just demonstrate the lack of remorse, the lack of

12    learning any lesson from what happened, the lack of any care

13    about concerns raised by other people because Mr. Cordova

14    sees YouTube profits and YouTube views as more important than

15    concerns of others.

16          Rather than feeling remorse, he's become

17    emboldened, and these four other arrests show that, because

18    other courts have not imposed any jail time or fines.

19          Third and finally on the 3553(a) factors is the

20    need for deterrence here.  This case presents a high need for

21    specific and for general deterrence.

22          As to specific deterrence, the Defendant has

23    repeated the same petty crimes, very similar petty crimes,

24    over and over.  He's been arrested at least for similar

25    crimes four times after the one in this case.

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 9
Case 5:25-cv-04685-VKD    Document 59-1    Filed 03/10/26    Page 268 of 318

9

1          As to general deterrence, the Defendant has posted

2     content, and posted this content to a community of YouTube

3     content creators.  He has told them his sentencing date on

4     those videos.  He's expressed that he's going to keep doing

5     what he's doing.  He's received thousands of views on his

6     arrest videos.

7          He and others, I don't think it's too strong to

8     say, commit crimes like the ones at the Social Security

9     Office for profit.  And he did it because he's seen others do

10    it before him.

11         On the August 2nd video, he talks about seeing

12    another content creator, Bay Area Transparency, doing a

13    similar thing, and that made him think that he could get away

14    with it here just like that individual did.

15         So the general deterrence is important here, and

16    the Government believes that the Court's sentence should send

17    a message to those who are contemplating similar action,

18    about the consequences of putting YouTube fame above the

19    public interest.

20         THE COURT:  So I'm not going to be sending

21    messages today.  I have one case in front of me, and I'll

22    make my decisions made on that case alone.  But I don't think

23    it's the business of Courts to send messages.  Those are

24    politicians, but not judicial officers.

25         MR. FANSLER:  Understood.  I was just making a

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 10
Case 5:25-cv-04685-VKD    Document 95-1    Filed 03/10/26    Page 269 of 318

10

1  point about general deterrence, which 3553(a) --

2           THE COURT:  But that's the deterrence of this

3  person, is what I'm concerned with.  Are you saying that

4  Statute speaks of general deterrence to others outside of

5  this case?

6           MR. FANSLER:  Yes.

7           THE COURT:  Okay.

8           MR. FANSLER:  I think it does.

9           THE COURT:  All right.  Thank you.  Anything

10  further?

11           MR. FANSLER:  Yeah.  I just want to turn briefly

12  to the fine, because that does have additional factors under

13  3772, and the Government is seeking a substantial fine here.

14           THE COURT:  Understood.

15           MR. FANSLER:  A $5,000.00 fine here is warranted,

16  because it was a financially motivated crime, and the

17  Defendant profited.  And so a fine is necessary here.

18           Looking at some of the 3572 factors, they include

19  the Defendant's income, earning capacity, ability to pay.

20  The Government provided evidence showing that he had received

21  a substantial amount of money from his YouTube channel during

22  the months when he was posting content related to his August

23  2nd arrest.

24           Another factor under 3572 that's especially

25  important here is not letting Defendant keep illegally

1    obtained gains from their crimes.  The Government provided

2    exhibits 4 and 5 in its sentencing statement to support an

3    approximately $11,000.00 calculation of profits.

4          And as the sentencing statement noted, this is a

5    conservative calculation of profit.  This is what his YouTube

6    channel earned during that period while he continued to post

7    content related to August 2nd.

8          But he had other means of profit.  So on his

9    August 2nd video, Your Honor heard that he preferred people

10   watching his video to donate money through other money

11   transfer apps, like Venmo or PayPal, because those apps

12   didn't take a cut of the money like YouTube did.  Those are

13   not included in the Government's exhibit.

14         He gained new subscribers, or would gain new

15   subscribers and viewers as a result of these videos, that can

16   pay membership fees, can buy merchandise that's marketed and

17   linked on his website.

18         He continued to post related content, like the

19   short videos and the recap videos, and the follow-up video

20   with the security officer when he found him in 2022, and in

21   2023 when he talks about kind of the stage of his Federal

22   proceedings.

23         He continued to post these videos, in short,

24   because it's profitable to do so, because he was getting

25   viewers when he did that.

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 12
Case 5:25-cv-04685-VKD    Document 53-1    Filed 03/10/26    Page 271 of 318

12

1           His brand, and the videos on his website show,

2   that his brand has become to get arrested on YouTube to gain

3   profits.  And the sentence today should take those profits

4   away.

5           And for all of those reasons, the Government

6   believes that a fine of $5,000.00, and a sentence of 20 days

7   of imprisonment, is sufficient but not more than necessary

8   under all of the sentencing factors.

9           THE COURT:  Thank you.  You'll have a chance for

10  rebuttal.

11          Mr. Schwab?

12          MR. SCHWAB:  Thank you, Your Honor.  Mr. Cordova

13  will also like to speak.

14          THE COURT:  That's fine.

15          MR. SCHWAB:  The Government puts you in a weird

16  position here, Your Honor.  They raised serious First

17  Amendment issues.  What is similar across these four cases is

18  that he was recording.  But the First Amendment protects the

19  right to record, including the most recent charge, which is

20  recording a police officer in public.

21          He hasn't had the opportunity to face that.

22          THE COURT:  But that's an appellate argument,

23  isn't that?

24          MR. SCHWAB:  Is that an appellate argument?

25          THE COURT:  Correct.  There's a conviction here.

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 13
Case 5:25-cv-04685-VKD    Document 95-1    Filed 03/10/26    Page 272 of 318

13

1    There's a conviction.  I'm not going to overturn it based on

2    the First Amendment.  The Appellate Court could, but that's

3    not what we're doing.  I understand.

4              But you say a First Amendment problem may be or

5    maybe not, but that's not a consideration for me, is it?

6              MR. SCHWAB:  I'm not talking about the conviction.

7              THE COURT:  Okay.

8              MR. SCHWAB:  I'm saying that the Government is

9    asking you to impose, and in fact changed their stance on

10   sentencing, on the basis that Mr. Cordova continues to video.

11   Not that he continues to go into public facilities, into

12   Social Security Offices or other Federal facilities under

13   this, it's that he just generally is out recording, and

14   sometimes gets arrested by police officers for interference.

15             What is the common thread here?  That he's

16   filming.  He's filming police officers and other public

17   officials.

18             THE COURT:  But isn't it also a common thread that

19   those people allow him to film up to a certain point, and he

20   crosses a line that they believe exists?  They tell him

21   that's the line.  You can film here, you can't film there.

22   That's one thing they're arguing.

23             The other thing they're arguing is that this is

24   not a pure First Amendment motive.  They are strongly arguing

25   that this is for money.

Case No. 1:22-po-07015-MEH   Document 41   filed 03/19/24   USDC Colorado   pg 14
Case 5:25-cv-04685-VKD   Document 59-1   Filed 03/10/26   Page 273 of 318

14

1            Now, a purist First Amendment activist doesn't do

2    it for money.  They do it for principle.  Right?

3            MR. SCHWAB:  Sure.

4            THE COURT:  Would you agree?

5            MR. SCHWAB:  And I think that Mr. Cordova does

6    this for principle.  And, you know, aspersions aside, he is

7    out there putting himself in -- you know, in potential legal

8    jeopardy because he believes in the principle that public

9    officials, not just police officers, but public officials at

10   large, when they are in public spaces, including the public

11   lobbies of a utility, a public utility, which is a publicly

12   owned building that is a sub-division of the City of Colorado

13   Springs, --

14           THE COURT:  My Chambers is publicly owned.

15           MR. SCHWAB:  Sure, but that's a private --

16           THE COURT:  Can your client walk back into my

17   Chambers freely?

18           MR. SCHWAB:  No.

19           THE COURT:  Why not?

20           MR. SCHWAB:  It's different than a public lobby.

21           THE COURT:  Well, I agree.

22           MR. SCHWAB:  And but beyond that, --

23           THE COURT:  We've already crossed that bridge,

24   though, here.  You argued that what he went in to was a

25   lobby.  I found that it wasn't.  He was in a lobby, but he

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 15
Case 5:25-cv-04685-VKD    Document 95-1    Filed 03/10/26    Page 274 of 318

15

1    moved into an area where they do the business with the

2    customers.  So we're beyond that.

3              MR. SCHWAB:  So would you like -- I mean, do we

4    want to rule today on whether this lobby functions -- this

5    lobby in Colorado Springs --

6              THE COURT:  No, no.  You mean the subsequent

7    alleged offense?

8              MR. SCHWAB:  Yeah.  I'm talking about Colorado

9    Springs.

10             THE COURT:  Sure.

11             MR. SCHWAB:  Which is the basis for which the

12   Government moved from community service to asking for a jail

13   sentence.

14             THE COURT:  Understood.

15             MR. SCHWAB:  So that means the Government's

16   premise on seeking this punishment now is based not on his

17   conduct in the Social Security Office, but subsequent conduct

18   based on his recording, conduct for which he has not yet had

19   the opportunity to contest.  He hasn't even had a -- he had

20   his first appearance this week, in fact, for both of these,

21   and he has not had the opportunity to go to trial.

22             He has defenses to be raised, and, as I mentioned

23   last time, one of the concerns I have with the Government's

24   position here on bringing these new things in as a basis for

25   their argument on sentencing, is he has due process issue, he

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 16
Case 5:25-cv-04685-VKD    Document 95-1    Filed 03/10/26    Page 275 of 318

16

1    hasn't had the opportunity to present his defense, which

2    include First Amendment defenses on these subsequent charges.

3            He has a potential double jeopardy argument.  If

4    you sentence him to jail on the basis that he has been

5    charged with these crimes, --

6            THE COURT:  Well, I couldn't do that.  Any

7    sentence is --

8            MR. SCHWAB:  That's what the Government has asked

9    you to do today.

10           THE COURT:  Okay.  So just like any detention or

11   incarceration consideration, they're using provisions in the

12   law that I can consider, but not the basis for the -- the

13   legal basis for whatever I do is the underlying conviction

14   solely.

15           MR. SCHWAB:  I understand.

16           THE COURT:  Okay.

17           MR. SCHWAB:  But if the Government's position is

18   you should charge him -- you should sentence him to jail now,

19   because he's been charged with filming in a public space, and

20   then he goes and wins that case, but you've sentenced him to

21   jail because of this added conduct that the Government now is

22   basing their request for jail time, he's now been sentenced

23   based on conduct for which he's later acquitted, but will

24   serve a sentence under this.

25           THE COURT:  Well, so, you know, I did ask for a

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 17
Case 5:25-cv-04685-VKD    Document 65-11    Filed 03/10/26    Page 276 of 318

17

1  criminal history.

2              MR. SCHWAB:  Sure.  And I'm talking about -- I'm

3  solely focused on subsequent conduct for which the Government

4  bases its entire argument for jail time.

5              THE COURT:  I understand.  But you're not

6  disputing I can take his criminal history into consideration,

7  are you?

8              MR. SCHWAB:  I am not.

9              THE COURT:  Okay.

10             MR. SCHWAB:  I am not, Your Honor.  And I'd be

11 happy to talk about the only two instances that he has any

12 criminal history in the decade before this incident.

13             One of them was filming in a city hall lobby,

14 because he believes that there is a right for the citizen,

15 for citizens to film non-disruptively in a city council or

16 city hall lobby.  That's what he was doing.

17             The second one was he was filming a police van,

18 police doing the speed enforcement with video tickets.  He

19 was recording that, and he got charged with I think

20 interference with a police sign or something.

21             All again related to his political activity and

22 his news gathering activity, which is protected under the

23 First Amendment.

24             You heard even in that clip "I'm here to collect

25 brochures and things."  We don't know if there are other

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 18
Case 5:25-cv-04685-VKD    Document 59-1    Filed 03/10/26    Page 277 of 318

18

1    instances where he does go in because the Government hasn't

2    produced those, where he goes into public lobbies like this,

3    shows the public lobby for the viewers, collects those

4    brochures, and walks out without incident.  It's only when

5    these officers confront him.

6            THE COURT:  I'll watch or listen or read anything

7    you submit that you believe is relevant.

8            MR. SCHWAB:  Sure.  I don't think any of that is

9    relevant in truth.  I don't think that this is relevant.

10           And, like I said, I think that it raises serious

11   issues.  The Government's stance and conduct in raising

12   subsequent offenses, I think raises serious issues under the

13   First Amendment and under the Fifth Amendment, both from a

14   due process and a double jeopardy perspective.

15           And I don't know how you can un-do that web here.

16   The Government first asked for community service, and then on

17   the sole basis of subsequent charges asked to impose jail

18   time.

19           THE COURT:  But I'm not bound by a recommendation

20   from the United States Government, or from you.

21           MR. SCHWAB:  I agree.  But it muddies --

22           THE COURT:  I have my own independent decision to

23   make.

24           MR. SCHWAB:  I agree.  But, however, the

25   Government's stance certainly clouds this water as to the

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 19
Case 5:25-cv-04685-VKD    Document 59-1    Filed 03/10/26    Page 278 of 318

19

 1    basis for your decision making.  It is now introduced in the

 2    Government's stance is he should be punished for subsequent

 3    offenses for which he has not been convicted.

 4         THE COURT:  Punished more severely.  They have

 5    always argued he should be punished.

 6         MR. SCHWAB:  Sure.  They are now arguing that he

 7    should be punished much more severely for conduct for which

 8    he has not had the opportunity to address.

 9         And I raised that the last time we were here, that

10    if Your Honor would like to have a trial within a trial to

11    really evaluate his conduct in these two other incidents,

12    you're welcome to do that and spend the next two hours, three

13    hours, having this trial or these two trials within trials.

14         THE COURT:  But there were two convictions.

15         MR. SCHWAB:  Yes.

16         THE COURT:  For activity that occurred after the

17    activity here.

18         MR. SCHWAB:  I would have to look at the timing.

19    I think yes.

20         THE COURT:  So the activity for one was December

21    of '22, and the activity for the other was March of '23.

22    Both resulted in convictions, correct?

23         MR. SCHWAB:  Sure.  But the Government didn't even

24    talk about those.  They're talking about and showing video

25    from subsquent.

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 20
Case 5:25-cv-04685-VKD    Document 51    Filed 03/10/26    Page 279 of 318

20

1          THE COURT:  Understood.  So you're asking me to

2  disregard that?

3          MR. SCHWAB:  The subsequent activity, of course.

4          THE COURT:  This what I saw today?

5          MR. SCHWAB:  Yes.  And the Government -- that's

6  all subsequent to your enter of conviction -- your entry of

7  conviction.  It's all subsequent to that.

8          And like I said, those are still pending cases.

9  He has only been accused of these issues -- of these crimes.

10          But the Government's request, and I think any jail

11  time, therefore, would violate Mr. Cordova's rights under the

12  First and Fifth Amendments.

13          They never asked for that prior to these

14  incidents, and they've only asked for that on the basis of

15  these incidents.

16          So I think that jail time here would be a grave

17  injustice.  And, like I said, and potentially implicate a

18  violation of Mr. Cordova's First and Fifth Amendment rights,

19  because he has the right to contest and to challenge those

20  convictions on a First Amendment basis, as well, since he was

21  recording, one of which was outside in public.

22          Police officers, unfortunately, and far too often,

23  arrest individuals filming on the side of the street and call

24  it interference.  That is -- I have gone to trial on that

25  five or ten times at this point, because unfortunately

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 21
Case 5:25-cv-04685-VKD    Document 59-1    Filed 03/10/26    Page 280 of 318

21

 1  officers, not all, but some do not like to be recorded.

 2          But recording officers in public, especially when

 3  they're outside interacting with people, is necessary.  If we

 4  would not have seen the abuses of the police system without

 5  recording, without Rodney King, without George Floyd, these

 6  are issues.  And that is part of why he's out there recording

 7  both in and out of public buildings.

 8          But never in private buildings.  He's never

 9  walking back into people's offices.  He's never doing

10  anything like that.

11          THE COURT:  So let's talk about that for a second.

12          MR. SCHWAB:  Sure.

13          THE COURT:  Those filmings you're talking about,

14  which are quite different --

15          MR. SCHWAB:  Yes.

16          THE COURT:  -- than what we're dealing with here.

17          MR. SCHWAB:  Two of the four incidents that people

18  talk about --

19          THE COURT:  Right.

20          MR. SCHWAB:  -- are filming outside.

21          THE COURT:  The purpose was to record what was

22  seen as Constitutional violations by the police.  Agreed?

23          MR. SCHWAB:  Yes.  At least as a possible --

24          THE COURT:  Sure.  The Fourth and Fifth

25  Amendments, excessive force?

1          MR. SCHWAB:  Sure.  Well, as a general induced

2    gathering.

3          THE COURT:  Maybe even racial discrimination.

4    Those were those allegations.

5          What are the allegations of Government wrong doing

6    that your client is filming?

7          MR. SCHWAB:  Oh, it's not to say that he's there

8    to respond to an allegation of wrong doing.  He believes that

9    the Government works for us, and when they're conducting

10   business in a public lobby space, when there are brochures,

11   that as a news gathering function, --

12         THE COURT:  What is the news, though?  That's what

13   I'm interested in your perspective on the news.

14         MR. SCHWAB:  He tours public facilities and

15   gathers pamphlets and things.

16         THE COURT:  What is the --

17         MR. SCHWAB:  He's not necessarily sitting there

18   and just -- you know, and certainly the Government has never

19   provided you any evidence that he's trying to record people's

20   private information, that he goes up to screens and looks at

21   their credit cards, or anything like that.

22         What you see is that he walks into a general

23   public lobby in a publicly owned space.  We don't know, for

24   example, if there is a regulation in place always, you know.

25         But in particular, the Statute that we're talking

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 23
Case 5:25-cv-04685-VKD    Document 59    Filed 03/10/26    Page 282 of 318

23

1   about -- not the Statute, but -- yeah, the Statute in the

2   Federal level, it's really not about recording.  It's about

3   -- well, I guess it is about recording.

4            But it is distinct from the conduct he's been

5   accused of in the rest of these.

6            THE COURT:  You still didn't answer what the news

7   value is.  Certainly reporting on something is intended to

8   provide value to whoever looks at it.

9            MR. SCHWAB:  Sure.

10            THE COURT:  What is the news value of the Social

11   Security Office or the Public Utilities Office?

12            MR. SCHWAB:  You know, I can't say.  But I don't

13   think that I or you, respectfully, should be judging the

14   value of the content.

15            THE COURT:  No, you proffered the information.

16   I'm asking you to explain what you said.

17            MR. SCHWAB:  I'm saying that I don't think we

18   should be making determinations on the respective value of

19   the content.  If he has a good faith argument and a good

20   faith belief that what he is doing is gathering news, whether

21   that's truly valuable news or not, is just -- it's

22   unnecessary, it's outside of the bounds of whether that

23   actually is protected by the First Amendment.

24            The quality of the speech is not an issue.  It's

25   just whether there is speech.  And if he is attempting to

Case No. 1:22-po-07015-MEH   Document 41   filed 03/19/24   USDC Colorado   pg 24
Case 5:25-cv-04685-VKD   Document 95-91   Filed 03/10/26   Page 283 of 318

24

1    gather news, whether it's valuable or not, once we start

2    deciding yes that is true news gathering and that's not

3    really what's interesting about going in there.  Now we're

4    engaged in content and viewpoint.

5            THE COURT:  No, but credibility is always an issue

6    in a courtroom.

7            MR. SCHWAB:  Sure.  Yeah.

8            THE COURT:  And if you say I'm gathering news, and

9    if you can't possibly identify what news you're gathering,

10   that's a credibility issue more than anything.

11           MR. SCHWAB:  And Mr. Cordova obviously can speak

12   to this more than I can.

13           THE COURT:  Okay.

14           MR. SCHWAB:  But is this a good faith effort to

15   gather information, including pamphlets, including how these

16   officers work, and how people can engage with them?  Viewers

17   potentially could engage with this office, what it's like to

18   go there.  I can speculate, certainly.

19           THE COURT:  I think you are.

20           MR. SCHWAB:  Oh, of course I am, because you know

21   what?  I'm not the one out there doing it.

22           THE COURT:  Sure.

23           MR. SCHWAB:  My interest in this side of it is

24   right here.

25           But the through thread here is truly that he's

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 25
Case 5:25-cv-04685-VKD    Document 59-1    Filed 03/10/26    Page 284 of 318

25

1  filming public officials.  There is no allegation that he's

2  gone to another Federal facility.  The video they talk about

3  with the day care, I don't -- I've never seen a day care in

4  that video.  He doesn't go inside.  And, in fact, the

5  suggestion that he found this guy, it looks like he walked

6  out of this courtroom, perhaps, and saw that security guard,

7  and filmed him on a public sidewalk.

8         THE COURT:  Well, I think the last clip he was

9  filming a person who is not a public official, and the

10  person's son.

11         MR. SCHWAB:  And I'd be happy -- and the

12  Government's -- I'm happy to get to that.  The Government's

13  representation to you is -- call it misleading, to say that

14  he accosted this individual.  We should watch -- let's watch

15  the whole interaction.  It starts at, I believe, 4:40.

16         And, again, this is also subsequent.  This is an

17  event that's subsequent, and I think any consideration of

18  this is significantly prejudicial and problematic from the

19  perspective of --

20         THE COURT:  I will not find that you're waiving

21  any argument by playing more of the clip.

22         MR. SCHWAB:  Okay.  But I do think we need to play

23  it for totality, because the Government's suggestion to you

24  that Mr. Cordova accosted this individual is just flat out

25  wrong.

1            In fact, why don't we go back to 4:15, just so you

2    can see about 30 second beforehand.

3        (Video played in open Court)

4            MR. SCHWAB:  It's earlier than that.  I'm

5    obviously working from a different video than you.

6            THE COURT:  Sure.

7            MR. SCHWAB:  We can just watch it from the

8    beginning.  I think it's only a two or three minute video.

9            THE COURT:  Fine.

10        (Video played in open Court)

11            MR. FANSLER:  Your Honor, just briefly.  If he's

12    going to play that, I would just like a copy.  Note that I

13    haven't seen the full video.

14            THE COURT:  Sure.  Was there a discovery order in

15    this case?

16            MR. FANSLER:  No, there wasn't.  I was just saying

17    -- and I don't need it in advance, I would just like the full

18    copy.

19            THE COURT:  Fine.  Yes, since it's being shown in

20    Court, it will be part of the record.  I think that would be

21    fine.  Thank you so much.

22            MR. FANSLER:  That's fine.

23        (Pause)

24        (Video played in open Court)

25            THE COURT:  We've already seen that.

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 27
Case 5:25-cv-04685-VKD    Document 95-1    Filed 03/10/26    Page 286 of 318

27

1          MR. SCHWAB:  I think we can stop there.  I think

2    he leaves a few minutes after this.

3          But you've seen the interaction.  Did Mr. Cordova

4    accost him?  No.  He never follows him, he never goes up to

5    him, he never starts any engagement.  Every time it's this

6    guy coming up aggressively, getting in his face.

7          In fact, Mr. Cordova doesn't initiate any

8    interaction with any of these individuals you see.  He says

9    "I'm here to tour the facility."

10         Again, all of this is completely irrelevant, and

11   the consideration of any of this raises serious

12   Constitutional issues.

13         But I just wanted to call attention to the United

14   States' brief saying that Mr. Cordova accosted him to

15   question their credibility and what they represent to you

16   about his intentions and all of the things that they know

17   that he did.  He didn't accost him.  He was accosted.

18         Mr. Cordova has a political respect here.  It is

19   that a public sphere, including public spaces of buildings,

20   but the streets, everywhere else, that the best disinfectant

21   is sunshine, and that he does so with his camera.

22         THE COURT:  That disinfectant is what?

23         MR. SCHWAB:  Sunshine.

24         THE COURT:  Oh.

25         MR. SCHWAB:  That he does so with his camera, and

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 28
Case 5:25-cv-04685-VKD    Document 51    Filed 03/10/26    Page 287 of 318

28

1    does he push boundaries?  Sure.  That's how we learn what our

2    rights are.  There is a raging debate across the Circuits in

3    this country, in the First, Third, Seventh, Fifth, Seventh,

4    Ninth, Tenth now with *Irizari v. Mejia,* and the Thirteenth.

5    They go to different lengths on the right to record in public

6    spaces and public officials.

7                    THE COURT:  There is no Thirteenth Circuit.

8                    MR. SCHWAB:  What's that?

9                    THE COURT:  It stops at Eleventh.

10                   MR. SCHWAB:  Oh yeah, you're right.  I don't know

11   why.  I mean, there are thirteen, but you're right.  Sorry

12   about that.

13                   In my mind, I was like it's all the odds, and then

14   we got to --

15                   THE COURT:  D.C., and Federal.

16                   MR. SCHWAB:  Yeah, I know.

17                   THE COURT:  Okay.

18                   MR. SCHWAB:  I apologize.  There is a raging

19   debate on the limits in the -- not really the limits, but how

20   far the person and extent.  Does it extend to public lines?

21   Does it extend to public officials outside of police

22   officers?

23                   That is a live issue in this society.  And to seek

24   to punish people for that is problematic.

25                   When Mr. Cordova went to the Social Security

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 29
Case 5:25-cv-04685-VKD    Document 59-1    Filed 03/10/26    Page 288 of 318

29

1    Office, he didn't try to film anyone's personal information.

2    He didn't try to egg people on.  In fact, he was very clear

3    "I don't believe that this regulation is Constitutional, that

4    my First Amendment rights allow me to go in to this -- past

5    this door to report."

6            You've answered in the negative.  But we wouldn't

7    know if you hadn't done so.  But it was not an aggressive

8    thing.

9            The people -- the United States cast aspersions

10   all over the place for his motive, but his motive is sincere,

11   that he wants to bring more public interactions in the

12   provision of public services in public spaces to the public.

13           There would be -- now, the nature and

14   circumstances of the offense, as I'm just discussing, are not

15   severe.  He didn't do anything other than a technical

16   violation of that Statute.  Perhaps he didn't know beforehand

17   that there was a question as to whether doing so violated a

18   Federal petty offense.

19           But he was clear that he believed that the First

20   Amendment protected.  And what did he do?  He walked in and

21   was arrested.  He did not engage, he did not yell at people,

22   he did not disrupt, he did not try to get personal

23   information, he didn't go over and film on someone's

24   handwritten thing.  He walked in, and I believe even in that

25   video, he says "I'm here to get pamphlets."

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 30
Case 5:25-cv-04685-VKD    Document 65-1    Filed 03/10/26    Page 289 of 318

30

1             And under the first factor under 3553, the nature

2    and circumstances of the offense are so minor as to make any

3    sentence of jail or significant probation or public service

4    even, inappropriate.

5             Under 3553(2)(a), similarly, the seriousness of

6    the offense.  It's not a serious offense.

7             And just to go back, I think that is where you

8    would consider his deep held belief in efforts to push the

9    boundaries of what the First Amendment protects.  We'll call

10   into question that that is the nature and circumstances of

11   this offense.

12            Now, the seriousness, as I mentioned, he didn't do

13   anything that would cause concern.  It was maybe some

14   perspective or speculative concern that there might be in the

15   future that he or potentially another individual might go in

16   and try to collect personal information.  But he certainly

17   didn't in this incident.

18            Under 3553(b) -- or 3553(2)(b) and (c), to call

19   this criminal conduct is an exaggeration.  This is much more

20   akin to a civil offense, a civil infraction, a technical

21   violation of where you are or are not allowed to record.

22            There is no violence, there is no, you know,

23   potential for deep community harm here.  This is someone that

24   is trying to push the bounds of what the First Amendment

25   protects, similar to a protester in the streets, maybe on

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 31
Case 5:25-cv-04685-VKD    Document 9-11    Filed 03/10/26    Page 290 of 318

31

1    Federal property, you know, on the steps of the Supreme

2    Court, trying to push the bounds of what is a forum.

3              But to the degree the United States asks you to

4    deter him, they're not asking you to deter him from criminal

5    conduct.  They're asking you to deter him from all filming.

6    All filming of public officials, of public spaces.  They

7    don't make a distinction between lobbies and police on the

8    street.

9              And that's the concern here, is that that effort

10   in deterrence may go beyond deterring him from committing

11   serious offenses, and instead deter him from engaging in

12   protected activity.  And yes, sometimes that line between

13   what is protected and what isn't is really hard to know.

14             But considering that, that pushes that bounds.

15   That calls into question whether what we're deterring here is

16   protected activity, as well.

17             Accordingly, an imposition of a sentence of jail

18   is incredibly out of line and out of -- it's just

19   unnecessary, and would an exaggerated thing.

20             I'm going to ask that you impose 20 hours of

21   community service.  One month of full working time of

22   community service, the United States' last offer was also

23   incredible.  This is the lowest Federal offense.

24             And as we've seen, this is not a malicious

25   individual.  This is someone who is out, maybe wrong, maybe

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 32
Case 5:25-cv-04685-VKD    Document 65-11    Filed 03/10/26    Page 291 of 318

32

1   misguidedly, but in a good faith belief that he is engaged in

2   protected First Amendment activity.  And that would support

3   an imposition of only 20 hours of community service.

4          Relating to the request for a $5,000.00 fine, the

5   United States says that Mr. Cordova made $11,000.00 off this,

6   yet they take a long period of time in all videos and all

7   content protected activity, other engagements that were

8   protected, and they just lump it all in.

9          In fact, if you look over, they only say that I

10  believe $872.00 were related to this and those videos that

11  were related to this.

12         Yes, he has catch phrases from his protected

13  activity, too.  Things that he says in video after video

14  after video, "do better."  Sometimes, you know what, police

15  officers do need to do better.

16         And to try to impose a fine on the basis that he

17  sells merchandise, that is stretching the bounds of saying

18  that he is getting ill-gotten profits.  If you want to impose

19  a fine on the basis of ill-gotten profits, $872.00 is -- I

20  apologize.  I have to look back, but I believe that is the

21  right number.  It is exceedingly low.  There are many, many,

22  many dates, and the people got those records from YouTube.

23  They could have gotten any records they wanted to, but they

24  only got the records from YouTube.

25         Many of those dates it's a penny.  He makes a

Case No. 1:22-po-07015-MEH     Document 41     filed 03/19/24     USDC Colorado     pg 33
Case 5:25-cv-04685-VKD     Document 59-1     Filed 03/10/26     Page 292 of 318

33

1  penny that day.  He makes two pennies that day.  $11,000.00,

2  that's like saying, you know, you got into a car accident,

3  and therefore every time you've ever gotten into the car

4  should count for, you know, the charges.

5          Now, I'm going to let Mr. Cordova speak to his

6  income.  There is no restitution to be considered in this

7  case.

8          And as you'll hear, Mr. Cordova does make -- have

9  a significant income that can support this type of award --

10  this type of fine.

11          That's why I'm going to ask you to not impose any

12  fine here.  But if the Court is determined to issue a fine,

13  then it should be limited to the actual profits from that

14  video, and nothing more.

15          I'm going to let Mr. Cordova speak directly to

16  you.  Thank you.

17          THE COURT:  Thank you.

18          MR. SCHWAB:  Do you have any other questions?

19          THE COURT:  I do not.

20          MR. CORDOVA:  Hi.

21          THE COURT:  Good afternoon.

22          MR. CORDOVA:  The first thing I'd like to do is to

23  answer your question about what I do as far as gathering

24  news.

25          So I do more than -- so there's lots of titles for

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 34
Case 5:25-cv-04685-VKD    Document 65-1    Filed 03/10/26    Page 293 of 318

34

1    what I do, and I give myself the title of a civil liberties

2    activist.  Okay?  And so I do actual stories where I just

3    covered a story in Edgewater where there was a murder, and

4    the man was pepper sprayed, and then he was shot in the back

5    twice.  And that's been over five months ago, and still no

6    charges have been brought against the man who murdered him.

7            I do actual news.  And when I was in City Hall for

8    the arrest that the U.S. Attorney is bringing up for

9    Sheridan, the reason why I was there is because I'm actually

10   trying to do public records requests.  So for the van that my

11   attorney was speaking of, there was a public employee who was

12   taking pictures of me.

13           And so this is news also when I'm recording the

14   van, you know, like this is, you know, they take pictures of

15   you and they send you fines.  My viewers are interested in

16   that type of information.

17           But she got out of her vehicle and started taking

18   pictures of me.  So if she's in her official capacity and

19   she's taking pictures of me, that's a public record she

20   created.

21           So I went to the City of Sheridan to do a public

22   records request, which I think it's CCJRA, it's not CORA, so

23   it's a little bit differently written, but they have a

24   reasonable amount of time to respond to it.  And three months

25   went by with no response.  They just completely ignored it.

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 35
Case 5:25-cv-04685-VKD    Document 59-1    Filed 03/10/26    Page 294 of 318

35

1          So when I go back in to the City Hall, that's my

2     business.  I'm documenting my interactions with government.

3          And so I was dealing with the City Attorney, I was

4     dealing with people giving me the run around.  Like I said,

5     several emails.  Months and months and months had gone by

6     with no response in regards to my records request.

7          And so eventually it got to the point where we

8     were going there all the time to say "hey, we have a lawful

9     right to get these records.  This is my news that I'm

10    reporting on."

11         And it got to the point where they just didn't

12    like it anymore, so then they just drafted up an

13    administrative order that the City Attorney did that states

14    that there's no recording.  Basically, they ban recording in

15    a public space.

16         So there is no CFR like there is in the Social

17    Security Office that says that you can't record in City Hall.

18    In fact, City Hall is widely known to be -- people record in

19    City Halls all the time.  So that's what happened.  So that's

20    what happened with that one.

21         But a lot of my news purposes really, like my

22    attorney said, is to stress test the First Amendment.  And so

23    when I'm out here and I'm doing my work, I'm doing it because

24    I believe in what I'm doing, and I'm trying to create case

25    law in the State of Colorado.

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 36
Case 5:25-cv-04685-VKD    Document 55-1    Filed 03/10/26    Page 295 of 318

36

1          And I'm not here -- like there's people in this

2     courtroom, and the U.S. Attorney said that I'm here

3     specifically to get arrested so I can profit from my arrest.

4     I lost money from these arrests.  I didn't gain money.

5          And there's all the people in the courtroom that

6     would say that I'm just here for clicks and views to make

7     money on YouTube, and I don't care about people's rights.

8          Well, if that was the case, then I made a really

9     bad career change, because I took a huge pay cut to do this.

10    I've been doing this full-time now for two years.  I made

11    $22,000.00 last year from YouTube.

12         I live in poverty.  I went from being an

13    electrician to making a good living to struggling.  And not

14    to say that I don't want to make money.  Yes, I ask for

15    donations.  My supporters, if they want to donate, it's not

16    required, but yes, they can donate.

17         He brought up Venmo or PayPal, yes, because

18    YouTube takes about 40 percent of those donations.  So yes,

19    if you want to donate, you can donate to me directly and more

20    money comes to me.

21         But there is a lot of costs associated with

22    fighting for your rights.  I've been arrested and locked in

23    cages several times now, and I have to pay for bond, I have

24    to pay for my attorney.

25         And, yes, like you said, that you would consider

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 37
Case 5:25-cv-04685-VKD    Document 45-1    Filed 03/10/26    Page 296 of 318

37

 1  my past criminal history, and I have been -- I'll be up-front

 2  with you, you already know, I've been in trouble with the law

 3  a lot as an adolescent.

 4          THE COURT:  Well, in your 20s.

 5          MR. CORDOVA:  In my 20s, yeah.  In my 20s.

 6          THE COURT:  That's not an adolescent.

 7          MR. CORDOVA:  Early adulthood, I guess, right?

 8          THE COURT:  Yes.

 9          MR. CORDOVA:  It did take me a little bit longer

10  to grow up than others, but I finally did.  And I haven't --

11  my last charge was from 2009, I believe.  And all of my

12  charges now within the last 15 years have been from my

13  activism.

14          So, you know, I -- the fact that there is, you

15  know, the U.S. Attorney and so many people out there who

16  think that I don't care about rights and I'm just here just

17  to make money, that's absolutely not true.  I honestly feel

18  like the Constitution, it's like a protein shake.  You can't

19  just drink protein shakes and get buff.  You have to

20  exercise.

21          So if you don't exercise your rights, they are

22  just words written down on a piece of paper.

23          And so, you know, I'm not here just to make money.

24  The real reason why I do this is because every American's

25  rights are more important than my paycheck.  That's why I

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 38
Case 5:25-cv-04685-VKD    Document 51    Filed 03/10/26    Page 297 of 318

38

1    made $22,000.00 last year, and the only reason I'm able to

2    survive is because I have good credit.  And I'm selling my

3    condo now so I can pay off my debt.

4              So, you know, I would like to also tell you that I

5    appreciate during the trial that you were asking my attorney

6    clarifying questions, and I really felt like you were really

7    trying to understand our argument.  So I do appreciate that,

8    because I have been in courtrooms and bench trials before,

9    like the attorney brought up, in Sheridan, the interference

10   charge where there's a municipal charge.  I was guilty before

11   I even walked in there.  You could tell.  So I do appreciate

12   that.

13             But the thing is that we disagree on the fact of

14   whether that space that I went to was a lobby.  I believe

15   that it was a lobby and they were conducting business in a

16   lobby.  You disagree, and that's your opinion.

17             And I understand that your opinion is the only one

18   that matters today.  So moving forward, I plan to be more

19   cognizant of where I record on Federal property, because this

20   is a learning experience for me, too.  I'm not perfect.

21             The things that I do are not to maliciously break

22   the law.  I do them because I believe they are lawful, and I

23   believe they are just.

24             So how do I fight for people's rights?  I do that

25   by engaging in civil disobedience.  So in the '60s, Rosa

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 39
Case 5:25-cv-04685-VKD    Document 55-1    Filed 03/10/26    Page 298 of 318

39

1  Parks was thought of as a trouble maker.  But today, she's

2  regarded a hero.

3           THE COURT:  But what rights are you fighting for?

4  That's what I don't understand.

5           MR. CORDOVA:  Oh.  Yeah, sure, absolutely.  So I'm

6  fighting for mainly the First Amendment right to record in

7  public, right?

8           But so like the interference charge, so if I'm

9  recording and the police officer -- there's no Supreme Court

10 ruling that I know of that says you have to be X amount of

11 feet away.  He wanted us specifically because we had cameras.

12 There was other people all around to be further back.

13          And so to interfere, I have to use force, threaten

14 to use force, physical interference, or an obstacle, to

15 prevent him from doing his job, which I wasn't doing.  I was

16 already behind the ambulance.

17          And so I believe that was an unlawful order.  But

18 then when he gave the order and started counting down from

19 five, I actually was in the process of moving back.  I was

20 obeying his order, but by the time he got to one, it was a

21 very fast countdown, I wasn't back fast enough.  I got

22 arrested.

23          But again, like my attorney said, that doesn't

24 have any relevance here.

25          But the rights that I'm fighting for are not just

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 40
Case 5:25-cv-04685-VKD    Document 59-1    Filed 03/10/26    Page 299 of 318

40

1    the First Amendment right.  It's our lawful right to obtain

2    information through CORA, like I was saying.  There's several

3    -- since I've been doing this for two years, I've been denied

4    public records requests or ignored of them.

5         I'm trying to educate my audience about

6    transparency and how you go about doing these things, and how

7    you do public records requests, and why I do those.

8         And so just recently there was a video -- there's

9    actually a gentleman here who is the librarian of the library

10   that we were at.  And a public employee was taking pictures

11   of me, and so I did the public records request and they said

12   there is no picture, even though she admitted that she was

13   taking a picture of me, and then I saw her phone.  I had a

14   picture of her phone, but on record mode.

15        So CRS 18-8-114, which is abuse of public records,

16   an employee knowing they don't have the authorization to do

17   so deletes, mutilates, or destroys, any public record, that's

18   a misdemeanor crime punishable up to 120 days in jail.

19        So these are the types of things, like I'm here to

20   engage in a First Amendment protected activity and to educate

21   that we have a right to record in a public space.  But when

22   another opportunity arises for me to educate my audience on,

23   let's say public records requests, and how it's against the

24   law for public officials to delete stuff out of their -- even

25   if it's a personal cell phone, I take that opportunity to

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 41
Case 5:25-cv-04685-VKD    Document 15-11    Filed 03/10/26    Page 300 of 318

41

1   educate my audience.

2           It's not just the First Amendment.  It's all kinds

3   of stuff.  I just kind of play it by ear and I try to learn

4   as much as I can from my attorney, from others in this

5   community, from my own audience that I learn from.  I have

6   police officers who used to record with me.  I have my friend

7   here who served in Iraq.

8           So we have a lot of police officers that agree

9   with what we do and say "man, you know, the reason I watch

10  your videos is because it just disgusts me the way some of

11  these -- not all, but some of these officers treat the

12  public."

13          And they swear an oath to the Constitution.  And

14  if you swear an oath to the Constitution, it doesn't give you

15  much credibility when you just enforce your feelings or, you

16  know, you arrest someone because you claim that they're

17  interfering when they're not really interfering.  Right?

18          So like my attorney said, even if you don't like

19  what I'm doing, you swore an oath to protect that.

20          So just in conclusion, that's the real reason why

21  I'm here, Your Honor.  I don't make a lot of money.  I can

22  prove it to you.  I made -- I'm sorry I didn't make more

23  money now, actually, but I've been consistently making about

24  $1,200.00 to $2,000.00 a month, and I've got to pay taxes on

25  that, too.

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 42
Case 5:25-cv-04685-VKD    Document 59-1    Filed 03/10/26    Page 301 of 318

42

1          So like I said, my tax return for last year, 2022,

2    was $22,000.00.  So the last two years I've racked up

3    $60,000.00 in debt in order to do this because, again, I

4    believe in this.  And my rights and your rights and everyone

5    in here's rights, even the people that don't like me, are

6    more important to me than my own paycheck.

7          So with that said, Your Honor, thank you for your

8    time.  And, again, thank you for hearing our side and really

9    listening to understand what we had to say.  I do appreciate

10   that.

11         And that's it.  Thank you.

12         THE COURT:  Thank you.  You may wrap it up.

13         MR. FANSLER:  Yes.  Just a couple of legal

14   responses, Your Honor.

15         One is the importance of considering post-arrest

16   and even post-conviction conduct.

17         The Tenth Circuit is very clear on that, as is the

18   Supreme Court.  I can give you one case cite, which is *United*

19   *States v. Lente,* 759 F. 3d 1149, the pin cite would be 1167-

20   1168, which calls that kind of conduct highly relevant, and

21   says that it's very important when a court gets the most up-

22   to-date picture possible of a defendant's history and

23   characteristics.

24         So that one wasn't even charged conduct.  It was

25   prison disciplinary records that enhanced the sentence.

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 43
Case 5:25-cv-04685-VKD    Document 59-1    Filed 03/10/26    Page 302 of 318

43

1          And what those Courts find out when actually it's

2     different, that it's even post-sentencing that's later

3     vacated.  That post-sentence conduct is even important.  So

4     the Tenth Circuit is very clear on that issue, and that's why

5     the United States believes that the additional arrests are a

6     reason why he should have a prison sentence here.

7          You've seen the full video clip was kind of

8     illuminated.  The Government's main point was that these

9     interactions do show that it's the Defendant's interests that

10    matter.  I mean, when he came in, he was immediately told by

11    the security officer "don't film in here."  He then had the

12    interaction with the other individual.  All of those were

13    disregarded.

14         And just to address briefly the point about the

15    Government is asking you to penalize him for filming.  That's

16    never been what the Government has asked to do.  We've asked

17    that he be punished for crimes he's been arrested for, that

18    he seems to do them because he wants to post them, and that

19    seems to be the incentive to do them.

20         But we're not asking to penalize the filming,

21    although if the Court were inclined to impose a sentence of

22    probation, then we do think that there should be a

23    occupational filming restriction in there.

24         That's all.  I don't -- I think Your Honor has

25    heard all of the other arguments.  I just wanted to briefly

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 44
Case 5:25-cv-04685-VKD    Document 59-1    Filed 03/10/26    Page 303 of 318

44

1    address those legal and other arguments.

2            THE COURT:  Okay.  Thank you.  This is United

3    States versus Christopher J. Cordova, 22-po-7015.

4            The Court finds that the information in the record

5    consisting of the information charging document that was

6    filed, the Court verdict, and the Government's sentencing

7    statement, enables the Court to exercise its sentencing

8    authority under 18 U.S.C. section 3553, without a full pre-

9    sentence investigation report, although there was a pre-

10   sentence report of some nature here.

11           Therefore, the Court will proceed to sentencing.

12           Pursuant to the Sentencing Reform Act of 1984, it

13   is the judgment of the Court that Defendant Christopher J.

14   Cordova, for count one, is hereby committed to the custody of

15   the Bureau of Prisons to serve a term of 15 days, and to be

16   placed on probation for a term of two years as to count two.

17           As to count one, no term of supervised release is

18   imposed, as supervised release is not authorized for class C

19   misdemeanors, infractions, or petty offenses, pursuant to 18

20   U.S.C. section 3583(b)(3).

21           As to count two, while on probation supervision,

22   Mr. Cordova, you must not commit another Federal, State, or

23   local crime, and must not unlawfully possess a controlled

24   substance.

25           You must refrain from any unlawful use of a

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 45
Case 5:25-cv-04685-VKD    Document 59-1    Filed 03/10/26    Page 304 of 318

45

 1   controlled substance.  You must submit to one drug test

 2   within 15 days of placement on supervision, and a maximum of

 3   20 tests per year of supervision thereafter.

 4         You must pay the assessment imposed in accordance

 5   with 18 U.S.C. section 3013.

 6         This judgment does impose -- I will impose a fine,

 7   so you must pay it in accordance with the Schedule of

 8   Payments sheet of this judgment.

 9         You must notify the Court of any material change

10   in your economic circumstances that might affect your ability

11   to pay restitution -- excuse me, no restitution.  A fine or

12   special assessments.

13         You must comply with the standard conditions

14   adopted by this Court pursuant to General Order 2020-20, as

15   listed below.

16         You must report to the probation office in the

17   Federal judicial district where you are authorized to reside

18   within 72 hours of the time you are sentenced, or 72 hours of

19   your release from imprisonment in supervised release cases,

20   unless the probation officer instructs you to report to a

21   different probation office or within a different time frame.

22         After initially reporting to the probation office,

23   you will receive instructions from the Court or the probation

24   officer about how and when you must report to the probation

25   officer, and you must report to the probation officer as

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado      pg 46
Case 5:25-cv-04685-VKD    Document 65-1    Filed 03/10/26    Page 305 of 318

46

1   instructed.

2            You must not knowingly leave the Federal judicial

3   district where you are authorized to reside without first

4   getting permission from the Court or the probation officer.

5            You must truthfully answer the questions asked by

6   your probation officer.

7            You must be at a place approved by the probation

8   officer if you plan to change where you live or anything

9   about your living arrangements, such as the people with whom

10  you live.

11           You must notify the probation officer at least 10

12  days before the change.  If notifying the probation officer

13  in advance is not possible due to unanticipated

14  circumstances, you must notify the probation officer within

15  72 hours of becoming aware of a change or expected change.

16           You must allow the probation officer to visit you

17  at any time at your home or elsewhere, and you must permit

18  the probation officer to take any items prohibited by the

19  conditions of your supervision that he or she observes in

20  plain view.

21           You must work full-time, at least 30 hours per

22  week, at a lawful type of employment unless the probation

23  officer excuses you from doing so.  If you do not have full-

24  time employment, you must try to find full-time employment

25  unless the probation officer excuses you from doing so.

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 47
Case 5:25-cv-04685-VKD    Document 59-1    Filed 03/10/26    Page 306 of 318

47

1          If you plan to change where you work or anything

2     about your work, such as your position or your job

3     responsibilities, you must notify the probation officer at

4     least 10 days before the change.  If notifying the probation

5     officer at least 10 days in advance is not possible due to

6     unanticipated circumstances, you must notify the probation

7     officer within 72 hours of becoming aware of a change or

8     expected change.

9          You must not communicate or interact with someone

10    you know is engaged in criminal activity.  If you know

11    someone has been convicted of a felony, you must not

12    knowingly communicate or interact with that person without

13    first getting the permission of the probation officer.

14         If you are arrested or questioned by a law

15    enforcement officer, you must notify the probation officer

16    within 72 hours.

17         You must not own, possess, or have access to a

18    firearm, ammunition, destructive device, or dangerous weapon.

19    In other words, anything that was designed or is modified for

20    the specific purpose of causing bodily injury or death to

21    another person, such as nunchucks or tasers.

22         You must not act as an informant with a law

23    enforcement agency or act as a confidential human source or

24    informant without getting first the permission of the Court.

25         If the probation officer determines that you pose

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 48
Case 5:25-cv-04685-VKD    Document 9-1    Filed 03/10/26    Page 307 of 318

48

1    a risk to another person, including an organization, the

2    probation officer may, after obtaining Court approval, notify

3    the person about the risk or require you to notify the person

4    about the risk, and you must comply with that instruction.

5            The probation officer may contact the person and

6    confirm that you have notified the person about the risk.

7            You must follow the instructions of the probation

8    officer related to the conditions of supervision.

9            The Court finds that the following special

10   conditions of supervision are determined to be reasonably

11   related to the facts enumerated in 18 U.S.C. section 3553(a),

12   and 18 U.S.C. section 3563(b), or they are based on the

13   nature and circumstances of the offense and the history and

14   characteristics of this particular Defendant.

15           These conditions do not constitute a greater

16   deprivation of liberty than necessary to accomplish the goals

17   of sentencing.

18           1.  If the judgment imposes a financial penalty,

19   you must pay the financial penalty in accordance with the

20   Schedule of Payments sheet of this judgment.

21           You must also notify the Court of any changes in

22   economic circumstances that might affect your ability to pay

23   the financial penalty.

24           2.  You must not incur any new credit charges or

25   open additional lines of credit without the approval of the

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 49
Case 5:25-cv-04685-VKD    Document 59-1    Filed 03/10/26    Page 308 of 318

49

1    probation officer, unless you are in compliance with the

2    periodic payment obligations imposed pursuant to the Court's

3    judgment and sentence.

4          3.   You must provide the probation officer access

5    to any requested financial information, and authorize the

6    release of any financial information, until all financial

7    obligations imposed by the Court are paid in full.

8          4.   You must apply any monies received from income

9    tax refunds, lottery winnings, inheritances, judgments, and

10   any anticipated or unexpected financial gains, to the

11   outstanding Court ordered financial obligation in this case.

12         5.   If you have an outstanding financial

13   obligation, the probation office may share any financial or

14   employment documentation relevant to you with the Asset

15   Recovery Division of the U.S. Attorney's Office, to assist in

16   the collection of the obligation.

17         The Defendant shall pay a special assessment of

18   $10.00, which is $5.00 per count, and a fine of $3,000.00 as

19   to count two.

20         The special assessment and fine obligation are due

21   immediately.  Any unpaid monetary obligations upon release

22   from incarceration shall be paid in monthly installment

23   payments during the term of supervised release.

24         The monthly installment payment will be calculated

25   as at least 10 percent of the Defendant's gross monthly

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 50
Case 5:25-cv-04685-VKD    Document 55-1    Filed 03/10/26    Page 309 of 318

50

 1   income.

 2            You are advised that you have the right to appeal

 3   this sentence.  If you desire to appeal, the notice of appeal

 4   must be filed with the Clerk of the Court within 14 days

 5   after entry of judgment, or the right to appeal will be lost.

 6            If you are unable to afford an attorney for an

 7   appeal, the Court will appoint one to represent you.

 8            If you so request, the Clerk of the Court will

 9   immediately prepare and file a notice of appeal on your

10   behalf.

11            So the question at the moment is with regard to

12   surrender.  Mr. Schwab?

13            MR. SCHWAB:  Yes, Your Honor.  I would first ask

14   that you stay execution pending appeal.  We intend to appeal

15   this case, and obviously no appeal will be heard in 15 days,

16   rendering any potential successful appeal not necessarily

17   moot, but certainly less effective.

18            THE COURT:  Understood.  Mr. Fansler?

19            MR. FANSLER:  No objection to self-surrender or to

20   staying pending appeal.

21            THE COURT:  You don't object to a stay pending

22   appeal?

23            MR. FANSLER:  I do not.  No.

24            THE COURT:  Okay.  All right.  So the order will

25   be self-surrender upon conclusion of the appeal if the

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 51
Case 5:25-cv-04685-VKD    Document 1-5    Filed 03/10/26    Page 310 of 318

51

1  conviction stands.

2          You didn't make that request with regard to the

3  fine.

4          MR. SCHWAB:  I apologize.  I meant to ask.

5          THE COURT:  And, Mr. Fansler?

6          MR. FANSLER:  I guess I don't -- it's not -- I

7  would oppose a stay of the fine.  I think there's no reason

8  to delay payment.

9          THE COURT:  What's the legal authority?  Is that

10 discretionary?

11         MR. FANSLER:  The fine amount?

12         THE COURT:  Whether to stay it or not.

13         MR. FANSLER:  I believe it is.  I don't have a

14 citation for it, though.

15      (Note:  Mr. Schwab is not near a microphone)

16         MR. SCHWAB:  I didn't know where to look.  In

17 State Court, a sentence like this would be automatically

18 stayed across the board, but --

19         THE COURT:  That's why I'm asking somebody whose

20 job it is to enforce the U.S. Code.

21         MR. FANSLER:  I don't know the authority for that,

22 Your Honor.  I don't object to staying enforcement of the

23 whole sentence.

24         THE COURT:  What about the term of probation?

25 You're asking for that, too?

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 52
Case 5:25-cv-04685-VKD    Document 95-1    Filed 03/10/26    Page 311 of 318

52

1              MR. SCHWAB:  Yes, Your Honor.

2              THE COURT:  And what's your position on that?

3              MR. FANSLER:  Your Honor, the Court will impose

4    the judgment after this.

5              THE COURT:  Well, you have to have a final

6    judgment in order to be able to appeal, so.

7              MR. FANSLER:  That's right.  Yeah.  I guess now

8    that I'm thinking through everything, I don't -- I think the

9    whole sentence should be enforced.

10             THE COURT:  Would you like to reserve briefing on

11   that?

12             MR. FANSLER:  Yeah.  I would reserve briefing on

13   that.

14             THE COURT:  Okay.

15             MR. FANSLER:  Whether we'll oppose the stay or

16   not.

17             THE COURT:  So I wouldn't have objected to self-

18   surrender anyway, but I will require a short time frame on

19   the briefing.

20             Since it is your request, Mr. Schwab, how soon can

21   you get a brief on file with regard to staying the sentence

22   of the Court?

23             MR. SCHWAB:  I enter a jury trial next week, and I

24   have a significant Title IX action that is on summary

25   judgment motions that I think I'll be responding to right

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 53
Case 5:25-cv-04685-VKD    Document 59-1    Filed 03/10/26    Page 312 of 318

53

1   around October 7th.  It's probably going to take me a couple

2   of months to be able to just --

3                   THE COURT:  I've given you some extensions already

4   in this whole process.  So.

5                   MR. SCHWAB:  At least until the 13th of October?

6                   THE COURT:  Hold on a second.

7           (Court confers with Court Clerk)

8                   THE COURT:  Okay.  So I do think this ought to be

9   a shortened time frame.  I'm sorry about the rest of your

10  obligations, but criminal cases supersede civil cases.  Did

11  you say you had a civil case coming up?

12                  MR. SCHWAB:  Yes.  I've got a jury trial next

13  week.

14                  THE COURT:  Okay.  It's a very discreet issue

15  whether I should impose a stay of the sentence pending

16  appeal.  So I'd like your position by Monday.

17                  MR. SCHWAB:  May I ask for a secondary stay?  Mr.

18  Cordova will be traveling out of the country at attend a

19  wedding.  Not out of the country, just out of state for a

20  wedding.  He bought tickets and hotels and everything for it.

21                  THE COURT:  Well, the restriction on travel is

22  during the period of probation, and probation hasn't started

23  until he walks out of prison.

24                  MR. SCHWAB:  I understand.  If the Court were to

25  impose a sentence before the --

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 54
Case 5:25-cv-04685-VKD    Document 59-1    Filed 03/10/26    Page 313 of 318

54

1                    THE COURT:  Where is it?

2                    MR. SCHWAB:  Massachusetts.

3                    THE COURT:  And what are the inclusive dates?

4                    MR. SCHWAB:  The 10th through 17th.

5                    THE COURT:  Of?

6                    MR. SCHWAB:  October.

7                    THE COURT:  And it's whose wedding?

8                    MR. SCHWAB:  His best friend.

9                    THE COURT:  Is he a groomsman?

10                    MR. SCHWAB:  He's best man.

11                    THE COURT:  Okay.  I'll take that into

12    consideration.

13                    And how quickly can you get a response?

14                    MR. FANSLER:  If it's file by Monday, I can

15    respond by Thursday.

16                    THE COURT:  Okay.  Thursday.  Monday, you want

17    close of business since you're in trial?  You probably should

18    file --

19                    MR. SCHWAB:  Can I have until midnight?

20                    THE COURT:  Okay.  Monday midnight.  Thursday

21    close of business, which is 5:00 o'clock.  Okay?

22                    MR. FANSLER:  Yes, Your Honor.

23                    THE COURT:  And no reply.  Okay?  I'll take the

24    burden of a reply off of you.

25                    MR. SCHWAB:  Thanks, Your Honor.  That will mean

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 55
Case 5:25-cv-04685-VKD    Document 59-1    Filed 03/10/26    Page 314 of 318

55

 1  that final judgment won't enter yet?

 2              THE COURT:  Correct.

 3              MR. SCHWAB:  The appeal clock won't start until --

 4              THE COURT:  Well, no.  Final judgment -- all

 5  right.  So you want --

 6              MR. SCHWAB:  If the final judgment enters today,

 7  and then the stay --

 8              THE COURT:  No.  I mean, the final judgment enters

 9  whenever I execute it.  So in many trials, there's a lot of

10  post-trial proceedings, and it's months.  But I would then

11  propose, if it's okay with you, to enter final judgment

12  concurrent with my decision on whether to stay imposition of

13  the fine, the prison, and the probation.

14              MR. FANSLER:  Yes, that's correct, Your Honor.  I

15  don't have any objection to issuing the final judgment with

16  the ruling on that issue.

17              THE COURT:  Okay.  All right.  So let's -- since I

18  won't have you back, and it's efficient to talk about this

19  right now, you're proposing to file a brief on October 2nd.

20  The United States responding on October 5th.  October 9th is

21  a Federal holiday.

22              So in the event that I reach a decision some time

23  later in the week of October 9th, and I do permit your client

24  to travel, when do you want him to surrender?

25              MR. SCHWAB:  I would suggest -- well, I would

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 56
Case 5:25-cv-04685-VKD    Document 9591    Filed 03/10/26    Page 315 of 318

56

1   suggest the 18th or the 19th.  The 19th.

2           THE COURT:  Okay.  Any objection to him

3   surrendering on October 19th?

4           MR. FANSLER:  No objection to that date, Your

5   Honor.

6           THE COURT:  Okay.  All right.  Very good.  So what

7   is the timing -- is it 14 days for an appeal?

8           MR. FANSLER:  That's correct, Your Honor.

9           THE COURT:  All right.  So you will --

10          MR. FANSLER:  The notice of appeal within 14 days.

11          THE COURT:  Yes.  It will start running on entry

12  of final judgment.

13          MR. SCHWAB:  Your Honor, I assume the U.S.

14  Marshals are still in possession of personal property of Mr.

15  Cordova.  I would ask that you enter an order releasing that.

16          THE COURT:  What is it?

17          MR. SCHWAB:  His cell phone.

18          THE COURT:  Obtained when?

19          MR. SCHWAB:  At this arrest.

20          THE COURT:  Okay.

21          MR. FANSLER:  I don't think we need an order.  We

22  can return it any time.

23          THE COURT:  You mean on his arrest months ago?

24          MR. SCHWAB:  No.  For this Social Security

25  incident.

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 57
Case 5:25-cv-04685-VKD    Document 59-1    Filed 03/10/26    Page 316 of 318

57

 1                    THE COURT:  That's what I mean, for this incident.
 2   What date did it occur?

 3                    MR. FANSLER:  August 2, 2022.

 4                    THE COURT:  August 2, 2022.  So they have had his
 5   cell phone since August 2, 2022.  Okay.  This is the first
 6   I've heard of that.  You never have requested that back
 7   anyway.

 8                    MR. FANSLER:  I did not.

 9                    THE COURT:  Just as evidence?

10                    MR. FANSLER:  Yes.  If counsel wants to email me,
11   we can set up the return.

12                    THE COURT:  Is that typical?

13                    MR. FANSLER:  Usually they wait on a request just
14   because they don't like proactively look to return things.

15                    THE COURT:  Have you ever requested this before?

16                    MR. SCHWAB:  I don't know if I did a motion.

17                    THE COURT:  All right.  Because any information
18   that was necessary for trial could be imaged off of the
19   physical phone.

20                    MR. FANSLER:  They have no need for a report at
21   this point.

22                    THE COURT:  All right.  So will you arrange?

23                    MR. FANSLER:  Yes.

24                    THE COURT:  Okay.  That's independent of anything
25   else.  He will arrange return of the phone.  Okay?

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 58
Case 5:25-cv-04685-VKD    Document 65-1    Filed 03/10/26    Page 317 of 318

58

```
 1              MR. FANSLER:  Your Honor, I spoke about the 14 day
 2    appeal clock.  I just realized that the initial appeal on
 3    this is to a District Court Judge.
 4              THE COURT:  That's fine.
 5              MR. FANSLER:  Rather than through the Federal
 6    Rules of Appellate Procedure.
 7              THE COURT:  Sounds correct.  Is it still 14 days?
 8              MR. FANSLER:  That's what I was just going to look
 9    up.  I thought that was going to be your follow up question.
10              MR. SCHWAB:  It is 14 days, Your Honor.
11              THE COURT:  What's the Statute?
12              MR. FANSLER:  I'm looking at it.  It's in the
13    Petty Docket Rule, which is the Rule.  Let me see if I can
14    find it here.  It's Rule 58.
15         (Pause)
16              MR. FANSLER:  Paragraph (g) looks like it related
17    to an appeal from a Magistrate Judge's order or judgment.
18    Defendant may appeal a Magistrate Judge's judgment of
19    conviction to a District Judge within 14 days of its entry.
20              THE COURT:  Okay.  So it still relies on the
21    judgment, so the judgment will start the clock at 14 days.
22    Your clock will start anyway with the judgment.
23              MR. SCHWAB:  Yes, but not today, right?
24              THE COURT:  Not today.
25              MR. SCHWAB:  All right.
```

Case No. 1:22-po-07015-MEH    Document 41    filed 03/19/24    USDC Colorado    pg 59
Case 5:25-cv-04685-VKD    Document 9591    Filed 03/10/26    Page 318 of 318

59

1          THE COURT:  At least that's my view.  I think it

2    has to have a judgment.  The Statute says -- the Rule says

3    judgment, and no judgment has been entered.  A sentence has

4    been rendered, but the actual formal document is the judgment

5    itself, and that gives the exact terms of the sentence.

6          Mr. Fansler, what else?

7          MR. FANSLER:  Nothing further, Your Honor.

8          THE COURT:  And Mr. Schwab?

9          MR. SCHWAB:  Nothing, Your Honor.

10          THE COURT:  All right.  Thank you for your

11    appearances today.  We'll be in recess.

12          MR. SCHWAB:  Thank you.

13          THE COURT CLERK:  All rise.

14                (Time noted:  2:41 p.m.)

15                    * * * * *

16                    CERTIFICATE

17    I, RANDEL RAISON, certify that the foregoing is a

18    correct transcript from the official electronic sound

19    recording of the proceedings in the above-entitled matter, to

20    the best of my ability.

21

22

23    _____          March 18, 2024

24    Randel Raison

25